ELLIS GEORGE LLP
Dennis S. Ellis (State Bar No. 178196)
  dellis@ellisgeorge.com
Katherine F. Murray (State Bar No. 211987)
  kmurray@ellisgeorge.com
Serli Polatoglu (State Bar No. 311023)
  spolatoglu@ellisgeorge.com
2121 Avenue of the Stars, 30th Floor
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

Attorneys for Defendants L'Oréal USA,
Inc., L'Oréal USA Products, Inc., and
SoftSheen-Carson, LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| CYNTHIA L. JONES, an individual,<br><br>      Plaintiff,<br><br>      vs.<br><br>L'ORÉAL USA, INC., a corporation; L'ORÉAL USA PRODUCTS, INC., a corporation; SOFT SHEEN-CARSON LLC, a corporation; SOFT SHEEN*CARSON (W.I.), INC., a corporation.; STRENGTH OF NATURE, LLC, a corporation; GODREJ SON HOLDINGS, INC., a corporation; AVLON INDUSTRIES, INC., a corporation; SAFEWAY INC., a corporation; THE VONS COMPANIES, INC., a corporation; and DOES 1-100 inclusive,,<br><br>      Defendants. | Case No.<br><br>**DEFENDANTS L'ORÉAL USA, INC., L'OREAL USA PRODUCTS, INC., AND SOFTSHEEN-CARSON, LLC'S NOTICE OF REMOVAL**<br><br>Case Filed:  July 18, 2024 |

2464364

PLEASE TAKE NOTICE THAT pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, Defendants L'Oréal USA, Inc., L'Oreal USA Products, Inc., and SoftSheen-Carson, LLC (collectively, "L'Oréal USA"), by and through their undersigned counsel, hereby give notice of the removal of this action titled *Cynthia L. Jones v. L'Oréal USA, Inc., et al.*, Case No. 24CV083993, from the Superior Court of the State of California, County of Alameda, to the United States District Court for the Northern District of California.  In support of its notice of removal, L'Oréal USA states as follows:

# I.    PROCEDURAL BACKGROUND AND GROUNDS FOR REMOVAL

1.    On July 18, 2024, Plaintiff Cynthia L. Jones ("Plaintiff") commenced the instant action in the Superior Court of the State of California, County of Alameda, against Defendants L'Oréal USA, Inc., L'Oréal USA Products, Inc., SoftSheen-Carson, LLC, Strength of Nature, LLC, Godrej SON Holdings, Inc., Avlon Industries, Inc., Safeway, Inc., the Vons Companies, Inc., and DOES 1-100. Pursuant to 28 U.S.C. § 1446(a), copies of all process, pleadings, and orders served upon or received by L'Oréal USA to date are attached hereto.

2.    This is a products liability lawsuit which arises from Plaintiff's allegation that her exposure to certain hair relaxer products caused her to develop uterine fibroids.  (*See* Ex. A, Compl. ¶ 3.)  Defendants to this action are certain manufacturers and alleged retailers of hair relaxer products.  (*Id*. ¶¶ 17-53, 65.)

3.    A defendant may remove any civil action filed in a state court of which the district courts of the United States have original jurisdiction.  *See* 28 U.S.C. § 1441(a).

4.    In cases where removability appears on the face of the state court complaint, a notice of removal must be filed within 30 days of service of the initial pleading from which removability can be ascertained.  *See* 28 U.S.C. § 1446(b)(1). L'Oréal USA was served with Plaintiff's Complaint on August 30, 2024.  This

1  Notice of Removal is timely because it is being filed within 30 days after L'Oréal

2  USA's initial receipt of the Summons and Complaint.

3      5.      As will be shown more fully below, the above-described action is a

4  civil action over which this Court has jurisdiction pursuant to the provisions of 28

5  U.S.C. § 1332(a), and is one which may be removed to this Court by L'Oréal USA

6  pursuant to 28 U.S.C. §§ 1441(b) and 1446.

7  **II.    REMOVAL IS PROPER BECAUSE THIS COURT HAS ORIGINAL**

8  **SUBJECT MATTER JURISDICTION PURSUANT TO 28 U.S.C. §**

9  **1332(A).**

10     **A.    The Diversity of Citizenship and Amount in Controversy**

11     **Requirements are Satisfied.**

12     6.      The district courts have original jurisdiction of all civil actions "where

13  the matter in controversy exceeds the sum or value of $75,000, exclusive of interest

14  and costs" and is between "citizens of different States." 28 U.S.C. § 1332(a)(1).

15     7.      Plaintiff, at the time she commenced this action, was a resident of the

16  State of California. (*See* Ex. A, Compl. ¶ 4.)

17     8.      Defendant L'Oréal USA, Inc. is a Delaware corporation with its

18  principal place of business in New York, New York.

19     9.      Defendant L'Oréal USA Products, Inc. is a Delaware corporation with

20  its principal place of business in New York, New York.

21     10.     Defendant SoftSheen-Carson, LLC at all relevant times was a limited

22  liability company organized under the laws of the state of New York. SoftSheen-

23  Carson, LLC's sole member was L'Oréal USA, Inc., a Delaware corporation with its

24  principal place of business in New York. For purposes of diversity jurisdiction, a

25  limited liability company has the citizenship of each of its members. *See Johnson v.*

26

27

28

*Columbia Props. Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006).  Thus, SoftSheen-Carson, LLC is a citizen of Delaware and New York.[1]

11.    Defendant Strength of Nature, LLC is a Georgia corporation with its principal place of business located in Savannah, Georgia.

12.    Defendant Godrej SON Holdings, Inc. is a Georgia corporation with its principal place of business located in Savannah, Georgia.

13.    Defendant Avlon Industries, Inc. is an Illinois corporation with its principal place of business in Melrose Park, Illinois.

14.    Defendant Safeway, Inc. is a Delaware corporation with its principal place of business in Pleasanton, California.

15.    Defendant The Vons Companies, Inc. is a Michigan corporation with its principal place of business in Pleasanton, California.

16.    As explained in section (B) below, Defendants Safeway, Inc. and The Vons Companies, Inc. have been fraudulently joined in this action and therefore their citizenship can be disregarded for purposes of evaluating diversity jurisdiction. All other parties are completely diverse because Plaintiff is a citizen of California and no other named Defendant is a citizen of California.  The other properly served Defendants consent to this removal.

17.    As to the amount in controversy, "a defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold."  *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014).  "Evidence establishing the amount is required by § 1446(c)(2)(B) only when the plaintiff contests, or the court questions, the defendant's allegation."  *Id*. at 89.

---

[1] Although Plaintiff also names Soft Sheen Carson (W.I.), Inc. as a Defendant, Soft Sheen Carson (W.I.), Inc. is not an existing corporate entity.

18.     Plaintiff seeks an unspecified amount in damages against Defendants for no less than $25,000.  (*See* Ex. A, Compl. caption page.)  The items of damages for which Plaintiff seeks recovery are compensatory damages for the described losses with respect to each cause of action; past medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; punitive damages with respect to each cause of action; reasonable attorneys' fees where recoverable; costs; pre-judgment and all other interest recoverable, and such other additional relief as she may be entitled to in law or in equity.  (*See* Ex. A, Compl. ¶ 420.)

19.     Plaintiff claims are not only that she was diagnosed with uterine fibroids.  (*See* Ex. A, Compl. ¶ 71.)  Plaintiff also claims that her symptoms affected her daily life in that she "struggled with heavy and irregular periods, severe pain and cramping, and sharp pain during intercourse." (*Id*. ¶ 72.)  Plaintiff further claims she underwent a uterine ablation but her symptoms continued to worsen and she was in such unbearable pain that she was forced to leave her full-time job.  (*Id*. ¶¶ 73, 74.)  Plaintiff also alleges that she underwent a total abdominal hysterectomy and hormone replacement therapy, that she was hospitalized for a week before delivering her child, and that her struggle with fibroids has caused her to develop anxiety and depression.  (*Id*. ¶¶ 75, 76, 77, 80.)

20.     Plaintiff further alleges that the sum of the economic and noneconomic losses damages she has suffered is in excess of the minimum jurisdictional limits of the Superior Court of California, County of Alameda, which is $35,000 for unlimited civil actions.  (*See, e.g.*, Ex. A, Compl. ¶¶ 234(c), 249(c).)  This amount and Plaintiff's demand for punitive damages is sufficient to establish that the amount in controversy plausibly exceeds the jurisdictional threshold of $75,000. *See Brooks v. Sanofi, S.A.*, No. 2:20-cv-565 JCM (EJY), 2020 WL 1847682, at *4 (D. Nev. Apr. 13, 2020) (explaining that the amount in controversy was met because even if a court were to consider "a 'conservative' estimate at a 1:1 ratio of punitive

to economic damages, plaintiff's past and future costs of care for two different forms of cancer would need to amount to only $37,500 to meet the amount in controversy. Notably, this is without considering any of plaintiff's other requested relief.").

### B. Plaintiff has Fraudulently Joined Defendants Safeway, Inc. and The Vons Companies, Inc. in an Improper Attempt to Preclude Removal.

21.     Removal is appropriate here pursuant to the doctrine of fraudulent joinder. *See Grancare, LLC v. Thrower by & through Mills*, 889 F.3d 543, 548 (9th Cir. 2018) ("In determining whether there is complete diversity, district courts may disregard the citizenship of a non-diverse defendant who has been fraudulently joined."). "If the plaintiff fails to state a cause of action against a resident defendant, and the failure is obvious according to the settled rules of the state, the joinder of the resident defendant is fraudulent." *McCabe v. Gen. Foods Corp.*, 811 F.2d 1336, 1339 (9th Cir. 1987).

22.     Here, the only two California-based Defendants are Safeway, Inc. ("Safeway") and The Vons Companies, Inc. ("Vons"). Plaintiff merely asserts that she "frequently purchased Relaxer Products from Defendants Safeway's and Vons Companies' stores in California." (Ex. A, Compl. ¶ 65.) However, L'Oréal USA, Strength of Nature LLC, Godrej SON Holdings, Inc., and Avlon Industries, Inc. have no records of selling the hair relaxer products that Plaintiff alleges she purchased to Safeway or Vons in California. Because Safeway and Vons did not supply the hair relaxer products Plaintiff purchased, no cause of action can be stated against them, and they have been fraudulently joined. Without these two Defendants, complete diversity exists.

23.     Pursuant to 28 U.S.C. §§ 1441 and 1446, removal of this action from the Superior Court of the State of California for the County of Alameda to the United States District Court for the Northern District of California is appropriate.

The Superior Court of the State of California for the County of Alameda is within this district.

## III.   THE PROCEDURAL REQUIREMENTS FOR REMOVAL ARE SATISFIED

24.     Pursuant to 28 U.S.C. § 1446(d), L'Oréal USA will promptly serve a copy of this Notice of Removal, including exhibits thereto, on Plaintiff's counsel and will file it with the Superior Court of the State of California for the County of Alameda in Case No. 24CV083993.

25.     By filing this Notice of Removal, L'Oréal USA does not waive any defense that is available to it.  In the event any question arises as to the propriety of the removal on this matter, L'Oréal USA requests the opportunity to present briefs, oral arguments, and if necessary, additional affidavits and other evidence in support of its position that removal is proper.

Wherefore, L'Oréal USA hereby removes this action from the Superior Court of the State of California, County of Alameda to the United States District Court for the Northern District of California.

DATED:  September 30, 2024         ELLIS GEORGE LLP
                                   Dennis S. Ellis
                                   Katherine F. Murray
                                   Serli Polatoglu


                                   By:   _____/s/ Dennis S. Ellis_____

                                   Attorneys for Defendants L'Oréal USA, Inc., L'Oréal USA Products, Inc., and SoftSheen-Carson, LLC

# EXHIBIT A

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

<table>
<tr><td>

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
L'Oreal USA. Inc., a corporation; (Additional Parties Attachment form is attached.)

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
CYNTHIA L. JONES, an individual.

</td><td>

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**ELECTRONICALLY FILED**
Superior Court of California
County of Alameda
07/22/2024
Chad Finke, Executive Officer / Clerk of the Court
By: _____ D. Franklin _____ Deputy

</td></tr>
</table>

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

   You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

   *Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

   *Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Alameda County Superior Court<br><br>1225 Fallon Street, Oakland, CA 94612 | CASE NUMBER:<br>*(Número del Caso):*<br>24CV083993 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Christopher R. Rodriguez, Singleton Schreiber, LLP, 1414 K Street, Suite 470, Sacramento, CA 95814

| DATE:<br>*(Fecha)* 07/22/2024    Chad Finke, Executive Officer / Clerk of the Court | Clerk, by<br>*(Secretario)* _____ D. Franklin _____ | , Deputy<br>*(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(speci...*
3. ☒ on behalf of *(specify):* L'Oreal USA. Inc., a corporation

   under: ☒ CCP 416.10 (corporation)       ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Cynthia L. Jones v. L'Oreal USA, Inc., et al. | 24CV083993 |

**INSTRUCTIONS FOR USE**

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

☐ Plaintiff    ☒ Defendant    ☐ Cross-Complainant    ☐ Cross-Defendant

L'ORÉAL USA PRODUCTS, INC., a corporation; SOFT SHEEN-CARSON LLC, a corporation; SOFT SHEEN*CARSON (W.I.), INC., a corporation.; STRENGTH OF NATURE, LLC, a corporation; GODREJ SON HOLDINGS, INC., a corporation; AVLON INDUSTRIES, INC., a corporation; SAFEWAY INC., a corporation; THE VONS COMPANIES, INC., a corporation; and DOES 1-100 inclusive,

Page  1  of  1

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

**ELECTRONICALLY FILED**
Superior Court of California,
County of Alameda
07/18/2024 at 04:43:15 PM
By: Damaree Franklin,
Deputy Clerk

1  Christopher R. Rodriguez (SBN: 212274)
2  Andrew D. Bluth (SBN: 232387)
   Danielle Ward Mason *(pro hac vice forthcoming)*
3  Singleton Schreiber, LLP
   1414 K Street, Suite 470
4  Sacramento, CA 95814
   Telephone: (916) 248-8478
5  Facsimile: (619) 255-1515

6  Attorneys for Plaintiff

7            **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8                      **COUNTY OF ALAMEDA**

9   CYNTHIA L. JONES, an individual,          Case No.  24CV083993

10                  Plaintiff,               **COMPLAINT FOR DAMAGES**

11  v.                                        (1) Strict Liability—Failure to Warn;
                                              (2) Strict Liability—Design Defect;
12  L'ORÉAL USA, INC., a corporation;         (3) Breach of Express Warranty;
13  L'ORÉAL USA PRODUCTS, INC., a             (4) Breach of Implied Warranty of
    corporation; SOFT SHEEN-CARSON LLC, a     Merchantability;
14  corporation; SOFT SHEEN*CARSON (W.I.),    (5) Breach of Implied Warranty of Fitness for a
    INC., a corporation.; STRENGTH OF         Particular Purpose
15  NATURE, LLC, a corporation; GODREJ SON    (6) Negligence—Design, Manufacture and
16  HOLDINGS, INC., a corporation; AVLON      Sale;
    INDUSTRIES, INC., a corporation;          (7) Negligence—Failure to Recall/Retrofit;
17  SAFEWAY INC., a corporation; THE VONS     (8) Negligence—Failure to Warn;
    COMPANIES, INC., a corporation; and DOES  (9-13) Fraud—Intentional Misrepresentation;
18  1-100 inclusive,                          (14-18) Fraud—Concealment;
19                                            (19) Unlawful Business Practices in Violation
                    Defendants.               of Ca. Health & Safety Code Sec. 25249.6 Et
20                                            Seq.

21                                            **(Unlimited Civil – Amount Demanded
                                              Exceeds $25,000)**
22
23                                            **DEMAND FOR JURY TRIAL**

24

25                      **I.    INTRODUCTION**

26      1.    This is an action for damages relating to L'ORÉAL USA, INC.; L'ORÉAL USA

27  PRODUCTS, INC.; SOFT SHEEN-CARSON LLC; SOFT SHEEN*CARSON (W.I.), INC.;

28  STRENGTH OF NATURE, LLC; GODREJ SON HOLDINGS, INC.; AVLON INDUSTRIES, INC.;

                                    1

1   SAFEWAY INC.; THE VONS COMPANIES, INC.; AND DOES 1-100 INCLUSIVE, hereinafter

2   "Defendants'" design, manufacture, research, sale, testing, marketing, advertising, promotion, and/or

3   distribution of chemical hair relaxer products ("Products"). These Products, commonly referred to as

4   "hair relaxers," are a type of lotion or cream product that uses the chemicals contained therein to alter

5   the structure of very tight curls or curly hair, thereby "relaxing" the curls.

6       2.      The Products are common among women in the United States and are historically

7   marketed particularly to Black and Brown women with tight curls or curly hair. When used as

8   intended, the Products pose an increased risk of hormone-related cancers and reproductive problems

9   including the development of uterine fibroids. Defendants had knowledge of these increased risks but

10  hid them from their customers and the public as they continued to manufacture, sell, promote, market,

11  and distribute the Products.

12      3.      As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered

13  serious and permanent physical and emotional injuries, and uterine fibroids, and seeks damages

14  relating to Defendants' design, development, manufacture, testing, packaging, promotion, advertising,

15  marketing, distribution, labeling, and sale of Products, as described below.

16                      **II.     THE PARTIES**

17      4.      Plaintiff Cynthia L. Jones is a citizen and resident of the State of California, with her place

18  of residence being North Highlands, California in Sacramento County.

19      5.      Defendant L'Oréal USA, Inc. is, and at all times relevant to this action, was a

20  corporation, with its principal places of business and headquarters located at 575 Fifth Avenue, New

21  York, New York 10017 and 888 North Douglas Street, El Segundo, California 90245. At all times

22  relevant hereto, Defendant L'Oréal USA, Inc. regularly and continuously did business within this

23  judicial district by designing, testing, manufacturing, researching, marketing, advertising, promoting,

24  selling, and/or distributing the Products.

25      6.      Defendant L'Oréal USA Products, Inc. is, and at all times relevant to this action, was a

26  corporation, with its principal place of business and headquarters located at 10 Hudson Yards 347 10th

27  Avenue New York, New York 10001 and 888 North Douglas Street, El Segundo, California 90245.

28  At all times relevant hereto, Defendant L'Oréal USA Products, Inc. regularly and continuously did

1    business within this judicial district by designing, testing, manufacturing, researching, marketing,

2    advertising, promoting, selling, and/or distributing the Products.

3           7.    Defendant Soft Sheen-Carson LLC ["Soft Sheen"], is, and at all times relevant to this

4    action, was a corporation with its principal place of business and headquarters located at 2870

5    Peachtree Rd. Suite 464, Atlanta GA 40405 and process may be served upon its registered agent,

6    Corporation Service Company, 80 State Street, Albany, NY 12207. At all times relevant hereto,

7    Defendant Soft Sheen regularly and continuously did business within this judicial district by

8    designing, testing, manufacturing, researching, marketing, advertising, promoting, selling, and/or

9    distributing the Products.

10          8.    Defendant Soft Sheen*Carson (W.I.), Inc., ["Carson (W.I)"], is, and at all times

11   relevant to this action, was a corporation and process may be served upon its registered agent,

12   Corporate Services Company 251 Little Falls Drive, Wilmington, Delaware 19808. At all times

13   relevant hereto, Defendant Carson (W.I) regularly and continuously did business within this judicial

14   district by designing, testing, manufacturing, researching, marketing, advertising, promoting, selling,

15   and/or distributing the Products.

16          9.    Defendant Strength of Nature, LLC ["Strength of Nature"] is, and at all times relevant

17   to this action, was a corporation with its principal place of business and headquarters located at 64

18   Ross Road, Savannah, GA 31405 and process may be served upon its registered agent, Karan Sood at

19   64 Ross Road, Savannah GA 31405. At all times relevant hereto, Defendant Strength of Nature

20   regularly and continuously did business within this judicial district by designing, testing,

21   manufacturing, researching, marketing, advertising, promoting, selling, and/or distributing the

22   Products.

23         10.    Godrej SON Holdings, Inc. ["Godrej SON"] is, and at all times relevant to this action,

24   was a corporation with its principal place of business and headquarters located at 64 Ross Road,

25   Savannah GA, 31405, and process may be served upon its registered agent, Karan Sood at 64 Ross

26   Road, Savannah, GA 31405. At all times relevant hereto, Defendant Godrej SON regularly and

27   continuously did business within this judicial district by designing, testing, manufacturing,

28   researching, marketing, advertising, promoting, selling, and/or distributing the Products.

11.     Defendant Avlon Industries, Inc. ["Avlon"], is, and at all times relevant to this action, was a corporation with its principal place of business and headquarters located at 1999 N 15th Ave Melrose Park, IL, 60160, and process may be served upon its registered agent, Kenneth J. Nemec, Jr. 835 McClintock Dr., 2nd Floor, Blurr Ridge, IL 60527. At all times relevant hereto, Defendant Avlon regularly and continuously did business within this judicial district by designing, testing, manufacturing, researching, marketing, advertising, promoting, selling, and/or distributing the Products.

12.     Defendant Safeway Inc. ["Safeway"] is and at all times relevant to this action, was a California citizen with its principal place of business and headquarters located at 11555 Dublin Canyon Road, Pleasanton, CA 94588 in Alameda County, and process may be served upon its registered agent Amanda Garcia at 330 N Brand Blvd, Glendale, CA 91203. At all times relevant hereto, Defendant Safeway regularly and continuously did business within this state and county, including at its corporate headquarters, located at 11555 Dublin Canyon Road, Pleasanton, CA 94588, by marketing, advertising, promoting, selling, and/or distributing the Products.

13.     Defendant The Vons Companies, Inc. ["Vons Companies"] is and at all times relevant to this action, was California citizen with its principal place of business and headquarters located at 11555 Dublin Canyon Road, Pleasanton, CA 94588 in Alameda County, and process may be served upon its registered agent Amanda Garcia at 330 N Brand Blvd, Glendale, CA 91203. At all times relevant hereto, Defendant Vons regularly and continuously did business within this state and county, including at its corporate headquarters, located at 11555 Dublin Canyon Road, Pleasanton, CA 94588, by marketing, advertising, promoting, selling, and/or distributing the Products.

### III.     JURISDICTION AND VENUE

14.     This Court has jurisdiction over the claims and causes of action asserted herein because such claims arise out of all of the Defendants' unlawful business practices within the State of California, at least some of the Defendants are citizens of the State of California, and Plaintiffs' injuries were suffered within the State of California as a result of Defendants' conduct.

15.     Venue is proper in this Court because: Pursuant to California Code of Civil Procedure section 395, at least some of the Defendants are residents of Alameda County; all of the Defendants

transact business in California and in the County of Alameda; and all of the Defendants have committed unlawful acts in the County; thus, a substantial part of the events giving rise to the claims alleged herein occurred in this County.

## IV.    STATEMENT OF FACTS

16.    Each of the preceding paragraphs is incorporated by reference herein.

17.    At all pertinent times, all Defendants were engaged in the research, development, manufacture, design, testing, sale, and marketing of the chemical hair relaxer products ("Products") and introduced such products into interstate commerce with knowledge and intent that such Products be sold in the State of California.

18.    At all times material hereto, Defendants L'Oréal USA, Inc., L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I) developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the defective chemical hair relaxer Products, Dark & Lovely and Mizani.

19.    Upon information and belief, Defendants L'Oréal USA, Inc., L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I)'s hair relaxer Products, Dark & Lovely and Mizani contained phthalates, including but not limited to diethyl phthalate (DEP), bis(2-ethyhexyl) phthalate (DEHP), and benzylbutyl phthalate.

20.    Upon information and belief Defendants L'Oréal USA, Inc., L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I)'s hair relaxer Products, Dark & Lovely and Mizani contained bisphenol A.

21.    Upon information and belief, Defendants L'Oréal USA, Inc., L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I)'s hair relaxer Products, Dark & Lovely and Mizani contained cyclosiloxanes, including but not limited to octamethylcycloetrasiloxane (D4), decamethylcyclopentasiloxane (D5), and dodecamethylcyclohexylsiloxane (D6).

22.    Upon information and belief, Defendants L'Oréal USA, Inc, L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I)'s hair relaxer Products, Dark & Lovely and Mizani contained parabens, including but not limited to methyl paraben, ethyl paraben, bis(2-ethylhexyl) adipate, and butyl paraben.

23.    · Upon information and belief, Defendants L'Oréal USA, Inc., L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I)'s hair relaxer Products, Dark & Lovely and Mizani contained antimicrobials including but not limited to o-phenylphenol, triclosan, and triclocarban.

24.    Upon information and belief, Defendants L'Oréal USA, Inc., L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I)'s hair relaxer Products, Dark & Lovely and Mizani contained ethanolamines, including but not limited to menoethanolamine and diethanolamine.

25.    Upon information and belief, Defendants L'Oréal USA, Inc., L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I)'s hair relaxer Products, Dark & Lovely and Mizani contained alkylphenols, including but not limited to 4-t-octylphenol, 4-t-nonylphenol, nonylphenol monoethoxylate, and nonylphenol diethoxylate.

26.    Upon information and belief, Defendants L'Oréal USA, Inc., L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I)'s hair relaxer Products, Dark & Lovely and Mizani contained UV filters including, but not limited to benzophenone, benzophenone-1, benzophenone-2, benzophenone-3, oxtinoxate, and octadimethyl PABA.

27.    Upon information and belief, Defendants L'Oréal USA, Inc., L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I)'s hair relaxer Products, Dark & Lovely and Mizani contained fragrances, including but not limited to benzylcetate, eugenol, hexyl cinnemal, limonene, linalool, methyl eugenol, methyl salicylate, pinene, terpineol, AHTN, bucinal, diphenyl ether, DPMI, HHCB, isobornyl acetate, methyl ionone, musk ketone, musk xylene, and phenethyl alcohol.

28.    At all times material hereto, Defendants L'Oréal USA, Inc., L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I) placed defective hair relaxer Products into the stream of interstate commerce.

29.    Plaintiff Jones used the following L'Oréal USA, Inc., L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I) Products:

   a.    Dark & Lovely No-Lye Children Relaxer System; and

   b.    Mizani Moderate Curl Reduction Relaxer with Shea Butter, Cocoa Butter, and Honey.

30.    At all pertinent times, all Defendants were engaged in the research, development,

manufacture, design, testing, sale, and marketing of the chemical hair relaxer products ("Products") and introduced such products into interstate commerce with knowledge and intent that such products be sold in the State of California.

31.    At all times material hereto, Defendants Godrej SON and Strength of Nature developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the defective chemical hair relaxer Products, Just For Me, TCB, Motions, and Dr. Miracle's.

32.    Upon information and belief, Defendants Godrej SON, Strength of Nature's product, Just For Me, TCB, Motions, and Dr. Miracle's hair relaxers contained phthalates, including but not limited to diethyl phthalate (DEP), bis(2-ethyhexyl) phthalate (DEHP), and benzylbutyl phthalate.

33.    Upon information and belief, Defendants Godrej SON, Strength of Nature's Products, Just For Me, TCB, Motions, and Dr. Miracle's hair relaxers contained bisphenol A.

34.    Upon information and belief, Defendants Godrej SON, Strength of Nature's Products, Just For Me, TCB, Motions, and Dr. Miracle's hair relaxers contained cyclosiloxanes, including but not limited to octamethylcycloetrasiloxane (D4), decamethylcyclopentasiloxane (D5), and dodecamethylcyclohexylsiloxane (D6).

35.    Upon information and belief, Defendants Godrej SON, Strength of Nature's Products, Just For Me, TCB, Motions, and Dr. Miracle's hair relaxers contained parabens, including but not limited to methyl paraben, ethyl paraben, bis(2-ethylhexyl) adipate, and butyl paraben.

36.    Upon information and belief, Defendants Godrej SON, Strength of Nature's product, Just For Me, TCB, Motions, and Dr. Miracle's hair relaxer contained antimicrobials including but not limited to o-phenylphenol, triclosan, and triclocarban.

37.    Upon information and belief, Defendants Godrej SON, Strength of Nature's product, Just For Me, TCB, Motions, and Dr. Miracle's hair relaxers contained ethanolamines, including but not limited to menoethanolamine and diethanolamine.

38.    Upon information and belief, Defendants Godrej SON, Strength of Nature's product, Just For Me, TCB, Motions, and Dr. Miracle's hair relaxers contained alkylphenols, including but not limited to 4-t-octylphenol, 4-t-nonylphenol, nonylphenol monoethoxylate, and nonylphenol

1 | diethoxylate.

2 |      39.    Upon information and belief, Defendants Godrej SON, Strength of Nature's product,

3 | Just For Me, TCB, Motions, and Dr. Miracle's hair relaxers contained UV filters including, but not

4 | limited to benzophenone, benzophenone-1, benzophenone-2, benzophenone-3, oxtinoxate, and

5 | octadimethyl PABA.

6 |      40.    Upon information and belief, Defendants Godrej SON, Strength of Nature product, Just

7 | For Me, TCB, Motions, and Dr. Miracle's hair relaxers contained fragrances, including but not limited

8 | to benzylcetate, eugenol, hexyl cinnemal, limonene, linalool, methyl eugenol, methyl salicylate,

9 | pinene, terpineol, AHTN, bucinal, diphenyl ether, DPMI, HHCB, isobornyl acetate, methyl ionone,

10 | musk ketone, musk xylene, and phenethyl alcohol.

11 |      41.    At all times material hereto, Defendants Godrej SON and Strength of Nature placed

12 | defective hair relaxer Products into the stream of interstate commerce.

13 |      42.    Plaintiff Jones used the following Defendants Godrej SON and Strength of Nature's

14 | Products:

15 |      a.   Just for Me No-Lye Conditioning Crème Relaxer with Sunflower Oil, Shea Butter,

16 |          Coconut Milk, and Vitamin E;

17 |      b.   Just for Me No-Lye Conditioning Crème Relaxer Kit Regular;

18 |      c.   TCB No Base Hair Relaxer with Protein and DNA Mild;

19 |      d.   Motions No-Lye Relaxer System with Shea Butter, Argan Oil, and Coconut Oil;

20 |      e.   African Pride Regular Hair Relaxer; and

21 |      f.   Dr. Miracle's No-Lye Relaxer with Vitamins A and E.

22 |      43.    At all times material hereto, Defendant Avlon developed, tested, assembled,

23 | manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the defective

24 | chemical hair relaxer Product, Affirm.

25 |      44.    Upon information and belief, Defendant Avlon's Product, Affirm hair relaxers

26 | contained phthalates, including but not limited to diethyl phthalate (DEP), bis(2-ethyhexyl) phthalate

27 | (DEHP), and benzylbutyl phthalate.

28 |      45.    Upon information and belief Defendant Avlon's Product Affirm hair relaxers

1    contained bisphenol A.

2         46.    Upon information and belief, Defendant Avlon's Product Affirm hair relaxers

3    contained cyclosiloxanes, including but not limited to octamethylcycloetrasiloxane (D4),

4    decamethylcyclopentasiloxane (D5), and dodecamethylcyclohexylsiloxane (D6).

5         47.    Upon information and belief, Defendant Avlon's Product, Affirm hair relaxers

6    contained parabens, including but not limited to methyl paraben, ethyl paraben, bis(2-ethylhexyl)

7    adipate, and butyl paraben.

8         48.    Upon information and belief, Defendant Avlon's Product, Affirm hair relaxers

9    contained antimicrobials including but not limited to o-phenylphenol, triclosan, and triclocarban.

10        49.    Upon information and belief, Defendant Avlon's Product, Affirm hair relaxers

11   contained ethanolamines, including but not limited to menoethanolamine and diethanolamine.

12        50.    Upon information and belief, Defendant Avlon's Product, Affirm hair relaxers

13   contained alkylphenols, including but not limited to 4-t-octylphenol, 4-t-nonylphenol, nonylphenol

14   monoethoxylate, and nonylphenol diethoxylate.

15        51.    Upon information and belief, Defendant Avlon's Product, Affirm hair relaxers

16   contained UV filters including, but not limited to benzophenone, benzophenone-1, benzophenone-2,

17   benzophenone-3, oxtinoxate, and octadimethyl PABA.

18        52.    Upon information and belief, Defendant Avlon's Product, Affirm hair relaxers

19   contained fragrances, including but not limited to benzylcetate, eugenol, hexyl cinnemal, limonene,

20   linalool, methyl eugenol, methyl salicylate, pinene, terpineol, AHTN, bucinal, diphenyl ether, DPMI,

21   HHCB, isobornyl acetate, methyl ionone, musk ketone, musk xylene, and phenethyl alcohol.

22        53.    At all times material hereto, Defendant Avlon placed defective hair Products into the

23   stream of interstate commerce and Plaintiff Jones used Affirm Relaxer Products.

24        54.    Plaintiff Jones used Defendant Avlon's "Affirm" branded relaxer Products.

25                  **PLAINTIFF JONES'S USE OF HAIR RELAXER PRODUCTS**

26        55.    Plaintiff Jones was first exposed to Endocrine Disrupting Chemicals ("EDCs") and/or

27   phthalate-based Products around 1989, at or around the age of eleven (11) when she began using

28   Defendants' Products.

56:    Plaintiff Jones continued using Defendants' Products from around 1989 to 2020, from approximately age eleven (11) to forty-two (42), resulting in thirty-one (31) years of continuous exposure.

57.    Between the ages of 14 and 42, Plaintiff Jones used L'Oréal USA, Inc., L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I)'s "Dark & Lovely" branded Products, including Dark & Lovely No-Lye Children Relaxer System.

58.    Between the ages of 13 and 20, Plaintiff Jones used L'Oréal USA, Inc., L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I)'s "Mizani" branded Products, including Mizani Moderate Curl Reduction Relaxer with Shea Butter, Cocoa Butter, and Honey.

59.    Between the ages of 11 to 14, Plaintiff Jones used Godrej SON and Strength of Nature's "Just for Me" branded Products, including:

    a.  Just for Me No-Lye Conditioning Crème Relaxer with Sunflower Oil, Shea Butter, Coconut Milk, and Vitamin E; and

    b.  Just for Me No-Lye Conditioning Crème Relaxer Kit Regular.

60.    Between the ages of 11 to 14, Plaintiff Jones used Godrej SON and Strength of Nature's "TCB" branded Products, including TCB No Base Mild Hair Relaxer with Protein and DNA.

61.    Between the ages of 30 to 32, Plaintiff Jones used Godrej SON and Strength of Nature's "African Pride" branded Products, including African Pride Regular Hair Relaxer.

62.    Between the ages of 16 to 42, Plaintiff Jones used Godrej SON and Strength of Nature's "Motions" branded Products, including Motions No-Lye Relaxer System with Shea Butter, Argan Oil, and Coconut Oil.

63.    Between the ages of 21 to 42, Plaintiff Jones used Godrej SON and Strength of Nature's "Dr. Miracle's" branded Products, including Dr. Miracle's No-Lye Relaxer with Vitamins A and E.

64.    Between the ages of 13 to 20, Plaintiff Jones used Defendant Avlon's "Affirm" branded Products.

65.    Plaintiff Jones frequently purchased Relaxer Products from Defendants Safeway's and Vons Companies' "Safeway" stores in California.

66.    Plaintiff Jones received retouches to relax her new growth approximately every four

(4) to six (6) weeks, resulting in approximately eight (8) to twelve (12) applications of relaxer per year.

67.    Plaintiff Jones used Defendants' Products by applying them to her hair by having a professional at a hair salon apply Defendants' Products exactly as instructed by Defendants.

68.    Plaintiff Jones kept the Product on her hair for the time allotted in the instructions.

69.    There was never any indication, on the Products packaging or otherwise, that this normal use could and would cause her to develop uterine fibroids.

70.    Plaintiff Jones's last purchase of hair relaxer products was in 2020 when she decided to go natural.

71.    Years earlier, in approximately 2005, Plaintiff Jones was diagnosed with uterine fibroids at the young age of twenty-seven (27) years old.

72.    Plaintiff Jones's fibroid symptoms affected her daily life. She struggled with heavy and irregular periods, severe pain and cramping, and sharp pain during intercourse.

73.    A few years after her diagnosis, Plaintiff Jones underwent uterine ablation to treat her fibroids. However, the treatment was unsuccessful, and her symptoms continued to worsen.

74.    In 2009, living with the pain and heavy bleeding became so unbearable that Plaintiff Jones was forced to leave her full-time job.

75.    After struggling with grueling symptoms for two more years, Plaintiff Jones made the impossible decision between her health and her desire to have more children. When she was just thirty-two (32) years old, Plaintiff Jones underwent a total abdominal hysterectomy on February 11, 2011.

76.    Plaintiff Jones then started hormone replacement therapy and began menopause at the young age of thirty-four (34).

77.    In 1998, prior to Plaintiff Jones's diagnosis of uterine fibroids, Plaintiff Jones gave birth to her first child prematurely at thirty (30) weeks into her pregnancy. Before delivering her child, Plaintiff Jones was hospitalized for a week due to considerations for the baby's safety.

78.    After her hysterectomy, Plaintiff Jones was forced to give up her dream of having more children forever. However, before Plaintiff Jones even had surgery, her fibroids prevented her from having children because of the severe pain she experienced during intercourse.

79.     Plaintiff Jones's inability to have children caused significant strain on her marriage, and eventually, contributed to Plaintiff Jones and her husband getting a divorce.

80.     Plaintiff Jones's struggle with fibroids has negatively impacted her mental health leading her to develop anxiety and depression.

81.     Plaintiff Jones could not and did not discover the causal connection between her use of Defendants' hair relaxer products and her own reproductive issues until late October 2022, when the Chang study was released linking the use of chemical hair straightener or relaxers to uterine cancers and raising awareness of its connection to other reproductive system issues.

82.     On October 18, 2022, just one day after the Chang study was published, its results were widely published and highlighted on multiple major television news networks and online and social media platforms.[1]

83.     Following the release of this study, a press conference was held for a woman in Illinois filing of the first lawsuits against Defendants for the development of uterine cancer, which went similarly viral, including in the state of California where Plaintiff Jones resides.

84.     The publicity of the study put Plaintiff Jones on notice for the first time that she may have similarly been harmed reproductively by her use of hair relaxers and that she may have a legal claim as a result.

85.     As a result of Defendants' acts and/or omissions, Plaintiff Jones suffered extreme pain

---

[1] *See, e.g.,* Jacqueline Howard, US woman files lawsuit against L'Orèal, claiming chemical hair straightening products are linked to her cancer, CNNHealth (Oct. 24, 2022), *available at* https://www.cnn.com/2022/10/24/health/hair-straightening-products-lawsuit/index.html (last accessed Feb. 27, 2023); Julian Mark, She was diagnosed with cancer at 28. Her lawsuit blames hair relaxers, The Washington Post (Oct. 27, 2022), *available at* https://www.washingtonpost.com/nation/2022/10/27/loreal-lawsuit-hair-straightener-relaxer/ (last accessed Feb. 27, 2023); Fox32News, Woman claims L'Oreal chemical relaxers caused uterine cancer: lawsuit, Fox5Atlanta (Oct. 24, 2022), *available at* https://www.fox5atlanta.com/news/woman-claims-loreal-chemical-relaxers-caused-uterine-cancer-lawsuit (last accessed Feb. 27, 2023); Amanda Su & Sabina Ghebremedhin, Woman sues 5 companies alleging their chemical hair-straightening products caused her uterine cancer, Good Morning America (Oct. 25, 2002), *available at* https://www.goodmorningamerica.com/wellness/story/woman-sues-companies-alleging-chemical-hair-straightening-products-92007557 (last accessed Feb. 27, 2023).

1  and suffering, and extreme emotional distress.

2  ## HAIR STRAIGHTENERS AND RELAXERS

3  **A.    Market for Hair Straightening and Relaxing Products**

4  86.    Black people make up about 13 percent of the U.S. population, but by one estimate,

5  their spending accounts for as much as 22 percent of the $42 billion-a-year personal care products

6  market, suggesting that they buy and use more of such products – including those with potentially

7  harmful ingredients– than Americans as a whole.[2]

8  87.    In an analysis of ingredients in 1,177 beauty and personal care products marketed to

9  Black women, about one in twelve (12) was ranked highly hazardous on the scoring system of EWG's

10  Skin Deep® Cosmetics Database, a free online resource for finding less-hazardous alternatives to

11  personal care products. The worst-scoring products marketed to Black women were hair relaxers. Each

12  of these categories had an average product score indicating high potential hazard.

13  88.    In the U.S. alone, Black consumers spend over $1 trillion each year, with a significant

14  amount of that spending toward hair care products.

15  89.    In 2020, the global Black hair care market was estimated at $2.5 billion, with the hair

16  relaxer market alone estimated at $718 million in 2021, with the expectation of growth to $854 million

17  annually by 2028.

18  **B.    History of Hair Relaxers in America**

19  90.    In its natural or virgin state, afro-hair texture is characterized by coily, springing,

20  zigzag, and s-curve curl patterns; as well as its density, fullness, texture, and feel.[3]

21  91.    Afro-textured hair "naturally grows up and out." [4]

22

23  [2] Thandisizwe Chimurenga, *How Toxic is Black Hair Care?*, New America Media, Feb. 2, 2012,
   americamedia.org/2012/02/skin-deep-in-more-ways-than-one.php;    *Personal    Care    Products*
24  *Manufacturing    Industry    Profile*,    Dun    &    Bradstreet    First    Research,    August    2016,
   www.firstresearch.com/Industry-Research/Personal-Care-Products-Manufacturing.html (This report
25  uses "Black" to describe not only people who identify as African-American, but Black people in the
   U.S. who come from the Caribbean or other areas. "African-American" is used only when a cited
26  source specifies that term).

27  [3] Patrick Obukowcho, *Hair Relaxers: Science, Design, and Application*, 26, 14 (2018).
28  [4] Ayana Byrd & Lori Tharps, *When Black Hair Is Against the Rules*, The New York Times, April 30,
   2014, https://www.nytimes.com/2014/05/01/opinion/when-black-hair-is-against-the-rules.html.

13

92.    In Africa, hair was seen as a source of personal and spiritual power. As the highest point of the body and "most elevated part of the body, some communities believe[d] [their hair] connected them with the divine."[5] For some, hair was the "conduit for spiritual interaction with God."[6]

93.    African hairstyles were also status symbols reflecting one's "marital status, age, religion, and rank in society" and one's tribe.[7] Warriors, kings, and queens wore braids to show their ranking in society.[8] The Wolof tribe in West Africa, wore braided styles when they went to war.[9]

94.    Most styling was extremely intricate and involved days of labor. "Only the mad and mourning did not do their hair."[10]

95.    One of the of first things slave masters did to enslaved people brought to American soil was cut their hair. This was a way to "break their spirit and make slaves easier to control."[11] What was once a symbol of pride became a tool for subordination and degradation. As such, hair cutting was also a common form of punishment.

96.    The very nature of slavery involved working long hours in dire conditions. Enslaved people had "no time to care about one's appearance or one's hair."[12] "Hair that was once a source of pride and expression of identity was often tucked away beneath cloth to cover rough, tangles tresses and shield them from hours spent toiling under the sun."[13] The hair that was once an important spiritual

---

[5] Nikki Fox, *6 Things Everyone Should Know About Black Hair History,* Odele, Feb. 22, 2021. https://odelebeauty.com/blogs/the-rinse/black-hair-history-facts.

[6] Rumeana Jahangir, *How Does Black Hair Reflect Black History?*, BBC News. May 31, 2015. https://www.bbc.com/news/uk-england-merseyside-31438273.amp.

[7] *History of Braids: More Than Just a Hairstyle*, Genesis Career College, https://www.genesiscareer.edu/history-of-braids-more-than-just-a-hairstyle/.

[8] *Id.*

[9] *Id.*

[10] Hlonipha Mokoena, *From Slavery to Colonialism and School Rules, Navigating the History of Myths about Black Hair*, Quartz Africa, Fe., 24, 2018, https://qz.com/africa/1215070/black-hair-myths-from-slavery-to-colonialism-school-rules-and-good-hair/.

[11] Brenda A. Randle, *I Am Not My Hair*, Race, Gender and Class, Volume 22, Number 1-2, 114 – 121 (2015).

[12] Nikki Fox, *6 Things Everyone Should Know About Black Hair History,* Odele, Feb. 22, 2021. https://odelebeauty.com/blogs/the-rinse/black-hair-history-facts.

[13] *Id.*

COMPLAINT FOR DAMAGES

1    and cultural symbol became tangled and matted.

2        97.    White Americans did not see African or Black hair as beautiful. Instead, they described

3    it as "closer to sheep wool than human hair."[14] African hair that was once considered an attractive

4    feature became a source of shame, to be covered or cut.

5        98.    In 1786, the Governor of Louisiana, Don Esteban Miro, passed the "Tignon Law"

6    requiring Black women to wear a tignon (scarf) over their hair as a way of signifying they were

7    members of the slave class, *even if they were free.*[15]

8        99.    "By requiring free Black women to wear the same hair covering, the governor was

9    marking them as related to enslaved women rather than white women."[16]

10       100.    This law sent a direct signal to Black people that their hair held a symbol of inequality

11   and was a sign of poverty regardless of their actual social status.

12       101.    Because afro-textured hair was kinky and reflected African heritage rather than

13   European ancestry afro-textured, hair was a symbol of low social status.[17]

14       102.    Slaves with lighter skin and less coily hair were favored to work in the home, a far less

15   strenuous position than in the plantation fields.[18]

16       103.    Texturism, the idea that "good hair" is equated with a straighter hair texture, was

17   cemented into American culture during its period of chattel slavery. "Eurocentric beauty standards

18   dictated that coily hair and dark skin were unattractive and inferior"; "lighter skinned and straighter

19   haired slaves were favored and selected for more desirable positions in the house" as opposed to the

20   fields.[19] Thus, "the texture of an enslaved person's hair could determine their value and working

21

22

23   [14] Ayana Byrd & Lori Tharps, *When Black Hair Is Against the Rules*, The New York Times, April
      30, 2014. https://www.nytimes.com/2014/05/01/opinion/when-black-hair-is-against-the-rules.html

24   [15] Nikki Fox, *6 Things Everyone Should Know About Black Hair History*, Odele, Feb. 22, 2021,
      https://odelebeauty.com/blogs/the-rinse/black-hair-history-facts.

25   [16] *Fashionable Rebellion*, Women and the American Story, New York Historical Society Museum
      and Library, https://wams.nyhistory.org/settler-colonialism-and-revolution/settler-

26   colonialism/fashionable-rebellion/.

27   [17] Brenda A. Randle, *I Am Not My Hair*, Race, Gender and Class, Volume 22, Number 1-2, 114 –
      121 (2015).

28   [18] *Id.*
      [19] *Id.*

conditions, which in turn might impact their overall health, comfort and chances for freedom[.]"[20]
Naturally, Black men and women strived for a better life in America and were taught that the straighter
and less kinky their hair was, the better of a life they could have. This fueled the desire for tools and
products that could straighten Black hair texture.

104. Gone were the days of African hairstyles and pride. "The goal of grooming the hair had
morphed from the elaborate and symbolic designs of Africa into an imitation of White styles adapted
to Black kinks and curls."[21]

105. To obtain a better life, so many slaves would go to "dangerous lengths to straighten
their hair."[22]

106. Black, or afro-textured hair texture, can be manipulated into a straightened state with
hair tools and products. Prior to the invention of the chemical relaxer in 1900s, individuals would
"press" afro-textured hair with metal hair tools such as the "hot comb." Pressing combs or hot combs
are metal hair tools that are first heated in a stove or ceramic heater, then pressed into hair strands to
temporarily straighten them.[23]

107. The hot comb was first invented by Frenchman, Marcel Grateau who popularized the
hair styling tool in Europe in the 1870s, including advertisements in catalogs of major department
stores like Sears and Bloomingdales.[24] The hot comb was later modified by Madam C.J. Walker, a
trailblazer in the development of black hair products, to be manufactured with wider comb teeth.[25]
With Walker's system, once the comb was heated a softening ointment was then applied for easier

---

[20] *Id.*
[21] Brenda A. Randle, *I Am Not My Hair*, Race, Gender and Class, Volume 22, Number 1-2, 114 –
121 (2015).
[22] Nikki Fox, *6 Things Everyone Should Know About Black Hair History,* Odele, Feb. 22, 2021.
https://odelebeauty.com/blogs/the-rinse/black-hair-history-facts
[23] Jaclyn Peterson, *The Price of Beauty*, CTI Charlotte Teachers Institute Curriculum (2021).
[24] Henry Louis Gates, *Madam Walker, the First Black American Woman to Be a Self-Made
Millionaire*, PBS 100 Amazing Facts About the Negro, https://www.pbs.org/wnet/african-americans-
many-rivers-to-cross/history/100-amazing-facts/madam-walker-the-first-black-american-woman-to-
be-a-self-made-millionaire/ (last visited October 18, 2022).
[25] Cookie Lommel, Madam C.J. Walker 60 (1993)

1 manipulation of Black hair.[26]

2 108.    Today, afro-textured hair is still often straightened with a hot comb rather than with

3 chemicals. However, pressed hair remains susceptible to "shrinkage." Shrinkage is the process by

4 which curly-kinky hair that has been temporarily straightened coils back into its natural state once the

5 hair interacts with water, humidity, or perspiration,[27] creating a shorter or fuller appearance.



**i.    The Invention of the Chemical Relaxer**

109.    African American inventor Garrett Augustus Morgan, discovered and created a system

that would permanently straighten afro-textured hair, eliminating the issue of "shrinkage."

110.    In addition to being an inventor, Morgan was also a tailor. In the early 1900s, Morgan

---

[26] *Id.* at 62.
[27] *Id.*

1   was repairing his sewing machines and wanted to find a way to polish the needles to stitch fabrics

2   more smoothly.[28] He applied a chemical solution to the needles and wiped the solution off with a rag

3   and later noticed that the "curly" fibers in the rag were straightened after exposure to the chemical.[29]

4          111.    Morgan further tested the chemical on a dog with curly hair and eventually on his own

5   hair. The chemical solution successfully straightened curly hair. He turned his formula into a gel-hair

6   product, creating the G.A. Morgan Hair Refining Cream which was marketed in 1913.





[28] Patrick Obukowcho, Hair Relaxers: Science, Design, and Application 27 (2018).
[29] Mary N. Oluonye, Garrett Augustus Morgan: Businessman, Inventor, Good Citizen 28 (2008).

1    112.    Morgan's invention paved the way for the alkaline relaxer and later development of

2    additional chemical based permanent hair straightening products in the Black hair care market.[30]

3    **ii.    Defendants' Marketing Efforts**

4    113.    In 1971, Dark and Lovely manufactured the first lye relaxer. The formula consisted of

5    sodium hydroxide, water, petroleum jelly, mineral oils, and emulsifiers.[31]

6    114.    In the 1970s, lye relaxer users and manufacturers noticed that the lye formula stripped

7    proteins from the hair strand, resulting in the hair thinning and breaking.[32] As a result, Johnson and

8    Johnson marketed the first "gentle" hair relaxer in 1981, which used milder chemicals such as

9    potassium hydroxide and lithium[33]



115.    Over time, Soft & Beautiful and other chemical relaxer manufacturers developed herbal

and botanical hair relaxer formulas.[34]

---

[30] Patrick Obukowcho, Hair Relaxers: Science, Design, and Application 27 (2018).

[31] Cicely A. Richard, *This History of Hair Relaxers*, September 29, 2017
https://classroom.synonym.com/the-history-of-hair-relaxers-12078983.html.

[32] *Id.*

[33] *Id.*

[34] *Id.*

COMPLAINT FOR DAMAGES

116.    For decades, Defendants have marketed their hair relaxer products to African American customers across the United States, and the world, reinforcing the same historical Eurocentric standards of beauty. Defendant's marketing scheme relies heavily on branding and slogans that reinforce straight hair as the standard.[35]

 

117.    For example, in the first ad above, L'Oreal touts "how beautiful Black hair *can be*" (emphasis added), implying that in its natural state Black Hair is *not as* beautiful as it *could be* if straightened.

118.    Defendants misrepresented that "no lye" relaxers, or "gentle treatment" relaxers were milder and/or safer than alternative relaxers. This was false. Hair relaxer products marketed as using "gentle treatment" or similar terminology are not any safer than the other hair relaxer products on the market.

119.    Finally, Defendant L'Oréal depicts a Black woman with straight hair on each of its Dark and Lovely and Optimum brands of relaxer product.

---

[35] *Id.*

20



120.    Defendants L'Oréal's and SoftSheen's Dark & Lovely brand hair relaxer products are intentionally labeled as providing a "healthy" gloss and containing "nourishing" shea butter with jojoba and avocado oils. The terms "healthy" and "nourishing" suggest that hair relaxer products are safe and even beneficial for the body when they are not.

21

COMPLAINT FOR DAMAGES



121.    Defendant L'Oréal and Softsheen-Carson's Beautiful Beginnings hair relaxer product line, which is targeted to young Black girls, states that it "moisturizes, nourishes, and prevents breakage...**without hurting your scalp.**" These representations suggest that their hair relaxer products are safe and even beneficial for children's bodies when they are not.





22

## C.    Chemical Relaxer Use

122.    Hair relaxers are classified as creams or lotions which are specifically marketed to Black and Brown women to "tame" their ethnic hair by making it smoother, straighter, and easier to manage on a daily basis.

123.    Hair relaxing, or lanthionization, can be performed by a professional cosmetologist in a salon or barbershop, or at home with at-home relaxer kits designed for individual use. These home kits are sold in grocery, drug, and beauty supply stores in urban and rural cities throughout the United States.

124.    Relaxers are applied to the base of the hair shaft and left in place for a "cooking" interval, during which the relaxer alters the hair's texture by purposefully damaging the hair's natural protein structure. The effect of this protein damage straightens and smooths the hair. After a period of weeks four (4) to eight (8) weeks on average, depending on the hair's natural growth rate), the treated portion of the hair grows away from the scalp as new growth sprouts from the roots, requiring additional relaxer treatment to smooth the roots. These additional treatments are colloquially referred to in the community as "re-touches", resulting in women relaxing their new growth every four to eight weeks on average, usually for decades.

125.    Hair relaxers can, and often do, cause burns and lesions in the scalp, facilitating entry of hair relaxer constituents into the body. The main ingredient of "lye" relaxers is sodium hydroxide; no-lye relaxers contain calcium hydroxide and guanidine carbonate, and "thio" relaxers contain thioglycolic acid salts. No-lye relaxers are advertised to cause fewer scalp lesions and burns than lye relaxers, but there is little evidence to support this claim.

126.    In some studies, up to 90% of Black and brown women have used hair relaxants and straighteners, which is more commonplace for these women than for any other race. Hair products such as relaxers contain hormonally active and carcinogenic compounds, such as phthalates, known to cause endocrine disruption, which are not required to be listed separately as ingredients and are often broadly lumped into the "fragrance" or "perfume" categories. Relaxer habits usually begin in formative childhood years, and adolescence is likely a period of enhanced susceptibility to debilitating

1   conditions resulting from exposure to these chemicals.[36]

2      127.   In the 1990s, the first relaxer product for young Black girls, Just for Me, hit the market

3   with a catchy advertising jingle that captured consumer attention.[37] It soon became one of the most

4   popular straightening treatments, touting a no-lye formula designed to be gentler for children's

5   sensitive scalps.

6      128.   Once relaxer use begins in childhood, it usually becomes a lifetime habit. The

7   frequency of scalp burns with relaxer application can increase the risk of permanent and debilitating

8   diseases associated with long-term exposure to endocrine-disrupting chemicals.

9      129.   The reasons for Black women's use and dependence upon hair straightening products

10   are associated with various factors, including (1) slavery and internalization of acceptable beauty

11   norms, (2) media and advertisements, (3) assimilation and economic security, (4) ease of hair

12   maintenance, and (5) culture.[38]

13      130.   In a culture where Black women feel reduced to a lower standard of beauty, these

14   factors impact women of color's decisions to begin and continue using products to alter the natural

15   state of their hair, many times as a protective mechanism against racial discrimination. In the Dove

16   CROWN Study for girls (2021) conducted by JOY Collective, the following statistics were

17   discovered:[39]

18        a.   100% of Black elementary school girls in majority-white schools who report experiencing

19            hair discrimination state they experience the discrimination by the age of ten (10).

---

[36] Patrick Obukowcho, Hair Relaxers: Science, Design, and Application 27 (2018).

[37] Dana Oliver, *The '90s Just For Me Hair Relaxer Commercial Song Is Stuck In Our Hea*ds, HuffPost, Feb. 1, 2014. https://www.huffpost.com/entry/just-for-me-hair-relaxer-commercial-song_n_4689981

[38] Chanel Donaldson, *Hair Alteration Practices Amongst Black Women and the Assumption of Self-Hatred*, Applied Psychology Opus, https://wp.nyu.edu/steinhardt-appsych_opus/hair-alteration-practices-amongst-black-women-and-the-assumption-of-self-hatred/

[39] The CROWN Act was created in 2019 by Dove and the CROWN Coalition, in partnership with then State Senator Holly J. Mitchell of California, to ensure protection against discrimination based on race-based hairstyles by extending statutory protection to hair texture and protective styles such as braids, locks, twists, and knots in the workplace and public schools. https://www.thecrownact.com/

COMPLAINT FOR DAMAGES

b. 86% of Black teens who experience discrimination state they have experienced discrimination based on their hair by the age of twelve (12).

c. 66% of Black girls in majority-white schools report experiencing hair discrimination compared to 45% of Black girls in all school environments.

d. 53% of Black mothers, whose daughters have experienced hair discrimination, say their daughters experienced discrimination as early as five (5) years old.

e. 47% of Black mothers report having experienced discrimination related to their hair.

f. Trauma from these experiences cause girls to miss days from school; teenage Black girls are missing a week of school per year due to hair dissatisfaction.

g. While 90% of Black girls believe their hair is beautiful, the microaggressions and discrimination she endures has an impact on how she sees herself.

h. Black women are 1.5 times more likely to be sent home from the workplace because of their hair.

i. Black women are 89% more likely than white women to agree with this statement, "I have to change my hair from its natural state to fit in at the office."

131.    The CROWN Act of 2021 is a legislative bill introduced in both houses of Congress to address discrimination against protective hair styles worn predominantly by women of color. While the bill has not yet passed fully on a federal level, eighteen states have signed a version of the bill into state law. Unless, and until, the CROWN Act makes hair discrimination illegal in every state, children, teenagers, and women of color continue to face discriminatory practices related to their hair choices, with relaxing and straightening their hair being a defensive, yet dangerous and toxic option.

**D.    Endocrine Disrupting Chemicals**

132.    The endocrine system is indispensable for life and influences nearly every cell, organ, and process within the body.[40] The endocrine system regulates all biological processes in the body

---

[40] *Endocrine System: The Endocrine System Includes The Thyroid, Adrenals, and the Pituitary Gland*, Science Direct, https://www.sciencedirect.com/topics/psychology/endocrine-system

COMPLAINT FOR DAMAGES

from conception through adulthood, including the development of the brain and nervous system, the growth and function of the reproductive system, as well as the metabolism and blood sugar levels.[41]

133.    The endocrine system is a tightly regulated system made up of glands that produce and release precise amounts of hormones that bind to receptors located on specific target cells throughout the body.[42]

134.    Hormones, such as estrogen, testosterone, progesterone, and androgen, are chemical signals that control or regulate critical biological processes.[43]

135.    When a hormone binds to a target cell's receptor, the receptor carries out the hormone's instructions, the stimulus, and either switches on or switches off specific biological processes in cells, tissues, and organs.[44]

136.    The precise functioning of the endocrine system is vital to maintain hormonal homeostasis, the body's natural hormonal production and degradation. A slight variation in hormone levels can lead to significant adverse-health effects, including reproductive impairment and infertility, cancer, cognitive deficits, immune disorders, and metabolic syndrome.[45]

137.    Endocrine disrupting chemicals ("EDCs") are chemicals, or chemical mixtures, which interfere with the normal activity of the endocrine system.

138.    EDCs can act directly on hormone receptors as mimics or antagonists or on proteins that control hormone delivery.[46]

139.    EDCs disrupt the endocrine system and interfere with the body's hormonal homeostasis in various ways.

---

[41] *Endocrine Disruption*, United States Environmental Protection Agency, Mar. 7, 2022, https://www.epa.gov/endocrine-disruption/what-endocrine-system
[42] *Id.*
[43] Id.
[44] Id.
[45] *Id.*; Michele La Merrill, et al., *Consensus on the Key Characteristics of Endocrine-Disrupting Chemicals as a Basis for Hazard Identification*, Nature Reviews Endocrinol, Nov. 12, 2019, https://www.nature.com/articles/s41574-019-0273-8
[46] Evanthia Diamanti-Kandarakis, et al., *Endocrine-Disrupting Chemicals: An Endocrine Society Scientific Statement*, Endocrine Reviews, June 30, 2009, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2726844/

140.    EDCs can cause the body to operate as if there were a proliferation of a hormone and thus over-respond to the stimulus or respond when it was not supposed to by mimicking a natural hormone.

141.    EDCs can increase or decrease the levels of the body's hormones by affecting the production, degradation, and storage of hormones.

142.    EDCs can block the hormone's stimulus by inducing epigenetic changes, modifications to DNA that regulate whether genes are turned on or off, or altering the structure of target cells' receptors.[47]

143.    EDCs are known to cause numerous adverse human health outcomes including endometriosis, impaired sperm quality, abnormalities in reproductive organs, various cancers, altered nervous system and immune function, respiratory problems, metabolic issues, diabetes, obesity, cardiovascular problems, growth, neurological, and learning disabilities.[48]

144.    EDCs that mimic the effects of estrogen in the body may contribute to disease risk because exposure to estrogen, endogenously and exogenously, is associated with a wide variety of reproductive diseases, including reproductive cancers, fibroids and endometriosis, and a woman's lifetime risk of developing these disease increases with greater duration and cumulative exposure.

145.    Natural and synthetic EDCs are present in hair products under the guise of "fragrance" and "perfumes", and thus enter the body when these products are exogenously applied to the hair and scalp. Studies exploring this issue have thus far classified EDCs as estrogens, phthalates, and parabens.

146.    Indeed, numerous studies spanning more than two decades have demonstrated the adverse impact EDCs including Di-2-ethylhexylphthalate have on the male and female reproductive

---

[47] Luis Daniel Martínez-Razo, et al., *The impact of Di-(2-ethylhexyl) Phthalate and Mono(2-ethylhexyl) Phthalate in placental development, function, and pathophysiology*, Environment International, January 2021, https://www.sciencedirect.com/science/article/pii/S0160412020321838?via%3Dihub
[48] *Endocrine Disrupting Chemicals (EDCs)*, Endocrine Society, Jan. 24, 2022, https://www.endocrine.org/patient-engagement/endocrine-library/edcs#:~:text=EDCs%20can%20disrupt%20many%20different,%2C%20certain%20cancers%2C%20respiratory%20problems%2C

COMPLAINT FOR DAMAGES

1    systems such as inducing endometriosis, abnormal reproductive tract formation, decreased sperm

2    counts and viability, pregnancy loss, and abnormal puberty onset.[49]

3        147.    Hair products used by Black women and children have been found to contain multiple

4    chemicals associated with endocrine disruption. In a 2018 study testing hair products, including hair

5    relaxers, relaxers marketed to children were found to contain the highest levels of four EDCs

6    prohibited in the European Union (DEHP, nonylphenol, BPA and diethanolamine) and  California

7    Prop 65 law (o-phenlyphenol), with one relaxer kit (Just For Me) containing all five of these EDCs.[50]

8        **i.    Phthalates**

9        148.    Phthalates are known EDCs which interfere with natural hormone production and

10   degradation and are detrimental to human health.[51]

11       149.    Phthalates are used in a variety of cosmetics and personal care products. Phthalates are

12   chemical compounds developed in the last century that are used to make plastics more durable. These

13   colorless, odorless, oily liquids are also referred to as "plasticizers" based on their most common uses.

14       150.    Phthalates also function as solvents and stabilizers in perfumes and other fragrance

15   preparations. Cosmetics that may contain phthalates include nail polishes, hair sprays, aftershave

16   lotions, cleansers, and shampoos.

17       151.    Phthalates are chemicals used to improve the stability and retention of fragrances and

18   to help topical products stick to and penetrate skin and hair.[52]

19

20

21

22

---

23   [49] Hee-Su Kim, et al., *Hershberger Assays for Di-2-ethylhexyl Phthalate and Its Substitute*
24   *Candidates*, Dev Reproduction, Mar. 22, 2018,
     https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5915764/.
25   [50] Helm Jessica S. et al., *Measurement of endocrine disrupting and asthma-associated chemicals in*
     *hair products used by Black women*, Environmental Research, Vol. 165:448-58 (2018),
26   https://doi.org/10.1016/j.envres.2018.03.030.
     [51] Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health*, Healthcare (Basel)
27   9, 603, May 9, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/
     [52] Olivia Koski & Sheila Hu, Fighting Phthalates, National Resources Defense Council, April 20,
28   2022, https://www.nrdc.org/stories/fighting-phthalates

152.    Phthalates are commonly used by cosmetics and hair care product manufacturers to make fragrances and colors last longer, and to make hair more flexible after a product is applied, among other uses.

153.    Phthalates can be found in most products that have contact with plastics during production, packaging, or delivery. Despite the short half-lives in tissues, chronic exposure to phthalates will adversely influence the endocrine system and functioning of multiple organs, which has negative long-term impacts on the success of pregnancy, child growth and development, and reproductive systems in both young children and adolescents. Several countries have established restrictions and regulations on some types of phthalates.[53]

154.    Phthalates are a series of chemical substances, which are mainly used as plasticizers added to polyvinyl chloride ("PVC") plastics for softening effects. Phthalates can potentially disrupt the endocrine system.[54]

155.    Under the authority of the Fair Packaging and Labeling Act ("FPLA"), the FDA requires an ingredient declaration on cosmetic products sold at the retail level to consumers.

156.    However, the regulations do not require the listing of the individual fragrance or flavor, or their specific ingredients, meaning phthalates evade listing when combined with a fragrance. As a result, consumers, including Plaintiff, are not able to determine from the ingredient declaration on the label if phthalates were present in a fragrance used in the herein referenced hair products used by the Plaintiff and placed into the stream of commerce by Defendants.

157.    Since 1999, the Centers for Disease Control ("CDC") found phthalates in individuals studied for chemical exposure.[55] Neither IARC nor NTP has evaluated DEHP with respect to human carcinogenicity.

158.    At all relevant times herein, Defendants' products contain phthalates, including Di-2-

---

[53] *Id.*
[54] *Id.*
[55] *Biomarker Groups*, National Report on Human Exposure to Environmental Chemicals, Center for Disease Control, https://www.cdc.gov/exposurereport/pdf/Biomarker_Groups_Infographic-508.pdf

ethylhexylphthalate.

### ii.    Di-2-ethylhexylphthalate

159.    Di-2-ethylhexylphthalate[56] ("DEHP") is a highly toxic manufactured chemical[57] that is not found naturally in the environment.[58]

160.    DEHP belongs to the family of chemicals called phthalates.[59]

161.    DEHP was first used in 1949 in United States and has been the most abundantly used phthalate derivative in the twentieth century.[60]

162.    DEHP does not covalently bind to its parent material. Non-covalent bonds are weak and, as a result, DEHP readily leaches into the environment increasing human exposure.[61]

163.    Humans are exposed to DEHP through ingestion, inhalation, dermal exposure for their lifetimes, including intrauterine life.[62]

164.    The Agency for Toxic Substances and Disease Registry ("ATSDR") estimates that the range of daily human exposure to DEHP is 3–30 µg/kg/day.[63]

---

[56] Also known as Bis(2-ethylhexyl) phthalate.
[57] Sai Rowdhwal & Jiaxiang Chen, *Toxic Effects of Di-2-ethylhexyl Phthalate: An Overview*, Biomed Research International, Feb. 22, 2018, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5842715/#:~:text=DEHP%20is%20noncovalently%20bound%20to,and%20plastic%20waste%20disposal%20sites.
[58] *Toxicological Profile for Di(2-Ethylhexyl) Phthalate (DEHP)*, U.S. Dept of Health and Human Services, January 2022, https://www.atsdr.cdc.gov/ToxProfiles/tp9.pdf (DEHP is listed as hazardous pollutants under the Clean Air Act.; DEHP is on the Proposition 65 list because it can cause cancer and birth defects or other reproductive harm).
[59] *Di(2-ethylhexyl) phthalate (DEHP)*, Proposition 65, California. Gov, https://www.p65warnings.ca.gov/fact-sheets/di2-ethylhexylphthalate-dehp
[60] Pinar Erkekoglu & Belma Kocer-Gumusel, *Environmental Effects of Endocrine-Disrupting Chemicals: A Special Focus on Phthalates and Bisphenol A*, Environmental Health Risk, June 16, 2016, https://www.intechopen.com/chapters/50234
[61] Katelyn H. Wong & Timur Durrani, *Exposures to Endocrine Disrupting Chemicals in Consumer Products – A Guide for Pediatricians*, Current Problems in Pediatric and Adolescent Health Care, Science Direct, May 2017, https://www.sciencedirect.com/science/article/pii/S1538544217300822?via%3Dihub
[62] Schmidt, Juliane-Susanne, et al., *Effects of Di(2-ethylhexyl) Phthalate (DEHP) on Female Fertility and Adipogenesis in C3H/N Mice*, Environmental Health Perspective, May 15, 2012, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3440070/
[63] Hannon, Patrick et. al., *Daily Exposure to Di(2-ethylhexyl) Phthalate Alters Estrous Cyclicity and Accelerates Primordial Follicle Recruitment Potentially Via Dysregulation of the*

30

165. The no-observed-adverse-effect level for DEHP to humans is 4.8 mg/kg bodyweight/day and the tolerate daily intake (TDI) is 48 µg/kg bodyweight.[64]

| Endpoint | Cancer (NSRL) | | Developmental and Reproductive Toxicity (MADL) | |
| --- | --- | --- | --- | --- |
| Route of Exposure | Oral | Inhalation | Oral | Inhalation |
| DEHP | 310 µg/day | N.C. | 410 µg/day | N.C. |

Source: OEHHA's safe harbor levels for TDCIPP, DBP, DEHP, benzene, and formaldehyde.

N.C. = not calculated by OEHHA as of August 2020.[65]

166. When DEHP enters the human body, it breaks down into specific metabolites. The toxicity of DEHP is mainly attributed to its unique metabolites which include the primary metabolite, mono-(2-ethylhexyl)phthalate (MEHP), and secondary metabolites, mono-(2-ethyl-5-hydroxyhexyl)phthalate (MEHHP), and mono-(2-ethyl-5-oxohexyl)phthlate (MEOHP).[66]

167. DEHP and its metabolites are known to cause significant adverse-health effects including but not limited to endometriosis, developmental abnormalities, reproductive dysfunction and

---

*Phosphatidylinositol 3-Kinase Signaling Pathway in Adult Mice*, Biology of Reproduction Volume 90, Issue 6, June 2014, 136, 1–11 https://academic.oup.com/biolreprod/article/90/6/136,%201-11/2514356

[64] Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health*, Healthcare (Basel) 9(5):603, May 18, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/

[65] Aalekhya Reddam & David Volz, *Inhalation of two Prop 65-listed Chemicals Within Vehicles May Be Associated with Increased Cancer Risk*, Environment International Volume 149, April 2021, https://www.sciencedirect.com/science/article/pii/S016041202100026X

[66] Saab, Yolande, et. al., *Risk Assessment of Phthalates and Their Metabolites in Hospitalized Patients: A Focus on Di- and Mono-(2-ethylhexyl) Phthalates Exposure from Intravenous Plastic Bags*. Toxics, 10(7), 357, https://pubmed.ncbi.nlm.nih.gov/35878262/; Ishtaf Sheikh, et. at., *Endocrine disruption: In silico perspectives of interactions of di-(2-ethylhexyl)phthalate and its five major metabolites with progesterone receptor*. BMC Structural Biology Volume 16, Suppl 1, 16, Sept., 30, 2016, https://bmcstructbiol.biomedcentral.com/articles/10.1186/s12900-016-0066-4 (Other secondary metabolites include mono(2-ethyl-5-carboxypentyl)phthalate (5-cx-MEPP) and mono[2-(carboxymethyl)hexyl]phthalate (2-cx-MMHP)).

1   infertility,[67] various cancers, and metabolic syndrome within the human population and their future
2   children.[68]

3      168.    Most of the available studies on the health effects of DEHP in laboratory animals used
4   oral administration, with a few inhalation studies and only two dermal exposure studies identified.[69]

5      169.    The results of the selected animal studies, along with limited human data, suggest
6   potential associations between DEHP exposure and the following health outcomes:

7         a.   **Reproductive effects.** Epidemiological studies suggest a potential association between
8            DEHP exposure and decreased serum testosterone and altered sperm parameters in males.
9            Available studies on fertility effects in humans do not indicate an association between DEHP
10           exposure and infertility. In animals, the available oral and inhalation studies provide evidence
11           that the male reproductive system, particularly the testes, is susceptible to DEHP toxicity.
12           Evidence from animal studies indicates decreased male and female fertility at high oral doses.

13        b.   **Developmental effects.** Epidemiological studies suggest a potential association
14           between reduced AGD and testicular decent in male infants and prenatal DEHP exposure. In
15           addition, human epidemiological studies provide mixed results for potential relationships
16           between exposure to DEHP and preterm birth, early puberty, and delayed mental and
17           psychomotor development in children. Studies in animals indicate that altered glucose
18           homeostasis and the development of the reproductive system following early life exposure is
19           a particularly sensitive target of DEHP toxicity.

20     170.    The global consumption of DEHP was estimated at 3.07 million tons (Global demand
21   for plasticizers continues to rise). The estimated global market of phthalates in 2020 is expected to
22   reach 10 billion USD and would still be widely used in plasticizers.[70]

23

---

24   [67] Richardson, Kadeem et. al., *Di(2-ethylhexyl) Phthalate (DEHP) Alters Proliferation and Uterine*
25   *Gland Numbers in the Uterine of Adult Exposed Mice,* Reproductive Toxicology, 77, 70-79,
     https://pubmed.ncbi.nlm.nih.gov/29458081/
26   [68] Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health*, Healthcare (Basel)
     9, 603, May 9, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/
27   [69] *Chapter 2: Health Effects*, Toxicological profile for Di(2-ethylhexyl) phthalate (DEHP) (2001),
     https://www.atsdr.cdc.gov/ToxProfiles/tp9-c2.pdf
28   [70] *Id.*

COMPLAINT FOR DAMAGES

171.    Human epidemiological studies have shown a significant association between phthalates exposures and adverse reproductive outcomes in both women and men.[71]

172.    Evidence found that DEHP was significantly related to insulin resistance and higher systolic blood pressure and the reproduction system problems, including earlier menopause, low birth weight, pregnancy loss, and preterm birth.[72]

173.    When it comes to the impacts on children, epidemiological studies about phthalates toxicity focused on pregnancy outcomes, genital development, semen quality, precocious puberty, thyroid function, respiratory symptoms, and neurodevelopment.[73]

174.    Since the turn of the century, restrictions on phthalates have been proposed in many Asian and western countries. In 2008, the U.S. Congress announced the Consumer Protection Safety Act (CPSA), which permanently banned the products, especially children's toys and childcare articles, containing DEHP, DBP, and BBP at levels >0.1% by weight.[74]

**E.      Regulatory Framework**

175.    The law does not require cosmetic products and ingredients, other than color additives, to have FDA approval before they go to market. But there are laws and regulations that apply to cosmetics placed on the market. The two most important laws pertaining to cosmetics marketed in the United States is the Federal Food Drug and Cosmetic Ace ("FD&C Act") and the Fair Packaging and Labeling Act ("FPLA").

176.    The FD&C Act expressly prohibits the marketing of "adulterated" or "misbranded" cosmetics in interstate commerce.

177.    Adulteration refers to a violation involving product composition whether it results from ingredients, contaminants, processing, packaging shipping or handling.

---

[71] *Id.*

[72] N.M. Grindler, et al., *Exposure to Phthalate, an Endocrine Disrupting Chemical, Alters the First Trimester Placental Methylome and Transcriptome in Women*, Scientific Reports Volume 8, April 17, 2018, https://doi.org/10.1038/s41598-018-24505-w

[73] *Id.*

[74] Consumer Product Safety Improvement Act of 2008, H.R. 4040, 110th Cong. (2008), https://www.congress.gov/110/plaws/publ314/PLAW-110publ314.pdf

1    178.    Under the FD&C Act a cosmetic is adulterated if: (1) it bears or contains any poisonous

2    or deleterious substance causing injury to the product user and (2) if its container is composed in whole

3    or in part, of any poisonous or deleterious substance which may render the contents injurious to health.

4    179.    Misbranding refers to violations involving improperly labeled or deceptively packaged

5    products.

6    180.    Under the FD&C Act, a cosmetic is misbranded if (1) labeling is false or misleading,

7    (2) the label does not include all required information, (3) required information is not prominent and

8    conspicuous, (4) the packaging and labeling is in violation of an applicable regulation issued pursuant

9    to section 3 and 4 of the Poison Prevention Packaging Act of 1970.[75]

10    181.    Under U.S. law, cosmetic manufacturers are not required to submit their safety data to

11    the FDA. However, it is against the law to put an ingredient in a cosmetic that makes the cosmetic

12    harmful when used as intended.[76] An example is methylene chloride because it causes cancer in

13    animals and is likely to be harmful to human health as well.[77]

14    182.    On May 19, 2022, the FDA issued a rule to amend its food additive regulations to no

15    longer provide for most previously authorized phthalates to be used as food additives because these

16    uses have been abandoned by industry.[78] The FDA revoked authorizations for the food contact use of

17    23 phthalates and two other substances used as plasticizers, adhesives, defoaming agents, lubricants,

18    resins, and slimicides.[79]

19    183.    Companies and/or individuals who manufacture or market cosmetics have a legal

20    responsibility and duty to ensure the safety of their own products. Neither the law nor FDA regulations

21

22

23

---

24    [75] Food and Drug Administration Cosmetic Act § 602 (1938).

[76] *Prohibited & Restricted Ingredients in Cosmetics*, U.S. Food and Drug Administration,

25    https://www.fda.gov/cosmetics/cosmetics-laws-regulations/prohibited-restricted-ingredients-cosmetics

26    [77] 21 Code of Federal Regulations § 700.19.

[78] § 87 FR 31080

27    [79] *Phthalates in Food Packages and Food Contact Applications,* U.S. Food and Drug

28    Administration, https://www.fda.gov/food/food-ingredients-packaging/phthalates-food-packaging-and-food-contact-applications

1    require specific tests to demonstrate the safety of individual products or ingredients, and the law also

2    does not require cosmetic companies to share their safety information with the FDA.

3        184.    The FDA has consistently advised manufacturers to use whatever testing is necessary

4    to ensure the safety of products and ingredients, which may be substantiated through (a) reliance on

5    already available toxicological test data on individual ingredients and on product formulations that are

6    similar in composition to the particular cosmetic and (b) performance of any additional toxicological

7    and other tests that are appropriate in light of such existing data and information.[80]

8        185.    Except for color additives and ingredients prohibited or restricted by regulation, a

9    manufacturer may use any ingredient in the formulation of a cosmetic, provided that (1) the ingredient

10   and the finished cosmetic are safe under labeled or customary conditions of use, (2) the product is

11   properly labeled, and (3) the use of the ingredient does not otherwise cause the cosmetic to be

12   adulterated or misbranded under the laws the FDA enforces.[81]

13       186.    With respect to whether the product is properly labeled, Title 21 of the Code of Federal

14   Regulations defines the establishment of warning statements related to cosmetic products. Section

15   740.1 states that "[t]he label of a cosmetic product **_shall_** bear a warning statement whenever necessary

16   or appropriate to prevent a health hazard that **_may_** be associated with the product." (Emphasis added).

17   This warning directive directly correlates with the broad authority of manufacturers over their own

18   cosmetic products to ensure that products are safe under labeled or customary conditions of use,

19   properly labeled, and not adulterated or misbranded under FDA laws.

20       187.    In short, under the current regulatory framework in the United States, it is incumbent

21   upon the manufacturers of cosmetic products, and them alone, to assess the safety and efficacy of their

22   products, and to warn consumers anytime a health hazard may be associated with their products. Here,

23   a wealth of scientific information is available regarding long-term use of hair relaxers, straighteners

24   and hair dyes as containing certain endocrine-disrupting chemicals, which should have alerted

25

26   _____

27   [80] *FDA Authority Over Cosmetics: How Cosmetics Are Not FDA-Approved, but Are FDA-Regulated,*
     U.S. Food and Drug Administration, Mar., 3, 2005,  https://www.fda.gov/cosmetics/cosmetics-laws-
     regulations/fda-authority-over-cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated
28   [81] *Id.*

COMPLAINT FOR DAMAGES

manufacturers of these products to the specific and dangerous harms associated with their products when used as intended, particularly in women of color.

188.    It is generally accepted that EDCs, like those contained in Defendants' hair relaxer products, act like "hormone mimics" and trick the body into thinking they are hormones.

189.    Products containing hormones that are topically applied, are regulated by the FDA under 21 C.F.R. section 310.530, which states that "any OTC drug product containing an ingredient offered for use as a topically applied hormone cannot be considered generally recognized as safe and effective for its intended use." *See* 21 C.F.A 310.530(a).

190.    At all relevant times, Defendants' products referenced herein, contained endocrine disrupting chemicals and hormonal agents, and are therefore subject to regulation by the FDA under 21 C.F.R. section 310.530.

191.    The Federal Food, Drug and Cosmetic Act also expressly prohibits the marketing of "adulterated" or "misbranded" cosmetics in interstate commerce.

192.    Adulteration refers to a violation involving product composition whether it results from ingredients, contaminants, processing, packaging shipping or handling.

193.    Under the FD&C Act a cosmetic is adulterated if: (1) it bears or contains any poisonous or deleterious substance causing injury to the product user and (2) if its container is composed in whole or in part, of any poisonous or deleterious substance which may render the contents injurious to health.

194.    Misbranding refers to violations involving improperly labeled or deceptively packaged products.

195.    Under the FD&C Act, a cosmetic is misbranded if (1) labeling is false or misleading, ( 2) the label does not include all required information, (3) required information is not prominent and conspicuous, (4) the packaging and labeling is in violation of an applicable regulation issued pursuant to section 3 and 4 of the Poison Prevention Packaging Act of 1970.[82]

196.    In addition, the federal regulations require that every ingredient in a cosmetic product and finished cosmetic product be adequately substantiated for safety prior to marketing, and state that

---

[82] Food and Drug Administration Cosmetic Act § 602 (1938).

1    any ingredient or product for which the safety has not been adequately substantiated prior to marketing

2    is misbranded unless it displays a warning statement declaring, "Warning – The safety or this product

3    has not been determined." 21 C.F.R. § 740.10.

4    **F.      California Prohibits Misbranded or Adulterated Cosmetics**

5         197.    The California Sherman Food, Drug, and Cosmetic Law prohibits the sale of

6    "misbranded" cosmetics. A cosmetic is deemed misbranded if, among other things, its labeling is false

7    or misleading if any word, statement or other information required to appear on the label or labeling

8    is not prominently placed upon the label or labeling with conspicuousness, as compared with other

9    words, statements, designs, or devices, in the labeling, and in terms as to render it likely to be read and

10   understood by the ordinary individual under customary conditions of purchase and use; and, if it is

11   subjected to the federal FDA regulations but is not in compliance therewith. Cal. Health & Saf. Code

12   §§ 111730, 111790.

13        198.    California also prohibits the sale of "adulterated" cosmetics mirroring the Federal

14   Food, Drug, and Cosmetics Act. A cosmetic is deemed adulterated if, among other things it bears or

15   contains any poisonous or deleterious substance that may render it injurious to users under the

16   conditions of use prescribed in the labeling or advertisement of the cosmetic, or under conditions of

17   use as are customary or unusual; and, if it is not in compliance with federal regulations. Cal. Health &

18   Saf. Code §§ 111670 - 111725.

19        199.    Effective January 1, 2006, the California Safe Cosmetics Act of 2005 (CSCA) became

20   law.

21        200.    The CSCA requires cosmetics manufacturers to disclose to the California Department

22   of Public Health (CDPH) all products sold in California containing ingredients listed in the Cal. Health

23   & Saf. Code § 111791.5.

24        201.    The California Legislature found and declared all of the following:

25             a.   Independent testing in the United States and the European union has determined

26                  that some cosmetic products contain substances known or suspected to cause cancer

27                  and reproductive toxicity that can harm the mother, fetus, and nursing children.

28             b.   Neither the federal Food and Drug Administration (FDA) nor the State Department

of Health Services (DHS) require premarket safety testing, review, or approval of cosmetic products. According to the FDA, the regulatory requirements governing the sale of cosmetics are not as stringent as those that apply to other FDA regulated products.

c.   Under the federal Food, Drug and Cosmetic Act (21 U.S.C. Sec. 301), cosmetics and their ingredients are not required to be approved before they are sold to the public and the FDA does not have the authority to require manufacturers to file health and safety data on cosmetic ingredients or to order a recall of a dangerous cosmetic product.

d.   Under the state Sherman Food, Drug, and Cosmetic Act, DHS has no authority to identify, review, or regulate ingredients in cosmetic products that may cause chronic health effects, such as cancer and reproductive toxicity.

e.   Federal law exempts chemicals used as fragrances or flavoring from being identified as ingredients on the labels of cosmetic products. Laboratory analyses of cosmetic products sold in California have found products that contain substances known to or likely to cause cancer or reproductive toxicity and not identified as an ingredient on the product's label. The law also does not require any ingredient labeling on cosmetic products sold for commercial use, thereby denying any information on ingredients to beauty care workers.

f.   Alternatives to substances that cause cancer or reproductive toxicity are readily available for use in cosmetic products. A number of manufacturers, including both small domestic producers and large multinational corporations, have eliminated substances that cause cancer or reproductive toxicity from their products.

g.   Given the presence of substances in cosmetic products that cause cancer or reproductive toxicity, the heavy use of these products by women of childbearing age, the significant exposure to these products in occupational settings such as beauty salons, the adverse impacts of these substances on human health, the inadequate information about the presence of these substances in products or the

38

extent of their impacts, and the availability of alternatives to the use of these substances, it is in the interest of the people of the State of California to take steps to ensure that cosmetic products sold and used in the state can be used safely.[83]

202.  Section 11792(a) of the CSCA places an affirmative duty on cosmetics manufacturers to inform state officials when they sell products in California that contain carcinogens or reproductive toxins:

> Commencing January 1, 2007, the manufacturer or any cosmetic product subject to regulation by the federal Food and drug Administration that is sold in this state shall, on a schedule and in electronic or other format, as determined by the division, provide the division with a complete and accurate list of its cosmetic products that, as of the date of submission, are sold in the state and that contain any ingredient that is a chemical identifies as causing cancer or reproductive toxicity.

203.  Section 11793.5 of the Act provides:

a.  The Legislature finds and declares the following:

(1) The Cosmetic Ingredient Review (CIR) panel is a nongovernmental body established and funded by the cosmetics industry to review the safety of cosmetic ingredients.

(2) According to a 2004 analysis of the 2003 CIR Compendium by the Environmental Working Group, 54 cosmetic products violate the CIR's own safe use recommendations to manufacturers by containing an ingredient that the CIR has found is not safe for the specific use indicated on the product's label.

(3) Federal regulations (21 C.F.R. 740.10) require every ingredient in a cosmetic product and every finished cosmetic product to be adequately substantiated for safety prior to marketing, and state that any ingredient or product whose safety has not been adequately substantiated prior to

---

[83] Cal. Health & Saf. Code § 111791 (2007).

marketing is misbranded unless it displays a warning statement declaring, "The safety of this product has not been determined."

b. The division may, as early as feasible within existing resources, determine whether the products identified in paragraph (2) of subdivision (a) have been adequately substantiated for safety pursuant to § 740.10 of Title 21 of the Code of Federal Regulations. For any product adequately substantiated for safety, the division shall determine if the product contains any ingredient that the CIR has found is not safe for the specific use indicated on the product's label.

c. If the division finds that a product has not been adequately substantiated for safety despite containing an ingredient that the CIR has found is not safe for the specific use indicated on the product's label, the division shall refer its findings to the Attorney General and the federal Food and Drug Administration for possible enforcement action pursuant to this part and the federal Food, Drug and Cosmetic Act (21 U.S.C. Sec. 301 *et seq.*).

204. The California Cosmetic Fragrance and Flavor Right to Know Act (CFFIRKA) became effective January 1, 2022.

205. CFFIRKA requires manufacturers that sell cosmetic products in California to report certain fragrance and flavor ingredients deemed hazardous to the Department of Public Health's (DPH) Safe Cosmetics Program.

206. The CFFIRKA requires companies selling retail cosmetic or professional salon products in California to report the presence of any fragrance or flavor ingredient that appears on one or more of the twenty-three (23) authoritative hazard lists referenced in the law to the California Safe Cosmetics Program.

207. The California Safe Cosmetics Program Database is updated twice annually and is available to the public.

208. The policy underlying CFFIRKA is that California residents are entitled to information on known potential "carcinogens, reproductive toxicants, asthmagens, neurotoxins, allergens and other chemicals of concern" in cosmetics products.

209.    Similar to federal law, the CFFIRKA defines a "cosmetic product" as "an article for retail sale or professional use intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to the human body for cleansing, beautifying, promoting attractiveness, or altering the appearance."[84]

210.    The CFFIRKA applies to both consumer and professional use products.

211.    In addition to requiring the disclosure of reportable ingredients, under the CFFIRKA, manufacturers must also disclose, 1) whether the product is intended for professional or retail use; 2) the Chemical Abstracts Service number for each ingredient and allergen; and 3) the corresponding Universal product Code for the product.

212.    Review of the California Safe Cosmetics Program's Reportable Ingredient list yielded at least twenty-five (25) ingredients found in hair relaxers[85] that are deemed "reportable" under the California Safe Cosmetics Program.

G.    **Uterine Fibroids are Associated with Exposure to Endocrine Disrupting Chemicals**

213.    Uterine fibroids are associated with phthalate metabolites found in chemical hair straightening and hair relaxer products.

214.    Black women have a higher prevalence of uterine fibroids and tumors than any other ethnicity/racial group.[86]

215.    A study looking at over 1 million U.S. women from 2003 to 2014 found that Black women had the highest rate of diagnosed uterine fibroids, with most diagnoses made between the age

---

[84] *Id.*

[85] The 45 ingredients detected in hair relaxers examined by the Helm study were compared to those listed as of May 20, 2024 on the Reportable Ingredients excel database. *See* Helm JS, Nishioka M, Brody JG, Rudel RA, Dodson RE. Measurement of endocrine disrupting and asthma-associated chemicals in hair products used by Black women. Environ Res. 2018 Aug;165:448-458. doi: 10.1016/j.envres.2018.03.030. Epub 2018 Apr 25. PMID: 29705122. *See also* https://cscpsubmit.cdph.ca.gov/submission/assets/files/Reportable_Ingredients_List.xlsx, last visited May 20, 2024.

[86] Food and Drug Administration Cosmetic Act § 602, *supra.*

41

1  of 30 – 54 years old.[87]

2      216.    Studies show that Black women are three to four times more likely to develop uterine

3  fibroids in their lifetime compared to non-Hispanic white women, and an estimated 70-80% of Black

4  women will develop fibroids over their lifetime.[88]

5      217.    It is estimated that the annual financial impact of uterine fibroids on Black women in

6  the United States is as high as 30 billion dollars, and this number may be an underestimation, as at

7  least one-quarter of women reported losing work due to their disease.[89]

8      218.    Black women are seven (7) times more likely to undergo a myomectomy compared to

9  non-Hispanic white women.[90]

10      219.    Uterine fibroids return at higher rates for Black women than white women following

11  surgical treatment, and recurrence can be as high as 59% within 5 years.[91]

12      220.    Given the magnitude of the problem – markedly altered quality of life, the effect on

13  reproductive health, and the costs of health care for this disease – the high prevalence of uterine

14  fibroids in Black women is considered a major public health issue.[92]

15      221.    A 2012 study in the American Journal of Epidemiology associated fibroid risk with the

16  use of hair relaxers.[93] Shirley McDonald of the Hair and Scalp Clinic says, "We now know that many

17

18

---

19  [87] Yu O, Scholes D, Schulze-Rath R, Grafton J, Hansen K, Reed SD. A US population-based study
20  of uterine fibroid diagnosis incidence, trends, and prevalence: 2005 through 2014. American Journal
    of Obstetrics and Gynecology. 2018;219(6):591.e1-591.e8.
21  [88] Al-Hendy A, Salama SA. Ethnic distribution of estrogen receptor-α polymorphism is associated
    with a higher prevalence of uterine leiomyomas in black Americans. Fertil Steril. 2006;86(3):686-
    693. Doi:10.1016/j.fertnstert.2006.01.052
22  [89] Igboeli P, Walker W, McHugh A, Sultan, A, et al. Burden of uterine fibroids: an african
    perspective, a call for action and opportunity for intervention. COGO. 287-294.
23  [90] Eltoukhi HM, Modi MN, Weston M, Armstrong AY, Stewart EA. The health disparities of uterine
    fibroid tumors for African American women: a public health issue. Am J Obstet Gynecol.
24  2014;210(3):194-199. doi:10.1016/j.ajog.2013.08.008
    [91] Donnez J, Dolmans M. Uterine fibroid management: from the present to the future. Hum Reprod
25  Update. 22(6):665–686.
    [92] Eltoukhi HM, Modi MN, Weston M, Armstrong AY, Stewart EA. The health disparities of
26  uterine fibroid tumors for African American women: a public health issue. Am J Obstet Gynecol.
    2014;210(3):194-199. doi:10.1016/j.ajog.2013.08.008
27  [93] Wise LA, Palmer JR, Reich D, Cozier YC, Rosenberg L. Hair relaxer use and risk of uterine
    leiomyomata in African-American women. Am J Epidemiol. 2012 Mar 1;175(5):432-40. doi:
28  10.1093/aje/kwr351. Epub 2012 Jan 10. PMID: 22234483; PMCID: PMC3282879.

hair products contain chemicals that are considered carcinogenic and/or hormone disrupters, leading to increased risk of medical issues such as fibroids (non-cancerous tumors that grow in the uterus, potentially damaging fertility and leading to a host of other complications). Trichologists see lots of conditions that are likely to be triggered by hair products, particularly central centrifugal cicatricial alopecia, a type of permanent hair loss to the crown area of the scalp."

222.    More recently, the National Institutes of Health spent eight-years studying over 46,000 women of all races between the ages of 35–74. They were looking for links between chemical hair relaxers and breast cancer. They discovered Black women's breast cancer risk increased risk by 45%.[94] Breast cancer and other reproductive issues, including fibroid development, are often connected. This study suggests there are even more reasons to steer clear of chemical hair straighteners and relaxers.

223.    Concerns around racial disparities in healthcare linked to chemicals found in cosmetic products are not new; previous studies, as far back as 2012, have also suggested a correlation between chemical relaxer use and uterine fibroids, a condition that disproportionately affects Black women.[95]

224.    Hair relaxers are used by millions of black women, possibly exposing them to various chemicals through scalp lesions and burns. In the Black Women's Health Study, the authors assessed hair relaxer use in relation to uterine leiomyomata incidence. In 1997, participants reported on hair relaxer use (age at first use, frequency, duration, number of burns, and type of formulation). From 1997 to 2009, 23,580 premenopausal women were followed for incident uterine leiomyomata. The incidence of uterine leiomyomata is 2–3 times higher in US black women than in US white women.

225.    The Houston Fibroids Clinic in Houston, Texas also highlights the association between hair relaxers and uterine fibroids, stating that black women develop fibroids up to three times as often

---

[94] Che-Jung Chang, Katie M. O'Brien, Alexander P. Keil, Symielle A. Gaston, Chandra L. Jackson, Dale P. Sandler, Alexandra J. White. Use of Straighteners and Other Hair Products and Incident Uterine Cancer. Journal of the National Cancer Institute DOI: https://doi.org/10.1093/jnci/djac165 (2022)

[95] Nadine White, *Campaign urges beauty firms to pull 'toxic' hair products aimed at Black women*, Independent (August 3, 2021), https://www.independent.co.uk/news/uk/home-news/black-hair-lye-no-more-lyes b1893747.html.

1    as women of other races, their fibroids develop earlier in age than other races (oftentimes in their

2    twenties), and are more likely to suffer from anemia due to fibroids. They also have a higher risk for

3    fibroid symptoms, including but not limited to, painful intercourse, severe pelvic pain, and heavy

4    periods.[96]

**FIRST CAUSE OF ACTION**

**STRICT LIABILITY – FAILURE TO WARN**

**(Against All Defendants)**

8    226.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation

9    set forth in the preceding paragraphs.

10    227.    At all pertinent times, the Defendants were manufacturing, marketing, testing,

11    promoting, selling and/or distributing the Products in the regular course of business.

12    228.    The Products had potential risks and side effects that were known or knowable to

13    defendants by the use of scientific knowledge available before, at, and after the time of manufacture,

14    distribution, and sale of the Products. Defendants knew or should have known of the defective

15    condition, characteristics, and risks associated with said product, as previously set forth herein.

16    229.    Defendants' Products were expected to and did reach consumers, including Plaintiff,

17    without substantial change in the condition in which their Products were manufactured, sold, or

18    otherwise released into the stream of commerce by Defendant.

19    230.    The Products that were manufactured, distributed, and/or sold by the defendants to

20    Plaintiff were in a defective condition that was unreasonably and substantially dangerous to any user

21    or ordinary consumer of the Products, such as Plaintiff. Such ordinary consumers, including Plaintiff,

22    would not and could not have recognized or discovered the potential risks and side effects of the

23    Products as set forth herein.

24    231.    At all pertinent times, Plaintiff used the Products on her hair and at the roots of her hair

25    which is a reasonably foreseeable use.

26    232.    At all pertinent times, Defendants knew or should have known that the use phthalates

27

28    [96]    Black Hair Relaxers and Fibroid Risk | Houston Fibroids

44

COMPLAINT FOR DAMAGES

1  and other EDCs in hair products significantly increases the risk of diseases including but not limited

2  to cancer, fibroids and/or endometriosis, based upon scientific knowledge dating back for decades.

3        233.    At all pertinent times, including the time of sale and consumption, the Products,

4  Defendants were then and there guilty of one or more of the following acts:

     a.    Manufactured, marketed, tested, promoted, sold, and/or distributed unreasonable dangerous and defective products;

     b.    Improperly warned of increased risk of diseases as required by C.F.R. § 740.1;

     c.    Inadequately warned of increased risk of diseases as required by C.F.R. § 740.1;

     d.    Inadequately labeled relaxer products as containing EDCs that act as hormonal agents as required by 21 C.F.R. § 310.530.

     e.    Improperly warned and instructed Plaintiff of inherent risks of debilitating and life-altering conditions.

      234.    Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and/or omissions:

     a.    Economic losses including medical care and lost earnings; and

     b.    Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

     c.    The sum of the damages Plaintiff has suffered is in excess of the minimum jurisdictional limits of this Court.

      235.    Defendants' lack of sufficient instructions or warnings prior to, on, and after the date of Plaintiff's initial use of the Products was a substantial factor in causing Plaintiff's injuries and damages, as described herein.

     WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory damages together with interest, the costs of suit and such other and further relief as this Court deems just and proper.

# SECOND CAUSE OF ACTION

## STRICT LIABILITY – DESIGN DEFECT

### (Against All Defendants)

236.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

237.    At all relevant times, Defendants engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in California and the United States.

238.    At all relevant times, Defendants engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff. Said defects included, but were not limited to, the fact that the Products contained phthalates and/or other endocrine receptive chemicals that substantially increased the risks of triggering tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of diseases including but not limited to cancer, fibroids, and/or endometriosis.

239.    Defendants caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

240.    The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which it was manufactured and sold by Defendant L'Oreal USA, Inc. and/or otherwise released into the stream of commerce.

241.    Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendants.

242.    Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing her risk of developing uterine fibroids.

243.    The propensity of phthalates and other endocrine receptive chemicals to trigger tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of diseases including but not limited to cancer, fibroids, and/or endometriosis, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

244.    Importantly, the Products are an inessential cosmetic product that do not treat or cure

1    any serious disease. Further, safer alternatives, including fragrance free products, have been readily

2    available for decades.

3        245.    Defendants knew, or by the exercise of reasonably care should have known, that the

4    Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute,

5    market, promote, and supply the Products to maximize sales and profits at the expense of public health

6    and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

7        246.    Defendants owed a duty to all reasonably foreseeable users to design a safe product.

8        247.    At all pertinent times, Defendants were then and there guilty of one or more of the

9    following acts and/or omissions:

10          a.  Designing, manufacturing, selling, distributing, marketing, promoting, and

11              supplying Products that they knew or should have known were unreasonable

12              dangerous;

13          b.  Failing to use reasonable care in the design and/or manufacturing of their Products;

14              or

15          c.  Failing to use reasonably feasible alternative designs in the design and/or

16              manufacturing of the Products.

17       248.    As a direct and proximate result thereof, it became necessary for plaintiff to incur

18   expenses for doctors, hospitals, surgeries, nurses, and other reasonably required and medically

19   necessary supplies and services. Plaintiff prays for leave to amend this Complaint to insert these

20   elements of damage when the same are finally determined.

21       249.    As a direct and proximate result of Defendants' conduct, including actions, omissions,

22   and misrepresentations, Plaintiff sustained the following damages:

23          a.  Economic losses including medical care and lost earnings; and

24          b.  Noneconomic losses including physical and mental pain and suffering, emotional

25              distress, inconvenience, loss of enjoyment and impairment of quality of life, past

26              and future.

27          c.  The sum of the damages Plaintiff has suffered is in excess of the minimum

28              jurisdictional limits of this Court.

250.    Defendants' design, manufacture, marketing, promotion, defense, and/or sale of the Products was a substantial factor in causing plaintiff's injuries, as described herein.

WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory damages together with interest, the costs of suit and such other and further relief as this Court deems just and proper.

### THIRD CAUSE OF ACTION

### BREACH OF EXPRESS WARRANTY

### (Against All Defendants)

251.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

252.    Defendants made statements of fact and promises to consumers, including Plaintiff, that the Products were:

    a.  Safe;

    b.  efficacious;

    c.  fit for use;

    d.  of merchantable quality;

    e.  adequately tested;

    f.  did not increase the risk of injury;

253.    Defendants breached the express warranties as follows:

    a.  Defendants misrepresented the safety of the Products in the Products' labeling, advertising, marketing materials, promotion, and/or publications;

    b.  Defendants misrepresented the risks associated with the Products;

    c.  Defendants withheld and/or concealed and/or downplayed the information and/or evidence that the products were associated with an increased risk of injuries;

    d.  Defendants misrepresented that the Products were safe, and/or safer than other similar products used;

    e.  Defendants fraudulently concealed information about the safety of the Products including information that the product was not safer than alternative products

48

1    available on the market; and

2        f.  Defendants misrepresented information regarding the safety and/or efficacy of the

3        Products.

4    254.    The Products did not conform to Defendants' express representations and warranties

5    or meet the quality of Defendants' descriptions of safety and efficacy.

6    255.    At all relevant times, including during the period that Plaintiff used the Products, they

7    did not perform as safely as an ordinary consumer would expect when used as intended or in a

8    reasonably foreseeable manner.

9    256.    At all relevant times, including during the period that Plaintiff used the Products, they

10    did not perform in accordance with the Defendants' representations.

11    257.    In deciding to purchase and use the Products, Plaintiff and other consumers relied upon

12    Defendants' express warranties.

13    258.    As a direct and proximate result of Defendants' conduct, including actions, omissions,

14    and misrepresentations described herein, Plaintiff sustained the following damages:

15        a.  Economic losses including medical care and lost earnings; and

16        b.  Noneconomic losses including physical and mental pain and suffering, emotional

17        distress, inconvenience, loss of enjoyment and impairment of quality of life, past

18        and future.

19        c.  The sum of the damages Plaintiff has suffered is in excess of the minimum

20        jurisdictional limits of this Court.

21    259.    The failure of the Products to perform as represented was a substantial factor in causing

22    Plaintiff's injuries and damages, as described herein.

23    WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory

24    damages together with interest, the costs of suit and such other and further relief as this Court deems

25    just and proper.

26

27

28

# FOURTH CAUSE OF ACTION

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### (Against All Defendants)

260.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

261.    Plaintiff purchased the Products from Defendants, and each of them.

262.    At all relevant and material times, including the time of Plaintiff's purchase, Defendants were in the business of manufacturing, designing, formulating, producing, marketing, promoting, selling and/or distributing the Products.

263.    Defendants by their occupation held themselves out as having special knowledge or skill regarding the Products.

264.    Defendants knew and intended that the Products be used when they were placed into the stream of commerce.

265.    Defendants knew and intended that the Products be used as they were by Plaintiff.

266.    Defendants impliedly warranted to Plaintiff that the Products were safe for use.

267.    Plaintiff reasonably and justifiably relied on Defendants' expertise, skill, judgment, and knowledge of the Defendants and upon the Defendants' express and/or implied warranty that the Products were safe, of merchantable quality, and fit for use.

268.    The Products used were not safe, of merchantable quality, fit for use, the quality that a buyer would expect, or the same quality of those products generally acceptable in the trade.

269.    The Products were not fit for the ordinary purposes for which such goods are used and did not conform to the quality established by the parties' prior dealings or by usage of trade.

270.    The Products used by Plaintiff were neither safe nor fit for use.

271.    Defendants were aware that consumers, including Plaintiff, would use the Products, which is to say that Plaintiff was a foreseeable user of Defendants' Products.

272.    Plaintiff was at all relevant times in privity with Defendants.

273.    Plaintiff took reasonable steps to notify Defendants, and each of them, within a reasonable time that the Products did not have the expected quality.

274. The Products were expected to reach and did in fact reach consumers, including Plaintiff, without substantial change in the condition in which the product was manufactured and sold by Defendants.

275. Defendants breached various implied warranties with respect to the Products as set forth above.

276. Defendants breached the implied warranties in that the Products did not conform to Defendants' implied representations and warranties.

277. Plaintiff reasonably relied upon one and/or several of the Defendants' implied warranties.

278. Plaintiff used the Products as intended and directed by the Defendants and in a foreseeable manner as intended, recommended, promoted, and/or marketed by Defendants.

279. Defendants breached one or several of the implied warranties provided to and relied on by Plaintiff.

280. As a direct and proximate result of Defendants' conduct, including actions, omissions, and misrepresentations described herein, Plaintiff sustained the following damages:

    a. Economic losses including medical care and lost earnings; and

    b. Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

    c. The sum of the damages Plaintiff has suffered is in excess of the minimum jurisdictional limits of this Court.

281. The failure of the Products to have the expected quality was a substantial factor in causing Plaintiff's harm.

WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory damages together with interest, the costs of suit and such other and further relief as this Court deems just and proper.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## FIFTH CAUSE OF ACTION

### BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

### (Against All Defendants)

282.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

283.    Plaintiff purchased the Products from Defendants, and each of them.

284.    At the time of purchase, Defendants, and each of them, knew or had reason to know that Plaintiff intended to use the product for a particular purpose.

285.    At the time of purchase, Defendants, and each of them, knew or had reason to know that Plaintiff was relying on Defendants' skill and judgment to select or furnish a product that was suitable for the particular purpose.

286.    Plaintiff reasonably and justifiably relied on Defendants' skill and judgment.

287.    The Products were not suitable for Plaintiff's particular purpose.

288.    Plaintiff took reasonable steps to notify Defendants, and each of them, within a reasonable time that the Products were not suitable.

289.    As a direct and proximate result of Defendants' conduct, including actions, omissions, and misrepresentations described herein, Plaintiff sustained the following damages:

      a.    Economic losses including medical care and lost earnings; and

      b.    Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

      c.    The sum of the damages Plaintiff has suffered is in excess of the minimum jurisdictional limits of this Court.

290.    The failure of the Products to be suitable was a substantial factor in causing Plaintiff's harm.

WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory damages together with interest, the costs of suit and such other and further relief as this Court deems just and proper.

COMPLAINT FOR DAMAGES

**SIXTH CAUSE OF ACTION**

**NEGLIGENCE – DESIGN, MANUFACTURE AND SALE**

**(Against All Defendants)**

291.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

292.    Prior to, on and after the date of Plaintiff's initial use of the Products, and at all relevant times, Defendants designed, tested, distributed, manufactured, advertised, sold, and/or marketed the Products for use by consumers, such as Plaintiff.

293.    Prior to, on, and after Plaintiff's initial use of the Products, Defendants were negligent and careless in and about their design, testing, distribution, manufacture, advertising, sale, and/or marketing of the above-described Products.

294.    Prior to, on, and after Plaintiff's initial use of the Products, Defendants performed inadequate evaluation and testing of the Products where such evaluation and testing would have revealed the propensity of the Products' failures, and increased risk of injury as described herein.

295.    Prior to, on, and/or after Plaintiff's initial use of the Products, Defendants had received complaints from consumers that the Products failed and posed an increased risk of injury as described herein, but Defendants consciously decided not to: perform any further testing on the Products; investigate the root cause of these failures and increased risk of injury; suspend sales and distribution; or warn consumers, such as Plaintiff, of the propensity of the Products to fail and pose an increased risk of injury as described herein.

296.    Defendants' conduct is *per se* negligent because their negligent design, manufacture, and sale of defective and dangerous products violated several federal and state laws, including but not limited to:

        a.    The Food, Drug, & Cosmetics Act, 21 U.S.C. ch. 9 § 301 et seq., and its accompanying regulations, including 21 U.S.C. §§ 331, 361; 21 U.S. Code § 362; and 21 CFR Part 740, including but not limited to 21 CFR § 740.1 and 21 CFR;

        b.    The California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Saf. Code §§ 111730, 111790;

    c.  The California Safe Cosmetics Act of 2005, Cal. Health & Saf. Code § 111791.5;

    d.  The California Cosmetic Frangrance and Flavor Right to Know Act (CFFIRKA) Cal. Health & Saf. Code § 111791.5; and

    e.  The Safe Drinking Water and Toxic Enforcement Act of 1986 ("Proposition 65"), Cal. Health & Saf. Code § 25249.5.

297.  As a direct and proximate result of Defendants' above-described negligence in design, testing, distribution, manufacture, advertising, sales, and/or marketing, Plaintiff sustained the following damages:

    a.  Economic losses including medical care and lost earnings; and

    b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

    c.  The sum of the damages Plaintiff has suffered is in excess of the minimum jurisdictional limits of this Court.

298.  As a direct and legal result of Defendants' actions and/or omissions, Plaintiff has also suffered, and continues to suffer, an increased risk of developing illnesses, diseases and/or disease processes relating to exposure to the Products.

299.  As a direct and legal result of Defendants' tortious conduct, Plaintiff has also suffered the past, present and future medical need to undergo diagnostic testing for the early detection of latent or misidentified illnesses, diseases and/or disease processes related to her exposure to the Products.

300.  Diagnostic and/or monitoring procedures exist that comport with contemporary scientific principles and the standard of care and make early detection of illnesses and conditions related to exposure to the Products possible and beneficial to Plaintiff.

301.  As a result of being significantly and repeatedly exposed to the Products, the need for Plaintiff's medical monitoring is currently necessary, and the monitoring is reasonable.

302.  Plaintiff thus also seeks an award of the cost of medical monitoring for the early detection of latent or misidentified illnesses, diseases and/or disease processes associated with exposure to the Products.

303.     Defendants' negligence in design, testing, distribution, manufacture, advertising, sales, and/or marketing prior to, on, and after the date of Plaintiff's initial surgery was a substantial factor in causing Plaintiff's injuries and damages, as described herein.

WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory damages together with interest, the costs of suit and such other and further relief as this Court deems just and proper.

## SEVENTH CAUSE OF ACTION

## NEGLIGENCE -- FAILURE TO RECALL/RETROFIT

### (Against All Defendants)

304.     Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

305.     Prior to, on, and/or after the date of Plaintiff's initial use of the Products, and at all relevant times, Defendants designed, distributed, manufactured, sold, and/or marketed the Products for use by consumers, such as Plaintiff.

306.     Prior to, on, and/or after the date of Plaintiff's initial use of the Products, and at all relevant times, Defendants knew or reasonably should have known that the Products and their warnings were dangerous or were likely to be dangerous when used in a reasonably foreseeable manner.

307.     Prior to, on, and/or after the date of Plaintiff's initial use of the Products, defendants became aware of the defects of the Products, including their propensity to increase the risk of injury as described herein.

308.     Defendants failed to recall, retrofit, or warn consumers, such as Plaintiff, about the danger of the Products prior to, on, and/or after the date of Plaintiff's initial use of the Products, and at all relevant times, and continue to fail to recall the Products to date.

309.     In light of the severity and amount of the data available to Defendants, reasonable manufacturers and distributors under the same or similar circumstances would have recalled or retrofitted the Products, and would thereby have avoided and prevented harm to hundreds of thousands of consumers, such as Plaintiff.

310.    As a direct and proximate result of Defendants' above-described negligent failure to recall or retrofit, Plaintiff sustained the following damages:

        a.  Economic losses including medical care and lost earnings; and

        b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

        c.  The sum of the damages Plaintiff has suffered is in excess of the minimum jurisdictional limits of this Court.

311.    Defendants' negligent failure to recall or retrofit the Products and their warnings was a substantial factor in causing Plaintiff's injuries and damages, as described herein.

WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory damages together with interest, the costs of suit and such other and further relief as this Court deems just and proper.

## EIGHTH CAUSE OF ACTION

## <u>NEGLIGENCE – FAILURE TO WARN</u>

### (Against All Defendants)

312.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

313.    At all relevant times, Defendants engaged in the design, development, manufacture, marketing, sale and distribution of the Products in a defective and unreasonably dangers condition to consumers, including Plaintiff.

314.    Defendants knew, or by the exercise of reasonable care, should have known use of their Products were dangerous, harmful, and injurious when used by consumers, such as Plaintiff, in a reasonably foreseeable manner. Such danger included the Products' propensity to increase the risk of injury, illness, and/or disease as described herein.

315.    Defendants knew, or by the exercise of reasonable care, should have known ordinary consumers, such as Plaintiff, would not have realized the potential risks and dangers of their Products, and that the Products were likely to increase the risk of tumors and cancerous growths in

premenopausal women, thereby increasing the risk of cancer, fibroids, and/or endometriosis, when used in the manner they were intended and to an extent beyond that would be contemplated by the ordinary consumer.

316.    Defendants owed a duty to all reasonably foreseeable consumers to disclose the risks associated with the use of their Products.

317.    At all pertinent times, Defendants were then and there guilty of one or more of the following acts and/or omissions:

    a.  Failed to provide adequate warnings on their Products;

    b.  Inadequately provided warnings on their Products;

    c.  Provided misleading advertisements; or

    d.  Failed to provide instructions on how to safely use their Products.

    e.  Failed to use due care in the manufacture, inspection and labeling of the Products to prevent risk of injuries to individuals, such as Plaintiff, who used the Products;

    f.  Failed to provide adequate and accurate warnings and information regarding the risk and dangers associated with the Products as described herein, to non-defendant entities that sold the Products; and

    g.  Failed to label the Products to adequately warn Plaintiff of the increased risk of injury associated with the product including an increased risk of hormone-related cancers and reproductive problems including the development of uterine fibroids and other injuries.

318.    Defendants' conduct is *per se* negligent because their failure to warn of dangerous ingredients of their products violated several federal and state laws, including but not limited to:

    a.  The Food, Drug, & Cosmetics Act, 21 U.S.C. ch. 9 § 301 et seq., and its accompanying regulations, including 21 U.S.C. §§ 331, 361; 21 U.S. Code § 362; and 21 CFR Part 740, including but not limited to 21 CFR § 740.1 and 21 CFR;

    b.  The California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Saf. Code §§ 111730, 111790;

c. The California Safe Cosmetics Act of 2005, Cal. Health & Saf. Code § 111791.5;

d. The California Cosmetic Frangrance and Flavor Right to Know Act (CFFIRKA) Cal. Health & Saf. Code § 111791.5; and

e. The Safe Drinking Water and Toxic Enforcement Act of 1986 ("Proposition 65"), Cal. Health & Saf. Code § 25249.5.

319.    As a direct and proximate result of Defendants' above-described negligent conduct, including failure to warn, actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

a. Economic losses including medical care and lost earnings; and

b. Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

c. The sum of the damages Plaintiff has suffered is in excess of the minimum jurisdictional limits of this Court.

320.    Defendants' negligent failure to warn consumers, including Plaintiff, at all relevant times, was a substantial factor in causing Plaintiff's injuries and damages, as described herein.

WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory damages together with interest, the costs of suit and such other and further relief as this Court deems just and proper.

## NINTH CAUSE OF ACTION

## FRAUD – INTENTIONAL MISREPRESENTATION

**(Against L'Oréal USA, Inc, L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I))**

321.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

322.    Defendants engaged in the development, manufacture, marketing, sale, and distribution of cosmetic and personal care products, including the Products, and owed a duty to provide accurate and complete information regarding said products.

323.    Defendants fraudulently misrepresented the use of the Products as safe, effective, and not unreasonably dangerous.

324.    Defendants knowingly and intentionally represented to consumers, including the Plaintiff, and the public that the Products were safe for use and that Defendants' labeling, marketing, and/or promotional materials fully described all known risks associated with the Products. Said representations were of facts that were material and important to Plaintiff's decision to use the Products.

325.    When Defendants made said representations, Defendants either knew that said representations were false or made said representations recklessly and without regard for their truth.

326.    When Defendants made said representations, Defendants intended that consumers, such as Plaintiff, would rely on said representations.

327.    Consumers, such as Plaintiff, reasonably and justifiably relied on Defendants' representations that the Products were safe for use and that their labeling, marketing, and promotional materials fully described all known risks associated with the Products.

328.    A recent article was published on October 4, 2022, on MSN and other online news outlets, titled "The Relaxer Box Girls: Where Are They Now ", which revealed that many of the young black girls featured on relaxer boxes and in relaxer ads in the 80s, 90s, and 2000s, never actually got their hair relaxed. Instead, they used other straightening tools and styling products to achieve the look of having the relaxer, without having exposed themselves to the dangerous chemicals within relaxers. Many of them are wearing natural hairstyles today.[97]

329.    At all pertinent times, Defendants were then and there guilty of one or more of the following acts and/or omissions:

  a.  Knowingly made omissions that were material, false, incomplete, misleading, deceptive, and deceitful;

  b.  Knowingly made misrepresentations for the purpose of deceiving and defrauding consumers, including Plaintiff; or

---

[97] The Relaxer Box Girls: Where Are They Now? (msn.com)

c. Knowingly made omissions for the purpose of deceiving and defrauding consumers, including Plaintiff.

330.    Plaintiff relied, with reasonable justification, on the misrepresentations by Defendants, which induced her to purchase and use the Products on a regular basis for decades.

331.    Defendants profited, significantly, from their unethical and illegal conduct that fraudulently induced Plaintiff, and millions of other consumers, to purchase a dangerous and defective product.

332.    As a direct and proximate result of Defendants' above-described fraudulent conduct, including intentional misrepresentations, Plaintiff sustained the following damages:

a. Economic losses including medical care and lost earnings; and

b. Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

c. The sum of the damages Plaintiff have suffered is in excess of the minimum jurisdictional limits of this Court.

333.    Plaintiff's reliance on said representations made by Defendants were a substantial factor in causing Plaintiff to suffer the injuries and damages described herein.

WHEREFORE, Plaintiff demand judgment against Defendants and seek compensatory damages together with interest, the costs of suit and such other and further relief as this Court deems just and proper.

## TENTH CAUSE OF ACTION

## <u>FRAUD – INTENTIONAL MISREPRESENTATION</u>

### (Against Godrej SON and Strength of Nature)

334.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

335.    Defendants engaged in the development, manufacture, marketing, sale, and distribution of cosmetic and personal care products, including the Products, and owed a duty to provide accurate and complete information regarding said products.

336.    Defendants fraudulently misrepresented the use of the Products as safe, effective and not unreasonably dangerous. For example, Defendants Godrej Consumer Products, Godrej SON, and Strength of Nature's Soft & Beautiful Products are intentionally labeled as "Botanicals" and with "Natural" ingredients that are "Ultra Nourishing," including but not limited to using "Natural Plant Oils and Butters."

337.    Defendants knowingly and intentionally represented to consumers, including the Plaintiff, and the public that the Products were safe for use and that Defendants' labeling, marketing, and/or promotional materials fully described all known risks associated with the Products. Said representations were of facts that were material and important to Plaintiff's decision to use the Products.

338.    When Defendants made said representations, Defendants either knew that said representations were false or made said representations recklessly and without regard for their truth.

339.    When Defendants made said representations, Defendants intended that consumers, such as Plaintiff, would rely on said representations.

340.    Consumers, such as Plaintiff, reasonably and justifiably relied on Defendants' representations that the Products were safe for use and that their labeling, marketing, and promotional materials fully described all known risks associated with the Products.

341.    A recent article was published on October 4, 2022, on MSN and other online news outlets, titled "The Relaxer Box Girls: Where Are They Now ", which revealed that many of the young black girls featured on relaxer boxes and in relaxer ads in the 80s, 90s, and 2000s, never actually got their hair relaxed. Instead, they used other straightening tools and styling products to achieve the look of having the relaxer, without having exposed themselves to the dangerous chemicals within relaxers. Many of them are wearing natural hairstyles today.[98]

342.    At all pertinent times, Defendants were then and there guilty of one or more of the following acts and/or omissions:

---

[98] The Relaxer Box Girls: Where Are They Now? (msn.com)

COMPLAINT FOR DAMAGES

d. Knowingly made omissions that were material, false, incomplete, misleading, deceptive, and deceitful;

e. Knowingly made misrepresentations for the purpose of deceiving and defrauding consumers, including Plaintiff; or

f. Knowingly made omissions for the purpose of deceiving and defrauding consumers, including Plaintiff.

343.    Plaintiff relied, with reasonable justification, on the misrepresentations by Defendants, which induced her to purchase and use the Products on a regular basis for decades.

344.    Defendants profited, significantly, from their unethical and illegal conduct that fraudulently induced Plaintiff, and millions of other consumers, to purchase a dangerous and defective product.

345.    As a direct and proximate result of Defendants' above-described fraudulent conduct, including intentional misrepresentations, Plaintiff sustained the following damages:

d. Economic losses including medical care and lost earnings; and

e. Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

f. The sum of the damages Plaintiff have suffered is in excess of the minimum jurisdictional limits of this Court.

346.    Plaintiff's reliance on said representations made by Defendants were a substantial factor in causing Plaintiff to suffer the injuries and damages described herein.

WHEREFORE, Plaintiff demand judgment against Defendants and seek compensatory damages together with interest, the costs of suit and such other and further relief as this Court deems just and proper.

## ELEVENTH CAUSE OF ACTION

## FRAUD – INTENTIONAL MISREPRESENTATION

### (Against Avlon)

347.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation

1 | set forth in the preceding paragraphs.

2 | 348. Defendants engaged in the development, manufacture, marketing, sale, and distribution

3 | of cosmetic and personal care products, including the Products, and owed a duty to provide accurate

4 | and complete information regarding said products.

5 | 349. Defendants fraudulently misrepresented the use of the Products as safe, effective, and

6 | not unreasonably dangerous, specifically:

7 |        a. Defendants Namaste, Dabur, and Dermoviva's Products are marketed as "Olive Oil"

8 |           products to imply natural products, and their Products are advertised as being "Build

9 |           in Protection;"

10 |       b. Defendants Namaste, Dabur, and Dermoviva's website states that their Products use

11 |          "Rich Olive and Avocado Oils" that they claim "moisturize and condition while

12 |          Aloe Vera protects the skin and scalp."

13 |       c. Defendants Namaste, Dabur, and Dermoviva's Products claim that they "use[] the

14 |          latest technology to safely elongate tight coils."

15 | 350. Defendants knowingly and intentionally represented to consumers, including the

16 | Plaintiff, and the public that the Products were safe for use and that Defendants' labeling, marketing,

17 | and/or promotional materials fully described all known risks associated with the Products. Said

18 | representations were of facts that were material and important to Plaintiff's decision to use the

19 | Products.

20 | 351. When Defendants made said representations, Defendants either knew that said

21 | representations were false or made said representations recklessly and without regard for their truth.

22 | 352. When Defendants made said representations, Defendants intended that consumers,

23 | such as Plaintiff, would rely on said representations.

24 | 353. Consumers, such as Plaintiff, reasonably and justifiably relied on Defendants'

25 | representations that the Products were safe for use and that their labeling, marketing, and promotional

26 | materials fully described all known risks associated with the Products.

27 | 354. A recent article was published on October 4, 2022, on MSN and other online news

28 | outlets, titled "The Relaxer Box Girls: Where Are They Now ", which revealed that many of the young

black girls featured on relaxer boxes and in relaxer ads in the 80s, 90s, and 2000s, never actually got their hair relaxed. Instead, they used other straightening tools and styling products to achieve the look of having the relaxer, without having exposed themselves to the dangerous chemicals within relaxers. Many of them are wearing natural hairstyles today.[99]

355.    At all pertinent times, Defendants were then and there guilty of one or more of the following acts and/or omissions:

g.   Knowingly made omissions that were material, false, incomplete, misleading, deceptive, and deceitful;

h.   Knowingly made misrepresentations for the purpose of deceiving and defrauding consumers, including Plaintiff; or

i.   Knowingly made omissions for the purpose of deceiving and defrauding consumers, including Plaintiff.

356.    Plaintiff relied, with reasonable justification, on the misrepresentations by Defendants, which induced her to purchase and use the Products on a regular basis for decades.

357.    Defendants profited, significantly, from their unethical and illegal conduct that fraudulently induced Plaintiff, and millions of other consumers, to purchase a dangerous and defective product.

358.    As a direct and proximate result of Defendants' above-described fraudulent conduct, including intentional misrepresentations, Plaintiff sustained the following damages:

g.   Economic losses including medical care and lost earnings; and

h.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

i.   The sum of the damages Plaintiff has suffered is in excess of the minimum jurisdictional limits of this Court.

359.    Plaintiff's reliance on said representations made by Defendants was a substantial factor

---

[99] The Relaxer Box Girls: Where Are They Now? (msn.com)

COMPLAINT FOR DAMAGES

1  in causing Plaintiff to suffer the injuries and damages described herein.

2      WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory

3  damages together with interest, the costs of suit and such other and further relief as this Court deems

4  just and proper.

## TWELFTH CAUSE OF ACTION

## FRAUD – INTENTIONAL MISREPRESENTATION

### (Against Doe Defendants 1-100)

8      360.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation

9      set forth in the preceding paragraphs.

10     361.    Defendants engaged in the development, manufacture, marketing, sale, and distribution

11  of cosmetic and personal care products, including the Products, and owed a duty to provide accurate

12  and complete information regarding said products.

13     362.    Defendants fraudulently misrepresented the use of the Products as safe, effective and

14  not unreasonably dangerous.

15     363.    Defendants knowingly and intentionally represented to consumers, including the

16  Plaintiff, and the public that the Products were safe for use and that Defendants' labeling, marketing,

17  and/or promotional materials fully described all known risks associated with the Products. Said

18  representations were of facts that were material and important to Plaintiff's decisions to use the

19  Products.

20     364.    When Defendants made said representations, Defendants either knew that said

21  representations were false or made said representations recklessly and without regard for their truth.

22     365.    When Defendants made said representations, Defendants intended consumers, such

23  as Plaintiff, would rely on said representations.

24     366.    Consumers, such as Plaintiff, reasonably and justifiably relied on Defendants'

25  representations that the Products were safe for use and that their labeling, marketing, and promotional

26  materials fully described all known risks associated with the Products.

27     367.    A recent article was published on October 4, 2022, on MSN and other online news

28  outlets, titled "The Relaxer Box Girls: Where Are They Now," which revealed that many of the young

1   black girls featured on relaxer boxes and in relaxer ads in the 80s, 90s, and 2000s, never actually got

2   their hair relaxed. Instead, they used other straightening tools and styling products to achieve the look

3   of having the relaxer, without having exposed themselves to the dangerous chemicals within relaxers.

4   Many of them are wearing natural hairstyles today.[100]

5       368.    At all pertinent times, Defendants were then and there guilty of one or more of the

6   following acts and/or omissions:

7           j.   Knowingly made omissions that were material, false, incomplete, misleading,

8                deceptive, and deceitful;

9           k.   Knowingly made misrepresentations for the purpose of deceiving and defrauding

10               consumers, including Plaintiff; or

11          l.   Knowingly made omissions for the purpose of deceiving and defrauding

12               consumers, including Plaintiff.

13      369.    Plaintiff relied, with reasonable justification, on the misrepresentations by Defendants,

14  which induced her to purchase and use the Products on a regular basis for decades.

15      370.    Defendants profited, significantly, from their unethical and illegal conduct that

16  fraudulently induced Plaintiff, and millions of other consumers, to purchase a dangerous and defective

17  product.

18      371.    As a direct and proximate result of Defendants' above-described fraudulent conduct,

19  including intentional misrepresentations, Plaintiff sustained the following damages:

20          j.   Economic losses including medical care and lost earnings; and

21          k.   Noneconomic losses including physical and mental pain and suffering, emotional

22               distress, inconvenience, loss of enjoyment and impairment of quality of life, past

23               and future.

24          l.   The sum of the damages Plaintiff have suffered is in excess of the minimum

25               jurisdictional limits of this Court.

26      372.    Plaintiff's reliance on said representations made by Defendants was a substantial factor

27  _____

28  [100] The Relaxer Box Girls: Where Are They Now? (msn.com)

1  in causing Plaintiff to suffer the injuries and damages described herein.

2      WHEREFORE, Plaintiff demand judgment against Defendants and seeks compensatory

3  damages together with interest, the costs of suit and such other and further relief as this Court deems

4  just and proper.

5              **THIRTEENTH CAUSE OF ACTION**

6              **FRAUD – CONCEALMENT**

7  **(Against L'Oréal USA, Inc., L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I))**

8      373.  Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation

9  set forth in the preceding paragraphs.

10     374.  In marketing and selling the Products, Defendants concealed material facts from

11 consumers, including Plaintiff. Said concealment included some or all of the following: disclosure of

12 some facts to consumers, such as Plaintiff, but intentional failure to disclose other important facts,

13 making said disclosure deceptive; intentionally failing to disclose important facts known only to

14 Defendants and that consumers, including Plaintiff, could not have discovered; and/or actively

15 concealing important facts from consumers, including Plaintiff, from discovery said important facts.

16     375.  At all pertinent times, Defendants were then and there guilty of one or more of the

17 following acts and/or omissions:

18         a.  Defendants omitted, suppressed, and/or concealed material facts concerning the

19             dangers and risk of injuries associated with the use of the Products and the fact that

20             the Product was unreasonably dangerous;

21         b.  Defendants purpose was willfully blind to, ignored, downplayed, avoided, concealed

22             and/or otherwise understated the nature of the risks associated with the use of the

23             Products to increase sales;

24         c.  Defendants undertook the concealment of material facts with an intent that

25             consumers, including Plaintiff, rely upon them.

26     376.  Plaintiff and other consumers did not know that Defendants concealed material facts

27 and were justified in their reliance on Defendants representations regarding the safety of the Products.

28     377.  Defendants had sole access to material facts concerning the dangers and unreasonable

1    risks of the Products.

2        378.    The intentional concealment of information by Defendants about the substantial risks

3    of injury and/or disease associated with the Products, was known by Defendants to be wrongful.

4        379.    Had Defendants not fraudulently concealed the information as described herein, the

5    Products would not have been used by Plaintiff.

6        380.    Had Plaintiff been aware of the increased risks of injury associated with the Products,

7    Plaintiff would not have used them.

8        381.    As a direct and proximate result of Defendants' fraudulent and/or intentional

9    concealment of facts, upon which Plaintiff reasonably relied, Plaintiff sustained the following

10    damages:

11            a.    Economic losses including medical care and lost earnings; and

12            b.    Noneconomic losses including physical and mental pain and suffering, emotional

13                distress, inconvenience, loss of enjoyment and impairment of quality of life, past

14                and future.

15            c.    The sum of the damages Plaintiff have suffered is in excess of the minimum

16                jurisdictional limits of this Court.

17        382.    Plaintiff's reasonable reliance on Defendants' fraudulent and/or intentional

18    concealment of facts was a was a substantial factor in causing Plaintiff to suffer the injuries and

19    damages described herein.

20        WHEREFORE, Plaintiff demands judgment against Defendants and seek compensatory

21    damages together with interest, the costs of suit and such other and further relief as this Court deems

22    just and proper.

23                            **FOURTEENTH CAUSE OF ACTION**

24                            **FRAUD – CONCEALMENT**

25                        **(Against Godrej SON and Strength of Nature)**

26        383.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation

27    set forth in the preceding paragraphs.

28        384.    In marketing and selling the Products, Defendants concealed material facts from

1  consumers, including Plaintiff. Said concealment included some or all of the following: disclosure of

2  some facts to consumers, such as Plaintiff, but intentional failure to disclose other important facts,

3  making said disclosure deceptive; intentionally failing to disclose important facts known only to

4  Defendants and that consumers, including Plaintiff, could not have discovered; and/or actively

5  concealing important facts from consumers, including Plaintiff, from discovery said important facts.

6      385.    At all pertinent times, Defendants were then and there guilty of one or more of the

7  following acts and/or omissions:

8          a.  Defendants omitted, suppressed, and/or concealed material facts concerning the

9              dangers and risk of injuries associated with the use of the Products and the fact that

10             the Product was unreasonably dangerous;

11         b.  Defendants purpose was willfully blind to, ignored, downplayed, avoided, concealed

12             and/or otherwise understated the nature of the risks associated with the use of the

13             Products in order to increase sales;

14         c.  Defendants undertook the concealment of material facts with an intent that

15             consumers, including Plaintiff, rely upon them.

16     386.    Plaintiff and other consumers did not know that Defendants concealed material facts

17  and were justified in their reliance on Defendants representations regarding the safety of the Products.

18     387.    Defendants had sole access to material facts concerning the dangers and unreasonable

19  risks of the Products.

20     388.    The intentional concealment of information by Defendants about the substantial risks

21  of injury and/or disease associated with the Products, was known by Defendants to be wrongful.

22     389.    Had Defendants not fraudulently concealed the information as described herein, the

23  Products would not have been used by Plaintiff.

24     390.    Had Plaintiff been aware of the increased risks of injury associated with the Products,

25  Plaintiff would not have used them.

26     391.    As a direct and proximate result of Defendants' fraudulent and/or intentional

27  concealment of facts, upon which Plaintiff reasonably relied, Plaintiff sustained the following

28  damages:

d.  Economic losses including medical care and lost earnings; and

e.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

f.  The sum of the damages Plaintiff have suffered is in excess of the minimum jurisdictional limits of this Court.

392.  Plaintiff's reasonable reliance on Defendants' fraudulent and/or intentional concealment of facts was a was a substantial factor in causing Plaintiff to suffer the injuries and damages described herein.

WHEREFORE, Plaintiff demand judgment against Defendants and seek compensatory damages together with interest, the costs of suit and such other and further relief as this Court deems just and proper.

# FIFTEENTH CAUSE OF ACTION

## <u>FRAUD – CONCEALMENT</u>

### (Against Avlon)

393.  Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

394.  In marketing and selling the Products, Defendants concealed material facts from consumers, including Plaintiff. Said concealment included some or all of the following: disclosure of some facts to consumers, such as Plaintiff, but intentional failure to disclose other important facts, making said disclosure deceptive; intentionally failing to disclose important facts known only to Defendants and that consumers, including Plaintiff, could not have discovered; and/or actively concealing important facts from consumers, including Plaintiff, from discovery said important facts.

395.  At all pertinent times, Defendants were then and there guilty of one or more of the following acts and/or omissions:

a.  Defendants omitted, suppressed, and/or concealed material facts concerning the dangers and risk of injuries associated with the use of the Products and the fact that the Product was unreasonably dangerous;

b. Defendants purpose was willfully blind to, ignored, downplayed, avoided, concealed and/or otherwise understated the nature of the risks associated with the use of the Products in order to increase sales;

c. Defendants undertook the concealment of material facts with an intent that consumers, including Plaintiff, rely upon them.

396.    Plaintiff and other consumers did not know that Defendants concealed material facts and were justified in their reliance on Defendants representations regarding the safety of the Products.

397.    Defendants had sole access to material facts concerning the dangers and unreasonable risks of the Products.

398.    The intentional concealment of information by Defendants about the substantial risks of injury and/or disease associated with the Products, was known by Defendants to be wrongful.

399.    Had Defendants not fraudulently concealed the information as described herein, the Products would not have been used by Plaintiff.

400.    Had Plaintiff been aware of the increased risks of injury associated with the Products, Plaintiff would not have used them.

401.    As a direct and proximate result of Defendants' fraudulent and/or intentional concealment of facts, upon which Plaintiff reasonably relied, Plaintiff sustained the following damages:

g. Economic losses including medical care and lost earnings; and

h. Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

i. The sum of the damages Plaintiff has suffered is in excess of the minimum jurisdictional limits of this Court.

402.    Plaintiff's reasonable reliance on Defendants' fraudulent and/or intentional concealment of facts was a was a substantial factor in causing Plaintiff to suffer the injuries and damages described herein.

WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory

71

1  damages together with interest, the costs of suit and such other and further relief as this Court deems

2  just and proper.

### SIXTEENTH CAUSE OF ACTION

### FRAUD – CONCEALMENT

### (Against Doe Defendants 1-100, inclusive)

403.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

404.    In marketing and selling the Products, Defendants concealed material facts from consumers, including Plaintiff. Said concealment included some or all of the following: disclosure of some facts to consumers, such as Plaintiff, but intentional failure to disclose other important facts, making said disclosure deceptive; intentionally failing to disclose important facts known only to Defendants and that consumers, including Plaintiff, could not have discovered; and/or actively concealing important facts from consumers, including Plaintiff, from discovery said important facts.

405.    At all pertinent times, Defendants were then and there guilty of one or more of the following acts and/or omissions:

    a.  Defendants omitted, suppressed, and/or concealed material facts concerning the dangers and risk of injuries associated with the use of the Products and the fact that the Product was unreasonably dangerous;

    b.  Defendants purpose was willfully blind to, ignored, downplayed, avoided, concealed and/or otherwise understated the nature of the risks associated with the use of the Products in order to increase sales;

    c.  Defendants undertook the concealment of material facts with an intent that consumers, including Plaintiff, rely upon them.

406.    Plaintiff and other consumers did not know that Defendants concealed material facts and were justified in their reliance on Defendants representations regarding the safety of the Products.

407.    Defendants had sole access to material facts concerning the dangers and unreasonable risks of the Products.

408.    The intentional concealment of information by Defendants about the substantial risks

1  of injury and/or disease associated with the Products, was known by Defendants to be wrongful.

2      409.    Had Defendants not fraudulently concealed the information as described herein, the

3  Products would not have been used by Plaintiff.

4      410.    Had Plaintiff been aware of the increased risks of injury associated with the Products,

5  Plaintiff would not have used them.

6      411.    As a direct and proximate result of Defendants' fraudulent and/or intentional

7  concealment of facts, upon which Plaintiff reasonably relied, Plaintiff sustained the following

8  damages:

9            j.   Economic losses including medical care and lost earnings; and

10            k.   Noneconomic losses including physical and mental pain and suffering, emotional

11                distress, inconvenience, loss of enjoyment and impairment of quality of life, past

12                and future.

13            l.   The sum of the damages Plaintiff have suffered is in excess of the minimum

14                jurisdictional limits of this Court.

15      412.    Plaintiff's reasonable reliance on Defendants' fraudulent and/or intentional

16  concealment of facts was a was a substantial factor in causing Plaintiff sto suffer the injuries and

17  damages described herein.

18      WHEREFORE, Plaintiff demand judgment against Defendants and seek compensatory

19  damages together with interest, the costs of suit and such other and further relief as this Court deems

20  just and proper.

21  <div align="center">**SEVENTEENTH CAUSE OF ACTION**</div>

22  <div align="center">**UNLAWFUL, UNFAIR AND FRAUDULENT BUSINESS PRACTICES IN VIOLATION OF**</div>

23  <div align="center">**CALIFORNIA B & P CODE SEC. 17200, ET SEQ.**</div>

24  <div align="center">**(Against All Defendants)**</div>

25      413.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation

26  set forth in the preceding paragraphs.

27      414.    California's Unfair Competition Law (UCL) creates a cause of action for those harmed

28  by unfair competition, which includes "any unlawful, unfair or fraudulent business act or practice and

1    unfair, deceptive, untrue or misleading advertising."

2    415.    Defendants have made numerous misrepresentations to Plaintiff, consumers, and the

3    general public. Among those misrepresentations are Defendants' claims that the Products are safe,

4    effective, and not unreasonably dangerous.

5    416.    Defendants failed to disclose to Plaintiff, consumers, and the general public that the

6    Products are defective, unreasonably dangerous and are likely to increase the risk of tumors and

7    cancerous growths in premenopausal women, thereby increasing the risk of cancer, fibroids, and/or

8    endometriosis, and injuries as described herein.

9    417.    Defendants' business practices relating to the Products are unlawful because they

10    constitute false advertising, intentional misrepresentation, and fraudulent concealment.

11    m. As a direct and proximate result of Defendants' unlawful business practices and

12    false advertising, Defendants have generated enormous revenues and profits at the

13    expense of Plaintiff.  Plaintiff is thus entitled to restitutionary disgorgement, in an

14    amount to be proven at trial, injunctive relief, attorney's fees, and other remedies

15    available under the law.

16    418.    Defendants' unlawful business practices, at all relevant times, were a substantial factor

17    in causing Plaintiff's harm, as described herein.

18    WHEREFORE, Plaintiff demands judgment against Defendants and seeks an order of this

19    Court awarding restitutionary disgorgement, injunctive relief, attorneys' fees and costs and all other

20    relief as this Court deems just and proper under California Business and Professions Code Section

21    17200 et seq.

## V.    PRAYER FOR RELIEF

23    419.    Plaintiff incorporates by reference each and every paragraph of this Complaint as

24    though set forth here in full and further prays.

25    420.    So far as the law and this Court allows, Plaintiff demands judgment against each

26    Defendant on each count as follows:

27    a.    Compensatory damages for the described losses with respect to each cause of

28    action;

74

1       b.     Past medical expenses;

2       c.     Past and future lost wages and loss of earning capacity;

3       d.     Past and future emotional distress;

4       e.     Punitive damages with respect to each cause of action;

5       f.     Reasonable attorneys' fees where recoverable;

6       g.     Costs of this action;

7       h.     Pre-judgment and all other interest recoverable; and

8       i.     Such other additional and further relief as Plaintiff may be entitled to in law or

9            in equity.

10                             **JURY DEMAND**

11    Plaintiff demands a jury trial for all claims so triable.

13 Dated:  July 18, 2024                   SINGLETON SCHRIBER, LLP

15                        By:            _____

16                             Andrew Bluth (SBN: 232387)

                              Christopher Rodriguez (SBN: 212274)

17                             Danielle Ward Mason *(pro hac vice*

                            *forthcoming)*

19                             *Attorneys for Plaintiff*

COMPLAINT FOR DAMAGES

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Christopher R. Rodriguez SBN 212274, Andrew D. Bluth SBN 232387, Singleton Schreiber, LLP, 1414 K Street, Suite 470, Sacramento, CA 958144 | **ELECTRONICALLY FILED** Superior Court of California, County of Alameda 07/18/2024 at 04:43:15 PM By: Damaree Franklin, Deputy Clerk |

TELEPHONE NO.:916-248-8478    FAX NO. *(Optional):* (619) 255-1515
E-MAIL ADDRESS: crodriguez@singletonschreiber.com
ATTORNEY FOR *(Name):* Plaintiff

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA**
STREET ADDRESS: 1225 Fallon Street
MAILING ADDRESS: 1225 Fallon Street
CITY AND ZIP CODE: Oakland, 94612
BRANCH NAME: Oakland - Rene C. Davidson Courthouse

CASE NAME:
Cynthia Jones v. L'Oreal USA, et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [x] **Unlimited** (Amount demanded exceeds $25,000) [ ] **Limited** (Amount demanded is $25,000 or less) | [ ] Counter [ ] Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | 24CV083993 JUDGE: DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[x] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [x] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [x] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [x] Substantial amount of documentary evidence
   d. [x] Large number of witnesses
   e. [x] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [x] monetary b. [x] nonmonetary; declaratory or injunctive relief c. [x] punitive
4. Number of causes of action *(specify):* 17
5. This case [ ] is [x] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: 07/18/2024

Andrew D. Bluth
_____ ▶ _____
(TYPE OR PRINT NAME)                (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev.September 1, 2021]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
*www.courts.ca.gov*

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET
CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
　Asbestos Property Damage
　Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
　Medical Malpractice– Physicians & Surgeons
　Other Professional Health Care Malpractice
Other PI/PD/WD (23)
　Premises Liability (e.g., slip and fall)
　Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
　Intentional Infliction of Emotional Distress
　Negligent Infliction of Emotional Distress
　Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
　Legal Malpractice
　Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
　Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
　Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
　Negligent Breach of Contract/ Warranty
　Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
　Collection Case–Seller Plaintiff
　Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
　Auto Subrogation
　Other Coverage
Other Contract (37)
　Contractual Fraud
　Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
　Writ of Possession of Real Property
　Mortgage Foreclosure
　Quiet Title
　Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
　Writ–Administrative Mandamus
　Writ–Mandamus on Limited Court Case Matter
　Writ–Other Limited Court Case Review
Other Judicial Review (39)
　Review of Health Officer Order
　Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
　Abstract of Judgment (Out of County)
　Confession of Judgment *(non-domestic relations)*
　Sister State Judgment
　Administrative Agency Award *(not unpaid taxes)*
　Petition/Certification of Entry of Judgment on Unpaid Taxes
　Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
　Declaratory Relief Only
　Injunctive Relief Only *(non-harassment)*
　Mechanics Lien
　Other Commercial Complaint Case *(non-tort/non-complex)*
　Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
　Civil Harassment
　Workplace Violence
　Elder/Dependent Adult Abuse
　Election Contest
　Petition for Name Change
　Petition for Relief From Late Claim
　Other Civil Petition

For your protection and privacy, please press the Clear This Form button after you have printed the form.

| Print this form | Save this form |

 Clear this form

*Unified Rules of the Superior Court of California, County of Alameda*

F. ADDENDUM TO CIVIL CASE COVER SHEET

| Short Title: Cynthia Jones v. L'Oreal USA, Inc., et al. | Case Number: |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM

**THIS FORM IS REQUIRED IN ALL NEW UNLIMITED CIVIL CASE FILINGS IN THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA**

[ X ] Oakland, Rene C. Davidson Alameda County Courthouse (446)
[  ] Hayward Hall of Justice  (447)
[  ] Pleasanton, Gale-Schenone Hall of Justice (448)

| Civil Case Cover Sheet Category | Civil Case Cover Sheet Case Type | Alameda County Case Type (check only one) | | |
|---|---|---|---|---|
| Auto Tort | Auto tort (22) | [ ] | 34 | Auto tort (G) |
| | | Is this an uninsured motorist case?  [ ] yes  [ ] no | | |
| Other PI /PD / WD Tort | Asbestos (04) | [ ] | 75 | Asbestos (D) |
| | Product liability (24) | [ ] | 89 | Product liability (not asbestos or toxic tort/environmental) (G) |
| | Medical malpractice (45) | [ ] | 97 | Medical malpractice (G) |
| | Other PI/PD/WD tort (23) | [ ] | 33 | Other PI/PD/WD tort (G) |
| Non - PI /PD / WD Tort | Bus tort / unfair bus. practice (07) | [ ] | 79 | Bus tort / unfair bus. practice (G) |
| | Civil rights (08) | [ ] | 80 | Civil rights (G) |
| | Defamation (13) | [ ] | 84 | Defamation (G) |
| | Fraud (16) | [ ] | 24 | Fraud (G) |
| | Intellectual property (19) | [ ] | 87 | Intellectual property (G) |
| | Professional negligence (25) | [ ] | 59 | Professional negligence - non-medical (G) |
| | Other non-PI/PD/WD tort (35) | [ ] | 03 | Other non-PI/PD/WD tort (G) |
| Employment | Wrongful termination (36) | [ ] | 38 | Wrongful termination (G) |
| | Other employment (15) | [ ] | 85 | Other employment (G) |
| | | [ ] | 53 | Labor comm award confirmation |
| | | [ ] | 54 | Notice of appeal - L.C.A. |
| Contract | Breach contract / Wrnty (06) | [ ] | 04 | Breach contract / Wrnty (G) |
| | Collections (09) | [ ] | 81 | Collections (G) |
| | Insurance coverage (18) | [ ] | 86 | Ins. coverage - non-complex (G) |
| | Other contract (37) | [ ] | 98 | Other contract (G) |
| Real Property | Eminent domain / Inv Cdm (14) | [ ] | 18 | Eminent domain / Inv Cdm (G) |
| | Wrongful eviction (33) | [ ] | 17 | Wrongful eviction (G) |
| | Other real property (26) | [ ] | 36 | Other real property (G) |
| Unlawful Detainer | Commercial (31) | [ ] | 94 | Unlawful Detainer - commercial |
| | Residential (32) | [ ] | 47 | Unlawful Detainer - residential |
| | Drugs (38) | [ ] | 21 | Unlawful detainer - drugs |
| Judicial Review | Asset forfeiture (05) | [ ] | 41 | Asset forfeiture |
| | Petition re: arbitration award (11) | [ ] | 62 | Pet. re: arbitration award |
| | Writ of Mandate (02) | [ ] | 49 | Writ of mandate |
| | | Is this a CEQA action (Publ.Res.Code section 21000 et seq)  [ ] Yes  [ ] No | | |
| | Other judicial review (39) | [ ] | 64 | Other judicial review |
| Provisionally Complex | Antitrust / Trade regulation (03) | [ ] | 77 | Antitrust / Trade regulation |
| | Construction defect (10) | [ ] | 82 | Construction defect |
| | Claims involving mass tort (40) | [X] | 78 | Claims involving mass tort |
| | Securities litigation (28) | [ ] | 91 | Securities litigation |
| | Toxic tort / Environmental (30) | [ ] | 93 | Toxic tort / Environmental |
| | Ins covrg from cmplx case type (41) | [ ] | 95 | Ins covrg from complex case type |
| Enforcement of Judgment | Enforcement of judgment (20) | [ ] | 19 | Enforcement of judgment |
| | | [ ] | 08 | Confession of judgment |
| Misc Complaint | RICO (27) | [ ] | 90 | RICO (G) |
| | Partnership / Corp. governance (21) | [ ] | 88 | Partnership / Corp. governance (G) |
| | Other complaint (42) | [ ] | 68 | All other complaints (G) |
| Misc. Civil Petition | Other petition (43) | [ ] | 06 | Change of name |
| | | [ ] | 69 | Other petition |

For the Unlawful Detainer rows: Is the deft. in possession of the property? [ ] Yes   [ ] No

202-19 (5/1/00)

A-13

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF ALAMEDA

COURTHOUSE ADDRESS:
Rene C. Davidson Courthouse
Administration Building, 1221 Oak Street, Oakland, CA 94612

PLAINTIFF:
CYNTHIA L JONES

DEFENDANT:
L'Oreal USA. Inc., a corporation et al

## NOTICE OF CASE MANAGEMENT CONFERENCE

Reserved for Clerk's File Stamp

**FILED**
Superior Court of California
County of Alameda

07/18/2024

Chad Finke, Executive Officer / Clerk of the Court

By: _____ Deputy
D. Franklin

CASE NUMBER:
24CV083993

---

TO THE PLAINTIFF(S)/ATTORNY(S) FOR PLAINTIFF(S) OF RECORD:

You are ordered to serve all named defendants and file proofs of service on those defendants with the court within 60 days of the filing of the complaint (Cal. Rules of Court, 3.110(b)).

Give notice of this conference to all other parties and file proof of service.

Your Case Management Conference has been scheduled on:

> Date: 11/15/2024    Time: 8:30 AM    Dept.: 23
>
> Location: Rene C. Davidson Courthouse
> Administration Building, 1221 Oak Street, Oakland, CA 94612

TO DEFENDANT(S)/ATTORNEY(S) FOR DEFENDANT(S) OF RECORD:

The setting of the Case Management Conference does not exempt the defendant from filing a responsive pleading as required by law, you must respond as stated on the summons.

TO ALL PARTIES who have appeared before the date of the conference must:

Pursuant to California Rules of Court, 3.725, a completed Case Management Statement (Judicial Council form CM-110) must be filed and served at least 15 calendar days before the Case Management Conference. The Case Management Statement may be filed jointly by all parties/attorneys of record or individually by each party/attorney of record.

**Meet and confer**, in person or by telephone as required by Cal. Rules of Court, rule 3.724.

**Post jury fees** as required by Code of Civil Procedure section 631.

If you do not follow the orders above, the court may issue an order to show cause why you should not be sanctioned under Cal. Rules of Court, rule 2.30. Sanctions may include monetary sanctions, striking pleadings or dismissal of the action.

The judge may place a Tentative Case Management Order in your case's on-line register of actions before the conference. This order may establish a discovery schedule, set a trial date or refer the case to Alternate Dispute Resolution, such as mediation or arbitration. Check the court's eCourt Public Portal for each assigned department's procedures regarding tentative case management orders at https://eportal.alameda.courts.ca.gov.

# NOTICE OF
# CASE MANAGEMENT CONFERENCE

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF ALAMEDA | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Rene C. Davidson Courthouse<br>1225 Fallon Street, Oakland, CA 94612 | **FILED**<br>Superior Court of California<br>County of Alameda<br>07/18/2024<br>Chad Finke, Executive Officer / Clerk of the Court<br>By: _____ Deputy<br>D. Franklin |
| PLAINTIFF/PETITIONER:<br>CYNTHIA L JONES | |
| DEFENDANT/RESPONDENT:<br>L'Oreal USA. Inc., a corporation et al | |
| **CERTIFICATE OF MAILING** | CASE NUMBER:<br>24CV083993 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the attached document upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Oakland, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.


Christopher R. Rodriguez
SINGLETON SCHREIBER LLP
1414 K St Ste 470
Sacramento, CA 95814


Chad Finke, Executive Officer / Clerk of the Court

Dated: 07/22/2024                          By:

D. Franklin, Deputy Clerk


**CERTIFICATE OF MAILING**

# EXHIBIT B

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

| | FOR COURT USE ONLY<br>*(SOLO PARA USO DE LA CORTE)* |
|---|---|

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
L'Oreal USA. Inc., a corporation; (Additional Parties Attachment form is attached.)

**ELECTRONICALLY FILED**
Superior Court of California
County of Alameda
07/22/2024
Chad Finke, Executive Officer / Clerk of the Court
By: _____ D. Franklin _____ Deputy

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
CYNTHIA L. JONES, an individual.

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Alameda County Superior Court<br><br>1225 Fallon Street, Oakland, CA 94612 | CASE NUMBER:<br>*(Número del Caso):*<br><br>24CV083993 |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Christopher R. Rodriguez, Singleton Schreiber, LLP, 1414 K Street, Suite 470, Sacramento, CA 95814

| DATE:<br>*(Fecha)* 07/22/2024 Chad Finke, Executive Officer / Clerk of the Court | Clerk, by<br>*(Secretario)* D. Franklin | , Deputy<br>*(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* — L'ORÉAL USA PRODUCTS, INC., a corporation
   under: ☒ CCP 416.10 (corporation)     ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)     ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)     ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

**SUM-200(A)**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Cynthia L. Jones v. L'Oreal USA, Inc., et al. | 24CV083993 |

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

[ ] Plaintiff    [x] Defendant    [ ] Cross-Complainant    [ ] Cross-Defendant

L'ORÉAL USA PRODUCTS, INC., a corporation; SOFT SHEEN-CARSON LLC, a corporation; SOFT SHEEN*CARSON (W.I.), INC., a corporation.; STRENGTH OF NATURE, LLC, a corporation; GODREJ SON HOLDINGS, INC., a corporation; AVLON INDUSTRIES, INC., a corporation; SAFEWAY INC., a corporation; THE VONS COMPANIES, INC., a corporation; and DOES 1-100 inclusive,

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

Christopher R. Rodriguez (SBN: 212274)
Andrew D. Bluth (SBN: 232387)
Danielle Ward Mason (*pro hac vice forthcoming*)
Singleton Schreiber, LLP
1414 K Street, Suite 470
Sacramento, CA 95814
Telephone: (916) 248-8478
Facsimile: (619) 255-1515

Attorneys for Plaintiff

**ELECTRONICALLY FILED**
Superior Court of California,
County of Alameda
07/18/2024 at 04:43:15 PM
By: Damaree Franklin,
Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ALAMEDA

CYNTHIA L. JONES, an individual,

               Plaintiff,

v.

L'ORÉAL USA, INC., a corporation;
L'ORÉAL USA PRODUCTS, INC., a
corporation; SOFT SHEEN-CARSON LLC, a
corporation; SOFT SHEEN*CARSON (W.I.),
INC., a corporation.; STRENGTH OF
NATURE, LLC, a corporation; GODREJ SON
HOLDINGS, INC., a corporation; AVLON
INDUSTRIES, INC., a corporation;
SAFEWAY INC., a corporation; THE VONS
COMPANIES, INC., a corporation; and DOES
1-100 inclusive,

               Defendants.

Case No.  24CV083993

**COMPLAINT FOR DAMAGES**

(1) Strict Liability—Failure to Warn;
(2) Strict Liability—Design Defect;
(3) Breach of Express Warranty;
(4) Breach of Implied Warranty of
Merchantability;
(5) Breach of Implied Warranty of Fitness for a
Particular Purpose
(6) Negligence—Design, Manufacture and
Sale;
(7) Negligence—Failure to Recall/Retrofit;
(8) Negligence—Failure to Warn;
(9-13) Fraud—Intentional Misrepresentation;
(14-18) Fraud—Concealment;
(19) Unlawful Business Practices in Violation
of Ca. Health & Safety Code Sec. 25249.6 Et
Seq.

**(Unlimited Civil – Amount Demanded
Exceeds $25,000)**

**DEMAND FOR JURY TRIAL**

## I.  INTRODUCTION

1.    This is an action for damages relating to L'ORÉAL USA, INC.; L'ORÉAL USA

PRODUCTS, INC.; SOFT SHEEN-CARSON LLC; SOFT SHEEN*CARSON (W.I.), INC.;

STRENGTH OF NATURE, LLC; GODREJ SON HOLDINGS, INC.; AVLON INDUSTRIES, INC.;

1  SAFEWAY INC.; THE VONS COMPANIES, INC.; AND DOES 1-100 INCLUSIVE, hereinafter

2  "Defendants'" design, manufacture, research, sale, testing, marketing, advertising, promotion, and/or

3  distribution of chemical hair relaxer products ("Products"). These Products, commonly referred to as

4  "hair relaxers," are a type of lotion or cream product that uses the chemicals contained therein to alter

5  the structure of very tight curls or curly hair, thereby "relaxing" the curls.

6      2.    The Products are common among women in the United States and are historically

7  marketed particularly to Black and Brown women with tight curls or curly hair. When used as

8  intended, the Products pose an increased risk of hormone-related cancers and reproductive problems

9  including the development of uterine fibroids. Defendants had knowledge of these increased risks but

10  hid them from their customers and the public as they continued to manufacture, sell, promote, market,

11  and distribute the Products.

12      3.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered

13  serious and permanent physical and emotional injuries, and uterine fibroids, and seeks damages

14  relating to Defendants' design, development, manufacture, testing, packaging, promotion, advertising,

15  marketing, distribution, labeling, and sale of Products, as described below.

## II.    THE PARTIES

17      4.    Plaintiff Cynthia L. Jones is a citizen and resident of the State of California, with her place

18  of residence being North Highlands, California in Sacramento County.

19      5.    Defendant L'Oréal USA, Inc. is, and at all times relevant to this action, was a

20  corporation, with its principal places of business and headquarters located at 575 Fifth Avenue, New

21  York, New York 10017 and 888 North Douglas Street, El Segundo, California 90245. At all times

22  relevant hereto, Defendant L'Oréal USA, Inc. regularly and continuously did business within this

23  judicial district by designing, testing, manufacturing, researching, marketing, advertising, promoting,

24  selling, and/or distributing the Products.

25      6.    Defendant L'Oréal USA Products, Inc. is, and at all times relevant to this action, was a

26  corporation, with its principal place of business and headquarters located at 10 Hudson Yards 347 10th

27  Avenue New York, New York 10001 and 888 North Douglas Street, El Segundo, California 90245.

28  At all times relevant hereto, Defendant L'Oréal USA Products, Inc. regularly and continuously did

1  business within this judicial district by designing, testing, manufacturing, researching, marketing,

2  advertising, promoting, selling, and/or distributing the Products.

3      7.      Defendant Soft Sheen-Carson LLC ["Soft Sheen"], is, and at all times relevant to this

4  action, was a corporation with its principal place of business and headquarters located at 2870

5  Peachtree Rd. Suite 464, Atlanta GA 40405 and process may be served upon its registered agent,

6  Corporation Service Company, 80 State Street, Albany, NY 12207. At all times relevant hereto,

7  Defendant Soft Sheen regularly and continuously did business within this judicial district by

8  designing, testing, manufacturing, researching, marketing, advertising, promoting, selling, and/or

9  distributing the Products.

10     8.      Defendant Soft Sheen*Carson (W.I.), Inc., ["Carson (W.I)"], is, and at all times

11  relevant to this action, was a corporation and process may be served upon its registered agent,

12  Corporate Services Company 251 Little Falls Drive, Wilmington, Delaware 19808. At all times

13  relevant hereto, Defendant Carson (W.I) regularly and continuously did business within this judicial

14  district by designing, testing, manufacturing, researching, marketing, advertising, promoting, selling,

15  and/or distributing the Products.

16     9.      Defendant Strength of Nature, LLC ["Strength of Nature"] is, and at all times relevant

17  to this action, was a corporation with its principal place of business and headquarters located at 64

18  Ross Road, Savannah, GA 31405 and process may be served upon its registered agent, Karan Sood at

19  64 Ross Road, Savannah GA 31405. At all times relevant hereto, Defendant Strength of Nature

20  regularly and continuously did business within this judicial district by designing, testing,

21  manufacturing, researching, marketing, advertising, promoting, selling, and/or distributing the

22  Products.

23     10.     Godrej SON Holdings, Inc. ["Godrej SON"] is, and at all times relevant to this action,

24  was a corporation with its principal place of business and headquarters located at 64 Ross Road,

25  Savannah GA, 31405, and process may be served upon its registered agent, Karan Sood at 64 Ross

26  Road, Savannah, GA 31405. At all times relevant hereto, Defendant Godrej SON regularly and

27  continuously did business within this judicial district by designing, testing, manufacturing,

28  researching, marketing, advertising, promoting, selling, and/or distributing the Products.

11.      Defendant Avlon Industries, Inc. ["Avlon"], is, and at all times relevant to this action, was a corporation with its principal place of business and headquarters located at 1999 N 15th Ave Melrose Park, IL, 60160, and process may be served upon its registered agent, Kenneth J. Nemec, Jr. 835 McClintock Dr., 2nd Floor, Blurr Ridge, IL 60527. At all times relevant hereto, Defendant Avlon regularly and continuously did business within this judicial district by designing, testing, manufacturing, researching, marketing, advertising, promoting, selling, and/or distributing the Products.

12.      Defendant Safeway Inc. ["Safeway"] is and at all times relevant to this action, was a California citizen with its principal place of business and headquarters located at 11555 Dublin Canyon Road, Pleasanton, CA 94588 in Alameda County, and process may be served upon its registered agent Amanda Garcia at 330 N Brand Blvd, Glendale, CA 91203. At all times relevant hereto, Defendant Safeway regularly and continuously did business within this state and county, including at its corporate headquarters, located at 11555 Dublin Canyon Road, Pleasanton, CA 94588, by marketing, advertising, promoting, selling, and/or distributing the Products.

13.      Defendant The Vons Companies, Inc. ["Vons Companies"] is and at all times relevant to this action, was California citizen with its principal place of business and headquarters located at 11555 Dublin Canyon Road, Pleasanton, CA 94588 in Alameda County, and process may be served upon its registered agent Amanda Garcia at 330 N Brand Blvd, Glendale, CA 91203. At all times relevant hereto, Defendant Vons regularly and continuously did business within this state and county, including at its corporate headquarters, located at 11555 Dublin Canyon Road, Pleasanton, CA 94588, by marketing, advertising, promoting, selling, and/or distributing the Products.

### III.      JURISDICTION AND VENUE

14.      This Court has jurisdiction over the claims and causes of action asserted herein because such claims arise out of all of the Defendants' unlawful business practices within the State of California, at least some of the Defendants are citizens of the State of California, and Plaintiffs' injuries were suffered within the State of California as a result of Defendants' conduct.

15.      Venue is proper in this Court because: Pursuant to California Code of Civil Procedure section 395, at least some of the Defendants are residents of Alameda County; all of the Defendants

1   transact business in California and in the County of Alameda; and all of the Defendants have

2   committed unlawful acts in the County; thus, a substantial part of the events giving rise to the claims

3   alleged herein occurred in this County.

4              **IV.**   **STATEMENT OF FACTS**

5      16.    Each of the preceding paragraphs is incorporated by reference herein.

6      17.    At all pertinent times, all Defendants were engaged in the research, development,

7   manufacture, design, testing, sale, and marketing of the chemical hair relaxer products ("Products")

8   and introduced such products into interstate commerce with knowledge and intent that such Products

9   be sold in the State of California.

10      18.    At all times material hereto, Defendants L'Oréal USA, Inc., L'Oréal USA Products,

11   Inc., Soft Sheen, and Carson (W.I) developed, tested, assembled, manufactured, packaged, labeled,

12   prepared, distributed, marketed, supplied, and/or sold the defective chemical hair relaxer Products,

13   Dark & Lovely and Mizani.

14      19.    Upon information and belief, Defendants L'Oréal USA, Inc., L'Oréal USA Products,

15   Inc., Soft Sheen, and Carson (W.I)'s hair relaxer Products, Dark & Lovely and Mizani contained

16   phthalates, including but not limited to diethyl phthalate (DEP), bis(2-ethyhexyl) phthalate (DEHP),

17   and benzylbutyl phthalate.

18      20.    Upon information and belief Defendants L'Oréal USA, Inc., L'Oréal USA Products,

19   Inc., Soft Sheen, and Carson (W.I)'s hair relaxer Products, Dark & Lovely and Mizani contained

20   bisphenol A.

21      21.    Upon information and belief, Defendants L'Oréal USA, Inc., L'Oréal USA Products,

22   Inc., Soft Sheen, and Carson (W.I)'s hair relaxer Products, Dark & Lovely and Mizani contained

23   cyclosiloxanes, including but not limited to octamethylcycloetrasiloxane (D4),

24   decamethylcyclopentasiloxane (D5), and dodecamethylcyclohexylsiloxane (D6).

25      22.    Upon information and belief, Defendants L'Oréal USA, Inc, L'Oréal USA Products,

26   Inc., Soft Sheen, and Carson (W.I)'s hair relaxer Products, Dark & Lovely and Mizani contained

27   parabens, including but not limited to methyl paraben, ethyl paraben, bis(2-ethylhexyl) adipate, and

28   butyl paraben.

23.    Upon information and belief, Defendants L'Oréal USA, Inc., L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I)'s hair relaxer Products, Dark & Lovely and Mizani contained antimicrobials including but not limited to o-phenylphenol, triclosan, and triclocarban.

24.    Upon information and belief, Defendants L'Oréal USA, Inc., L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I)'s hair relaxer Products, Dark & Lovely and Mizani contained ethanolamines, including but not limited to menoethanolamine and diethanolamine.

25.    Upon information and belief, Defendants L'Oréal USA, Inc., L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I)'s hair relaxer Products, Dark & Lovely and Mizani contained alkylphenols, including but not limited to 4-t-octylphenol, 4-t-nonylphenol, nonylphenol monoethoxylate, and nonylphenol diethoxylate.

26.    Upon information and belief, Defendants L'Oréal USA, Inc., L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I)'s hair relaxer Products, Dark & Lovely and Mizani contained UV filters including, but not limited to benzophenone, benzophenone-1, benzophenone-2, benzophenone-3, oxtinoxate, and octadimethyl PABA.

27.    Upon information and belief, Defendants L'Oréal USA, Inc., L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I)'s hair relaxer Products, Dark & Lovely and Mizani contained fragrances, including but not limited to benzylcetate, eugenol, hexyl cinnemal, limonene, linalool, methyl eugenol, methyl salicylate, pinene, terpineol, AHTN, bucinal, diphenyl ether, DPMI, HHCB, isobornyl acetate, methyl ionone, musk ketone, musk xylene, and phenethyl alcohol.

28.    At all times material hereto, Defendants L'Oréal USA, Inc., L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I) placed defective hair relaxer Products into the stream of interstate commerce.

29.    Plaintiff Jones used the following L'Oréal USA, Inc., L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I) Products:

    a.  Dark & Lovely No-Lye Children Relaxer System; and

    b.  Mizani Moderate Curl Reduction Relaxer with Shea Butter, Cocoa Butter, and Honey.

30.    At all pertinent times, all Defendants were engaged in the research, development,

1   manufacture, design, testing, sale, and marketing of the chemical hair relaxer products ("Products")

2   and introduced such products into interstate commerce with knowledge and intent that such products

3   be sold in the State of California.

4       31.    At all times material hereto, Defendants Godrej SON and Strength of Nature

5   developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed,

6   supplied, and/or sold the defective chemical hair relaxer Products, Just For Me, TCB, Motions, and

7   Dr. Miracle's.

8       32.    Upon information and belief, Defendants Godrej SON, Strength of Nature's product,

9   Just For Me, TCB, Motions, and Dr. Miracle's hair relaxers contained phthalates, including but not

10  limited to diethyl phthalate (DEP), bis(2-ethyhexyl) phthalate (DEHP), and benzylbutyl phthalate.

11      33.    Upon information and belief, Defendants Godrej SON, Strength of Nature's Products,

12  Just For Me, TCB, Motions, and Dr. Miracle's hair relaxers contained bisphenol A.

13      34.    Upon information and belief, Defendants Godrej SON, Strength of Nature's Products,

14  Just For Me, TCB, Motions, and Dr. Miracle's hair relaxers contained cyclosiloxanes, including but

15  not limited to octamethylcycloetrasiloxane (D4), decamethylcyclopentasiloxane (D5), and

16  dodecamethylcyclohexylsiloxane (D6).

17      35.    Upon information and belief, Defendants Godrej SON, Strength of Nature's Products,

18  Just For Me, TCB, Motions, and Dr. Miracle's hair relaxers contained parabens, including but not

19  limited to methyl paraben, ethyl paraben, bis(2-ethylhexyl) adipate, and butyl paraben.

20      36.    Upon information and belief, Defendants Godrej SON, Strength of Nature's product,

21  Just For Me, TCB, Motions, and Dr. Miracle's hair relaxer contained antimicrobials including but not

22  limited to o-phenylphenol, triclosan, and triclocarban.

23      37.    Upon information and belief, Defendants Godrej SON, Strength of Nature's product,

24  Just For Me, TCB, Motions, and Dr. Miracle's hair relaxers contained ethanolamines, including but

25  not limited to menoethanolamine and diethanolamine.

26      38.    Upon information and belief, Defendants Godrej SON, Strength of Nature's product,

27  Just For Me, TCB, Motions, and Dr. Miracle's hair relaxers contained alkylphenols, including but not

28  limited to 4-t-octylphenol, 4-t-nonylphenol, nonylphenol monoethoxylate, and nonylphenol

1  diethoxylate.

2      39.     Upon information and belief, Defendants Godrej SON, Strength of Nature's product,

3  Just For Me, TCB, Motions, and Dr. Miracle's hair relaxers contained UV filters including, but not

4  limited to benzophenone, benzophenone-1, benzophenone-2, benzophenone-3, oxtinoxate, and

5  octadimethyl PABA.

6      40.     Upon information and belief, Defendants Godrej SON, Strength of Nature product, Just

7  For Me, TCB, Motions, and Dr. Miracle's hair relaxers contained fragrances, including but not limited

8  to benzylcetate, eugenol, hexyl cinnemal, limonene, linalool, methyl eugenol, methyl salicylate,

9  pinene, terpineol, AHTN, bucinal, diphenyl ether, DPMI, HHCB, isobornyl acetate, methyl ionone,

10  musk ketone, musk xylene, and phenethyl alcohol.

11     41.     At all times material hereto, Defendants Godrej SON and Strength of Nature placed

12  defective hair relaxer Products into the stream of interstate commerce.

13     42.     Plaintiff Jones used the following Defendants Godrej SON and Strength of Nature's

14  Products:

15          a.   Just for Me No-Lye Conditioning Crème Relaxer with Sunflower Oil, Shea Butter,

16               Coconut Milk, and Vitamin E;

17          b.   Just for Me No-Lye Conditioning Crème Relaxer Kit Regular;

18          c.   TCB No Base Hair Relaxer with Protein and DNA Mild;

19          d.   Motions No-Lye Relaxer System with Shea Butter, Argan Oil, and Coconut Oil;

20          e.   African Pride Regular Hair Relaxer; and

21          f.   Dr. Miracle's No-Lye Relaxer with Vitamins A and E.

22     43.     At all times material hereto, Defendant Avlon developed, tested, assembled,

23  manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the defective

24  chemical hair relaxer Product, Affirm.

25     44.     Upon information and belief, Defendant Avlon's Product, Affirm hair relaxers

26  contained phthalates, including but not limited to diethyl phthalate (DEP), bis(2-ethyhexyl) phthalate

27  (DEHP), and benzylbutyl phthalate.

28     45.     Upon information and belief Defendant Avlon's Product Affirm hair relaxers

1    contained bisphenol A.

2    46.    Upon information and belief, Defendant Avlon's Product Affirm hair relaxers

3    contained cyclosiloxanes, including but not limited to octamethylcycloetrasiloxane (D4),

4    decamethylcyclopentasiloxane (D5), and dodecamethylcyclohexylsiloxane (D6).

5    47.    Upon information and belief, Defendant Avlon's Product, Affirm hair relaxers

6    contained parabens, including but not limited to methyl paraben, ethyl paraben, bis(2-ethylhexyl)

7    adipate, and butyl paraben.

8    48.    Upon information and belief, Defendant Avlon's Product, Affirm hair relaxers

9    contained antimicrobials including but not limited to o-phenylphenol, triclosan, and triclocarban.

10    49.    Upon information and belief, Defendant Avlon's Product, Affirm hair relaxers

11    contained ethanolamines, including but not limited to menoethanolamine and diethanolamine.

12    50.    Upon information and belief, Defendant Avlon's Product, Affirm hair relaxers

13    contained alkylphenols, including but not limited to 4-t-octylphenol, 4-t-nonylphenol, nonylphenol

14    monoethoxylate, and nonylphenol diethoxylate.

15    51.    Upon information and belief, Defendant Avlon's Product, Affirm hair relaxers

16    contained UV filters including, but not limited to benzophenone, benzophenone-1, benzophenone-2,

17    benzophenone-3, oxtinoxate, and octadimethyl PABA.

18    52.    Upon information and belief, Defendant Avlon's Product, Affirm hair relaxers

19    contained fragrances, including but not limited to benzylcetate, eugenol, hexyl cinnemal, limonene,

20    linalool, methyl eugenol, methyl salicylate, pinene, terpineol, AHTN, bucinal, diphenyl ether, DPMI,

21    HHCB, isobornyl acetate, methyl ionone, musk ketone, musk xylene, and phenethyl alcohol.

22    53.    At all times material hereto, Defendant Avlon placed defective hair Products into the

23    stream of interstate commerce and Plaintiff Jones used Affirm Relaxer Products.

24    54.    Plaintiff Jones used Defendant Avlon's "Affirm" branded relaxer Products.

25    **PLAINTIFF JONES'S USE OF HAIR RELAXER PRODUCTS**

26    55.    Plaintiff Jones was first exposed to Endocrine Disrupting Chemicals ("EDCs") and/or

27    phthalate-based Products around 1989, at or around the age of eleven (11) when she began using

28    Defendants' Products.

56. Plaintiff Jones continued using Defendants' Products from around 1989 to 2020, from approximately age eleven (11) to forty-two (42), resulting in thirty-one (31) years of continuous exposure.

57. Between the ages of 14 and 42, Plaintiff Jones used L'Oréal USA, Inc., L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I)'s "Dark & Lovely" branded Products, including Dark & Lovely No-Lye Children Relaxer System.

58. Between the ages of 13 and 20, Plaintiff Jones used L'Oréal USA, Inc., L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I)'s "Mizani" branded Products, including Mizani Moderate Curl Reduction Relaxer with Shea Butter, Cocoa Butter, and Honey.

59. Between the ages of 11 to 14, Plaintiff Jones used Godrej SON and Strength of Nature's "Just for Me" branded Products, including:

    a. Just for Me No-Lye Conditioning Crème Relaxer with Sunflower Oil, Shea Butter, Coconut Milk, and Vitamin E; and

    b. Just for Me No-Lye Conditioning Crème Relaxer Kit Regular.

60. Between the ages of 11 to 14, Plaintiff Jones used Godrej SON and Strength of Nature's "TCB" branded Products, including TCB No Base Mild Hair Relaxer with Protein and DNA.

61. Between the ages of 30 to 32, Plaintiff Jones used Godrej SON and Strength of Nature's "African Pride" branded Products, including African Pride Regular Hair Relaxer.

62. Between the ages of 16 to 42, Plaintiff Jones used Godrej SON and Strength of Nature's "Motions" branded Products, including Motions No-Lye Relaxer System with Shea Butter, Argan Oil, and Coconut Oil.

63. Between the ages of 21 to 42, Plaintiff Jones used Godrej SON and Strength of Nature's "Dr. Miracle's" branded Products, including Dr. Miracle's No-Lye Relaxer with Vitamins A and E.

64. Between the ages of 13 to 20, Plaintiff Jones used Defendant Avlon's "Affirm" branded Products.

65. Plaintiff Jones frequently purchased Relaxer Products from Defendants Safeway's and Vons Companies' "Safeway" stores in California.

66. Plaintiff Jones received retouches to relax her new growth approximately every four

(4) to six (6) weeks, resulting in approximately eight (8) to twelve (12) applications of relaxer per year.

67.  Plaintiff Jones used Defendants' Products by applying them to her hair by having a professional at a hair salon apply Defendants' Products exactly as instructed by Defendants.

68.  Plaintiff Jones kept the Product on her hair for the time allotted in the instructions.

69.  There was never any indication, on the Products packaging or otherwise, that this normal use could and would cause her to develop uterine fibroids.

70.  Plaintiff Jones's last purchase of hair relaxer products was in 2020 when she decided to go natural.

71.  Years earlier, in approximately 2005, Plaintiff Jones was diagnosed with uterine fibroids at the young age of twenty-seven (27) years old.

72.  Plaintiff Jones's fibroid symptoms affected her daily life. She struggled with heavy and irregular periods, severe pain and cramping, and sharp pain during intercourse.

73.  A few years after her diagnosis, Plaintiff Jones underwent uterine ablation to treat her fibroids. However, the treatment was unsuccessful, and her symptoms continued to worsen.

74.  In 2009, living with the pain and heavy bleeding became so unbearable that Plaintiff Jones was forced to leave her full-time job.

75.  After struggling with grueling symptoms for two more years, Plaintiff Jones made the impossible decision between her health and her desire to have more children. When she was just thirty-two (32) years old, Plaintiff Jones underwent a total abdominal hysterectomy on February 11, 2011.

76.  Plaintiff Jones then started hormone replacement therapy and began menopause at the young age of thirty-four (34).

77.  In 1998, prior to Plaintiff Jones's diagnosis of uterine fibroids, Plaintiff Jones gave birth to her first child prematurely at thirty (30) weeks into her pregnancy. Before delivering her child, Plaintiff Jones was hospitalized for a week due to considerations for the baby's safety.

78.  After her hysterectomy, Plaintiff Jones was forced to give up her dream of having more children forever. However, before Plaintiff Jones even had surgery, her fibroids prevented her from having children because of the severe pain she experienced during intercourse.

1    79.    Plaintiff Jones's inability to have children caused significant strain on her marriage,

2    and eventually, contributed to Plaintiff Jones and her husband getting a divorce.

3    80.    Plaintiff Jones's struggle with fibroids has negatively impacted her mental health

4    leading her to develop anxiety and depression.

5    81.    Plaintiff Jones could not and did not discover the causal connection between her use of

6    Defendants' hair relaxer products and her own reproductive issues until late October 2022, when the

7    Chang study was released linking the use of chemical hair straightener or relaxers to uterine cancers

8    and raising awareness of its connection to other reproductive system issues.

9    82.    On October 18, 2022, just one day after the Chang study was published, its results were

10   widely published and highlighted on multiple major television news networks and online and social

11   media platforms.[1]

12   83.    Following the release of this study, a press conference was held for a woman in Illinois

13   filing of the first lawsuits against Defendants for the development of uterine cancer, which went

14   similarly viral, including in the state of California where Plaintiff Jones resides.

15   84.    The publicity of the study put Plaintiff Jones on notice for the first time that she may

16   have similarly been harmed reproductively by her use of hair relaxers and that she may have a legal

17   claim as a result.

18   85.    As a result of Defendants' acts and/or omissions, Plaintiff Jones suffered extreme pain

19

20   [1] *See, e.g.,* Jacqueline Howard, US woman files lawsuit against L'Oréal, claiming chemical hair
21   straightening products are linked to her cancer, CNNHealth (Oct. 24, 2022), *available at*
     https://www.cnn.com/2022/10/24/health/hair-straightening-products-lawsuit/index.html (last
22   accessed Feb. 27, 2023); Julian Mark, She was diagnosed with cancer at 28. Her lawsuit blames hair
     relaxers, The Washington Post (Oct. 27, 2022), *available at*
23   https://www.washingtonpost.com/nation/2022/10/27/loreal-lawsuit-hair-straightener-relaxer/ (last
24   accessed Feb. 27, 2023); Fox32News, Woman claims L'Oreal chemical relaxers caused uterine
     cancer: lawsuit, Fox5Atlanta (Oct. 24, 2022), *available at*
25   https://www.fox5atlanta.com/news/woman-claims-loreal-chemical-relaxers-caused-uterine-cancer-
     lawsuit (last accessed Feb. 27, 2023);  Amanda Su & Sabina Ghebremedhin, Woman sues 5
26   companies alleging their chemical hair-straightening products caused her uterine cancer, Good
     Morning America (Oct. 25, 2002), *available at*
27   https://www.goodmorningamerica.com/wellness/story/woman-sues-companies-alleging-chemical-
28   hair-straightening-products-92007557 (last accessed Feb. 27, 2023).

1    and suffering, and extreme emotional distress.

## HAIR STRAIGHTENERS AND RELAXERS

### A.    Market for Hair Straightening and Relaxing Products

86.    Black people make up about 13 percent of the U.S. population, but by one estimate, their spending accounts for as much as 22 percent of the $42 billion-a-year personal care products market, suggesting that they buy and use more of such products – including those with potentially harmful ingredients– than Americans as a whole.[2]

87.    In an analysis of ingredients in 1,177 beauty and personal care products marketed to Black women, about one in twelve (12) was ranked highly hazardous on the scoring system of EWG's Skin Deep® Cosmetics Database, a free online resource for finding less-hazardous alternatives to personal care products. The worst-scoring products marketed to Black women were hair relaxers. Each of these categories had an average product score indicating high potential hazard.

88.    In the U.S. alone, Black consumers spend over $1 trillion each year, with a significant amount of that spending toward hair care products.

89.    In 2020, the global Black hair care market was estimated at $2.5 billion, with the hair relaxer market alone estimated at $718 million in 2021, with the expectation of growth to $854 million annually by 2028.

### B.    History of Hair Relaxers in America

90.    In its natural or virgin state, afro-hair texture is characterized by coily, springing, zigzag, and s-curve curl patterns; as well as its density, fullness, texture, and feel.[3]

91.    Afro-textured hair "naturally grows up and out." [4]

---

[2] Thandisizwe Chimurenga, *How Toxic is Black Hair Care?*, New America Media, Feb. 2, 2012, americamedia.org/2012/02/skin-deep-in-more-ways-than-one.php; *Personal Care Products Manufacturing Industry Profile*, Dun & Bradstreet First Research, August 2016, www.firstresearch.com/Industry-Research/Personal-Care-Products-Manufacturing.html (This report uses "Black" to describe not only people who identify as African-American, but Black people in the U.S. who come from the Caribbean or other areas. "African-American" is used only when a cited source specifies that term).

[3] Patrick Obukowcho, *Hair Relaxers: Science, Design, and Application*, 26, 14 (2018).

[4] Ayana Byrd & Lori Tharps, *When Black Hair Is Against the Rules*, The New York Times, April 30, 2014, https://www.nytimes.com/2014/05/01/opinion/when-black-hair-is-against-the-rules.html.

13

92.     In Africa, hair was seen as a source of personal and spiritual power. As the highest point of the body and "most elevated part of the body, some communities believe[d] [their hair] connected them with the divine."[5] For some, hair was the "conduit for spiritual interaction with God."[6]

93.     African hairstyles were also status symbols reflecting one's "marital status, age, religion, and rank in society" and one's tribe.[7] Warriors, kings, and queens wore braids to show their ranking in society.[8] The Wolof tribe in West Africa, wore braided styles when they went to war.[9]

94.     Most styling was extremely intricate and involved days of labor. "Only the mad and mourning did not do their hair."[10]

95.     One of the of first things slave masters did to enslaved people brought to American soil was cut their hair. This was a way to "break their spirit and make slaves easier to control."[11] What was once a symbol of pride became a tool for subordination and degradation. As such, hair cutting was also a common form of punishment.

96.     The very nature of slavery involved working long hours in dire conditions. Enslaved people had "no time to care about one's appearance or one's hair."[12] "Hair that was once a source of pride and expression of identity was often tucked away beneath cloth to cover rough, tangles tresses and shield them from hours spent toiling under the sun."[13] The hair that was once an important spiritual

---

[5] Nikki Fox, *6 Things Everyone Should Know About Black Hair History,* Odele, Feb. 22, 2021. https://odelebeauty.com/blogs/the-rinse/black-hair-history-facts.
[6] Rumeana Jahangir, *How Does Black Hair Reflect Black History?*, BBC News. May 31, 2015. https://www.bbc.com/news/uk-england-merseyside-31438273.amp.
[7] *History of Braids: More Than Just a Hairstyle*, Genesis Career College, https://www.genesiscareer.edu/history-of-braids-more-than-just-a-hairstyle/.
[8] *Id.*
[9] *Id.*
[10] Hlonipha Mokoena, *From Slavery to Colonialism and School Rules, Navigating the History of Myths about Black Hair*, Quartz Africa, Fe., 24, 2018, https://qz.com/africa/1215070/black-hair-myths-from-slavery-to-colonialism-school-rules-and-good-hair/.
[11] Brenda A. Randle, *I Am Not My Hair*, Race, Gender and Class, Volume 22, Number 1-2, 114 – 121 (2015).
[12] Nikki Fox, *6 Things Everyone Should Know About Black Hair History,* Odele, Feb. 22, 2021. https://odelebeauty.com/blogs/the-rinse/black-hair-history-facts.
[13] *Id.*

14

1    and cultural symbol became tangled and matted.

2        97.    White Americans did not see African or Black hair as beautiful. Instead, they described

3    it as "closer to sheep wool than human hair."[14] African hair that was once considered an attractive

4    feature became a source of shame, to be covered or cut.

5        98.    In 1786, the Governor of Louisiana, Don Esteban Miro, passed the "Tignon Law"

6    requiring Black women to wear a tignon (scarf) over their hair as a way of signifying they were

7    members of the slave class, *even if they were free*.[15]

8        99.    "By requiring free Black women to wear the same hair covering, the governor was

9    marking them as related to enslaved women rather than white women."[16]

10       100.    This law sent a direct signal to Black people that their hair held a symbol of inequality

11    and was a sign of poverty regardless of their actual social status.

12       101.    Because afro-textured hair was kinky and reflected African heritage rather than

13    European ancestry afro-textured, hair was a symbol of low social status.[17]

14       102.    Slaves with lighter skin and less coily hair were favored to work in the home, a far less

15    strenuous position than in the plantation fields.[18]

16       103.    Texturism, the idea that "good hair" is equated with a straighter hair texture, was

17    cemented into American culture during its period of chattel slavery. "Eurocentric beauty standards

18    dictated that coily hair and dark skin were unattractive and inferior"; "lighter skinned and straighter

19    haired slaves were favored and selected for more desirable positions in the house" as opposed to the

20    fields.[19]  Thus, "the texture of an enslaved person's hair could determine their value and working

21

22    ―――――――――――――――――――

23    [14] Ayana Byrd & Lori Tharps, *When Black Hair Is Against the Rules*, The New York Times, April 30, 2014. https://www.nytimes.com/2014/05/01/opinion/when-black-hair-is-against-the-rules.html

24    [15] Nikki Fox, *6 Things Everyone Should Know About Black Hair History*, Odele, Feb. 22, 2021, https://odelebeauty.com/blogs/the-rinse/black-hair-history-facts.

25    [16] *Fashionable Rebellion*, Women and the American Story, New York Historical Society Museum and Library, https://wams.nyhistory.org/settler-colonialism-and-revolution/settler-colonialism/fashionable-rebellion/.

26

27    [17] Brenda A. Randle, *I Am Not My Hair*, Race, Gender and Class, Volume 22, Number 1-2, 114 – 121 (2015).

28    [18] *Id.*
     [19] *Id.*

conditions, which in turn might impact their overall health, comfort and chances for freedom[.]"[20]
Naturally, Black men and women strived for a better life in America and were taught that the straighter
and less kinky their hair was, the better of a life they could have. This fueled the desire for tools and
products that could straighten Black hair texture.

104.    Gone were the days of African hairstyles and pride. "The goal of grooming the hair had
morphed from the elaborate and symbolic designs of Africa into an imitation of White styles adapted
to Black kinks and curls."[21]

105.    To obtain a better life, so many slaves would go to "dangerous lengths to straighten
their hair."[22]

106.    Black, or afro-textured hair texture, can be manipulated into a straightened state with
hair tools and products. Prior to the invention of the chemical relaxer in 1900s, individuals would
"press" afro-textured hair with metal hair tools such as the "hot comb." Pressing combs or hot combs
are metal hair tools that are first heated in a stove or ceramic heater, then pressed into hair strands to
temporarily straighten them.[23]

107.    The hot comb was first invented by Frenchman, Marcel Grateau who popularized the
hair styling tool in Europe in the 1870s, including advertisements in catalogs of major department
stores like Sears and Bloomingdales.[24] The hot comb was later modified by Madam C.J. Walker, a
trailblazer in the development of black hair products, to be manufactured with wider comb teeth.[25]
With Walker's system, once the comb was heated a softening ointment was then applied for easier

---

[20] *Id.*
[21] Brenda A. Randle, *I Am Not My Hair*, Race, Gender and Class, Volume 22, Number 1-2, 114 –
121 (2015).
[22]  Nikki Fox, *6 Things Everyone Should Know About Black Hair History,* Odele, Feb. 22, 2021.
https://odelebeauty.com/blogs/the-rinse/black-hair-history-facts
[23] Jaclyn Peterson, *The Price of Beauty*, CTI Charlotte Teachers Institute Curriculum (2021).
[24] Henry Louis Gates, *Madam Walker, the First Black American Woman to Be a Self-Made
Millionaire*, PBS 100 Amazing Facts About the Negro, https://www.pbs.org/wnet/african-americans-
many-rivers-to-cross/history/100-amazing-facts/madam-walker-the-first-black-american-woman-to-
be-a-self-made-millionaire/ (last visited October 18, 2022).
[25] Cookie Lommel, Madam C.J. Walker 60 (1993)

16

1   manipulation of Black hair.[26]

2   108.   Today, afro-textured hair is still often straightened with a hot comb rather than with

3   chemicals. However, pressed hair remains susceptible to "shrinkage." Shrinkage is the process by

4   which curly-kinky hair that has been temporarily straightened coils back into its natural state once the

5   hair interacts with water, humidity, or perspiration,[27] creating a shorter or fuller appearance.



i.   **The Invention of the Chemical Relaxer**

109.   African American inventor Garrett Augustus Morgan, discovered and created a system

that would permanently straighten afro-textured hair, eliminating the issue of "shrinkage."

110.   In addition to being an inventor, Morgan was also a tailor. In the early 1900s, Morgan

---

[26] *Id.* at 62.
[27] *Id.*

1  was repairing his sewing machines and wanted to find a way to polish the needles to stitch fabrics

2  more smoothly.[28] He applied a chemical solution to the needles and wiped the solution off with a rag

3  and later noticed that the "curly" fibers in the rag were straightened after exposure to the chemical.[29]

4      111.    Morgan further tested the chemical on a dog with curly hair and eventually on his own

5  hair. The chemical solution successfully straightened curly hair. He turned his formula into a gel-hair

6  product, creating the G.A. Morgan Hair Refining Cream which was marketed in 1913.





<hr/>

[28] Patrick Obukowcho, Hair Relaxers: Science, Design, and Application 27 (2018).

[29] Mary N. Oluonye, Garrett Augustus Morgan: Businessman, Inventor, Good Citizen 28 (2008).

18

112.    Morgan's invention paved the way for the alkaline relaxer and later development of additional chemical based permanent hair straightening products in the Black hair care market.[30]

**ii.    Defendants' Marketing Efforts**

113.    In 1971, Dark and Lovely manufactured the first lye relaxer. The formula consisted of sodium hydroxide, water, petroleum jelly, mineral oils, and emulsifiers.[31]

114.    In the 1970s, lye relaxer users and manufacturers noticed that the lye formula stripped proteins from the hair strand, resulting in the hair thinning and breaking.[32] As a result, Johnson and Johnson marketed the first "gentle" hair relaxer in 1981, which used milder chemicals such as potassium hydroxide and lithium[33]



115.    Over time, Soft & Beautiful and other chemical relaxer manufacturers developed herbal and botanical hair relaxer formulas.[34]

---

[30] Patrick Obukowcho, Hair Relaxers: Science, Design, and Application 27 (2018).
[31] Cicely A. Richard, *This History of Hair Relaxers*, September 29, 2017
https://classroom.synonym.com/the-history-of-hair-relaxers-12078983.html.
[32] *Id.*
[33] *Id.*
[34] *Id.*

1    116.    For decades, Defendants have marketed their hair relaxer products to African American

2    customers across the United States, and the world, reinforcing the same historical Eurocentric

3    standards of beauty. Defendant's marketing scheme relies heavily on branding and slogans that

4    reinforce straight hair as the standard.[35]

 

5

6

7

8

9

10

11

12

13

14

15

16    117.    For example, in the first ad above, L'Oreal touts "how beautiful Black hair *can be*"

17    (emphasis added), implying that in its natural state Black Hair is *not as* beautiful as it *could be* if

18    straightened.

19    118.    Defendants misrepresented that "no lye" relaxers, or "gentle treatment" relaxers were

20    milder and/or safer than alternative relaxers. This was false. Hair relaxer products marketed as using

21    "gentle treatment" or similar terminology are not any safer than the other hair relaxer products on the

22    market.

23    119.    Finally, Defendant L'Oréal depicts a Black woman with straight hair on each of its

24    Dark and Lovely and Optimum brands of relaxer product.

25

26

27

28    [35] *Id.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17    120.    Defendants L'Oréal's and SoftSheen's Dark & Lovely brand hair relaxer products are

18 intentionally labeled as providing a "healthy" gloss and containing "nourishing" shea butter with

19 jojoba and avocado oils. The terms "healthy" and "nourishing" suggest that hair relaxer products are

20 safe and even beneficial for the body when they are not.

21
22
23
24
25
26
27
28



121.    Defendant L'Oréal and Softsheen-Carson's Beautiful Beginnings hair relaxer product line, which is targeted to young Black girls, states that it "moisturizes, nourishes, and prevents breakage…**without hurting your scalp**." These representations suggest that their hair relaxer products are safe and even beneficial for children's bodies when they are not.



22

## C.    Chemical Relaxer Use

122.    Hair relaxers are classified as creams or lotions which are specifically marketed to Black and Brown women to "tame" their ethnic hair by making it smoother, straighter, and easier to manage on a daily basis.

123.    Hair relaxing, or lanthionization, can be performed by a professional cosmetologist in a salon or barbershop, or at home with at-home relaxer kits designed for individual use. These home kits are sold in grocery, drug, and beauty supply stores in urban and rural cities throughout the United States.

124.    Relaxers are applied to the base of the hair shaft and left in place for a "cooking" interval, during which the relaxer alters the hair's texture by purposefully damaging the hair's natural protein structure. The effect of this protein damage straightens and smooths the hair. After a period of weeks four (4) to eight (8) weeks on average, depending on the hair's natural growth rate), the treated portion of the hair grows away from the scalp as new growth sprouts from the roots, requiring additional relaxer treatment to smooth the roots. These additional treatments are colloquially referred to in the community as "re-touches", resulting in women relaxing their new growth every four to eight weeks on average, usually for decades.

125.    Hair relaxers can, and often do, cause burns and lesions in the scalp, facilitating entry of hair relaxer constituents into the body. The main ingredient of "lye" relaxers is sodium hydroxide; no-lye relaxers contain calcium hydroxide and guanidine carbonate, and "thio" relaxers contain thioglycolic acid salts. No-lye relaxers are advertised to cause fewer scalp lesions and burns than lye relaxers, but there is little evidence to support this claim.

126.    In some studies, up to 90% of Black and brown women have used hair relaxants and straighteners, which is more commonplace for these women than for any other race. Hair products such as relaxers contain hormonally active and carcinogenic compounds, such as phthalates, known to cause endocrine disruption, which are not required to be listed separately as ingredients and are often broadly lumped into the "fragrance" or "perfume" categories. Relaxer habits usually begin in formative childhood years, and adolescence is likely a period of enhanced susceptibility to debilitating

1    conditions resulting from exposure to these chemicals.[36]

2        127.    In the 1990s, the first relaxer product for young Black girls, Just for Me, hit the market

3    with a catchy advertising jingle that captured consumer attention.[37] It soon became one of the most

4    popular straightening treatments, touting a no-lye formula designed to be gentler for children's

5    sensitive scalps.

6        128.    Once relaxer use begins in childhood, it usually becomes a lifetime habit. The

7    frequency of scalp burns with relaxer application can increase the risk of permanent and debilitating

8    diseases associated with long-term exposure to endocrine-disrupting chemicals.

9        129.    The reasons for Black women's use and dependence upon hair straightening products

10    are associated with various factors, including (1) slavery and internalization of acceptable beauty

11    norms, (2) media and advertisements, (3) assimilation and economic security, (4) ease of hair

12    maintenance, and (5) culture.[38]

13        130.    In a culture where Black women feel reduced to a lower standard of beauty, these

14    factors impact women of color's decisions to begin and continue using products to alter the natural

15    state of their hair, many times as a protective mechanism against racial discrimination. In the Dove

16    CROWN Study for girls (2021) conducted by JOY Collective, the following statistics were

17    discovered:[39]

18        a.    100% of Black elementary school girls in majority-white schools who report experiencing

19           hair discrimination state they experience the discrimination by the age of ten (10).

20

21    [36] Patrick Obukowcho, Hair Relaxers: Science, Design, and Application 27 (2018).

22    [37] Dana Oliver, *The '90s Just For Me Hair Relaxer Commercial Song Is Stuck In Our Hea*ds, HuffPost, Feb. 1, 2014. https://www.huffpost.com/entry/just-for-me-hair-relaxer-commercial-

23    song_n_4689981

24    [38] Chanel Donaldson, *Hair Alteration Practices Amongst Black Women and the Assumption of Self-Hatred*, Applied Psychology Opus, https://wp.nyu.edu/steinhardt-appsych_opus/hair-alteration-

25    practices-amongst-black-women-and-the-assumption-of-self-hatred/

    [39] The CROWN Act was created in 2019 by Dove and the CROWN Coalition, in partnership with

26    then State Senator Holly J. Mitchell of California, to ensure protection against discrimination based on race-based hairstyles by extending statutory protection to hair texture and protective styles such

27    as braids, locks, twists, and knots in the workplace and public schools.

    https://www.thecrownact.com/

28

COMPLAINT FOR DAMAGES

b.  86% of Black teens who experience discrimination state they have experienced discrimination based on their hair by the age of twelve (12).

c.  66% of Black girls in majority-white schools report experiencing hair discrimination compared to 45% of Black girls in all school environments.

d.  53% of Black mothers, whose daughters have experienced hair discrimination, say their daughters experienced discrimination as early as five (5) years old.

e.  47% of Black mothers report having experienced discrimination related to their hair.

f.  Trauma from these experiences cause girls to miss days from school; teenage Black girls are missing a week of school per year due to hair dissatisfaction.

g.  While 90% of Black girls believe their hair is beautiful, the microaggressions and discrimination she endures has an impact on how she sees herself.

h.  Black women are 1.5 times more likely to be sent home from the workplace because of their hair.

i.  Black women are 89% more likely than white women to agree with this statement, "I have to change my hair from its natural state to fit in at the office."

131.    The CROWN Act of 2021 is a legislative bill introduced in both houses of Congress to address discrimination against protective hair styles worn predominantly by women of color. While the bill has not yet passed fully on a federal level, eighteen states have signed a version of the bill into state law. Unless, and until, the CROWN Act makes hair discrimination illegal in every state, children, teenagers, and women of color continue to face discriminatory practices related to their hair choices, with relaxing and straightening their hair being a defensive, yet dangerous and toxic option.

**D.    Endocrine Disrupting Chemicals**

132.    The endocrine system is indispensable for life and influences nearly every cell, organ, and process within the body.[40] The endocrine system regulates all biological processes in the body

---

[40] *Endocrine System: The Endocrine System Includes The Thyroid, Adrenals, and the Pituitary Gland*, Science Direct, https://www.sciencedirect.com/topics/psychology/endocrine-system

1   from conception through adulthood, including the development of the brain and nervous system, the

2   growth and function of the reproductive system, as well as the metabolism and blood sugar levels.[41]

3       133.   The endocrine system is a tightly regulated system made up of glands that produce and

4   release precise amounts of hormones that bind to receptors located on specific target cells throughout

5   the body.[42]

6       134.   Hormones, such as estrogen, testosterone, progesterone, and androgen, are chemical

7   signals that control or regulate critical biological processes.[43]

8       135.   When a hormone binds to a target cell's receptor, the receptor carries out the hormone's

9   instructions, the stimulus, and either switches on or switches off specific biological processes in cells,

10  tissues, and organs.[44]

11      136.   The precise functioning of the endocrine system is vital to maintain hormonal

12  homeostasis, the body's natural hormonal production and degradation. A slight variation in hormone

13  levels can lead to significant adverse-health effects, including reproductive impairment and infertility,

14  cancer, cognitive deficits, immune disorders, and metabolic syndrome.[45]

15      137.   Endocrine disrupting chemicals ("EDCs") are chemicals, or chemical mixtures, which

16  interfere with the normal activity of the endocrine system.

17      138.   EDCs can act directly on hormone receptors as mimics or antagonists or on proteins

18  that control hormone delivery.[46]

19      139.   EDCs disrupt the endocrine system and interfere with the body's hormonal homeostasis

20  in various ways.

---

[41] *Endocrine Disruption*, United States Environmental Protection Agency, Mar. 7, 2022, https://www.epa.gov/endocrine-disruption/what-endocrine-system

[42] *Id.*

[43] Id.

[44] Id.

[45] *Id.*; Michele La Merrill, et al., *Consensus on the Key Characteristics of Endocrine-Disrupting Chemicals as a Basis for Hazard Identification*, Nature Reviews Endocrinol, Nov. 12, 2019, https://www.nature.com/articles/s41574-019-0273-8

[46] Evanthia Diamanti-Kandarakis, et al., *Endocrine-Disrupting Chemicals: An Endocrine Society Scientific Statement*, Endocrine Reviews, June 30, 2009, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2726844/

140.    EDCs can cause the body to operate as if there were a proliferation of a hormone and thus over-respond to the stimulus or respond when it was not supposed to by mimicking a natural hormone.

141.    EDCs can increase or decrease the levels of the body's hormones by affecting the production, degradation, and storage of hormones.

142.    EDCs can block the hormone's stimulus by inducing epigenetic changes, modifications to DNA that regulate whether genes are turned on or off, or altering the structure of target cells' receptors.[47]

143.    EDCs are known to cause numerous adverse human health outcomes including endometriosis, impaired sperm quality, abnormalities in reproductive organs, various cancers, altered nervous system and immune function, respiratory problems, metabolic issues, diabetes, obesity, cardiovascular problems, growth, neurological, and learning disabilities.[48]

144.    EDCs that mimic the effects of estrogen in the body may contribute to disease risk because exposure to estrogen, endogenously and exogenously, is associated with a wide variety of reproductive diseases, including reproductive cancers, fibroids and endometriosis, and a woman's lifetime risk of developing these disease increases with greater duration and cumulative exposure.

145.    Natural and synthetic EDCs are present in hair products under the guise of "fragrance" and "perfumes", and thus enter the body when these products are exogenously applied to the hair and scalp. Studies exploring this issue have thus far classified EDCs as estrogens, phthalates, and parabens.

146.    Indeed, numerous studies spanning more than two decades have demonstrated the adverse impact EDCs including Di-2-ethylhexylphthalate have on the male and female reproductive

---

[47] Luis Daniel Martínez-Razo, et al., *The impact of Di-(2-ethylhexyl) Phthalate and Mono(2-ethylhexyl) Phthalate in placental development, function, and pathophysiology*, Environment International, January 2021, https://www.sciencedirect.com/science/article/pii/S0160412020321838?via%3Dihub
[48] *Endocrine Disrupting Chemicals (EDCs)*, Endocrine Society, Jan. 24, 2022, https://www.endocrine.org/patient-engagement/endocrine-library/edcs#:~:text=EDCs%20can%20disrupt%20many%20different,%2C%20certain%20cancers%2C%20respiratory%20problems%2C

COMPLAINT FOR DAMAGES

1   systems such as inducing endometriosis, abnormal reproductive tract formation, decreased sperm

2   counts and viability, pregnancy loss, and abnormal puberty onset.[49]

3       147.    Hair products used by Black women and children have been found to contain multiple

4   chemicals associated with endocrine disruption. In a 2018 study testing hair products, including hair

5   relaxers, relaxers marketed to children were found to contain the highest levels of four EDCs

6   prohibited in the European Union (DEHP, nonylphenol, BPA and diethanolamine) and  California

7   Prop 65 law (o-phenlyphenol), with one relaxer kit (Just For Me) containing all five of these EDCs.[50]

8       **i.    Phthalates**

9       148.    Phthalates are known EDCs which interfere with natural hormone production and

10   degradation and are detrimental to human health.[51]

11       149.    Phthalates are used in a variety of cosmetics and personal care products. Phthalates are

12   chemical compounds developed in the last century that are used to make plastics more durable. These

13   colorless, odorless, oily liquids are also referred to as "plasticizers" based on their most common uses.

14       150.    Phthalates also function as solvents and stabilizers in perfumes and other fragrance

15   preparations. Cosmetics that may contain phthalates include nail polishes, hair sprays, aftershave

16   lotions, cleansers, and shampoos.

17       151.    Phthalates are chemicals used to improve the stability and retention of fragrances and

18   to help topical products stick to and penetrate skin and hair.[52]

19

20

21

22

---

23   [49] Hee-Su Kim, et al., *Hershberger Assays for Di-2-ethylhexyl Phthalate and Its Substitute*
24   *Candidates*, Dev Reproduction, Mar. 22, 2018,
     https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5915764/.
25   [50] Helm Jessica S. et al., *Measurement of endocrine disrupting and asthma-associated chemicals in*
     *hair products used by Black women*, Environmental Research, Vol. 165:448-58 (2018),
26   https://doi.org/10.1016/j.envres.2018.03.030.
27   [51] Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health*, Healthcare (Basel)
     9, 603, May 9, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/
28   [52] Olivia Koski & Sheila Hu, Fighting Phthalates, National Resources Defense Council, April 20,
     2022, https://www.nrdc.org/stories/fighting-phthalates

152.    Phthalates are commonly used by cosmetics and hair care product manufacturers to make fragrances and colors last longer, and to make hair more flexible after a product is applied, among other uses.

153.    Phthalates can be found in most products that have contact with plastics during production, packaging, or delivery. Despite the short half-lives in tissues, chronic exposure to phthalates will adversely influence the endocrine system and functioning of multiple organs, which has negative long-term impacts on the success of pregnancy, child growth and development, and reproductive systems in both young children and adolescents. Several countries have established restrictions and regulations on some types of phthalates.[53]

154.    Phthalates are a series of chemical substances, which are mainly used as plasticizers added to polyvinyl chloride ("PVC") plastics for softening effects. Phthalates can potentially disrupt the endocrine system.[54]

155.    Under the authority of the Fair Packaging and Labeling Act ("FPLA"), the FDA requires an ingredient declaration on cosmetic products sold at the retail level to consumers.

156.    However, the regulations do not require the listing of the individual fragrance or flavor, or their specific ingredients, meaning phthalates evade listing when combined with a fragrance. As a result, consumers, including Plaintiff, are not able to determine from the ingredient declaration on the label if phthalates were present in a fragrance used in the herein referenced hair products used by the Plaintiff and placed into the stream of commerce by Defendants.

157.    Since 1999, the Centers for Disease Control ("CDC") found phthalates in individuals studied for chemical exposure.[55] Neither IARC nor NTP has evaluated DEHP with respect to human carcinogenicity.

158.    At all relevant times herein, Defendants' products contain phthalates, including Di-2-

---

[53] *Id.*
[54] *Id.*
[55] *Biomarker Groups*, National Report on Human Exposure to Environmental Chemicals, Center for Disease Control, https://www.cdc.gov/exposurereport/pdf/Biomarker_Groups_Infographic-508.pdf

1  ethylhexylphthalate.

2        **ii.**    **Di-2-ethylhexylphthalate**

3      159.    Di-2-ethylhexylphthalate[56] ("DEHP") is a highly toxic manufactured chemical[57] that is

4  not found naturally in the environment.[58]

5      160.    DEHP belongs to the family of chemicals called phthalates.[59]

6      161.    DEHP was first used in 1949 in United States and has been the most abundantly used

7  phthalate derivative in the twentieth century.[60]

8      162.    DEHP does not covalently bind to its parent material. Non-covalent bonds are weak

9  and, as a result, DEHP readily leaches into the environment increasing human exposure.[61]

10      163.    Humans are exposed to DEHP through ingestion, inhalation, dermal exposure for their

11  lifetimes, including intrauterine life.[62]

12      164.    The Agency for Toxic Substances and Disease Registry ("ATSDR") estimates that the

13  range of daily human exposure to DEHP is 3–30 µg/kg/day.[63]

14

15

16  [56] Also known as Bis(2-ethylhexyl) phthalate.

  [57] Sai Rowdhwal & Jiaxiang Chen, *Toxic Effects of Di-2-ethylhexyl Phthalate: An Overview*, Biomed
17  Research International, Feb. 22, 2018,
  https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5842715/#:~:text=DEHP%20is%20noncovalently%
18  20bound%20to,and%20plastic%20waste%20disposal%20sites.

  [58] *Toxicological Profile for Di(2-Ethylhexyl) Phthalate (DEHP)*, U.S. Dept of Health and Human
19  Services, January 2022, https://www.atsdr.cdc.gov/ToxProfiles/tp9.pdf (DEHP is listed as hazardous
  pollutants under the Clean Air Act.; DEHP is on the Proposition 65 list because it can cause cancer
20  and birth defects or other reproductive harm).

21  [59] *Di(2-ethylhexyl) phthalate (DEHP)*, Proposition 65, California. Gov,
  https://www.p65warnings.ca.gov/fact-sheets/di2-ethylhexylphthalate-dehp

22  [60] Pinar Erkekoglu & Belma Kocer-Gumusel, *Environmental Effects of Endocrine-Disrupting
  Chemicals: A Special Focus on Phthalates and Bisphenol A*, Environmental Health Risk, June 16,
23  2016, https://www.intechopen.com/chapters/50234

  [61] Katelyn H. Wong & Timur Durrani, *Exposures to Endocrine Disrupting Chemicals in Consumer
24  Products – A Guide for Pediatricians*, Current Problems in Pediatric and Adolescent Health Care,
  Science Direct, May 2017,
25  https://www.sciencedirect.com/science/article/pii/S1538544217300822?via%3Dihub

26  [62] Schmidt, Juliane-Susanne, et al., *Effects of Di(2-ethylhexyl) Phthalate (DEHP) on Female Fertility
  and Adipogenesis in C3H/N Mice*, Environmental Health Perspective, May 15, 2012,
27  https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3440070/

  [63] Hannon, Patrick et. al., *Daily Exposure to Di(2-ethylhexyl) Phthalate Alters Estous Cyclicity and
28  Accelerates Primordial Follicle Recruitment Potentially Via Dysregulation of the*

1    165.    The no-observed-adverse-effect level for DEHP to humans is 4.8 mg/kg

2    bodyweight/day and the tolerate daily intake (TDI) is 48 µg/kg bodyweight.[64]

| Endpoint | Cancer (NSRL) | | Developmental and Reproductive Toxicity (MADL) | |
| --- | --- | --- | --- | --- |
| Route of Exposure | Oral | Inhalation | Oral | Inhalation |
| **DEHP** | 310 µg/day | N.C. | 410 µg/day | N.C. |

Source: OEHHA's safe harbor levels for TDCIPP, DBP, DEHP, benzene, and formaldehyde.

N.C. = not calculated by OEHHA as of August 2020.[65]

12    166.    When DEHP enters the human body, it breaks down into specific metabolites. The

13    toxicity of DEHP is mainly attributed to its unique metabolites which include the primary metabolite,

14    mono-(2-ethylhexyl)phthalate    (MEHP),    and    secondary    metabolites,    mono-(2-ethyl-5-

15    hydroxyhexyl)phthalate (MEHHP), and mono-(2-ethyl-5-oxohexyl)phthlate (MEOHP).[66]

16    167.    DEHP and its metabolites are known to cause significant adverse-health effects

17    including but not limited to endometriosis, developmental abnormalities, reproductive dysfunction and

*Phosphatidylinositol 3-Kinase Signaling Pathway in Adult Mice*, Biology of Reproduction Volume 90, Issue 6, June 2014, 136, 1–11 https://academic.oup.com/biolreprod/article/90/6/136,%201-11/2514356

[64] Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health*, Healthcare (Basel) 9(5):603, May 18, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/

[65] Aalekhya Reddam & David Volz, *Inhalation of two Prop 65-listed Chemicals Within Vehicles May Be Associated with Increased Cancer Risk*, Environment International Volume 149, April 2021, https://www.sciencedirect.com/science/article/pii/S016041202100026X

[66] Saab, Yolande, et. al., *Risk Assessment of Phthalates and Their Metabolites in Hospitalized Patients: A Focus on Di- and Mono-(2-ethylhexyl) Phthalates Exposure from Intravenous Plastic Bags*. Toxics, 10(7), 357, https://pubmed.ncbi.nlm.nih.gov/35878262/;  Ishtaf Sheikh, et. at., *Endocrine disruption: In silico perspectives of interactions of di-(2-ethylhexyl)phthalate and its five major metabolites with progesterone receptor*. BMC Structural Biology Volume 16, Suppl 1, 16, Sept., 30, 2016, https://bmcstructbiol.biomedcentral.com/articles/10.1186/s12900-016-0066-4 (Other secondary metabolites include mono(2-ethyl-5-carboxypentyl)phthalate (5-cx-MEPP) and mono[2-(carboxymethyl)hexyl]phthalate (2-cx-MMHP)).

31

1    infertility,[67] various cancers, and metabolic syndrome within the human population and their future

2    children.[68]

3        168.    Most of the available studies on the health effects of DEHP in laboratory animals used

4    oral administration, with a few inhalation studies and only two dermal exposure studies identified.[69]

5        169.    The results of the selected animal studies, along with limited human data, suggest

6    potential associations between DEHP exposure and the following health outcomes:

7        a.  **Reproductive effects.** Epidemiological studies suggest a potential association between

8        DEHP exposure and decreased serum testosterone and altered sperm parameters in males.

9        Available studies on fertility effects in humans do not indicate an association between DEHP

10        exposure and infertility. In animals, the available oral and inhalation studies provide evidence

11        that the male reproductive system, particularly the testes, is susceptible to DEHP toxicity.

12        Evidence from animal studies indicates decreased male and female fertility at high oral doses.

13        b.  **Developmental effects.** Epidemiological studies suggest a potential association

14        between reduced AGD and testicular decent in male infants and prenatal DEHP exposure. In

15        addition, human epidemiological studies provide mixed results for potential relationships

16        between exposure to DEHP and preterm birth, early puberty, and delayed mental and

17        psychomotor development in children. Studies in animals indicate that altered glucose

18        homeostasis and the development of the reproductive system following early life exposure is

19        a particularly sensitive target of DEHP toxicity.

20        170.    The global consumption of DEHP was estimated at 3.07 million tons (Global demand

21    for plasticizers continues to rise). The estimated global market of phthalates in 2020 is expected to

22    reach 10 billion USD and would still be widely used in plasticizers.[70]

23

---

24    [67] Richardson, Kadeem et. al., *Di(2-ethylhexyl) Phthalate (DEHP) Alters Proliferation and Uterine*

25    *Gland Numbers in the Uterine of Adult Exposed Mice,* Reproductive Toxicology, 77, 70-79,
     https://pubmed.ncbi.nlm.nih.gov/29458081/

26    [68] Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health*, Healthcare (Basel)
     9, 603, May 9, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/

27    [69] *Chapter 2: Health Effects*, Toxicological profile for Di(2-ethylhexyl) phthalate (DEHP) (2001),
     https://www.atsdr.cdc.gov/ToxProfiles/tp9-c2.pdf

28    [70] *Id.*

171.    Human epidemiological studies have shown a significant association between phthalates exposures and adverse reproductive outcomes in both women and men.[71]

172.    Evidence found that DEHP was significantly related to insulin resistance and higher systolic blood pressure and the reproduction system problems, including earlier menopause, low birth weight, pregnancy loss, and preterm birth.[72]

173.    When it comes to the impacts on children, epidemiological studies about phthalates toxicity focused on pregnancy outcomes, genital development, semen quality, precocious puberty, thyroid function, respiratory symptoms, and neurodevelopment.[73]

174.    Since the turn of the century, restrictions on phthalates have been proposed in many Asian and western countries. In 2008, the U.S. Congress announced the Consumer Protection Safety Act (CPSA), which permanently banned the products, especially children's toys and childcare articles, containing DEHP, DBP, and BBP at levels >0.1% by weight.[74]

**E.    Regulatory Framework**

175.    The law does not require cosmetic products and ingredients, other than color additives, to have FDA approval before they go to market. But there are laws and regulations that apply to cosmetics placed on the market. The two most important laws pertaining to cosmetics marketed in the United States is the Federal Food Drug and Cosmetic Ace ("FD&C Act") and the Fair Packaging and Labeling Act ("FPLA").

176.    The FD&C Act expressly prohibits the marketing of "adulterated" or "misbranded" cosmetics in interstate commerce.

177.    Adulteration refers to a violation involving product composition whether it results from ingredients, contaminants, processing, packaging shipping or handling.

---

[71] *Id.*

[72] N.M. Grindler, et al., *Exposure to Phthalate, an Endocrine Disrupting Chemical, Alters the First Trimester Placental Methylome and Transcriptome in Women*, Scientific Reports Volume 8, April 17, 2018, https://doi.org/10.1038/s41598-018-24505-w

[73] *Id.*

[74] Consumer Product Safety Improvement Act of 2008, H.R. 4040, 110th Cong. (2008), https://www.congress.gov/110/plaws/publ314/PLAW-110publ314.pdf

COMPLAINT FOR DAMAGES

1    178.    Under the FD&C Act a cosmetic is adulterated if: (1) it bears or contains any poisonous

2    or deleterious substance causing injury to the product user and (2) if its container is composed in whole

3    or in part, of any poisonous or deleterious substance which may render the contents injurious to health.

4    179.    Misbranding refers to violations involving improperly labeled or deceptively packaged

5    products.

6    180.    Under the FD&C Act, a cosmetic is misbranded if (1) labeling is false or misleading,

7    (2) the label does not include all required information, (3) required information is not prominent and

8    conspicuous, (4) the packaging and labeling is in violation of an applicable regulation issued pursuant

9    to section 3 and 4 of the Poison Prevention Packaging Act of 1970.[75]

10    181.    Under U.S. law, cosmetic manufacturers are not required to submit their safety data to

11    the FDA. However, it is against the law to put an ingredient in a cosmetic that makes the cosmetic

12    harmful when used as intended.[76] An example is methylene chloride because it causes cancer in

13    animals and is likely to be harmful to human health as well.[77]

14    182.    On May 19, 2022, the FDA issued a rule to amend its food additive regulations to no

15    longer provide for most previously authorized phthalates to be used as food additives because these

16    uses have been abandoned by industry.[78] The FDA revoked authorizations for the food contact use of

17    23 phthalates and two other substances used as plasticizers, adhesives, defoaming agents, lubricants,

18    resins, and slimicides.[79]

19    183.    Companies and/or individuals who manufacture or market cosmetics have a legal

20    responsibility and duty to ensure the safety of their own products. Neither the law nor FDA regulations

---

[75] Food and Drug Administration Cosmetic Act § 602 (1938).
[76] *Prohibited & Restricted Ingredients in Cosmetics*, U.S. Food and Drug Administration, https://www.fda.gov/cosmetics/cosmetics-laws-regulations/prohibited-restricted-ingredients-cosmetics
[77] 21 Code of Federal Regulations § 700.19.
[78] § 87 FR 31080
[79] *Phthalates in Food Packages and Food Contact Applications,* U.S. Food and Drug Administration, https://www.fda.gov/food/food-ingredients-packaging/phthalates-food-packaging-and-food-contact-applications

require specific tests to demonstrate the safety of individual products or ingredients, and the law also does not require cosmetic companies to share their safety information with the FDA.

184.    The FDA has consistently advised manufacturers to use whatever testing is necessary to ensure the safety of products and ingredients, which may be substantiated through (a) reliance on already available toxicological test data on individual ingredients and on product formulations that are similar in composition to the particular cosmetic and (b) performance of any additional toxicological and other tests that are appropriate in light of such existing data and information.[80]

185.    Except for color additives and ingredients prohibited or restricted by regulation, a manufacturer may use any ingredient in the formulation of a cosmetic, provided that (1) the ingredient and the finished cosmetic are safe under labeled or customary conditions of use, (2) the product is properly labeled, and (3) the use of the ingredient does not otherwise cause the cosmetic to be adulterated or misbranded under the laws the FDA enforces.[81]

186.    With respect to whether the product is properly labeled, Title 21 of the Code of Federal Regulations defines the establishment of warning statements related to cosmetic products. Section 740.1 states that "[t]he label of a cosmetic product ***shall*** bear a warning statement whenever necessary or appropriate to prevent a health hazard that ***may*** be associated with the product." (Emphasis added). This warning directive directly correlates with the broad authority of manufacturers over their own cosmetic products to ensure that products are safe under labeled or customary conditions of use, properly labeled, and not adulterated or misbranded under FDA laws.

187.    In short, under the current regulatory framework in the United States, it is incumbent upon the manufacturers of cosmetic products, and them alone, to assess the safety and efficacy of their products, and to warn consumers anytime a health hazard may be associated with their products. Here, a wealth of scientific information is available regarding long-term use of hair relaxers, straighteners and hair dyes as containing certain endocrine-disrupting chemicals, which should have alerted

---

[80] *FDA Authority Over Cosmetics: How Cosmetics Are Not FDA-Approved, but Are FDA-Regulated,* U.S. Food and Drug Administration, Mar., 3, 2005,  https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-over-cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated
[81] *Id.*

1    manufacturers of these products to the specific and dangerous harms associated with their products

2    when used as intended, particularly in women of color.

3         188.    It is generally accepted that EDCs, like those contained in Defendants' hair relaxer

4    products, act like "hormone mimics" and trick the body into thinking they are hormones.

5         189.    Products containing hormones that are topically applied, are regulated by the FDA

6    under 21 C.F.R. section 310.530, which states that "any OTC drug product containing an ingredient

7    offered for use as a topically applied hormone cannot be considered generally recognized as safe and

8    effective for its intended use." *See* 21 C.F.A 310.530(a).

9         190.    At all relevant times, Defendants' products referenced herein, contained endocrine

10   disrupting chemicals and hormonal agents, and are therefore subject to regulation by the FDA under

11   21 C.F.R. section 310.530.

12        191.    The Federal Food, Drug and Cosmetic Act also expressly prohibits the marketing of

13   "adulterated" or "misbranded" cosmetics in interstate commerce.

14        192.    Adulteration refers to a violation involving product composition whether it results from

15   ingredients, contaminants, processing, packaging shipping or handling.

16        193.    Under the FD&C Act a cosmetic is adulterated if: (1) it bears or contains any poisonous

17   or deleterious substance causing injury to the product user and (2) if its container is composed in whole

18   or in part, of any poisonous or deleterious substance which may render the contents injurious to health.

19        194.    Misbranding refers to violations involving improperly labeled or deceptively packaged

20   products.

21        195.    Under the FD&C Act, a cosmetic is misbranded if (1) labeling is false or misleading, (

22   2) the label does not include all required information, (3) required information is not prominent and

23   conspicuous, (4) the packaging and labeling is in violation of an applicable regulation issued pursuant

24   to section 3 and 4 of the Poison Prevention Packaging Act of 1970.[82]

25        196.    In addition, the federal regulations require that every ingredient in a cosmetic product

26   and finished cosmetic product be adequately substantiated for safety prior to marketing, and state that

27   _____

28   [82] Food and Drug Administration Cosmetic Act § 602 (1938).

1  any ingredient or product for which the safety has not been adequately substantiated prior to marketing

2  is misbranded unless it displays a warning statement declaring, "Warning – The safety or this product

3  has not been determined." 21 C.F.R. § 740.10.

4  **F.    California Prohibits Misbranded or Adulterated Cosmetics**

5      197.    The California Sherman Food, Drug, and Cosmetic Law prohibits the sale of

6  "misbranded" cosmetics. A cosmetic is deemed misbranded if, among other things, its labeling is false

7  or misleading if any word, statement or other information required to appear on the label or labeling

8  is not prominently placed upon the label or labeling with conspicuousness, as compared with other

9  words, statements, designs, or devices, in the labeling, and in terms as to render it likely to be read and

10  understood by the ordinary individual under customary conditions of purchase and use; and, if it is

11  subjected to the federal FDA regulations but is not in compliance therewith. Cal. Health & Saf. Code

12  §§ 111730, 111790.

13      198.    California also prohibits the sale of "adulterated" cosmetics mirroring the Federal

14  Food, Drug, and Cosmetics Act. A cosmetic is deemed adulterated if, among other things it bears or

15  contains any poisonous or deleterious substance that may render it injurious to users under the

16  conditions of use prescribed in the labeling or advertisement of the cosmetic, or under conditions of

17  use as are customary or unusual; and, if it is not in compliance with federal regulations. Cal. Health &

18  Saf. Code §§ 111670 - 111725.

19      199.    Effective January 1, 2006, the California Safe Cosmetics Act of 2005 (CSCA) became

20  law.

21      200.    The CSCA requires cosmetics manufacturers to disclose to the California Department

22  of Public Health (CDPH) all products sold in California containing ingredients listed in the Cal. Health

23  & Saf. Code § 111791.5.

24      201.    The California Legislature found and declared all of the following:

25          a.  Independent testing in the United States and the European union has determined

26              that some cosmetic products contain substances known or suspected to cause cancer

27              and reproductive toxicity that can harm the mother, fetus, and nursing children.

28          b.  Neither the federal Food and Drug Administration (FDA) nor the State Department

of Health Services (DHS) require premarket safety testing, review, or approval of cosmetic products. According to the FDA, the regulatory requirements governing the sale of cosmetics are not as stringent as those that apply to other FDA regulated products.

c.  Under the federal Food, Drug and Cosmetic Act (21 U.S.C. Sec. 301), cosmetics and their ingredients are not required to be approved before they are sold to the public and the FDA does not have the authority to require manufacturers to file health and safety data on cosmetic ingredients or to order a recall of a dangerous cosmetic product.

d.  Under the state Sherman Food, Drug, and Cosmetic Act, DHS has no authority to identify, review, or regulate ingredients in cosmetic products that may cause chronic health effects, such as cancer and reproductive toxicity.

e.  Federal law exempts chemicals used as fragrances or flavoring from being identified as ingredients on the labels of cosmetic products. Laboratory analyses of cosmetic products sold in California have found products that contain substances known to or likely to cause cancer or reproductive toxicity and not identified as an ingredient on the product's label. The law also does not require any ingredient labeling on cosmetic products sold for commercial use, thereby denying any information on ingredients to beauty care workers.

f.  Alternatives to substances that cause cancer or reproductive toxicity are readily available for use in cosmetic products. A number of manufacturers, including both small domestic producers and large multinational corporations, have eliminated substances that cause cancer or reproductive toxicity from their products.

g.  Given the presence of substances in cosmetic products that cause cancer or reproductive toxicity, the heavy use of these products by women of childbearing age, the significant exposure to these products in occupational settings such as beauty salons, the adverse impacts of these substances on human health, the inadequate information about the presence of these substances in products or the

38

extent of their impacts, and the availability of alternatives to the use of these substances, it is in the interest of the people of the State of California to take steps to ensure that cosmetic products sold and used in the state can be used safely.[83]

202.    Section 11792(a) of the CSCA places an affirmative duty on cosmetics manufacturers to inform state officials when they sell products in California that contain carcinogens or reproductive toxins:

Commencing January 1, 2007, the manufacturer or any cosmetic product subject to regulation by the federal Food and drug Administration that is sold in this state shall, on a schedule and in electronic or other format, as determined by the division, provide the division with a complete and accurate list of its cosmetic products that, as of the date of submission, are sold in the state and that contain any ingredient that is a chemical identifies as causing cancer or reproductive toxicity.

203.    Section 11793.5 of the Act provides:

a.   The Legislature finds and declares the following:

(1) The Cosmetic Ingredient Review (CIR) panel is a nongovernmental body established and funded by the cosmetics industry to review the safety of cosmetic ingredients.

(2) According to a 2004 analysis of the 2003 CIR Compendium by the Environmental Working Group, 54 cosmetic products violate the CIR's own safe use recommendations to manufacturers by containing an ingredient that the CIR has found is not safe for the specific use indicated on the product's label.

(3) Federal regulations (21 C.F.R. 740.10) require every ingredient in a cosmetic product and every finished cosmetic product to be adequately substantiated for safety prior to marketing, and state that any ingredient or product whose safety has not been adequately substantiated prior to

---

[83] Cal. Health & Saf. Code § 111791 (2007).

1         marketing is misbranded unless it displays a warning statement

2         declaring, "The safety of this product has not been determined."

3      b.  The division may, as early as feasible within existing resources, determine whether

4         the products identified in paragraph (2) of subdivision (a) have been adequately

5         substantiated for safety pursuant to § 740.10 of Title 21 of the Code of Federal

6         Regulations. For any product adequately substantiated for safety, the division shall

7         determine if the product contains any ingredient that the CIR has found is not safe

8         for the specific use indicated on the product's label.

9      c.  If the division finds that a product has not been adequately substantiated for safety

10        despite containing an ingredient that the CIR has found is not safe for the specific

11        use indicated on the product's label, the division shall refer its findings to the

12        Attorney General and the federal Food and Drug Administration for possible

13        enforcement action pursuant to this part and the federal Food, Drug and Cosmetic

14        Act (21 U.S.C. Sec. 301 *et seq.*).

15     204.    The California Cosmetic Fragrance and Flavor Right to Know Act (CFFIRKA) became

16 effective January 1, 2022.

17     205.    CFFIRKA requires manufacturers that sell cosmetic products in California to report

18 certain fragrance and flavor ingredients deemed hazardous to the Department of Public Health's

19 (DPH) Safe Cosmetics Program.

20     206.    The CFFIRKA requires companies selling retail cosmetic or professional salon

21 products in California to report the presence of any fragrance or flavor ingredient that appears on one

22 or more of the twenty-three (23) authoritative hazard lists referenced in the law to the California Safe

23 Cosmetics Program.

24     207.    The California Safe Cosmetics Program Database is updated twice annually and is

25 available to the public.

26     208.    The policy underlying CFFIRKA is that California residents are entitled to information

27 on known potential "carcinogens, reproductive toxicants, asthmagens, neurotoxins, allergens and other

28 chemicals of concern" in cosmetics products.

209. Similar to federal law, the CFFIRKA defines a "cosmetic product" as "an article for retail sale or professional use intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to the human body for cleansing, beautifying, promoting attractiveness, or altering the appearance."[84]

210. The CFFIRKA applies to both consumer and professional use products.

211. In addition to requiring the disclosure of reportable ingredients, under the CFFIRKA, manufacturers must also disclose, 1) whether the product is intended for professional or retail use; 2) the Chemical Abstracts Service number for each ingredient and allergen; and 3) the corresponding Universal product Code for the product.

212. Review of the California Safe Cosmetics Program's Reportable Ingredient list yielded at least twenty-five (25) ingredients found in hair relaxers[85] that are deemed "reportable" under the California Safe Cosmetics Program.

**G.    Uterine Fibroids are Associated with Exposure to Endocrine Disrupting Chemicals**

213. Uterine fibroids are associated with phthalate metabolites found in chemical hair straightening and hair relaxer products.

214. Black women have a higher prevalence of uterine fibroids and tumors than any other ethnicity/racial group.[86]

215. A study looking at over 1 million U.S. women from 2003 to 2014 found that Black women had the highest rate of diagnosed uterine fibroids, with most diagnoses made between the age

---

[84] *Id.*

[85] The 45 ingredients detected in hair relaxers examined by the Helm study were compared to those listed as of May 20, 2024 on the Reportable Ingredients excel database. *See* Helm JS, Nishioka M, Brody JG, Rudel RA, Dodson RE. Measurement of endocrine disrupting and asthma-associated chemicals in hair products used by Black women. Environ Res. 2018 Aug;165:448-458. doi: 10.1016/j.envres.2018.03.030. Epub 2018 Apr 25. PMID: 29705122. *See also* https://cscpsubmit.cdph.ca.gov/submission/assets/files/Reportable_Ingredients_List.xlsx, last visited May 20, 2024.

[86] Food and Drug Administration Cosmetic Act § 602, *supra.*

1  of 30 – 54 years old.[87]

2      216.    Studies show that Black women are three to four times more likely to develop uterine

3  fibroids in their lifetime compared to non-Hispanic white women, and an estimated 70-80% of Black

4  women will develop fibroids over their lifetime.[88]

5      217.    It is estimated that the annual financial impact of uterine fibroids on Black women in

6  the United States is as high as 30 billion dollars, and this number may be an underestimation, as at

7  least one-quarter of women reported losing work due to their disease.[89]

8      218.    Black women are seven (7) times more likely to undergo a myomectomy compared to

9  non-Hispanic white women.[90]

10     219.    Uterine fibroids return at higher rates for Black women than white women following

11  surgical treatment, and recurrence can be as high as 59% within 5 years.[91]

12     220.    Given the magnitude of the problem – markedly altered quality of life, the effect on

13  reproductive health, and the costs of health care for this disease – the high prevalence of uterine

14  fibroids in Black women is considered a major public health issue.[92]

15     221.    A 2012 study in the American Journal of Epidemiology associated fibroid risk with the

16  use of hair relaxers.[93] Shirley McDonald of the Hair and Scalp Clinic says, "We now know that many

---

[87] Yu O, Scholes D, Schulze-Rath R, Grafton J, Hansen K, Reed SD. A US population-based study of uterine fibroid diagnosis incidence, trends, and prevalence: 2005 through 2014. American Journal of Obstetrics and Gynecology. 2018;219(6):591.e1-591.e8.

[88] Al-Hendy A, Salama SA. Ethnic distribution of estrogen receptor-α polymorphism is associated with a higher prevalence of uterine leiomyomas in black Americans. Fertil Steril. 2006;86(3):686-693. Doi:10.1016/j.fertnstert.2006.01.052

[89] Igboeli P, Walker W, McHugh A, Sultan, A, et al. Burden of uterine fibroids: an african perspective, a call for action and opportunity for intervention. COGO. 287-294.

[90] Eltoukhi HM, Modi MN, Weston M, Armstrong AY, Stewart EA. The health disparities of uterine fibroid tumors for African American women: a public health issue. Am J Obstet Gynecol. 2014;210(3):194-199. doi:10.1016/j.ajog.2013.08.008

[91] Donnez J, Dolmans M. Uterine fibroid management: from the present to the future. Hum Reprod Update. 22(06):665–686.

[92] Eltoukhi HM, Modi MN, Weston M, Armstrong AY, Stewart EA. The health disparities of uterine fibroid tumors for African American women: a public health issue. Am J Obstet Gynecol. 2014;210(3):194-199. doi:10.1016/j.ajog.2013.08.008

[93] Wise LA, Palmer JR, Reich D, Cozier YC, Rosenberg L. Hair relaxer use and risk of uterine leiomyomata in African-American women. Am J Epidemiol. 2012 Mar 1;175(5):432-40. doi: 10.1093/aje/kwr351. Epub 2012 Jan 10. PMID: 22234483; PMCID: PMC3282879.

COMPLAINT FOR DAMAGES

1   hair products contain chemicals that are considered carcinogenic and/or hormone disrupters, leading

2   to increased risk of medical issues such as fibroids (non-cancerous tumors that grow in the uterus,

3   potentially damaging fertility and leading to a host of other complications). Trichologists see lots of

4   conditions that are likely to be triggered by hair products, particularly central centrifugal cicatricial

5   alopecia, a type of permanent hair loss to the crown area of the scalp."

6       222.    More recently, the National Institutes of Health spent eight-years studying over 46,000

7   women of all races between the ages of 35–74. They were looking for links between chemical hair

8   relaxers and breast cancer. They discovered Black women's breast cancer risk increased risk by 45%.[94]

9   Breast cancer and other reproductive issues, including fibroid development, are often connected. This

10  study suggests there are even more reasons to steer clear of chemical hair straighteners and relaxers.

11      223.    Concerns around racial disparities in healthcare linked to chemicals found in cosmetic

12  products are not new; previous studies, as far back as 2012, have also suggested a correlation between

13  chemical relaxer use and uterine fibroids, a condition that disproportionately affects Black women.[95]

14      224.    Hair relaxers are used by millions of black women, possibly exposing them to various

15  chemicals through scalp lesions and burns. In the Black Women's Health Study, the authors assessed

16  hair relaxer use in relation to uterine leiomyomata incidence. In 1997, participants reported on hair

17  relaxer use (age at first use, frequency, duration, number of burns, and type of formulation). From

18  1997 to 2009, 23,580 premenopausal women were followed for incident uterine leiomyomata. The

19  incidence of uterine leiomyomata is 2–3 times higher in US black women than in US white women.

20      225.    The Houston Fibroids Clinic in Houston, Texas also highlights the association between

21  hair relaxers and uterine fibroids, stating that black women develop fibroids up to three times as often

---

[94] Che-Jung Chang, Katie M. O'Brien, Alexander P. Keil, Symielle A. Gaston, Chandra L. Jackson, Dale P. Sandler, Alexandra J. White. Use of Straighteners and Other Hair Products and Incident Uterine Cancer. Journal of the National Cancer Institute DOI: https://doi.org/10.1093/jnci/djac165 (2022)

[95] Nadine White, *Campaign urges beauty firms to pull 'toxic' hair products aimed at Black women*, Independent (August 3, 2021), https://www.independent.co.uk/news/uk/home-news/black-hair-lye-no-more-lyes b1893747.html.

1    as women of other races, their fibroids develop earlier in age than other races (oftentimes in their

2    twenties), and are more likely to suffer from anemia due to fibroids. They also have a higher risk for

3    fibroid symptoms, including but not limited to, painful intercourse, severe pelvic pain, and heavy

4    periods.[96]

**FIRST CAUSE OF ACTION**

**STRICT LIABILITY – FAILURE TO WARN**

**(Against All Defendants)**

8    226.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation

9    set forth in the preceding paragraphs.

10    227.    At all pertinent times, the Defendants were manufacturing, marketing, testing,

11    promoting, selling and/or distributing the Products in the regular course of business.

12    228.    The Products had potential risks and side effects that were known or knowable to

13    defendants by the use of scientific knowledge available before, at, and after the time of manufacture,

14    distribution, and sale of the Products. Defendants knew or should have known of the defective

15    condition, characteristics, and risks associated with said product, as previously set forth herein.

16    229.    Defendants' Products were expected to and did reach consumers, including Plaintiff,

17    without substantial change in the condition in which their Products were manufactured, sold, or

18    otherwise released into the stream of commerce by Defendant.

19    230.    The Products that were manufactured, distributed, and/or sold by the defendants to

20    Plaintiff were in a defective condition that was unreasonably and substantially dangerous to any user

21    or ordinary consumer of the Products, such as Plaintiff. Such ordinary consumers, including Plaintiff,

22    would not and could not have recognized or discovered the potential risks and side effects of the

23    Products as set forth herein.

24    231.    At all pertinent times, Plaintiff used the Products on her hair and at the roots of her hair

25    which is a reasonably foreseeable use.

26    232.    At all pertinent times, Defendants knew or should have known that the use phthalates

27

28    [96]    Black Hair Relaxers and Fibroid Risk | Houston Fibroids

and other EDCs in hair products significantly increases the risk of diseases including but not limited to cancer, fibroids and/or endometriosis, based upon scientific knowledge dating back for decades.

233.    At all pertinent times, including the time of sale and consumption, the Products, Defendants were then and there guilty of one or more of the following acts:

    a.  Manufactured, marketed, tested, promoted, sold, and/or distributed unreasonable dangerous and defective products;

    b.  Improperly warned of increased risk of diseases as required by C.F.R. § 740.1;

    c.  Inadequately warned of increased risk of diseases as required by C.F.R. § 740.1;

    d.  Inadequately labeled relaxer products as containing EDCs that act as hormonal agents as required by 21 C.F.R. § 310.530.

    e.  Improperly warned and instructed Plaintiff of inherent risks of debilitating and life-altering conditions.

234.    Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and/or omissions:

    a.  Economic losses including medical care and lost earnings; and

    b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

    c.  The sum of the damages Plaintiff has suffered is in excess of the minimum jurisdictional limits of this Court.

235.    Defendants' lack of sufficient instructions or warnings prior to, on, and after the date of Plaintiff's initial use of the Products was a substantial factor in causing Plaintiff's injuries and damages, as described herein.

WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory damages together with interest, the costs of suit and such other and further relief as this Court deems just and proper.

**SECOND CAUSE OF ACTION**

**STRICT LIABILITY – DESIGN DEFECT**

**(Against All Defendants)**

236.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

237.    At all relevant times, Defendants engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in California and the United States.

238.    At all relevant times, Defendants engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff. Said defects included, but were not limited to, the fact that the Products contained phthalates and/or other endocrine receptive chemicals that substantially increased the risks of triggering tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of diseases including but not limited to cancer, fibroids, and/or endometriosis.

239.    Defendants caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

240.    The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which it was manufactured and sold by Defendant L'Oreal USA, Inc. and/or otherwise released into the stream of commerce.

241.    Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendants.

242.    Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing her risk of developing uterine fibroids.

243.    The propensity of phthalates and other endocrine receptive chemicals to trigger tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of diseases including but not limited to cancer, fibroids, and/or endometriosis, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

244.    Importantly, the Products are an inessential cosmetic product that do not treat or cure

any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

245.    Defendants knew, or by the exercise of reasonably care should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

246.    Defendants owed a duty to all reasonably foreseeable users to design a safe product.

247.    At all pertinent times, Defendants were then and there guilty of one or more of the following acts and/or omissions:

    a.  Designing, manufacturing, selling, distributing, marketing, promoting, and supplying Products that they knew or should have known were unreasonable dangerous;

    b.  Failing to use reasonable care in the design and/or manufacturing of their Products; or

    c.  Failing to use reasonably feasible alternative designs in the design and/or manufacturing of the Products.

248.    As a direct and proximate result thereof, it became necessary for plaintiff to incur expenses for doctors, hospitals, surgeries, nurses, and other reasonably required and medically necessary supplies and services. Plaintiff prays for leave to amend this Complaint to insert these elements of damage when the same are finally determined.

249.    As a direct and proximate result of Defendants' conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

    a.  Economic losses including medical care and lost earnings; and

    b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

    c.  The sum of the damages Plaintiff has suffered is in excess of the minimum jurisdictional limits of this Court.

250.    Defendants' design, manufacture, marketing, promotion, defense, and/or sale of the Products was a substantial factor in causing plaintiff's injuries, as described herein.

WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory damages together with interest, the costs of suit and such other and further relief as this Court deems just and proper.

### THIRD CAUSE OF ACTION

### BREACH OF EXPRESS WARRANTY

### (Against All Defendants)

251.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

252.    Defendants made statements of fact and promises to consumers, including Plaintiff, that the Products were:

    a.  Safe;

    b.  efficacious;

    c.  fit for use;

    d.  of merchantable quality;

    e.  adequately tested;

    f.  did not increase the risk of injury;

253.    Defendants breached the express warranties as follows:

    a.  Defendants misrepresented the safety of the Products in the Products' labeling, advertising, marketing materials, promotion, and/or publications;

    b.  Defendants misrepresented the risks associated with the Products;

    c.  Defendants withheld and/or concealed and/or downplayed the information and/or evidence that the products were associated with an increased risk of injuries;

    d.  Defendants misrepresented that the Products were safe, and/or safer than other similar products used;

    e.  Defendants fraudulently concealed information about the safety of the Products including information that the product was not safer than alternative products

48

1    available on the market; and

2       f.  Defendants misrepresented information regarding the safety and/or efficacy of the

3         Products.

4       254.  The Products did not conform to Defendants' express representations and warranties

5    or meet the quality of Defendants' descriptions of safety and efficacy.

6       255.  At all relevant times, including during the period that Plaintiff used the Products, they

7    did not perform as safely as an ordinary consumer would expect when used as intended or in a

8    reasonably foreseeable manner.

9       256.  At all relevant times, including during the period that Plaintiff used the Products, they

10   did not perform in accordance with the Defendants' representations.

11      257.  In deciding to purchase and use the Products, Plaintiff and other consumers relied upon

12   Defendants' express warranties.

13      258.  As a direct and proximate result of Defendants' conduct, including actions, omissions,

14   and misrepresentations described herein, Plaintiff sustained the following damages:

15      a.  Economic losses including medical care and lost earnings; and

16      b.  Noneconomic losses including physical and mental pain and suffering, emotional

17        distress, inconvenience, loss of enjoyment and impairment of quality of life, past

18        and future.

19      c.  The sum of the damages Plaintiff has suffered is in excess of the minimum

20        jurisdictional limits of this Court.

21      259.  The failure of the Products to perform as represented was a substantial factor in causing

22   Plaintiff's injuries and damages, as described herein.

23      WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory

24   damages together with interest, the costs of suit and such other and further relief as this Court deems

25   just and proper.

26

27

28

1

**FOURTH CAUSE OF ACTION**

2

<u>**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**</u>

3

**(Against All Defendants)**

4       260.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation

5    set forth in the preceding paragraphs.

6       261.    Plaintiff purchased the Products from Defendants, and each of them.

7       262.    At all relevant and material times, including the time of Plaintiff's purchase,

8    Defendants were in the business of manufacturing, designing, formulating, producing, marketing,

9    promoting, selling and/or distributing the Products.

10      263.    Defendants by their occupation held themselves out as having special knowledge or

11   skill regarding the Products.

12      264.    Defendants knew and intended that the Products be used when they were placed into

13   the stream of commerce.

14      265.    Defendants knew and intended that the Products be used as they were by Plaintiff.

15      266.    Defendants impliedly warranted to Plaintiff that the Products were safe for use.

16      267.    Plaintiff reasonably and justifiably relied on Defendants' expertise, skill, judgment, and

17   knowledge of the Defendants and upon the Defendants' express and/or implied warranty that the

18   Products were safe, of merchantable quality, and fit for use.

19      268.    The Products used were not safe, of merchantable quality, fit for use, the quality that a

20   buyer would expect, or the same quality of those products generally acceptable in the trade.

21      269.    The Products were not fit for the ordinary purposes for which such goods are used and

22   did not conform to the quality established by the parties' prior dealings or by usage of trade.

23      270.    The Products used by Plaintiff were neither safe nor fit for use.

24      271.    Defendants were aware that consumers, including Plaintiff, would use the Products,

25   which is to say that Plaintiff was a foreseeable user of Defendants' Products.

26      272.    Plaintiff was at all relevant times in privity with Defendants.

27      273.    Plaintiff took reasonable steps to notify Defendants, and each of them, within a

28   reasonable time that the Products did not have the expected quality.

274.    The Products were expected to reach and did in fact reach consumers, including Plaintiff, without substantial change in the condition in which the product was manufactured and sold by Defendants.

275.    Defendants breached various implied warranties with respect to the Products as set forth above.

276.    Defendants breached the implied warranties in that the Products did not conform to Defendants' implied representations and warranties.

277.    Plaintiff reasonably relied upon one and/or several of the Defendants' implied warranties.

278.    Plaintiff used the Products as intended and directed by the Defendants and in a foreseeable manner as intended, recommended, promoted, and/or marketed by Defendants.

279.    Defendants breached one or several of the implied warranties provided to and relied on by Plaintiff.

280.    As a direct and proximate result of Defendants' conduct, including actions, omissions, and misrepresentations described herein, Plaintiff sustained the following damages:

      a.    Economic losses including medical care and lost earnings; and

      b.    Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

      c.    The sum of the damages Plaintiff has suffered is in excess of the minimum jurisdictional limits of this Court.

281.    The failure of the Products to have the expected quality was a substantial factor in causing Plaintiff's harm.

WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory damages together with interest, the costs of suit and such other and further relief as this Court deems just and proper.

# FIFTH CAUSE OF ACTION

## **BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE**

### (Against All Defendants)

282.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

283.    Plaintiff purchased the Products from Defendants, and each of them.

284.    At the time of purchase, Defendants, and each of them, knew or had reason to know that Plaintiff intended to use the product for a particular purpose.

285.    At the time of purchase, Defendants, and each of them, knew or had reason to know that Plaintiff was relying on Defendants' skill and judgment to select or furnish a product that was suitable for the particular purpose.

286.    Plaintiff reasonably and justifiably relied on Defendants' skill and judgment.

287.    The Products were not suitable for Plaintiff's particular purpose.

288.    Plaintiff took reasonable steps to notify Defendants, and each of them, within a reasonable time that the Products were not suitable.

289.    As a direct and proximate result of Defendants' conduct, including actions, omissions, and misrepresentations described herein, Plaintiff sustained the following damages:

    a.   Economic losses including medical care and lost earnings; and

    b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

    c.   The sum of the damages Plaintiff has suffered is in excess of the minimum jurisdictional limits of this Court.

290.    The failure of the Products to be suitable was a substantial factor in causing Plaintiff's harm.

WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory damages together with interest, the costs of suit and such other and further relief as this Court deems just and proper.

**SIXTH CAUSE OF ACTION**

**NEGLIGENCE – DESIGN, MANUFACTURE AND SALE**

**(Against All Defendants)**

291.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

292.    Prior to, on and after the date of Plaintiff's initial use of the Products, and at all relevant times, Defendants designed, tested, distributed, manufactured, advertised, sold, and/or marketed the Products for use by consumers, such as Plaintiff.

293.    Prior to, on, and after Plaintiff's initial use of the Products, Defendants were negligent and careless in and about their design, testing, distribution, manufacture, advertising, sale, and/or marketing of the above-described Products.

294.    Prior to, on, and after Plaintiff's initial use of the Products, Defendants performed inadequate evaluation and testing of the Products where such evaluation and testing would have revealed the propensity of the Products' failures, and increased risk of injury as described herein.

295.    Prior to, on, and/or after Plaintiff's initial use of the Products, Defendants had received complaints from consumers that the Products failed and posed an increased risk of injury as described herein, but Defendants consciously decided not to: perform any further testing on the Products; investigate the root cause of these failures and increased risk of injury; suspend sales and distribution; or warn consumers, such as Plaintiff, of the propensity of the Products to fail and pose an increased risk of injury as described herein.

296.    Defendants' conduct is *per se* negligent because their negligent design, manufacture, and sale of defective and dangerous products violated several federal and state laws, including but not limited to:

    a.  The Food, Drug, & Cosmetics Act, 21 U.S.C. ch. 9 § 301 et seq., and its accompanying regulations, including 21 U.S.C. §§ 331, 361; 21 U.S. Code § 362; and 21 CFR Part 740, including but not limited to 21 CFR § 740.1 and 21 CFR;

    b.  The California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Saf. Code §§ 111730, 111790;

c. The California Safe Cosmetics Act of 2005, Cal. Health & Saf. Code § 111791.5;

d. The California Cosmetic Frangrance and Flavor Right to Know Act (CFFIRKA) Cal. Health & Saf. Code § 111791.5; and

e. The Safe Drinking Water and Toxic Enforcement Act of 1986 ("Proposition 65"), Cal. Health & Saf. Code § 25249.5.

297.    As a direct and proximate result of Defendants' above-described negligence in design, testing, distribution, manufacture, advertising, sales, and/or marketing, Plaintiff sustained the following damages:

a. Economic losses including medical care and lost earnings; and

b. Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

c. The sum of the damages Plaintiff has suffered is in excess of the minimum jurisdictional limits of this Court.

298.    As a direct and legal result of Defendants' actions and/or omissions, Plaintiff has also suffered, and continues to suffer, an increased risk of developing illnesses, diseases and/or disease processes relating to exposure to the Products.

299.    As a direct and legal result of Defendants' tortious conduct, Plaintiff has also suffered the past, present and future medical need to undergo diagnostic testing for the early detection of latent or misidentified illnesses, diseases and/or disease processes related to her exposure to the Products.

300.    Diagnostic and/or monitoring procedures exist that comport with contemporary scientific principles and the standard of care and make early detection of illnesses and conditions related to exposure to the Products possible and beneficial to Plaintiff.

301.    As a result of being significantly and repeatedly exposed to the Products, the need for Plaintiff's medical monitoring is currently necessary, and the monitoring is reasonable.

302.    Plaintiff thus also seeks an award of the cost of medical monitoring for the early detection of latent or misidentified illnesses, diseases and/or disease processes associated with exposure to the Products.

303.    Defendants' negligence in design, testing, distribution, manufacture, advertising, sales, and/or marketing prior to, on, and after the date of Plaintiff's initial surgery was a substantial factor in causing Plaintiff's injuries and damages, as described herein.

WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory damages together with interest, the costs of suit and such other and further relief as this Court deems just and proper.

### SEVENTH CAUSE OF ACTION

### NEGLIGENCE – FAILURE TO RECALL/RETROFIT

### (Against All Defendants)

304.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

305.    Prior to, on, and/or after the date of Plaintiff's initial use of the Products, and at all relevant times, Defendants designed, distributed, manufactured, sold, and/or marketed the Products for use by consumers, such as Plaintiff.

306.    Prior to, on, and/or after the date of Plaintiff's initial use of the Products, and at all relevant times, Defendants knew or reasonably should have known that the Products and their warnings were dangerous or were likely to be dangerous when used in a reasonably foreseeable manner.

307.    Prior to, on, and/or after the date of Plaintiff's initial use of the Products, defendants became aware of the defects of the Products, including their propensity to increase the risk of injury as described herein.

308.    Defendants failed to recall, retrofit, or warn consumers, such as Plaintiff, about the danger of the Products prior to, on, and/or after the date of Plaintiff's initial use of the Products, and at all relevant times, and continue to fail to recall the Products to date.

309.    In light of the severity and amount of the data available to Defendants, reasonable manufacturers and distributors under the same or similar circumstances would have recalled or retrofitted the Products, and would thereby have avoided and prevented harm to hundreds of thousands of consumers, such as Plaintiff.

310.    As a direct and proximate result of Defendants' above-described negligent failure to recall or retrofit, Plaintiff sustained the following damages:

    a.  Economic losses including medical care and lost earnings; and

    b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

    c.  The sum of the damages Plaintiff has suffered is in excess of the minimum jurisdictional limits of this Court.

311.    Defendants' negligent failure to recall or retrofit the Products and their warnings was a substantial factor in causing Plaintiff's injuries and damages, as described herein.

WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory damages together with interest, the costs of suit and such other and further relief as this Court deems just and proper.

## EIGHTH CAUSE OF ACTION

## NEGLIGENCE – FAILURE TO WARN

### (Against All Defendants)

312.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

313.    At all relevant times, Defendants engaged in the design, development, manufacture, marketing, sale and distribution of the Products in a defective and unreasonably dangers condition to consumers, including Plaintiff.

314.    Defendants knew, or by the exercise of reasonable care, should have known use of their Products were dangerous, harmful, and injurious when used by consumers, such as Plaintiff, in a reasonably foreseeable manner. Such danger included the Products' propensity to increase the risk of injury, illness, and/or disease as described herein.

315.    Defendants knew, or by the exercise of reasonable care, should have known ordinary consumers, such as Plaintiff, would not have realized the potential risks and dangers of their Products, and that the Products were likely to increase the risk of tumors and cancerous growths in

premenopausal women, thereby increasing the risk of cancer, fibroids, and/or endometriosis, when used in the manner they were intended and to an extent beyond that would be contemplated by the ordinary consumer.

316.    Defendants owed a duty to all reasonably foreseeable consumers to disclose the risks associated with the use of their Products.

317.    At all pertinent times, Defendants were then and there guilty of one or more of the following acts and/or omissions:

     a.  Failed to provide adequate warnings on their Products;

     b.  Inadequately provided warnings on their Products;

     c.  Provided misleading advertisements; or

     d.  Failed to provide instructions on how to safely use their Products.

     e.  Failed to use due care in the manufacture, inspection and labeling of the Products to prevent risk of injuries to individuals, such as Plaintiff, who used the Products;

     f.  Failed to provide adequate and accurate warnings and information regarding the risk and dangers associated with the Products as described herein, to non-defendant entities that sold the Products; and

     g.  Failed to label the Products to adequately warn Plaintiff of the increased risk of injury associated with the product including an increased risk of hormone-related cancers and reproductive problems including the development of uterine fibroids and other injuries.

318.    Defendants' conduct is *per se* negligent because their failure to warn of dangerous ingredients of their products violated several federal and state laws, including but not limited to:

     a.  The Food, Drug, & Cosmetics Act, 21 U.S.C. ch. 9 § 301 et seq., and its accompanying regulations, including 21 U.S.C. §§ 331, 361; 21 U.S. Code § 362; and 21 CFR Part 740, including but not limited to 21 CFR § 740.1 and 21 CFR;

     b.  The California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Saf. Code §§ 111730, 111790;

1       c. The California Safe Cosmetics Act of 2005, Cal. Health & Saf. Code § 111791.5;

2       d. The California Cosmetic Frangrance and Flavor Right to Know Act (CFFIRKA)

3          Cal. Health & Saf. Code § 111791.5; and

4       e. The Safe Drinking Water and Toxic Enforcement Act of 1986 ("Proposition 65"),

5          Cal. Health & Saf. Code § 25249.5.

6      319.  As a direct and proximate result of Defendants' above-described negligent conduct,

7   including failure to warn, actions, omissions, and misrepresentations, Plaintiff sustained the following

8   damages:

9       a. Economic losses including medical care and lost earnings; and

10      b. Noneconomic losses including physical and mental pain and suffering, emotional

11         distress, inconvenience, loss of enjoyment and impairment of quality of life, past

12         and future.

13      c. The sum of the damages Plaintiff has suffered is in excess of the minimum

14         jurisdictional limits of this Court.

15     320.  Defendants' negligent failure to warn consumers, including Plaintiff, at all relevant

16  times, was a substantial factor in causing Plaintiff's injuries and damages, as described herein.

17     WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory

18  damages together with interest, the costs of suit and such other and further relief as this Court deems

19  just and proper.

20  ### NINTH CAUSE OF ACTION

21  ### <u>FRAUD – INTENTIONAL MISREPRESENTATION</u>

22  **(Against L'Oréal USA, Inc, L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I))**

23     321.  Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation

24  set forth in the preceding paragraphs.

25     322.  Defendants engaged in the development, manufacture, marketing, sale, and distribution

26  of cosmetic and personal care products, including the Products, and owed a duty to provide accurate

27  and complete information regarding said products.

28

1    323.    Defendants fraudulently misrepresented the use of the Products as safe, effective, and

2    not unreasonably dangerous.

3    324.    Defendants knowingly and intentionally represented to consumers, including the

4    Plaintiff, and the public that the Products were safe for use and that Defendants' labeling, marketing,

5    and/or promotional materials fully described all known risks associated with the Products. Said

6    representations were of facts that were material and important to Plaintiff's decision to use the

7    Products.

8    325.    When Defendants made said representations, Defendants either knew that said

9    representations were false or made said representations recklessly and without regard for their truth.

10    326.    When Defendants made said representations, Defendants intended that consumers,

11    such as Plaintiff, would rely on said representations.

12    327.    Consumers, such as Plaintiff, reasonably and justifiably relied on Defendants'

13    representations that the Products were safe for use and that their labeling, marketing, and promotional

14    materials fully described all known risks associated with the Products.

15    328.    A recent article was published on October 4, 2022, on MSN and other online news

16    outlets, titled "The Relaxer Box Girls: Where Are They Now ", which revealed that many of the young

17    black girls featured on relaxer boxes and in relaxer ads in the 80s, 90s, and 2000s, never actually got

18    their hair relaxed. Instead, they used other straightening tools and styling products to achieve the look

19    of having the relaxer, without having exposed themselves to the dangerous chemicals within relaxers.

20    Many of them are wearing natural hairstyles today.[97]

21    329.    At all pertinent times, Defendants were then and there guilty of one or more of the

22    following acts and/or omissions:

23        a.    Knowingly made omissions that were material, false, incomplete, misleading,

24            deceptive, and deceitful;

25        b.    Knowingly made misrepresentations for the purpose of deceiving and defrauding

26            consumers, including Plaintiff; or

27    _____

28    [97] The Relaxer Box Girls: Where Are They Now? (msn.com)

c. Knowingly made omissions for the purpose of deceiving and defrauding consumers, including Plaintiff.

330.    Plaintiff relied, with reasonable justification, on the misrepresentations by Defendants, which induced her to purchase and use the Products on a regular basis for decades.

331.    Defendants profited, significantly, from their unethical and illegal conduct that fraudulently induced Plaintiff, and millions of other consumers, to purchase a dangerous and defective product.

332.    As a direct and proximate result of Defendants' above-described fraudulent conduct, including intentional misrepresentations, Plaintiff sustained the following damages:

a. Economic losses including medical care and lost earnings; and

b. Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

c. The sum of the damages Plaintiff have suffered is in excess of the minimum jurisdictional limits of this Court.

333.    Plaintiff's reliance on said representations made by Defendants were a substantial factor in causing Plaintiff to suffer the injuries and damages described herein.

WHEREFORE, Plaintiff demand judgment against Defendants and seek compensatory damages together with interest, the costs of suit and such other and further relief as this Court deems just and proper.

## TENTH CAUSE OF ACTION

## <u>FRAUD – INTENTIONAL MISREPRESENTATION</u>

### (Against Godrej SON and Strength of Nature)

334.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

335.    Defendants engaged in the development, manufacture, marketing, sale, and distribution of cosmetic and personal care products, including the Products, and owed a duty to provide accurate and complete information regarding said products.

336.    Defendants fraudulently misrepresented the use of the Products as safe, effective and not unreasonably dangerous. For example, Defendants Godrej Consumer Products, Godrej SON, and Strength of Nature's Soft & Beautiful Products are intentionally labeled as "Botanicals" and with "Natural" ingredients that are "Ultra Nourishing," including but not limited to using "Natural Plant Oils and Butters."

337.    Defendants knowingly and intentionally represented to consumers, including the Plaintiff, and the public that the Products were safe for use and that Defendants' labeling, marketing, and/or promotional materials fully described all known risks associated with the Products. Said representations were of facts that were material and important to Plaintiff's decision to use the Products.

338.    When Defendants made said representations, Defendants either knew that said representations were false or made said representations recklessly and without regard for their truth.

339.    When Defendants made said representations, Defendants intended that consumers, such as Plaintiff, would rely on said representations.

340.    Consumers, such as Plaintiff, reasonably and justifiably relied on Defendants' representations that the Products were safe for use and that their labeling, marketing, and promotional materials fully described all known risks associated with the Products.

341.    A recent article was published on October 4, 2022, on MSN and other online news outlets, titled "The Relaxer Box Girls: Where Are They Now ", which revealed that many of the young black girls featured on relaxer boxes and in relaxer ads in the 80s, 90s, and 2000s, never actually got their hair relaxed. Instead, they used other straightening tools and styling products to achieve the look of having the relaxer, without having exposed themselves to the dangerous chemicals within relaxers. Many of them are wearing natural hairstyles today.[98]

342.    At all pertinent times, Defendants were then and there guilty of one or more of the following acts and/or omissions:

---

[98] The Relaxer Box Girls: Where Are They Now? (msn.com)

COMPLAINT FOR DAMAGES

d.  Knowingly made omissions that were material, false, incomplete, misleading, deceptive, and deceitful;

e.  Knowingly made misrepresentations for the purpose of deceiving and defrauding consumers, including Plaintiff; or

f.  Knowingly made omissions for the purpose of deceiving and defrauding consumers, including Plaintiff.

343.  Plaintiff relied, with reasonable justification, on the misrepresentations by Defendants, which induced her to purchase and use the Products on a regular basis for decades.

344.  Defendants profited, significantly, from their unethical and illegal conduct that fraudulently induced Plaintiff, and millions of other consumers, to purchase a dangerous and defective product.

345.  As a direct and proximate result of Defendants' above-described fraudulent conduct, including intentional misrepresentations, Plaintiff sustained the following damages:

d.  Economic losses including medical care and lost earnings; and

e.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

f.  The sum of the damages Plaintiff have suffered is in excess of the minimum jurisdictional limits of this Court.

346.  Plaintiff's reliance on said representations made by Defendants were a substantial factor in causing Plaintiff to suffer the injuries and damages described herein.

WHEREFORE, Plaintiff demand judgment against Defendants and seek compensatory damages together with interest, the costs of suit and such other and further relief as this Court deems just and proper.

### ELEVENTH CAUSE OF ACTION

### <u>FRAUD – INTENTIONAL MISREPRESENTATION</u>

### (Against Avlon)

347.  Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation

1   ·set forth in the preceding paragraphs.

2       348.    Defendants engaged in the development, manufacture, marketing, sale, and distribution

3   of cosmetic and personal care products, including the Products, and owed a duty to provide accurate

4   and complete information regarding said products.

5       349.    Defendants fraudulently misrepresented the use of the Products as safe, effective, and

6   not unreasonably dangerous, specifically:

7           a.  Defendants Namaste, Dabur, and Dermoviva's Products are marketed as "Olive Oil"

8               products to imply natural products, and their Products are advertised as being "Build

9               in Protection;"

10          b.  Defendants Namaste, Dabur, and Dermoviva's website states that their Products use

11              "Rich Olive and Avocado Oils" that they claim "moisturize and condition while

12              Aloe Vera protects the skin and scalp."

13          c.  Defendants Namaste, Dabur, and Dermoviva's Products claim that they "use[] the

14              latest technology to safely elongate tight coils."

15      350.    Defendants knowingly and intentionally represented to consumers, including the

16  Plaintiff, and the public that the Products were safe for use and that Defendants' labeling, marketing,

17  and/or promotional materials fully described all known risks associated with the Products. Said

18  representations were of facts that were material and important to Plaintiff's decision to use the

19  Products.

20      351.    When Defendants made said representations, Defendants either knew that said

21  representations were false or made said representations recklessly and without regard for their truth.

22      352.    When Defendants made said representations, Defendants intended that consumers,

23  such as Plaintiff, would rely on said representations.

24      353.    Consumers, such as Plaintiff, reasonably and justifiably relied on Defendants'

25  representations that the Products were safe for use and that their labeling, marketing, and promotional

26  materials fully described all known risks associated with the Products.

27      354.    A recent article was published on October 4, 2022, on MSN and other online news

28  outlets, titled "The Relaxer Box Girls: Where Are They Now ", which revealed that many of the young

1   black girls featured on relaxer boxes and in relaxer ads in the 80s, 90s, and 2000s, never actually got

2   their hair relaxed. Instead, they used other straightening tools and styling products to achieve the look

3   of having the relaxer, without having exposed themselves to the dangerous chemicals within relaxers.

4   Many of them are wearing natural hairstyles today.[99]

5        355.   At all pertinent times, Defendants were then and there guilty of one or more of the

6   following acts and/or omissions:

7              g.  Knowingly made omissions that were material, false, incomplete, misleading,

8                  deceptive, and deceitful;

9              h.  Knowingly made misrepresentations for the purpose of deceiving and defrauding

10                 consumers, including Plaintiff; or

11             i.  Knowingly made omissions for the purpose of deceiving and defrauding

12                 consumers, including Plaintiff.

13       356.   Plaintiff relied, with reasonable justification, on the misrepresentations by Defendants,

14  which induced her to purchase and use the Products on a regular basis for decades.

15       357.   Defendants profited, significantly, from their unethical and illegal conduct that

16  fraudulently induced Plaintiff, and millions of other consumers, to purchase a dangerous and defective

17  product.

18       358.   As a direct and proximate result of Defendants' above-described fraudulent conduct,

19  including intentional misrepresentations, Plaintiff sustained the following damages:

20             g.  Economic losses including medical care and lost earnings; and

21             h.  Noneconomic losses including physical and mental pain and suffering, emotional

22                 distress, inconvenience, loss of enjoyment and impairment of quality of life, past

23                 and future.

24             i.  The sum of the damages Plaintiff has suffered is in excess of the minimum

25                 jurisdictional limits of this Court.

26       359.   Plaintiff's reliance on said representations made by Defendants was a substantial factor

27

28  [99] The Relaxer Box Girls: Where Are They Now? (msn.com)

1    in causing Plaintiff to suffer the injuries and damages described herein.

2        WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory

3    damages together with interest, the costs of suit and such other and further relief as this Court deems

4    just and proper.

<div align="center">

**TWELFTH CAUSE OF ACTION**

**<u>FRAUD – INTENTIONAL MISREPRESENTATION</u>**

**(Against Doe Defendants 1-100)**

</div>

8        360.   Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation

9    set forth in the preceding paragraphs.

10        361.   Defendants engaged in the development, manufacture, marketing, sale, and distribution

11    of cosmetic and personal care products, including the Products, and owed a duty to provide accurate

12    and complete information regarding said products.

13        362.   Defendants fraudulently misrepresented the use of the Products as safe, effective and

14    not unreasonably dangerous.

15        363.   Defendants knowingly and intentionally represented to consumers, including the

16    Plaintiff, and the public that the Products were safe for use and that Defendants' labeling, marketing,

17    and/or promotional materials fully described all known risks associated with the Products. Said

18    representations were of facts that were material and important to Plaintiff's decisions to use the

19    Products.

20        364.   When Defendants made said representations, Defendants either knew that said

21    representations were false or made said representations recklessly and without regard for their truth.

22        365.   When Defendants made said representations, Defendants intended consumers, such

23    as Plaintiff, would rely on said representations.

24        366.   Consumers, such as Plaintiff, reasonably and justifiably relied on Defendants'

25    representations that the Products were safe for use and that their labeling, marketing, and promotional

26    materials fully described all known risks associated with the Products.

27        367.   A recent article was published on October 4, 2022, on MSN and other online news

28    outlets, titled "The Relaxer Box Girls: Where Are They Now," which revealed that many of the young

<div align="center">

65

COMPLAINT FOR DAMAGES

</div>

black girls featured on relaxer boxes and in relaxer ads in the 80s, 90s, and 2000s, never actually got their hair relaxed. Instead, they used other straightening tools and styling products to achieve the look of having the relaxer, without having exposed themselves to the dangerous chemicals within relaxers. Many of them are wearing natural hairstyles today.[100]

368.    At all pertinent times, Defendants were then and there guilty of one or more of the following acts and/or omissions:

    j.   Knowingly made omissions that were material, false, incomplete, misleading, deceptive, and deceitful;

    k.   Knowingly made misrepresentations for the purpose of deceiving and defrauding consumers, including Plaintiff; or

    l.   Knowingly made omissions for the purpose of deceiving and defrauding consumers, including Plaintiff.

369.    Plaintiff relied, with reasonable justification, on the misrepresentations by Defendants, which induced her to purchase and use the Products on a regular basis for decades.

370.    Defendants profited, significantly, from their unethical and illegal conduct that fraudulently induced Plaintiff, and millions of other consumers, to purchase a dangerous and defective product.

371.    As a direct and proximate result of Defendants' above-described fraudulent conduct, including intentional misrepresentations, Plaintiff sustained the following damages:

    j.   Economic losses including medical care and lost earnings; and

    k.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

    l.   The sum of the damages Plaintiff have suffered is in excess of the minimum jurisdictional limits of this Court.

372.    Plaintiff's reliance on said representations made by Defendants was a substantial factor

---

[100] The Relaxer Box Girls: Where Are They Now? (msn.com)

COMPLAINT FOR DAMAGES

1  in causing Plaintiff to suffer the injuries and damages described herein.

2      WHEREFORE, Plaintiff demand judgment against Defendants and seeks compensatory

3  damages together with interest, the costs of suit and such other and further relief as this Court deems

4  just and proper.

### THIRTEENTH CAUSE OF ACTION

### <u>FRAUD – CONCEALMENT</u>

**(Against L'Oréal USA, Inc., L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I))**

373.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

374.    In marketing and selling the Products, Defendants concealed material facts from consumers, including Plaintiff. Said concealment included some or all of the following: disclosure of some facts to consumers, such as Plaintiff, but intentional failure to disclose other important facts, making said disclosure deceptive; intentionally failing to disclose important facts known only to Defendants and that consumers, including Plaintiff, could not have discovered; and/or actively concealing important facts from consumers, including Plaintiff, from discovery said important facts.

375.    At all pertinent times, Defendants were then and there guilty of one or more of the following acts and/or omissions:

      a. Defendants omitted, suppressed, and/or concealed material facts concerning the dangers and risk of injuries associated with the use of the Products and the fact that the Product was unreasonably dangerous;

      b. Defendants purpose was willfully blind to, ignored, downplayed, avoided, concealed and/or otherwise understated the nature of the risks associated with the use of the Products to increase sales;

      c. Defendants undertook the concealment of material facts with an intent that consumers, including Plaintiff, rely upon them.

376.    Plaintiff and other consumers did not know that Defendants concealed material facts and were justified in their reliance on Defendants representations regarding the safety of the Products.

377.    Defendants had sole access to material facts concerning the dangers and unreasonable

1  risks of the Products.

2      378.    The intentional concealment of information by Defendants about the substantial risks

3  of injury and/or disease associated with the Products, was known by Defendants to be wrongful.

4      379.    Had Defendants not fraudulently concealed the information as described herein, the

5  Products would not have been used by Plaintiff.

6      380.    Had Plaintiff been aware of the increased risks of injury associated with the Products,

7  Plaintiff would not have used them.

8      381.    As a direct and proximate result of Defendants' fraudulent and/or intentional

9  concealment of facts, upon which Plaintiff reasonably relied, Plaintiff sustained the following

10  damages:

11          a.  Economic losses including medical care and lost earnings; and

12          b.  Noneconomic losses including physical and mental pain and suffering, emotional

13              distress, inconvenience, loss of enjoyment and impairment of quality of life, past

14              and future.

15          c.  The sum of the damages Plaintiff have suffered is in excess of the minimum

16              jurisdictional limits of this Court.

17      382.    Plaintiff's reasonable reliance on Defendants' fraudulent and/or intentional

18  concealment of facts was a was a substantial factor in causing Plaintiff to suffer the injuries and

19  damages described herein.

20      WHEREFORE, Plaintiff demands judgment against Defendants and seek compensatory

21  damages together with interest, the costs of suit and such other and further relief as this Court deems

22  just and proper.

23                      **FOURTEENTH CAUSE OF ACTION**

24                          **FRAUD – CONCEALMENT**

25                  **(Against Godrej SON and Strength of Nature)**

26      383.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation

27  set forth in the preceding paragraphs.

28      384.    In marketing and selling the Products, Defendants concealed material facts from

1    consumers, including Plaintiff. Said concealment included some or all of the following: disclosure of

2    some facts to consumers, such as Plaintiff, but intentional failure to disclose other important facts,

3    making said disclosure deceptive; intentionally failing to disclose important facts known only to

4    Defendants and that consumers, including Plaintiff, could not have discovered; and/or actively

5    concealing important facts from consumers, including Plaintiff, from discovery said important facts.

6         385.    At all pertinent times, Defendants were then and there guilty of one or more of the

7    following acts and/or omissions:

8           a.  Defendants omitted, suppressed, and/or concealed material facts concerning the

9             dangers and risk of injuries associated with the use of the Products and the fact that

10             the Product was unreasonably dangerous;

11           b.  Defendants purpose was willfully blind to, ignored, downplayed, avoided, concealed

12             and/or otherwise understated the nature of the risks associated with the use of the

13             Products in order to increase sales;

14           c.  Defendants undertook the concealment of material facts with an intent that

15             consumers, including Plaintiff, rely upon them.

16         386.    Plaintiff and other consumers did not know that Defendants concealed material facts

17    and were justified in their reliance on Defendants representations regarding the safety of the Products.

18         387.    Defendants had sole access to material facts concerning the dangers and unreasonable

19    risks of the Products.

20         388.    The intentional concealment of information by Defendants about the substantial risks

21    of injury and/or disease associated with the Products, was known by Defendants to be wrongful.

22         389.    Had Defendants not fraudulently concealed the information as described herein, the

23    Products would not have been used by Plaintiff.

24         390.    Had Plaintiff been aware of the increased risks of injury associated with the Products,

25    Plaintiff would not have used them.

26         391.    As a direct and proximate result of Defendants' fraudulent and/or intentional

27    concealment of facts, upon which Plaintiff reasonably relied, Plaintiff sustained the following

28    damages:

      d.  Economic losses including medical care and lost earnings; and

      e.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

      f.  The sum of the damages Plaintiff have suffered is in excess of the minimum jurisdictional limits of this Court.

392.   Plaintiff's reasonable reliance on Defendants' fraudulent and/or intentional concealment of facts was a was a substantial factor in causing Plaintiff to suffer the injuries and damages described herein.

WHEREFORE, Plaintiff demand judgment against Defendants and seek compensatory damages together with interest, the costs of suit and such other and further relief as this Court deems just and proper.

## FIFTEENTH CAUSE OF ACTION

## FRAUD – CONCEALMENT

### (Against Avlon)

393.   Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

394.   In marketing and selling the Products, Defendants concealed material facts from consumers, including Plaintiff. Said concealment included some or all of the following: disclosure of some facts to consumers, such as Plaintiff, but intentional failure to disclose other important facts, making said disclosure deceptive; intentionally failing to disclose important facts known only to Defendants and that consumers, including Plaintiff, could not have discovered; and/or actively concealing important facts from consumers, including Plaintiff, from discovery said important facts.

395.   At all pertinent times, Defendants were then and there guilty of one or more of the following acts and/or omissions:

      a.  Defendants omitted, suppressed, and/or concealed material facts concerning the dangers and risk of injuries associated with the use of the Products and the fact that the Product was unreasonably dangerous;

b.  Defendants purpose was willfully blind to, ignored, downplayed, avoided, concealed and/or otherwise understated the nature of the risks associated with the use of the Products in order to increase sales;

c.  Defendants undertook the concealment of material facts with an intent that consumers, including Plaintiff, rely upon them.

396.    Plaintiff and other consumers did not know that Defendants concealed material facts and were justified in their reliance on Defendants representations regarding the safety of the Products.

397.    Defendants had sole access to material facts concerning the dangers and unreasonable risks of the Products.

398.    The intentional concealment of information by Defendants about the substantial risks of injury and/or disease associated with the Products, was known by Defendants to be wrongful.

399.    Had Defendants not fraudulently concealed the information as described herein, the Products would not have been used by Plaintiff.

400.    Had Plaintiff been aware of the increased risks of injury associated with the Products, Plaintiff would not have used them.

401.    As a direct and proximate result of Defendants' fraudulent and/or intentional concealment of facts, upon which Plaintiff reasonably relied, Plaintiff sustained the following damages:

g.  Economic losses including medical care and lost earnings; and

h.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

i.  The sum of the damages Plaintiff has suffered is in excess of the minimum jurisdictional limits of this Court.

402.    Plaintiff's reasonable reliance on Defendants' fraudulent and/or intentional concealment of facts was a was a substantial factor in causing Plaintiff to suffer the injuries and damages described herein.

WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory

1  damages together with interest, the costs of suit and such other and further relief as this Court deems

2  just and proper.

### SIXTEENTH CAUSE OF ACTION

### <u>FRAUD – CONCEALMENT</u>

### (Against Doe Defendants 1-100, inclusive)

6  403.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation

7  set forth in the preceding paragraphs.

8  404.    In marketing and selling the Products, Defendants concealed material facts from

9  consumers, including Plaintiff. Said concealment included some or all of the following: disclosure of

10  some facts to consumers, such as Plaintiff, but intentional failure to disclose other important facts,

11  making said disclosure deceptive; intentionally failing to disclose important facts known only to

12  Defendants and that consumers, including Plaintiff, could not have discovered; and/or actively

13  concealing important facts from consumers, including Plaintiff, from discovery said important facts.

14  405.    At all pertinent times, Defendants were then and there guilty of one or more of the

15  following acts and/or omissions:

16      a.  Defendants omitted, suppressed, and/or concealed material facts concerning the

17          dangers and risk of injuries associated with the use of the Products and the fact that

18          the Product was unreasonably dangerous;

19      b.  Defendants purpose was willfully blind to, ignored, downplayed, avoided, concealed

20          and/or otherwise understated the nature of the risks associated with the use of the

21          Products in order to increase sales;

22      c.  Defendants undertook the concealment of material facts with an intent that

23          consumers, including Plaintiff, rely upon them.

24  406.    Plaintiff and other consumers did not know that Defendants concealed material facts

25  and were justified in their reliance on Defendants representations regarding the safety of the Products.

26  407.    Defendants had sole access to material facts concerning the dangers and unreasonable

27  risks of the Products.

28  408.    The intentional concealment of information by Defendants about the substantial risks

1   of injury and/or disease associated with the Products, was known by Defendants to be wrongful.

2   409.   Had Defendants not fraudulently concealed the information as described herein, the

3   Products would not have been used by Plaintiff.

4   410.   Had Plaintiff been aware of the increased risks of injury associated with the Products,

5   Plaintiff would not have used them.

6   411.   As a direct and proximate result of Defendants' fraudulent and/or intentional

7   concealment of facts, upon which Plaintiff reasonably relied, Plaintiff sustained the following

8   damages:

9        j.   Economic losses including medical care and lost earnings; and

10        k.   Noneconomic losses including physical and mental pain and suffering, emotional

11           distress, inconvenience, loss of enjoyment and impairment of quality of life, past

12           and future.

13        l.   The sum of the damages Plaintiff have suffered is in excess of the minimum

14           jurisdictional limits of this Court.

15   412.   Plaintiff's reasonable reliance on Defendants' fraudulent and/or intentional

16   concealment of facts was a was a substantial factor in causing Plaintiff sto suffer the injuries and

17   damages described herein.

18   WHEREFORE, Plaintiff demand judgment against Defendants and seek compensatory

19   damages together with interest, the costs of suit and such other and further relief as this Court deems

20   just and proper.

21   **SEVENTEENTH CAUSE OF ACTION**

22   **UNLAWFUL, UNFAIR AND FRAUDULENT BUSINESS PRACTICES IN VIOLATION OF**

23   **CALIFORNIA B & P CODE SEC. 17200, ET SEQ.**

24   **(Against All Defendants)**

25   413.   Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation

26   set forth in the preceding paragraphs.

27   414.   California's Unfair Competition Law (UCL) creates a cause of action for those harmed

28   by unfair competition, which includes "any unlawful, unfair or fraudulent business act or practice and

1  unfair, deceptive, untrue or misleading advertising."

2      415.    Defendants have made numerous misrepresentations to Plaintiff, consumers, and the

3  general public. Among those misrepresentations are Defendants' claims that the Products are safe,

4  effective, and not unreasonably dangerous.

5      416.    Defendants failed to disclose to Plaintiff, consumers, and the general public that the

6  Products are defective, unreasonably dangerous and are likely to increase the risk of tumors and

7  cancerous growths in premenopausal women, thereby increasing the risk of cancer, fibroids, and/or

8  endometriosis, and injuries as described herein.

9      417.    Defendants' business practices relating to the Products are unlawful because they

10  constitute false advertising, intentional misrepresentation, and fraudulent concealment.

11          m. As a direct and proximate result of Defendants' unlawful business practices and

12              false advertising, Defendants have generated enormous revenues and profits at the

13              expense of Plaintiff.  Plaintiff is thus entitled to restitutionary disgorgement, in an

14              amount to be proven at trial, injunctive relief, attorney's fees, and other remedies

15              available under the law.

16      418.    Defendants' unlawful business practices, at all relevant times, were a substantial factor

17  in causing Plaintiff's harm, as described herein.

18      WHEREFORE, Plaintiff demands judgment against Defendants and seeks an order of this

19  Court awarding restitutionary disgorgement, injunctive relief, attorneys' fees and costs and all other

20  relief as this Court deems just and proper under California Business and Professions Code Section

21  17200 et seq.

## V.    **PRAYER FOR RELIEF**

23      419.    Plaintiff incorporates by reference each and every paragraph of this Complaint as

24  though set forth here in full and further prays.

25      420.    So far as the law and this Court allows, Plaintiff demands judgment against each

26  Defendant on each count as follows:

27          a.    Compensatory damages for the described losses with respect to each cause of

28              action;

1        b.    Past medical expenses;

2        c.    Past and future lost wages and loss of earning capacity;

3        d.    Past and future emotional distress;

4        e.    Punitive damages with respect to each cause of action;

5        f.    Reasonable attorneys' fees where recoverable;

6        g.    Costs of this action;

7        h.    Pre-judgment and all other interest recoverable; and

8        i.    Such other additional and further relief as Plaintiff may be entitled to in law or

9        in equity.

## JURY DEMAND

Plaintiff demands a jury trial for all claims so triable.

Dated: July 18, 2024           SINGLETON SCHRIBER, LLP

By: _____
Andrew Bluth (SBN: 232387)
Christopher Rodriguez (SBN: 212274)
Danielle Ward Mason *(pro hac vice forthcoming)*

*Attorneys for Plaintiff*

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Christopher R. Rodriguez SBN 212274, Andrew D. Bluth SBN 232387, Singleton Schreiber, LLP, 1414 K Street, Suite 470, Sacramento, CA 958144 | **ELECTRONICALLY FILED** Superior Court of California, County of Alameda 07/18/2024 at 04:43:15 PM By: Damaree Franklin, Deputy Clerk |

TELEPHONE NO.: 916-248-8478   FAX NO. *(Optional)*: (619) 255-1515
E-MAIL ADDRESS: crodriguez@singletonschreiber.com
ATTORNEY FOR *(Name)*: Plaintiff

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA
STREET ADDRESS: 1225 Fallon Street
MAILING ADDRESS: 1225 Fallon Street
CITY AND ZIP CODE: Oakland, 94612
BRANCH NAME: Oakland - Rene C. Davidson Courthouse

CASE NAME:
Cynthia Jones v. L'Oreal USA, et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| [x] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter   [ ] Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | | **24CV083993** |
| | | | JUDGE: | |
| | | | DEPT.: | |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403) |
|---|---|---|
| [ ] Auto (22) | [ ] Breach of contract/warranty (06) | [ ] Antitrust/Trade regulation (03) |
| [ ] Uninsured motorist (46) | [ ] Rule 3.740 collections (09) | [ ] Construction defect (10) |
| **Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort** | [ ] Other collections (09) | [x] Mass tort (40) |
| [ ] Asbestos (04) | [ ] Insurance coverage (18) | [ ] Securities litigation (28) |
| [ ] Product liability (24) | [ ] Other contract (37) | [ ] Environmental/Toxic tort (30) |
| [ ] Medical malpractice (45) | **Real Property** | [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41) |
| [ ] Other PI/PD/WD (23) | [ ] Eminent domain/Inverse condemnation (14) | |
| **Non-PI/PD/WD (Other) Tort** | [ ] Wrongful eviction (33) | **Enforcement of Judgment** |
| [ ] Business tort/unfair business practice (07) | [ ] Other real property (26) | [ ] Enforcement of judgment (20) |
| [ ] Civil rights (08) | **Unlawful Detainer** | **Miscellaneous Civil Complaint** |
| [ ] Defamation (13) | [ ] Commercial (31) | [ ] RICO (27) |
| [ ] Fraud (16) | [ ] Residential (32) | [ ] Other complaint *(not specified above)* (42) |
| [ ] Intellectual property (19) | [ ] Drugs (38) | **Miscellaneous Civil Petition** |
| [ ] Professional negligence (25) | **Judicial Review** | [ ] Partnership and corporate governance (21) |
| [ ] Other non-PI/PD/WD tort (35) | [ ] Asset forfeiture (05) | [ ] Other petition *(not specified above)* (43) |
| **Employment** | [ ] Petition re: arbitration award (11) | |
| [ ] Wrongful termination (36) | [ ] Writ of mandate (02) | |
| [ ] Other employment (15) | [ ] Other judicial review (39) | |

2. This case [x] is   [ ] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties   d. [x] Large number of witnesses
   b. [x] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve   e. [x] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. [x] Substantial amount of documentary evidence   f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply)*: a. [x] monetary  b. [x] nonmonetary; declaratory or injunctive relief  c. [x] punitive
4. Number of causes of action *(specify)*: 17
5. This case [ ] is   [x] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: 07/18/2024
Andrew D. Bluth
_____          ►          _____
(TYPE OR PRINT NAME)                                              (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. September 1, 2021]
**CIVIL CASE COVER SHEET**
Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courts.ca.gov

**CM-010**

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases, only parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
 Damage/Wrongful Death
Uninsured Motorist (46) *(if the
 case involves an uninsured
 motorist claim subject to
 arbitration, check this item
 instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
 Asbestos Property Damage
 Asbestos Personal Injury/
  Wrongful Death
Product Liability *(not asbestos or
 toxic/environmental)* (24)
Medical Malpractice (45)
 Medical Malpractice–
  Physicians & Surgeons
 Other Professional Health Care
  Malpractice
Other PI/PD/WD (23)
 Premises Liability (e.g., slip
  and fall)
 Intentional Bodily Injury/PD/WD
  (e.g., assault, vandalism)
 Intentional Infliction of
  Emotional Distress
 Negligent Infliction of
  Emotional Distress
 Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
 Practice (07)
Civil Rights (e.g., discrimination,
 false arrest) *(not civil
 harassment)* (08)
Defamation (e.g., slander, libel)
 (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
 Legal Malpractice
 Other Professional Malpractice
  *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
 Breach of Rental/Lease
  Contract *(not unlawful detainer
  or wrongful eviction)*
 Contract/Warranty Breach–Seller
  Plaintiff *(not fraud or negligence)*
 Negligent Breach of Contract/
  Warranty
 Other Breach of Contract/Warranty
Collections (e.g., money owed, open
 book accounts) (09)
 Collection Case–Seller Plaintiff
 Other Promissory Note/Collections
  Case
Insurance Coverage *(not provisionally
 complex)* (18)
 Auto Subrogation
 Other Coverage
Other Contract (37)
 Contractual Fraud
 Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
 Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
 Writ of Possession of Real Property
 Mortgage Foreclosure
 Quiet Title
 Other Real Property *(not eminent
  domain, landlord/tenant, or
  foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
 drugs, check this item; otherwise,
 report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
 Writ–Administrative Mandamus
 Writ–Mandamus on Limited Court
  Case Matter
 Writ–Other Limited Court Case
  Review
Other Judicial Review (39)
 Review of Health Officer Order
 Notice of Appeal–Labor
  Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
 *(arising from provisionally complex
 case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
 Abstract of Judgment (Out of
  County)
 Confession of Judgment *(non-
  domestic relations)*
 Sister State Judgment
 Administrative Agency Award
  *(not unpaid taxes)*
 Petition/Certification of Entry of
  Judgment on Unpaid Taxes
 Other Enforcement of Judgment
  Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
 above)* (42)
 Declaratory Relief Only
 Injunctive Relief Only *(non-
  harassment)*
 Mechanics Lien
 Other Commercial Complaint
  Case *(non-tort/non-complex)*
 Other Civil Complaint
  *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
 Governance (21)
Other Petition *(not specified
 above)* (43)
 Civil Harassment
 Workplace Violence
 Elder/Dependent Adult
  Abuse
 Election Contest
 Petition for Name Change
 Petition for Relief From Late
  Claim
 Other Civil Petition

For your protection and privacy, please press the Clear
This Form button after you have printed the form.

| Print this form | Save this form |

Clear this form

F. ADDENDUM TO CIVIL CASE COVER SHEET

*Unified Rules of the Superior Court of California, County of Alameda*

| Short Title: Cynthia Jones v. L'Oreal USA, Inc., et al. | Case Number: |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM

**THIS FORM IS REQUIRED IN ALL NEW UNLIMITED CIVIL CASE FILINGS IN THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA**

[ x ] Oakland, Rene C. Davidson Alameda County Courthouse  (446)
[ ] Hayward Hall of Justice  (447)
[ ] Pleasanton, Gale-Schenone Hall of Justice  (448)

| Civil Case Cover Sheet Category | Civil Case Cover Sheet Case Type | Alameda County Case Type (check only one) |
|---|---|---|
| Auto Tort | Auto tort (22) | [ ] 34 Auto tort (G)<br>Is this an uninsured motorist case? [ ] yes [ ] no |
| Other PI /PD / WD Tort | Asbestos (04) | [ ] 75 Asbestos (D) |
| | Product liability (24) | [ ] 89 Product liability (not asbestos or toxic tort/environmental) (G) |
| | Medical malpractice (45) | [ ] 97 Medical malpractice (G) |
| | Other PI/PD/WD tort (23) | [ ] 33 Other PI/PD/WD tort (G) |
| Non - PI /PD / WD Tort | Bus tort / unfair bus. practice (07) | [ ] 79 Bus tort / unfair bus. practice (G) |
| | Civil rights (08) | [ ] 80 Civil rights (G) |
| | Defamation (13) | [ ] 84 Defamation (G) |
| | Fraud (16) | [ ] 24 Fraud (G) |
| | Intellectual property (19) | [ ] 87 Intellectual property (G) |
| | Professional negligence (25) | [ ] 59 Professional negligence - non-medical (G) |
| | Other non-PI/PD/WD tort (35) | [ ] 03 Other non-PI/PD/WD tort (G) |
| Employment | Wrongful termination (36) | [ ] 38 Wrongful termination (G) |
| | Other employment (15) | [ ] 85 Other employment (G) |
| | | [ ] 53 Labor comm award confirmation |
| | | [ ] 54 Notice of appeal - L.C.A. |
| Contract | Breach contract / Wrnty (06) | [ ] 04 Breach contract / Wrnty (G) |
| | Collections (09) | [ ] 81 Collections (G) |
| | Insurance coverage (18) | [ ] 86 Ins. coverage - non-complex (G) |
| | Other contract (37) | [ ] 98 Other contract (G) |
| Real Property | Eminent domain / Inv Cdm (14) | [ ] 18 Eminent domain / Inv Cdm (G) |
| | Wrongful eviction (33) | [ ] 17 Wrongful eviction (G) |
| | Other real property (26) | [ ] 36 Other real property (G) |
| Unlawful Detainer | Commercial (31) | [ ] 94 Unlawful Detainer - commercial   Is the deft. in possession |
| | Residential (32) | [ ] 47 Unlawful Detainer - residential   of the property? |
| | Drugs (38) | [ ] 21 Unlawful detainer - drugs   [ ] Yes   [ ] No |
| Judicial Review | Asset forfeiture (05) | [ ] 41 Asset forfeiture |
| | Petition re: arbitration award (11) | [ ] 62 Pet. re: arbitration award |
| | Writ of Mandate (02) | [ ] 49 Writ of mandate |
| | | Is this a CEQA action (Publ.Res.Code section 21000 et seq) [ ] Yes [ ] No |
| | Other judicial review (39) | [ ] 64 Other judicial review |
| Provisionally Complex | Antitrust / Trade regulation (03) | [ ] 77 Antitrust / Trade regulation |
| | Construction defect (10) | [ ] 82 Construction defect |
| | Claims involving mass tort (40) | [X] 78 Claims involving mass tort |
| | Securities litigation (28) | [ ] 91 Securities litigation |
| | Toxic tort / Environmental (30) | [ ] 93 Toxic tort / Environmental |
| | Ins covrg from cmplx case type (41) | [ ] 95 Ins covrg from complex case type |
| Enforcement of Judgment | Enforcement of judgment (20) | [ ] 19 Enforcement of judgment |
| | | [ ] 08 Confession of judgment |
| Misc Complaint | RICO (27) | [ ] 90 RICO (G) |
| | Partnership / Corp. governance (21) | [ ] 88 Partnership / Corp. governance (G) |
| | Other complaint (42) | [ ] 68 All other complaints (G) |
| Misc. Civil Petition | Other petition (43) | [ ] 06 Change of name |
| | | [ ] 69 Other petition |

| SUPERIOR COURT OF CALIFORNIA COUNTY OF ALAMEDA | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Rene C. Davidson Courthouse<br>Administration Building, 1221 Oak Street, Oakland, CA 94612 | **FILED**<br>Superior Court of California<br>County of Alameda<br>07/18/2024<br>Chad Fhke, Executive Officer / Clerk of the Court<br>By: _____ Deputy<br>D. Franklin |
| PLAINTIFF:<br>CYNTHIA L JONES | |
| DEFENDANT:<br>L'Oreal USA. Inc., a corporation et al | |
| **NOTICE OF CASE MANAGEMENT CONFERENCE** | CASE NUMBER:<br>24CV083993 |

TO THE PLAINTIFF(S)/ATTORNY(S) FOR PLAINTIFF(S) OF RECORD:

You are ordered to serve all named defendants and file proofs of service on those defendants with the court within 60 days of the filing of the complaint (Cal. Rules of Court, 3.110(b)).

Give notice of this conference to all other parties and file proof of service.

Your Case Management Conference has been scheduled on:

| | |
|---|---|
| Date: 11/15/2024    Time: 8:30 AM    Dept.: 23 | |
| Location: Rene C. Davidson Courthouse<br>Administration Building, 1221 Oak Street, Oakland, CA 94612 | |

TO DEFENDANT(S)/ATTORNEY(S) FOR DEFENDANT(S) OF RECORD:

The setting of the Case Management Conference does not exempt the defendant from filing a responsive pleading as required by law, you must respond as stated on the summons.

TO ALL PARTIES who have appeared before the date of the conference must:

Pursuant to California Rules of Court, 3.725, a completed Case Management Statement (Judicial Council form CM-110) must be filed and served at least 15 calendar days before the Case Management Conference. The Case Management Statement may be filed jointly by all parties/attorneys of record or individually by each party/attorney of record.

**Meet and confer**, in person or by telephone as required by Cal. Rules of Court, rule 3.724.

**Post jury fees** as required by Code of Civil Procedure section 631.

If you do not follow the orders above, the court may issue an order to show cause why you should not be sanctioned under Cal. Rules of Court, rule 2.30. Sanctions may include monetary sanctions, striking pleadings or dismissal of the action.

The judge may place a Tentative Case Management Order in your case's on-line register of actions before the conference. This order may establish a discovery schedule, set a trial date or refer the case to Alternate Dispute Resolution, such as mediation or arbitration. Check the court's eCourt Public Portal for each assigned department's procedures regarding tentative case management orders at https://eportal.alameda.courts.ca.gov.

**NOTICE OF
CASE MANAGEMENT CONFERENCE**

| SUPERIOR COURT OF CALIFORNIA COUNTY OF ALAMEDA | Reserved for Clerk's File Stamp |
|---|---|

| COURTHOUSE ADDRESS: Rene C. Davidson Courthouse 1225 Fallon Street, Oakland, CA 94612 | **FILED** Superior Court of California County of Alameda 07/18/2024 Chad Finke, Executive Officer/Clerk of the Court By: _____ Deputy D. Franklin |
|---|---|

| PLAINTIFF/PETITIONER: CYNTHIA L JONES | |
|---|---|

| DEFENDANT/RESPONDENT: L'Oreal USA. Inc., a corporation et al | |
|---|---|

| **CERTIFICATE OF MAILING** | CASE NUMBER: 24CV083993 |
|---|---|

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the attached document upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Oakland, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.

Christopher R. Rodriguez
SINGLETON SCHREIBER LLP
1414 K St Ste 470
Sacramento, CA 95814

Chad Finke, Executive Officer / Clerk of the Court

Dated: 07/22/2024                    By:

D. Franklin, Deputy Clerk

**CERTIFICATE OF MAILING**

# EXHIBIT C

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**ELECTRONICALLY FILED**
Superior Court of California
County of Alameda
07/22/2024
Chad Finke, Executive Officer / Clerk of the Court
By: _____ D. Franklin _____ Deputy

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
L'Oreal USA. Inc., a corporation; (Additional Parties Attachment form is attached.)

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
CYNTHIA L. JONES, an individual.

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Alameda County Superior Court
1225 Fallon Street, Oakland, CA 94612

CASE NUMBER:
*(Número del Caso):*
24CV083993

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Christopher R. Rodriguez, Singleton Schreiber, LLP, 1414 K Street, Suite 470, Sacramento, CA 95814

DATE: 07/22/2024    Chad Finke, Executive Officer / Clerk of the Court    Clerk, by    D. Franklin    , Deputy
*(Fecha)*    *(Secretario)*    *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* SOFT SHEEN-CARSON LLC, a corporation

   under: ☒ CCP 416.10 (corporation)     ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

**SUM-200(A)**

| SHORT TITLE:<br>Cynthia L. Jones v. L'Oreal USA, Inc., et al. | CASE NUMBER:<br>24CV083993 |
|---|---|

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff    ☒ Defendant    ☐ Cross-Complainant    ☐ Cross-Defendant

L'ORÉAL USA PRODUCTS, INC., a corporation; SOFT SHEEN-CARSON LLC, a corporation; SOFT SHEEN*CARSON (W.I.), INC., a corporation.; STRENGTH OF NATURE, LLC, a corporation; GODREJ SON HOLDINGS, INC., a corporation; AVLON INDUSTRIES, INC., a corporation; SAFEWAY INC., a corporation; THE VONS COMPANIES, INC., a corporation; and DOES 1-100 inclusive,

Page ___1___ of ___1___

**Page 1 of 1**

Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

1  Christopher R. Rodriguez (SBN: 212274)
2  Andrew D. Bluth (SBN: 232387)
   Danielle Ward Mason *(pro hac vice forthcoming)*
3  Singleton Schreiber, LLP
   1414 K Street, Suite 470
4  Sacramento, CA 95814
   Telephone: (916) 248-8478
5  Facsimile: (619) 255-1515

6  Attorneys for Plaintiff

**ELECTRONICALLY FILED**
Superior Court of California,
County of Alameda
07/18/2024 at 04:43:15 PM
By: Damaree Franklin,
Deputy Clerk

7              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8                          **COUNTY OF ALAMEDA**

9  CYNTHIA L. JONES, an individual,              Case No. 24CV083993

10                    Plaintiff,                 **COMPLAINT FOR DAMAGES**

11  v.                                           (1) Strict Liability—Failure to Warn;
                                                 (2) Strict Liability—Design Defect;
12  L'ORÉAL USA, INC., a corporation;            (3) Breach of Express Warranty;
    L'ORÉAL USA PRODUCTS, INC., a                (4) Breach of Implied Warranty of
13  corporation; SOFT SHEEN-CARSON LLC, a        Merchantability;
    corporation; SOFT SHEEN*CARSON (W.I.),       (5) Breach of Implied Warranty of Fitness for a
14  INC., a corporation.; STRENGTH OF            Particular Purpose
    NATURE, LLC, a corporation; GODREJ SON       (6) Negligence—Design, Manufacture and
15  HOLDINGS, INC., a corporation; AVLON         Sale;
    INDUSTRIES, INC., a corporation;             (7) Negligence—Failure to Recall/Retrofit;
16  SAFEWAY INC., a corporation; THE VONS        (8) Negligence—Failure to Warn;
17  COMPANIES, INC., a corporation; and DOES     (9-13) Fraud—Intentional Misrepresentation;
    1-100 inclusive,                             (14-18) Fraud—Concealment;
18                                               (19) Unlawful Business Practices in Violation
                    Defendants.                  of Ca. Health & Safety Code Sec. 25249.6 Et
19                                               Seq.
20
                                                 **(Unlimited Civil – Amount Demanded**
21                                               **Exceeds $25,000)**
22
                                                 **DEMAND FOR JURY TRIAL**
23

24

25                    **I.    INTRODUCTION**

26      1.     This is an action for damages relating to L'ORÉAL USA, INC.; L'ORÉAL USA

27  PRODUCTS, INC.; SOFT SHEEN-CARSON LLC; SOFT SHEEN*CARSON (W.I.), INC.;

28  STRENGTH OF NATURE, LLC; GODREJ SON HOLDINGS, INC.; AVLON INDUSTRIES, INC.;

                                          1

1    SAFEWAY INC.; THE VONS COMPANIES, INC.; AND DOES 1-100 INCLUSIVE, hereinafter

2    "Defendants'" design, manufacture, research, sale, testing, marketing, advertising, promotion, and/or

3    distribution of chemical hair relaxer products ("Products"). These Products, commonly referred to as

4    "hair relaxers," are a type of lotion or cream product that uses the chemicals contained therein to alter

5    the structure of very tight curls or curly hair, thereby "relaxing" the curls.

6        2.    The Products are common among women in the United States and are historically

7    marketed particularly to Black and Brown women with tight curls or curly hair. When used as

8    intended, the Products pose an increased risk of hormone-related cancers and reproductive problems

9    including the development of uterine fibroids. Defendants had knowledge of these increased risks but

10   hid them from their customers and the public as they continued to manufacture, sell, promote, market,

11   and distribute the Products.

12       3.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered

13   serious and permanent physical and emotional injuries, and uterine fibroids, and seeks damages

14   relating to Defendants' design, development, manufacture, testing, packaging, promotion, advertising,

15   marketing, distribution, labeling, and sale of Products, as described below.

16                        **II.    THE PARTIES**

17       4.    Plaintiff Cynthia L. Jones is a citizen and resident of the State of California, with her place

18   of residence being North Highlands, California in Sacramento County.

19       5.    Defendant L'Oréal USA, Inc. is, and at all times relevant to this action, was a

20   corporation, with its principal places of business and headquarters located at 575 Fifth Avenue, New

21   York, New York 10017 and 888 North Douglas Street, El Segundo, California 90245. At all times

22   relevant hereto, Defendant L'Oréal USA, Inc. regularly and continuously did business within this

23   judicial district by designing, testing, manufacturing, researching, marketing, advertising, promoting,

24   selling, and/or distributing the Products.

25       6.    Defendant L'Oréal USA Products, Inc. is, and at all times relevant to this action, was a

26   corporation, with its principal place of business and headquarters located at 10 Hudson Yards 347 10th

27   Avenue New York, New York 10001 and 888 North Douglas Street, El Segundo, California 90245.

28   At all times relevant hereto, Defendant L'Oréal USA Products, Inc. regularly and continuously did

1    business within this judicial district by designing, testing, manufacturing, researching, marketing,
2    advertising, promoting, selling, and/or distributing the Products.

3        7.    Defendant Soft Sheen-Carson LLC ["Soft Sheen"], is, and at all times relevant to this
4    action, was a corporation with its principal place of business and headquarters located at 2870
5    Peachtree Rd. Suite 464, Atlanta GA 40405 and process may be served upon its registered agent,
6    Corporation Service Company, 80 State Street, Albany, NY 12207. At all times relevant hereto,
7    Defendant Soft Sheen regularly and continuously did business within this judicial district by
8    designing, testing, manufacturing, researching, marketing, advertising, promoting, selling, and/or
9    distributing the Products.

10        8.    Defendant Soft Sheen*Carson (W.I.), Inc., ["Carson (W.I)"], is, and at all times
11    relevant to this action, was a corporation and process may be served upon its registered agent,
12    Corporate Services Company 251 Little Falls Drive, Wilmington, Delaware 19808. At all times
13    relevant hereto, Defendant Carson (W.I) regularly and continuously did business within this judicial
14    district by designing, testing, manufacturing, researching, marketing, advertising, promoting, selling,
15    and/or distributing the Products.

16        9.    Defendant Strength of Nature, LLC ["Strength of Nature"] is, and at all times relevant
17    to this action, was a corporation with its principal place of business and headquarters located at 64
18    Ross Road, Savannah, GA 31405 and process may be served upon its registered agent, Karan Sood at
19    64 Ross Road, Savannah GA 31405. At all times relevant hereto, Defendant Strength of Nature
20    regularly and continuously did business within this judicial district by designing, testing,
21    manufacturing, researching, marketing, advertising, promoting, selling, and/or distributing the
22    Products.

23        10.    Godrej SON Holdings, Inc. ["Godrej SON"] is, and at all times relevant to this action,
24    was a corporation with its principal place of business and headquarters located at 64 Ross Road,
25    Savannah GA, 31405, and process may be served upon its registered agent, Karan Sood at 64 Ross
26    Road, Savannah, GA 31405. At all times relevant hereto, Defendant Godrej SON regularly and
27    continuously did business within this judicial district by designing, testing, manufacturing,
28    researching, marketing, advertising, promoting, selling, and/or distributing the Products.

11.    Defendant Avlon Industries, Inc. ["Avlon"], is, and at all times relevant to this action, was a corporation with its principal place of business and headquarters located at 1999 N 15th Ave Melrose Park, IL, 60160, and process may be served upon its registered agent, Kenneth J. Nemec, Jr. 835 McClintock Dr., 2nd Floor, Blurr Ridge, IL 60527. At all times relevant hereto, Defendant Avlon regularly and continuously did business within this judicial district by designing, testing, manufacturing, researching, marketing, advertising, promoting, selling, and/or distributing the Products.

12.    Defendant Safeway Inc. ["Safeway"] is and at all times relevant to this action, was a California citizen with its principal place of business and headquarters located at 11555 Dublin Canyon Road, Pleasanton, CA 94588 in Alameda County, and process may be served upon its registered agent Amanda Garcia at 330 N Brand Blvd, Glendale, CA 91203. At all times relevant hereto, Defendant Safeway regularly and continuously did business within this state and county, including at its corporate headquarters, located at 11555 Dublin Canyon Road, Pleasanton, CA 94588, by marketing, advertising, promoting, selling, and/or distributing the Products.

13.    Defendant The Vons Companies, Inc. ["Vons Companies"] is and at all times relevant to this action, was California citizen with its principal place of business and headquarters located at 11555 Dublin Canyon Road, Pleasanton, CA 94588 in Alameda County, and process may be served upon its registered agent Amanda Garcia at 330 N Brand Blvd, Glendale, CA 91203. At all times relevant hereto, Defendant Vons regularly and continuously did business within this state and county, including at its corporate headquarters, located at 11555 Dublin Canyon Road, Pleasanton, CA 94588, by marketing, advertising, promoting, selling, and/or distributing the Products.

### III.    JURISDICTION AND VENUE

14.    This Court has jurisdiction over the claims and causes of action asserted herein because such claims arise out of all of the Defendants' unlawful business practices within the State of California, at least some of the Defendants are citizens of the State of California, and Plaintiffs' injuries were suffered within the State of California as a result of Defendants' conduct.

15.    Venue is proper in this Court because: Pursuant to California Code of Civil Procedure section 395, at least some of the Defendants are residents of Alameda County; all of the Defendants

1    transact business in California and in the County of Alameda; and all of the Defendants have

2    committed unlawful acts in the County; thus, a substantial part of the events giving rise to the claims

3    alleged herein occurred in this County.

### IV.    STATEMENT OF FACTS

5        16.    Each of the preceding paragraphs is incorporated by reference herein.

6        17.    At all pertinent times, all Defendants were engaged in the research, development,

7    manufacture, design, testing, sale, and marketing of the chemical hair relaxer products ("Products")

8    and introduced such products into interstate commerce with knowledge and intent that such Products

9    be sold in the State of California.

10       18.    At all times material hereto, Defendants L'Oréal USA, Inc., L'Oréal USA Products,

11   Inc., Soft Sheen, and Carson (W.I) developed, tested, assembled, manufactured, packaged, labeled,

12   prepared, distributed, marketed, supplied, and/or sold the defective chemical hair relaxer Products,

13   Dark & Lovely and Mizani.

14       19.    Upon information and belief, Defendants L'Oréal USA, Inc., L'Oréal USA Products,

15   Inc., Soft Sheen, and Carson (W.I)'s hair relaxer Products, Dark & Lovely and Mizani contained

16   phthalates, including but not limited to diethyl phthalate (DEP), bis(2-ethyhexyl) phthalate (DEHP),

17   and benzylbutyl phthalate.

18       20.    Upon information and belief Defendants L'Oréal USA, Inc., L'Oréal USA Products,

19   Inc., Soft Sheen, and Carson (W.I)'s hair relaxer Products, Dark & Lovely and Mizani contained

20   bisphenol A.

21       21.    Upon information and belief, Defendants L'Oréal USA, Inc., L'Oréal USA Products,

22   Inc., Soft Sheen, and Carson (W.I)'s hair relaxer Products, Dark & Lovely and Mizani contained

23   cyclosiloxanes,    including    but    not    limited    to    octamethylcycloetrasiloxane    (D4),

24   decamethylcyclopentasiloxane (D5), and dodecamethylcyclohexylsiloxane (D6).

25       22.    Upon information and belief, Defendants L'Oréal USA, Inc, L'Oréal USA Products,

26   Inc., Soft Sheen, and Carson (W.I)'s hair relaxer Products, Dark & Lovely and Mizani contained

27   parabens, including but not limited to methyl paraben, ethyl paraben, bis(2-ethylhexyl) adipate, and

28   butyl paraben.

23. Upon information and belief, Defendants L'Oréal USA, Inc., L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I)'s hair relaxer Products, Dark & Lovely and Mizani contained antimicrobials including but not limited to o-phenylphenol, triclosan, and triclocarban.

24. Upon information and belief, Defendants L'Oréal USA, Inc., L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I)'s hair relaxer Products, Dark & Lovely and Mizani contained ethanolamines, including but not limited to menoethanolamine and diethanolamine.

25. Upon information and belief, Defendants L'Oréal USA, Inc., L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I)'s hair relaxer Products, Dark & Lovely and Mizani contained alkylphenols, including but not limited to 4-t-octylphenol, 4-t-nonylphenol, nonylphenol monoethoxylate, and nonylphenol diethoxylate.

26. Upon information and belief, Defendants L'Oréal USA, Inc., L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I)'s hair relaxer Products, Dark & Lovely and Mizani contained UV filters including, but not limited to benzophenone, benzophenone-1, benzophenone-2, benzophenone-3, oxtinoxate, and octadimethyl PABA.

27. Upon information and belief, Defendants L'Oréal USA, Inc., L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I)'s hair relaxer Products, Dark & Lovely and Mizani contained fragrances, including but not limited to benzylcetate, eugenol, hexyl cinnemal, limonene, linalool, methyl eugenol, methyl salicylate, pinene, terpineol, AHTN, bucinal, diphenyl ether, DPMI, HHCB, isobornyl acetate, methyl ionone, musk ketone, musk xylene, and phenethyl alcohol.

28. At all times material hereto, Defendants L'Oréal USA, Inc., L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I) placed defective hair relaxer Products into the stream of interstate commerce.

29. Plaintiff Jones used the following L'Oréal USA, Inc., L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I) Products:

      a. Dark & Lovely No-Lye Children Relaxer System; and

      b. Mizani Moderate Curl Reduction Relaxer with Shea Butter, Cocoa Butter, and Honey.

30. At all pertinent times, all Defendants were engaged in the research, development,

1    manufacture, design, testing, sale, and marketing of the chemical hair relaxer products ("Products")
2    and introduced such products into interstate commerce with knowledge and intent that such products
3    be sold in the State of California.

4         31.    At all times material hereto, Defendants Godrej SON and Strength of Nature
5    developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed,
6    supplied, and/or sold the defective chemical hair relaxer Products, Just For Me, TCB, Motions, and
7    Dr. Miracle's.

8         32.    Upon information and belief, Defendants Godrej SON, Strength of Nature's product,
9    Just For Me, TCB, Motions, and Dr. Miracle's hair relaxers contained phthalates, including but not
10   limited to diethyl phthalate (DEP), bis(2-ethyhexyl) phthalate (DEHP), and benzylbutyl phthalate.

11        33.    Upon information and belief, Defendants Godrej SON, Strength of Nature's Products,
12   Just For Me, TCB, Motions, and Dr. Miracle's hair relaxers contained bisphenol A.

13        34.    Upon information and belief, Defendants Godrej SON, Strength of Nature's Products,
14   Just For Me, TCB, Motions, and Dr. Miracle's hair relaxers contained cyclosiloxanes, including but
15   not limited to octamethylcycloetrasiloxane (D4), decamethylcyclopentasiloxane (D5), and
16   dodecamethylcyclohexylsiloxane (D6).

17        35.    Upon information and belief, Defendants Godrej SON, Strength of Nature's Products,
18   Just For Me, TCB, Motions, and Dr. Miracle's hair relaxers contained parabens, including but not
19   limited to methyl paraben, ethyl paraben, bis(2-ethylhexyl) adipate, and butyl paraben.

20        36.    Upon information and belief, Defendants Godrej SON, Strength of Nature's product,
21   Just For Me, TCB, Motions, and Dr. Miracle's hair relaxer  contained antimicrobials including but not
22   limited to o-phenylphenol, triclosan, and triclocarban.

23        37.    Upon information and belief, Defendants Godrej SON, Strength of Nature's product,
24   Just For Me, TCB, Motions, and Dr. Miracle's hair relaxers contained ethanolamines, including but
25   not limited to menoethanolamine and diethanolamine.

26        38.    Upon information and belief, Defendants Godrej SON, Strength of Nature's product,
27   Just For Me, TCB, Motions, and Dr. Miracle's hair relaxers contained alkylphenols, including but not
28   limited to 4-t-octylphenol, 4-t-nonylphenol, nonylphenol monoethoxylate, and nonylphenol

1 | diethoxylate.

2      39.    Upon information and belief, Defendants Godrej SON, Strength of Nature's product,
3 | Just For Me, TCB, Motions, and Dr. Miracle's hair relaxers contained UV filters including, but not
4 | limited to benzophenone, benzophenone-1, benzophenone-2, benzophenone-3, oxtinoxate, and
5 | octadimethyl PABA.

6      40.    Upon information and belief, Defendants Godrej SON, Strength of Nature product, Just
7 | For Me, TCB, Motions, and Dr. Miracle's hair relaxers contained fragrances, including but not limited
8 | to benzylcetate, eugenol, hexyl cinnemal, limonene, linalool, methyl eugenol, methyl salicylate,
9 | pinene, terpineol, AHTN, bucinal, diphenyl ether, DPMI, HHCB, isobornyl acetate, methyl ionone,
10 | musk ketone, musk xylene, and phenethyl alcohol.

11      41.    At all times material hereto, Defendants Godrej SON and Strength of Nature placed
12 | defective hair relaxer Products into the stream of interstate commerce.

13      42.    Plaintiff Jones used the following Defendants Godrej SON and Strength of Nature's
14 | Products:

15      a.   Just for Me No-Lye Conditioning Crème Relaxer with Sunflower Oil, Shea Butter,
16         Coconut Milk, and Vitamin E;

17      b.   Just for Me No-Lye Conditioning Crème Relaxer Kit Regular;

18      c.   TCB No Base Hair Relaxer with Protein and DNA Mild;

19      d.   Motions No-Lye Relaxer System with Shea Butter, Argan Oil, and Coconut Oil;

20      e.   African Pride Regular Hair Relaxer; and

21      f.   Dr. Miracle's No-Lye Relaxer with Vitamins A and E.

22      43.    At all times material hereto, Defendant Avlon developed, tested, assembled,
23 | manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the defective
24 | chemical hair relaxer Product, Affirm.

25      44.    Upon information and belief, Defendant Avlon's Product, Affirm hair relaxers
26 | contained phthalates, including but not limited to diethyl phthalate (DEP), bis(2-ethyhexyl) phthalate
27 | (DEHP), and benzylbutyl phthalate.

28      45.    Upon information and belief Defendant Avlon's Product Affirm hair relaxers

1  contained bisphenol A.

2      46.    Upon information and belief, Defendant Avlon's Product Affirm hair relaxers
3  contained cyclosiloxanes, including but not limited to octamethylcycloetrasiloxane (D4),
4  decamethylcyclopentasiloxane (D5), and dodecamethylcyclohexylsiloxane (D6).

5      47.    Upon information and belief, Defendant Avlon's Product, Affirm hair relaxers
6  contained parabens, including but not limited to methyl paraben, ethyl paraben, bis(2-ethylhexyl)
7  adipate, and butyl paraben.

8      48.    Upon information and belief, Defendant Avlon's Product, Affirm hair relaxers
9  contained antimicrobials including but not limited to o-phenylphenol, triclosan, and triclocarban.

10      49.    Upon information and belief, Defendant Avlon's Product, Affirm hair relaxers
11  contained ethanolamines, including but not limited to menoethanolamine and diethanolamine.

12      50.    Upon information and belief, Defendant Avlon's Product, Affirm hair relaxers
13  contained alkylphenols, including but not limited to 4-t-octylphenol, 4-t-nonylphenol, nonylphenol
14  monoethoxylate, and nonylphenol diethoxylate.

15      51.    Upon information and belief, Defendant Avlon's Product, Affirm hair relaxers
16  contained UV filters including, but not limited to benzophenone, benzophenone-1, benzophenone-2,
17  benzophenone-3, oxtinoxate, and octadimethyl PABA.

18      52.    Upon information and belief, Defendant Avlon's Product, Affirm hair relaxers
19  contained fragrances, including but not limited to benzylcetate, eugenol, hexyl cinnemal, limonene,
20  linalool, methyl eugenol, methyl salicylate, pinene, terpineol, AHTN, bucinal, diphenyl ether, DPMI,
21  HHCB, isobornyl acetate, methyl ionone, musk ketone, musk xylene, and phenethyl alcohol.

22      53.    At all times material hereto, Defendant Avlon placed defective hair Products into the
23  stream of interstate commerce and Plaintiff Jones used Affirm Relaxer Products.

24      54.    Plaintiff Jones used Defendant Avlon's "Affirm" branded relaxer Products.

25              **PLAINTIFF JONES'S USE OF HAIR RELAXER PRODUCTS**

26      55.    Plaintiff Jones was first exposed to Endocrine Disrupting Chemicals ("EDCs") and/or
27  phthalate-based Products around 1989, at or around the age of eleven (11) when she began using
28  Defendants' Products.

1    56.    Plaintiff Jones continued using Defendants' Products from around 1989 to 2020, from

2    approximately age eleven (11) to forty-two (42), resulting in thirty-one (31) years of continuous

3    exposure.

4    57.    Between the ages of 14 and 42, Plaintiff Jones used L'Oréal USA, Inc., L'Oréal USA

5    Products, Inc., Soft Sheen, and Carson (W.I)'s "Dark & Lovely" branded Products, including Dark &

6    Lovely No-Lye Children Relaxer System.

7    58.    Between the ages of 13 and 20, Plaintiff Jones used L'Oréal USA, Inc., L'Oréal USA

8    Products, Inc., Soft Sheen, and Carson (W.I)'s "Mizani" branded Products, including Mizani Moderate

9    Curl Reduction Relaxer with Shea Butter, Cocoa Butter, and Honey.

10    59.    Between the ages of 11 to 14, Plaintiff Jones used Godrej SON and Strength of Nature's

11    "Just for Me" branded Products, including:

12        a.    Just for Me No-Lye Conditioning Crème Relaxer with Sunflower Oil, Shea Butter,

13            Coconut Milk, and Vitamin E; and

14        b.    Just for Me No-Lye Conditioning Crème Relaxer Kit Regular.

15    60.    Between the ages of 11 to 14, Plaintiff Jones used Godrej SON and Strength of Nature's

16    "TCB" branded Products, including TCB No Base Mild Hair Relaxer with Protein and DNA.

17    61.    Between the ages of 30 to 32, Plaintiff Jones used Godrej SON and Strength of Nature's

18    "African Pride" branded Products, including African Pride Regular Hair Relaxer.

19    62.    Between the ages of 16 to 42, Plaintiff Jones used Godrej SON and Strength of Nature's

20    "Motions" branded Products, including Motions No-Lye Relaxer System with Shea Butter, Argan Oil,

21    and Coconut Oil.

22    63.    Between the ages of 21 to 42, Plaintiff Jones used Godrej SON and Strength of Nature's

23    "Dr. Miracle's" branded Products, including Dr. Miracle's No-Lye Relaxer with Vitamins A and E.

24    64.    Between the ages of 13 to 20, Plaintiff Jones used Defendant Avlon's "Affirm" branded

25    Products.

26    65.    Plaintiff Jones frequently purchased Relaxer Products from Defendants Safeway's and

27    Vons Companies' "Safeway" stores in California.

28    66.    Plaintiff Jones received retouches to relax her new growth approximately every four

1  (4) to six (6) weeks, resulting in approximately eight (8) to twelve (12) applications of relaxer per
2  year.

3    67.    Plaintiff Jones used Defendants' Products by applying them to her hair by having a
4  professional at a hair salon apply Defendants' Products exactly as instructed by Defendants.

5    68.    Plaintiff Jones kept the Product on her hair for the time allotted in the instructions.

6    69.    There was never any indication, on the Products packaging or otherwise, that this
7  normal use could and would cause her to develop uterine fibroids.

8    70.    Plaintiff Jones's last purchase of hair relaxer products was in 2020 when she decided
9  to go natural.

10    71.    Years earlier, in approximately 2005, Plaintiff Jones was diagnosed with uterine
11  fibroids at the young age of twenty-seven (27) years old.

12    72.    Plaintiff Jones's fibroid symptoms affected her daily life. She struggled with heavy and
13  irregular periods, severe pain and cramping, and sharp pain during intercourse.

14    73.    A few years after her diagnosis, Plaintiff Jones underwent uterine ablation to treat her
15  fibroids. However, the treatment was unsuccessful, and her symptoms continued to worsen.

16    74.    In 2009, living with the pain and heavy bleeding became so unbearable that Plaintiff
17  Jones was forced to leave her full-time job.

18    75.    After struggling with grueling symptoms for two more years, Plaintiff Jones made the
19  impossible decision between her health and her desire to have more children. When she was just thirty-
20  two (32) years old, Plaintiff Jones underwent a total abdominal hysterectomy on February 11, 2011.

21    76.    Plaintiff Jones then started hormone replacement therapy and began menopause at the
22  young age of thirty-four (34).

23    77.    In 1998, prior to Plaintiff Jones's diagnosis of uterine fibroids, Plaintiff Jones gave
24  birth to her first child prematurely at thirty (30) weeks into her pregnancy. Before delivering her child,
25  Plaintiff Jones was hospitalized for a week due to considerations for the baby's safety.

26    78.    After her hysterectomy, Plaintiff Jones was forced to give up her dream of having more
27  children forever. However, before Plaintiff Jones even had surgery, her fibroids prevented her from
28  having children because of the severe pain she experienced during intercourse.

79.    Plaintiff Jones's inability to have children caused significant strain on her marriage, and eventually, contributed to Plaintiff Jones and her husband getting a divorce.

80.    Plaintiff Jones's struggle with fibroids has negatively impacted her mental health leading her to develop anxiety and depression.

81.    Plaintiff Jones could not and did not discover the causal connection between her use of Defendants' hair relaxer products and her own reproductive issues until late October 2022, when the Chang study was released linking the use of chemical hair straightener or relaxers to uterine cancers and raising awareness of its connection to other reproductive system issues.

82.    On October 18, 2022, just one day after the Chang study was published, its results were widely published and highlighted on multiple major television news networks and online and social media platforms.[1]

83.    Following the release of this study, a press conference was held for a woman in Illinois filing of the first lawsuits against Defendants for the development of uterine cancer, which went similarly viral, including in the state of California where Plaintiff Jones resides.

84.    The publicity of the study put Plaintiff Jones on notice for the first time that she may have similarly been harmed reproductively by her use of hair relaxers and that she may have a legal claim as a result.

85.    As a result of Defendants' acts and/or omissions, Plaintiff Jones suffered extreme pain

---

[1] *See, e.g.,* Jacqueline Howard, US woman files lawsuit against L'Orèal, claiming chemical hair straightening products are linked to her cancer, CNNHealth (Oct. 24, 2022), *available at* https://www.cnn.com/2022/10/24/health/hair-straightening-products-lawsuit/index.html (last accessed Feb. 27, 2023); Julian Mark, She was diagnosed with cancer at 28. Her lawsuit blames hair relaxers, The Washington Post (Oct. 27, 2022), *available at* https://www.washingtonpost.com/nation/2022/10/27/loreal-lawsuit-hair-straightener-relaxer/ (last accessed Feb. 27, 2023); Fox32News, Woman claims L'Oreal chemical relaxers caused uterine cancer: lawsuit, Fox5Atlanta (Oct. 24, 2022), *available at* https://www.fox5atlanta.com/news/woman-claims-loreal-chemical-relaxers-caused-uterine-cancer-lawsuit (last accessed Feb. 27, 2023);  Amanda Su & Sabina Ghebremedhin, Woman sues 5 companies alleging their chemical hair-straightening products caused her uterine cancer, Good Morning America (Oct. 25, 2002), *available at* https://www.goodmorningamerica.com/wellness/story/woman-sues-companies-alleging-chemical-hair-straightening-products-92007557 (last accessed Feb. 27, 2023).

1    and suffering, and extreme emotional distress.

2    <center>**HAIR STRAIGHTENERS AND RELAXERS**</center>

3    **A.    Market for Hair Straightening and Relaxing Products**

4    86.    Black people make up about 13 percent of the U.S. population, but by one estimate,
5    their spending accounts for as much as 22 percent of the $42 billion-a-year personal care products
6    market, suggesting that they buy and use more of such products – including those with potentially
7    harmful ingredients– than Americans as a whole.[2]

8    87.    In an analysis of ingredients in 1,177 beauty and personal care products marketed to
9    Black women, about one in twelve (12) was ranked highly hazardous on the scoring system of EWG's
10    Skin Deep® Cosmetics Database, a free online resource for finding less-hazardous alternatives to
11    personal care products. The worst-scoring products marketed to Black women were hair relaxers. Each
12    of these categories had an average product score indicating high potential hazard.

13    88.    In the U.S. alone, Black consumers spend over $1 trillion each year, with a significant
14    amount of that spending toward hair care products.

15    89.    In 2020, the global Black hair care market was estimated at $2.5 billion, with the hair
16    relaxer market alone estimated at $718 million in 2021, with the expectation of growth to $854 million
17    annually by 2028.

18    **B.    History of Hair Relaxers in America**

19    90.    In its natural or virgin state, afro-hair texture is characterized by coily, springing,
20    zigzag, and s-curve curl patterns; as well as its density, fullness, texture, and feel.[3]

21    91.    Afro-textured hair "naturally grows up and out." [4]

22

23    [2] Thandisizwe Chimurenga, *How Toxic is Black Hair Care?*, New America Media, Feb. 2, 2012,
24    americamedia.org/2012/02/skin-deep-in-more-ways-than-one.php;    *Personal    Care    Products*
     *Manufacturing    Industry    Profile*,    Dun    &    Bradstreet    First    Research,    August    2016,
25    www.firstresearch.com/Industry-Research/Personal-Care-Products-Manufacturing.html (This report
     uses "Black" to describe not only people who identify as African-American, but Black people in the
26    U.S. who come from the Caribbean or other areas. "African-American" is used only when a cited
     source specifies that term).

27    [3] Patrick Obukowcho, *Hair Relaxers: Science, Design, and Application*, 26, 14 (2018).
     [4] Ayana Byrd & Lori Tharps, *When Black Hair Is Against the Rules*, The New York Times, April 30,
28    2014, https://www.nytimes.com/2014/05/01/opinion/when-black-hair-is-against-the-rules.html.

<center>13</center>
<center>COMPLAINT FOR DAMAGES</center>

92.    In Africa, hair was seen as a source of personal and spiritual power. As the highest point of the body and "most elevated part of the body, some communities believe[d] [their hair] connected them with the divine."[5] For some, hair was the "conduit for spiritual interaction with God."[6]

93.    African hairstyles were also status symbols reflecting one's "marital status, age, religion, and rank in society" and one's tribe. [7] Warriors, kings, and queens wore braids to show their ranking in society.[8] The Wolof tribe in West Africa, wore braided styles when they went to war.[9]

94.    Most styling was extremely intricate and involved days of labor. "Only the mad and mourning did not do their hair." [10]

95.    One of the of the first things slave masters did to enslaved people brought to American soil was cut their hair. This was a way to "break their spirit and make slaves easier to control."[11] What was once a symbol of pride became a tool for subordination and degradation. As such, hair cutting was also a common form of punishment.

96.    The very nature of slavery involved working long hours in dire conditions. Enslaved people had "no time to care about one's appearance or one's hair."[12] "Hair that was once a source of pride and expression of identity was often tucked away beneath cloth to cover rough, tangles tresses and shield them from hours spent toiling under the sun."[13] The hair that was once an important spiritual

---

[5] Nikki Fox, *6 Things Everyone Should Know About Black Hair History,* Odele, Feb. 22, 2021. https://odelebeauty.com/blogs/the-rinse/black-hair-history-facts.
[6] Rumeana Jahangir, *How Does Black Hair Reflect Black History?*, BBC News. May 31, 2015. https://www.bbc.com/news/uk-england-merseyside-31438273.amp.
[7] *History of Braids: More Than Just a Hairstyle*, Genesis Career College, https://www.genesiscareer.edu/history-of-braids-more-than-just-a-hairstyle/.
[8] *Id.*
[9] *Id.*
[10] Hlonipha Mokoena, *From Slavery to Colonialism and School Rules, Navigating the History of Myths about Black Hair*, Quartz Africa, Fe., 24, 2018, https://qz.com/africa/1215070/black-hair-myths-from-slavery-to-colonialism-school-rules-and-good-hair/.
[11] Brenda A. Randle, *I Am Not My Hair*, Race, Gender and Class, Volume 22, Number 1-2, 114 – 121 (2015).
[12] Nikki Fox, *6 Things Everyone Should Know About Black Hair History,* Odele, Feb. 22, 2021. https://odelebeauty.com/blogs/the-rinse/black-hair-history-facts.
[13] *Id.*

1 and cultural symbol became tangled and matted.

2     97.    White Americans did not see African or Black hair as beautiful. Instead, they described

3 it as "closer to sheep wool than human hair."[14] African hair that was once considered an attractive

4 feature became a source of shame, to be covered or cut.

5     98.    In 1786, the Governor of Louisiana, Don Esteban Miro, passed the "Tignon Law"

6 requiring Black women to wear a tignon (scarf) over their hair as a way of signifying they were

7 members of the slave class, *even if they were free.*[15]

8     99.    "By requiring free Black women to wear the same hair covering, the governor was

9 marking them as related to enslaved women rather than white women."[16]

10     100.    This law sent a direct signal to Black people that their hair held a symbol of inequality

11 and was a sign of poverty regardless of their actual social status.

12     101.    Because afro-textured hair was kinky and reflected African heritage rather than

13 European ancestry afro-textured, hair was a symbol of low social status.[17]

14     102.    Slaves with lighter skin and less coily hair were favored to work in the home, a far less

15 strenuous position than in the plantation fields.[18]

16     103.    Texturism, the idea that "good hair" is equated with a straighter hair texture, was

17 cemented into American culture during its period of chattel slavery. "Eurocentric beauty standards

18 dictated that coily hair and dark skin were unattractive and inferior"; "lighter skinned and straighter

19 haired slaves were favored and selected for more desirable positions in the house" as opposed to the

20 fields.[19] Thus, "the texture of an enslaved person's hair could determine their value and working

21

22

23 [14] Ayana Byrd & Lori Tharps, *When Black Hair Is Against the Rules*, The New York Times, April 30, 2014. https://www.nytimes.com/2014/05/01/opinion/when-black-hair-is-against-the-rules.html

24 [15] Nikki Fox, *6 Things Everyone Should Know About Black Hair History*, Odele, Feb. 22, 2021, https://odelebeauty.com/blogs/the-rinse/black-hair-history-facts.

25 [16] *Fashionable Rebellion*, Women and the American Story, New York Historical Society Museum and Library, https://wams.nyhistory.org/settler-colonialism-and-revolution/settler-

26 colonialism/fashionable-rebellion/.

27 [17] Brenda A. Randle, *I Am Not My Hair*, Race, Gender and Class, Volume 22, Number 1-2, 114 – 121 (2015).

28 [18] *Id.*
    [19] *Id.*

1    conditions, which in turn might impact their overall health, comfort and chances for freedom[.]"[20]

2    Naturally, Black men and women strived for a better life in America and were taught that the straighter

3    and less kinky their hair was, the better of a life they could have. This fueled the desire for tools and

4    products that could straighten Black hair texture.

5        104.    Gone were the days of African hairstyles and pride. "The goal of grooming the hair had

6    morphed from the elaborate and symbolic designs of Africa into an imitation of White styles adapted

7    to Black kinks and curls."[21]

8        105.    To obtain a better life, so many slaves would go to "dangerous lengths to straighten

9    their hair."[22]

10        106.    Black, or afro-textured hair texture, can be manipulated into a straightened state with

11    hair tools and products. Prior to the invention of the chemical relaxer in 1900s, individuals would

12    "press" afro-textured hair with metal hair tools such as the "hot comb." Pressing combs or hot combs

13    are metal hair tools that are first heated in a stove or ceramic heater, then pressed into hair strands to

14    temporarily straighten them.[23]

15        107.    The hot comb was first invented by Frenchman, Marcel Grateau who popularized the

16    hair styling tool in Europe in the 1870s, including advertisements in catalogs of major department

17    stores like Sears and Bloomingdales.[24] The hot comb was later modified by Madam C.J. Walker, a

18    trailblazer in the development of black hair products, to be manufactured with wider comb teeth.[25]

19    With Walker's system, once the comb was heated a softening ointment was then applied for easier

---

[20] *Id.*
[21] Brenda A. Randle, *I Am Not My Hair*, Race, Gender and Class, Volume 22, Number 1-2, 114 – 121 (2015).
[22] Nikki Fox, *6 Things Everyone Should Know About Black Hair History,* Odele, Feb. 22, 2021. https://odelebeauty.com/blogs/the-rinse/black-hair-history-facts
[23] Jaclyn Peterson, *The Price of Beauty*, CTI Charlotte Teachers Institute Curriculum (2021).
[24] Henry Louis Gates, *Madam Walker, the First Black American Woman to Be a Self-Made Millionaire*, PBS 100 Amazing Facts About the Negro, https://www.pbs.org/wnet/african-americans-many-rivers-to-cross/history/100-amazing-facts/madam-walker-the-first-black-american-woman-to-be-a-self-made-millionaire/ (last visited October 18, 2022).
[25] Cookie Lommel, Madam C.J. Walker 60 (1993)

16

1   manipulation of Black hair.[26]

2       108.   Today, afro-textured hair is still often straightened with a hot comb rather than with

3   chemicals. However, pressed hair remains susceptible to "shrinkage." Shrinkage is the process by

4   which curly-kinky hair that has been temporarily straightened coils back into its natural state once the

5   hair interacts with water, humidity, or perspiration,[27] creating a shorter or fuller appearance.



22       i.    **The Invention of the Chemical Relaxer**

23       109.   African American inventor Garrett Augustus Morgan, discovered and created a system

24   that would permanently straighten afro-textured hair, eliminating the issue of "shrinkage."

25       110.   In addition to being an inventor, Morgan was also a tailor. In the early 1900s, Morgan

---

[26] *Id.* at 62.
[27] *Id.*

1    was repairing his sewing machines and wanted to find a way to polish the needles to stitch fabrics

2    more smoothly.[28] He applied a chemical solution to the needles and wiped the solution off with a rag

3    and later noticed that the "curly" fibers in the rag were straightened after exposure to the chemical.[29]

4    111.    Morgan further tested the chemical on a dog with curly hair and eventually on his own

5    hair. The chemical solution successfully straightened curly hair. He turned his formula into a gel-hair

6    product, creating the G.A. Morgan Hair Refining Cream which was marketed in 1913.





---

[28] Patrick Obukwocho, Hair Relaxers: Science, Design, and Application 27 (2018).
[29] Mary N. Oluonye, Garrett Augustus Morgan: Businessman, Inventor, Good Citizen 28 (2008).

18

112.    Morgan's invention paved the way for the alkaline relaxer and later development of additional chemical based permanent hair straightening products in the Black hair care market.[30]

**ii.    Defendants' Marketing Efforts**

113.    In 1971, Dark and Lovely manufactured the first lye relaxer. The formula consisted of sodium hydroxide, water, petroleum jelly, mineral oils, and emulsifiers.[31]

114.    In the 1970s, lye relaxer users and manufacturers noticed that the lye formula stripped proteins from the hair strand, resulting in the hair thinning and breaking.[32] As a result, Johnson and Johnson marketed the first "gentle" hair relaxer in 1981, which used milder chemicals such as potassium hydroxide and lithium[33]



115.    Over time, Soft & Beautiful and other chemical relaxer manufacturers developed herbal and botanical hair relaxer formulas.[34]

---

[30] Patrick Obukowcho, Hair Relaxers: Science, Design, and Application 27 (2018).
[31] Cicely A. Richard, *This History of Hair Relaxers*, September 29, 2017
https://classroom.synonym.com/the-history-of-hair-relaxers-12078983.html.
[32] *Id.*
[33] *Id.*
[34] *Id.*

116.    For decades, Defendants have marketed their hair relaxer products to African American customers across the United States, and the world, reinforcing the same historical Eurocentric standards of beauty. Defendant's marketing scheme relies heavily on branding and slogans that reinforce straight hair as the standard.[35]

 

117.    For example, in the first ad above, L'Oreal touts "how beautiful Black hair *can be*" (emphasis added), implying that in its natural state Black Hair is *not as* beautiful as it *could be* if straightened.

118.    Defendants misrepresented that "no lye" relaxers, or "gentle treatment" relaxers were milder and/or safer than alternative relaxers. This was false. Hair relaxer products marketed as using "gentle treatment" or similar terminology are not any safer than the other hair relaxer products on the market.

119.    Finally, Defendant L'Oréal depicts a Black woman with straight hair on each of its Dark and Lovely and Optimum brands of relaxer product.

---

[35] *Id.*

20

COMPLAINT FOR DAMAGES





120.    Defendants L'Oréal's and SoftSheen's Dark & Lovely brand hair relaxer products are intentionally labeled as providing a "healthy" gloss and containing "nourishing" shea butter with jojoba and avocado oils. The terms "healthy" and "nourishing" suggest that hair relaxer products are safe and even beneficial for the body when they are not.



121.    Defendant L'Oréal and Softsheen-Carson's Beautiful Beginnings hair relaxer product line, which is targeted to young Black girls, states that it "moisturizes, nourishes, and prevents breakage...**without hurting your scalp**." These representations suggest that their hair relaxer products are safe and even beneficial for children's bodies when they are not.





COMPLAINT FOR DAMAGES

**C.    Chemical Relaxer Use**

122.    Hair relaxers are classified as creams or lotions which are specifically marketed to Black and Brown women to "tame" their ethnic hair by making it smoother, straighter, and easier to manage on a daily basis.

123.    Hair relaxing, or lanthionization, can be performed by a professional cosmetologist in a salon or barbershop, or at home with at-home relaxer kits designed for individual use. These home kits are sold in grocery, drug, and beauty supply stores in urban and rural cities throughout the United States.

124.    Relaxers are applied to the base of the hair shaft and left in place for a "cooking" interval, during which the relaxer alters the hair's texture by purposefully damaging the hair's natural protein structure. The effect of this protein damage straightens and smooths the hair. After a period of weeks four (4) to eight (8) weeks on average, depending on the hair's natural growth rate), the treated portion of the hair grows away from the scalp as new growth sprouts from the roots, requiring additional relaxer treatment to smooth the roots. These additional treatments are colloquially referred to in the community as "re-touches", resulting in women relaxing their new growth every four to eight weeks on average, usually for decades.

125.    Hair relaxers can, and often do, cause burns and lesions in the scalp, facilitating entry of hair relaxer constituents into the body. The main ingredient of "lye" relaxers is sodium hydroxide; no-lye relaxers contain calcium hydroxide and guanidine carbonate, and "thio" relaxers contain thioglycolic acid salts. No-lye relaxers are advertised to cause fewer scalp lesions and burns than lye relaxers, but there is little evidence to support this claim.

126.    In some studies, up to 90% of Black and brown women have used hair relaxants and straighteners, which is more commonplace for these women than for any other race. Hair products such as relaxers contain hormonally active and carcinogenic compounds, such as phthalates, known to cause endocrine disruption, which are not required to be listed separately as ingredients and are often broadly lumped into the "fragrance" or "perfume" categories. Relaxer habits usually begin in formative childhood years, and adolescence is likely a period of enhanced susceptibility to debilitating

1    conditions resulting from exposure to these chemicals.[36]

2       127.    In the 1990s, the first relaxer product for young Black girls, Just for Me, hit the market

3    with a catchy advertising jingle that captured consumer attention.[37] It soon became one of the most

4    popular straightening treatments, touting a no-lye formula designed to be gentler for children's

5    sensitive scalps.

6       128.    Once relaxer use begins in childhood, it usually becomes a lifetime habit. The

7    frequency of scalp burns with relaxer application can increase the risk of permanent and debilitating

8    diseases associated with long-term exposure to endocrine-disrupting chemicals.

9       129.    The reasons for Black women's use and dependence upon hair straightening products

10   are associated with various factors, including (1) slavery and internalization of acceptable beauty

11   norms, (2) media and advertisements, (3) assimilation and economic security, (4) ease of hair

12   maintenance, and (5) culture.[38]

13      130.    In a culture where Black women feel reduced to a lower standard of beauty, these

14   factors impact women of color's decisions to begin and continue using products to alter the natural

15   state of their hair, many times as a protective mechanism against racial discrimination. In the Dove

16   CROWN Study for girls (2021) conducted by JOY Collective, the following statistics were

17   discovered:[39]

18      a.   100% of Black elementary school girls in majority-white schools who report experiencing

19          hair discrimination state they experience the discrimination by the age of ten (10).

20

21   _____

[36] Patrick Obukowcho, Hair Relaxers: Science, Design, and Application 27 (2018).

22   [37] Dana Oliver, *The '90s Just For Me Hair Relaxer Commercial Song Is Stuck In Our Hea*ds,
     HuffPost, Feb. 1, 2014. https://www.huffpost.com/entry/just-for-me-hair-relaxer-commercial-

23   song_n_4689981

24   [38] Chanel Donaldson, *Hair Alteration Practices Amongst Black Women and the Assumption of Self-Hatred*, Applied Psychology Opus, https://wp.nyu.edu/steinhardt-appsych_opus/hair-alteration-

25   practices-amongst-black-women-and-the-assumption-of-self-hatred/

     [39] The CROWN Act was created in 2019 by Dove and the CROWN Coalition, in partnership with

26   then State Senator Holly J. Mitchell of California, to ensure protection against discrimination based
     on race-based hairstyles by extending statutory protection to hair texture and protective styles such

27   as braids, locks, twists, and knots in the workplace and public schools.
     https://www.thecrownact.com/

28

24

COMPLAINT FOR DAMAGES

b. 86% of Black teens who experience discrimination state they have experienced discrimination based on their hair by the age of twelve (12).

c. 66% of Black girls in majority-white schools report experiencing hair discrimination compared to 45% of Black girls in all school environments.

d. 53% of Black mothers, whose daughters have experienced hair discrimination, say their daughters experienced discrimination as early as five (5) years old.

e. 47% of Black mothers report having experienced discrimination related to their hair.

f. Trauma from these experiences cause girls to miss days from school; teenage Black girls are missing a week of school per year due to hair dissatisfaction.

g. While 90% of Black girls believe their hair is beautiful, the microaggressions and discrimination she endures has an impact on how she sees herself.

h. Black women are 1.5 times more likely to be sent home from the workplace because of their hair.

i. Black women are 89% more likely than white women to agree with this statement, "I have to change my hair from its natural state to fit in at the office."

131.    The CROWN Act of 2021 is a legislative bill introduced in both houses of Congress to address discrimination against protective hair styles worn predominantly by women of color. While the bill has not yet passed fully on a federal level, eighteen states have signed a version of the bill into state law. Unless, and until, the CROWN Act makes hair discrimination illegal in every state, children, teenagers, and women of color continue to face discriminatory practices related to their hair choices, with relaxing and straightening their hair being a defensive, yet dangerous and toxic option.

**D.    Endocrine Disrupting Chemicals**

132.    The endocrine system is indispensable for life and influences nearly every cell, organ, and process within the body.[40] The endocrine system regulates all biological processes in the body

---

[40] *Endocrine System: The Endocrine System Includes The Thyroid, Adrenals, and the Pituitary Gland*, Science Direct, https://www.sciencedirect.com/topics/psychology/endocrine-system

1    from conception through adulthood, including the development of the brain and nervous system, the

2    growth and function of the reproductive system, as well as the metabolism and blood sugar levels.[41]

3        133.    The endocrine system is a tightly regulated system made up of glands that produce and

4    release precise amounts of hormones that bind to receptors located on specific target cells throughout

5    the body.[42]

6        134.    Hormones, such as estrogen, testosterone, progesterone, and androgen, are chemical

7    signals that control or regulate critical biological processes.[43]

8        135.    When a hormone binds to a target cell's receptor, the receptor carries out the hormone's

9    instructions, the stimulus, and either switches on or switches off specific biological processes in cells,

10    tissues, and organs.[44]

11        136.    The precise functioning of the endocrine system is vital to maintain hormonal

12    homeostasis, the body's natural hormonal production and degradation. A slight variation in hormone

13    levels can lead to significant adverse-health effects, including reproductive impairment and infertility,

14    cancer, cognitive deficits, immune disorders, and metabolic syndrome.[45]

15        137.    Endocrine disrupting chemicals ("EDCs") are chemicals, or chemical mixtures, which

16    interfere with the normal activity of the endocrine system.

17        138.    EDCs can act directly on hormone receptors as mimics or antagonists or on proteins

18    that control hormone delivery.[46]

19        139.    EDCs disrupt the endocrine system and interfere with the body's hormonal homeostasis

20    in various ways.

21

22    _____

23    [41] *Endocrine Disruption*, United States Environmental Protection Agency, Mar. 7, 2022,
      https://www.epa.gov/endocrine-disruption/what-endocrine-system

24    [42] *Id.*
      [43] Id.

25    [44] Id.
      [45]*Id.*; Michele La Merrill, et al., *Consensus on the Key Characteristics of Endocrine-Disrupting*

26    *Chemicals as a Basis for Hazard Identification*, Nature Reviews Endocrinol, Nov. 12, 2019,
      https://www.nature.com/articles/s41574-019-0273-8

27    [46] Evanthia Diamanti-Kandarakis, et al., *Endocrine-Disrupting Chemicals: An Endocrine Society*
      *Scientific Statement*, Endocrine Reviews, June 30, 2009,

28    https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2726844/

140.    EDCs can cause the body to operate as if there were a proliferation of a hormone and thus over-respond to the stimulus or respond when it was not supposed to by mimicking a natural hormone.

141.    EDCs can increase or decrease the levels of the body's hormones by affecting the production, degradation, and storage of hormones.

142.    EDCs can block the hormone's stimulus by inducing epigenetic changes, modifications to DNA that regulate whether genes are turned on or off, or altering the structure of target cells' receptors.[47]

143.    EDCs are known to cause numerous adverse human health outcomes including endometriosis, impaired sperm quality, abnormalities in reproductive organs, various cancers, altered nervous system and immune function, respiratory problems, metabolic issues, diabetes, obesity, cardiovascular problems, growth, neurological, and learning disabilities.[48]

144.    EDCs that mimic the effects of estrogen in the body may contribute to disease risk because exposure to estrogen, endogenously and exogenously, is associated with a wide variety of reproductive diseases, including reproductive cancers, fibroids and endometriosis, and a woman's lifetime risk of developing these disease increases with greater duration and cumulative exposure.

145.    Natural and synthetic EDCs are present in hair products under the guise of "fragrance" and "perfumes", and thus enter the body when these products are exogenously applied to the hair and scalp. Studies exploring this issue have thus far classified EDCs as estrogens, phthalates, and parabens.

146.    Indeed, numerous studies spanning more than two decades have demonstrated the adverse impact EDCs including Di-2-ethylhexylphthalate have on the male and female reproductive

---

[47] Luis Daniel Martínez-Razo, et al., *The impact of Di-(2-ethylhexyl) Phthalate and Mono(2-ethylhexyl) Phthalate in placental development, function, and pathophysiology*, Environment International, January 2021,
https://www.sciencedirect.com/science/article/pii/S0160412020321838?via%3Dihub
[48]*Endocrine Disrupting Chemicals (EDCs)*, Endocrine Society, Jan. 24, 2022,
https://www.endocrine.org/patient-engagement/endocrine-library/edcs#:~:text=EDCs%20can%20disrupt%20many%20different,%2C%20certain%20cancers%2C%20respiratory%20problems%2C

27

1    systems such as inducing endometriosis, abnormal reproductive tract formation, decreased sperm

2    counts and viability, pregnancy loss, and abnormal puberty onset.[49]

3        147.    Hair products used by Black women and children have been found to contain multiple

4    chemicals associated with endocrine disruption. In a 2018 study testing hair products, including hair

5    relaxers, relaxers marketed to children were found to contain the highest levels of four EDCs

6    prohibited in the European Union (DEHP, nonylphenol, BPA and diethanolamine) and  California

7    Prop 65 law (o-phenlyphenol), with one relaxer kit (Just For Me) containing all five of these EDCs.[50]

8        **i.    Phthalates**

9        148.    Phthalates are known EDCs which interfere with natural hormone production and

10    degradation and are detrimental to human health.[51]

11        149.    Phthalates are used in a variety of cosmetics and personal care products. Phthalates are

12    chemical compounds developed in the last century that are used to make plastics more durable. These

13    colorless, odorless, oily liquids are also referred to as "plasticizers" based on their most common uses.

14        150.    Phthalates also function as solvents and stabilizers in perfumes and other fragrance

15    preparations. Cosmetics that may contain phthalates include nail polishes, hair sprays, aftershave

16    lotions, cleansers, and shampoos.

17        151.    Phthalates are chemicals used to improve the stability and retention of fragrances and

18    to help topical products stick to and penetrate skin and hair.[52]

19

20

21

22

---

23    [49] Hee-Su Kim, et al., *Hershberger Assays for Di-2-ethylhexyl Phthalate and Its Substitute*
24    *Candidates*, Dev Reproduction, Mar. 22, 2018,
       https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5915764/.
25    [50] Helm Jessica S. et al., *Measurement of endocrine disrupting and asthma-associated chemicals in*
       *hair products used by Black women*, Environmental Research, Vol. 165:448-58 (2018),
26    https://doi.org/10.1016/j.envres.2018.03.030.
       [51] Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health*, Healthcare (Basel)
27    9, 603, May 9, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/
       [52] Olivia Koski & Sheila Hu, Fighting Phthalates, National Resources Defense Council, April 20,
28    2022, https://www.nrdc.org/stories/fighting-phthalates

152.    Phthalates are commonly used by cosmetics and hair care product manufacturers to make fragrances and colors last longer, and to make hair more flexible after a product is applied, among other uses.

153.    Phthalates can be found in most products that have contact with plastics during production, packaging, or delivery. Despite the short half-lives in tissues, chronic exposure to phthalates will adversely influence the endocrine system and functioning of multiple organs, which has negative long-term impacts on the success of pregnancy, child growth and development, and reproductive systems in both young children and adolescents. Several countries have established restrictions and regulations on some types of phthalates.[53]

154.    Phthalates are a series of chemical substances, which are mainly used as plasticizers added to polyvinyl chloride ("PVC") plastics for softening effects. Phthalates can potentially disrupt the endocrine system.[54]

155.    Under the authority of the Fair Packaging and Labeling Act ("FPLA"), the FDA requires an ingredient declaration on cosmetic products sold at the retail level to consumers.

156.    However, the regulations do not require the listing of the individual fragrance or flavor, or their specific ingredients, meaning phthalates evade listing when combined with a fragrance. As a result, consumers, including Plaintiff, are not able to determine from the ingredient declaration on the label if phthalates were present in a fragrance used in the herein referenced hair products used by the Plaintiff and placed into the stream of commerce by Defendants.

157.    Since 1999, the Centers for Disease Control ("CDC") found phthalates in individuals studied for chemical exposure.[55] Neither IARC nor NTP has evaluated DEHP with respect to human carcinogenicity.

158.    At all relevant times herein, Defendants' products contain phthalates, including Di-2-

---

[53] *Id.*
[54] *Id.*
[55] *Biomarker Groups*, National Report on Human Exposure to Environmental Chemicals, Center for Disease Control, https://www.cdc.gov/exposurereport/pdf/Biomarker_Groups_Infographic-508.pdf

1  ethylhexylphthalate.

2      **ii.    Di-2-ethlhexylphthalate**

3      159.    Di-2-ethylhexylphthalate[56] ("DEHP") is a highly toxic manufactured chemical[57] that is

4  not found naturally in the environment.[58]

5      160.    DEHP belongs to the family of chemicals called phthalates.[59]

6      161.    DEHP was first used in 1949 in United States and has been the most abundantly used

7  phthalate derivative in the twentieth century.[60]

8      162.    DEHP does not covalently bind to its parent material. Non-covalent bonds are weak

9  and, as a result, DEHP readily leaches into the environment increasing human exposure.[61]

10     163.    Humans are exposed to DEHP through ingestion, inhalation, dermal exposure for their

11 lifetimes, including intrauterine life.[62]

12     164.    The Agency for Toxic Substances and Disease Registry ("ATSDR") estimates that the

13 range of daily human exposure to DEHP is 3–30 μg/kg/day.[63]

14

15 _____

16 [56] Also known as Bis(2-ethylhexyl) phthalate.
[57] Sai Rowdhwal & Jiaxiang Chen, *Toxic Effects of Di-2-ethylhexyl Phthalate: An Overview*, Biomed
17 Research International, Feb. 22, 2018,
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5842715/#:~:text=DEHP%20is%20noncovalently%
18 20bound%20to,and%20plastic%20waste%20disposal%20sites.
[58] *Toxicological Profile for Di(2-Ethylhexyl) Phthalate (DEHP)*, U.S. Dept of Health and Human
19 Services, January 2022, https://www.atsdr.cdc.gov/ToxProfiles/tp9.pdf (DEHP is listed as hazardous
pollutants under the Clean Air Act.; DEHP is on the Proposition 65 list because it can cause cancer
20 and birth defects or other reproductive harm).
[59] *Di(2-ethylhexyl) phthalate (DEHP)*, Proposition 65, California. Gov,
21 https://www.p65warnings.ca.gov/fact-sheets/di2-ethylhexylphthalate-dehp
[60] Pinar Erkekoglu & Belma Kocer-Gumusel, *Environmental Effects of Endocrine-Disrupting*
22 *Chemicals: A Special Focus on Phthalates and Bisphenol A*, Environmental Health Risk, June 16,
23 2016, https://www.intechopen.com/chapters/50234
[61] Katelyn H. Wong & Timur Durrani, *Exposures to Endocrine Disrupting Chemicals in Consumer*
24 *Products – A Guide for Pediatricians*, Current Problems in Pediatric and Adolescent Health Care,
25 Science Direct, May 2017,
https://www.sciencedirect.com/science/article/pii/S1538544217300822?via%3Dihub
26 [62] Schmidt, Juliane-Susanne, et al., *Effects of Di(2-ethylhexyl) Phthalate (DEHP) on Female Fertility*
*and Adipogenesis in C3H/N Mice*, Environmental Health Perspective, May 15, 2012,
27 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3440070/
[63] Hannon, Patrick et. al., *Daily Exposure to Di(2-ethylhexyl) Phthalate Alters Estous Cyclicity and*
28 *Accelerates Primordial Follicle Recruitment Potentially Via Dysregulation of the*

165.  The no-observed-adverse-effect level for DEHP to humans is 4.8 mg/kg bodyweight/day and the tolerate daily intake (TDI) is 48 µg/kg bodyweight.[64]

| Endpoint | Cancer (NSRL) | | Developmental and Reproductive Toxicity (MADL) | |
|---|---|---|---|---|
| Route of Exposure | Oral | Inhalation | Oral | Inhalation |
| DEHP | 310 µg/day | N.C. | 410 µg/day | N.C. |

Source: OEHHA's safe harbor levels for TDCIPP, DBP, DEHP, benzene, and formaldehyde.

N.C. = not calculated by OEHHA as of August 2020.[65]

166.  When DEHP enters the human body, it breaks down into specific metabolites. The toxicity of DEHP is mainly attributed to its unique metabolites which include the primary metabolite, mono-(2-ethylhexyl)phthalate (MEHP), and secondary metabolites, mono-(2-ethyl-5-hydroxyhexyl)phthalate (MEHHP), and mono-(2-ethyl-5-oxohexyl)phthlate (MEOHP).[66]

167.  DEHP and its metabolites are known to cause significant adverse-health effects including but not limited to endometriosis, developmental abnormalities, reproductive dysfunction and

---

*Phosphatidylinositol 3-Kinase Signaling Pathway in Adult Mice*, Biology of Reproduction Volume 90, Issue 6, June 2014, 136, 1–11 https://academic.oup.com/biolreprod/article/90/6/136,%201-11/2514356

[64] Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health*, Healthcare (Basel) 9(5):603, May 18, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/

[65] Aalekhya Reddam & David Volz, *Inhalation of two Prop 65-listed Chemicals Within Vehicles May Be Associated with Increased Cancer Risk*, Environment International Volume 149, April 2021, https://www.sciencedirect.com/science/article/pii/S016041202100026X

[66] Saab, Yolande, et. al., *Risk Assessment of Phthalates and Their Metabolites in Hospitalized Patients: A Focus on Di- and Mono-(2-ethylhexyl) Phthalates Exposure from Intravenous Plastic Bags*. Toxics, 10(7), 357, https://pubmed.ncbi.nlm.nih.gov/35878262/; Ishtaf Sheikh, et. at., *Endocrine disruption: In silico perspectives of interactions of di-(2-ethylhexyl)phthalate and its five major metabolites with progesterone receptor*. BMC Structural Biology Volume 16, Suppl 1, 16, Sept., 30, 2016, https://bmcstructbiol.biomedcentral.com/articles/10.1186/s12900-016-0066-4 (Other secondary metabolites include mono(2-ethyl-5-carboxypentyl)phthalate (5-cx-MEPP) and mono[2-(carboxymethyl)hexyl]phthalate (2-cx-MMHP)).

31

1 infertility,[67] various cancers, and metabolic syndrome within the human population and their future
2 children.[68]

3    168.    Most of the available studies on the health effects of DEHP in laboratory animals used
4 oral administration, with a few inhalation studies and only two dermal exposure studies identified.[69]

5    169.    The results of the selected animal studies, along with limited human data, suggest
6 potential associations between DEHP exposure and the following health outcomes:

7    a.  **Reproductive effects.** Epidemiological studies suggest a potential association between
8    DEHP exposure and decreased serum testosterone and altered sperm parameters in males.
9    Available studies on fertility effects in humans do not indicate an association between DEHP
10    exposure and infertility. In animals, the available oral and inhalation studies provide evidence
11    that the male reproductive system, particularly the testes, is susceptible to DEHP toxicity.
12    Evidence from animal studies indicates decreased male and female fertility at high oral doses.

13    b.  **Developmental effects.** Epidemiological studies suggest a potential association
14    between reduced AGD and testicular decent in male infants and prenatal DEHP exposure. In
15    addition, human epidemiological studies provide mixed results for potential relationships
16    between exposure to DEHP and preterm birth, early puberty, and delayed mental and
17    psychomotor development in children. Studies in animals indicate that altered glucose
18    homeostasis and the development of the reproductive system following early life exposure is
19    a particularly sensitive target of DEHP toxicity.

20    170.    The global consumption of DEHP was estimated at 3.07 million tons (Global demand
21 for plasticizers continues to rise). The estimated global market of phthalates in 2020 is expected to
22 reach 10 billion USD and would still be widely used in plasticizers.[70]

23

---

24 [67] Richardson, Kadeem et. al., *Di(2-ethylhexyl) Phthalate (DEHP) Alters Proliferation and Uterine*
25 *Gland Numbers in the Uterine of Adult Exposed Mice*, Reproductive Toxicology, 77, 70-79,
https://pubmed.ncbi.nlm.nih.gov/29458081/
26 [68] Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health*, Healthcare (Basel)
9, 603, May 9, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/
27 [69] *Chapter 2: Health Effects*, Toxicological profile for Di(2-ethylhexyl) phthalate (DEHP) (2001),
https://www.atsdr.cdc.gov/ToxProfiles/tp9-c2.pdf
28 [70] *Id.*

171.    Human epidemiological studies have shown a significant association between phthalates exposures and adverse reproductive outcomes in both women and men.[71]

172.    Evidence found that DEHP was significantly related to insulin resistance and higher systolic blood pressure and the reproduction system problems, including earlier menopause, low birth weight, pregnancy loss, and preterm birth.[72]

173.    When it comes to the impacts on children, epidemiological studies about phthalates toxicity focused on pregnancy outcomes, genital development, semen quality, precocious puberty, thyroid function, respiratory symptoms, and neurodevelopment.[73]

174.    Since the turn of the century, restrictions on phthalates have been proposed in many Asian and western countries. In 2008, the U.S. Congress announced the Consumer Protection Safety Act (CPSA), which permanently banned the products, especially children's toys and childcare articles, containing DEHP, DBP, and BBP at levels >0.1% by weight.[74]

**E.    Regulatory Framework**

175.    The law does not require cosmetic products and ingredients, other than color additives, to have FDA approval before they go to market. But there are laws and regulations that apply to cosmetics placed on the market. The two most important laws pertaining to cosmetics marketed in the United States is the Federal Food Drug and Cosmetic Ace ("FD&C Act") and the Fair Packaging and Labeling Act ("FPLA").

176.    The FD&C Act expressly prohibits the marketing of "adulterated" or "misbranded" cosmetics in interstate commerce.

177.    Adulteration refers to a violation involving product composition whether it results from ingredients, contaminants, processing, packaging shipping or handling.

---

[71] *Id.*

[72] N.M. Grindler, et al., *Exposure to Phthalate, an Endocrine Disrupting Chemical, Alters the First Trimester Placental Methylome and Transcriptome in Women*, Scientific Reports Volume 8, April 17, 2018, https://doi.org/10.1038/s41598-018-24505-w

[73] *Id.*

[74] Consumer Product Safety Improvement Act of 2008, H.R. 4040, 110th Cong. (2008), https://www.congress.gov/110/plaws/publ314/PLAW-110publ314.pdf

178.    Under the FD&C Act a cosmetic is adulterated if: (1) it bears or contains any poisonous or deleterious substance causing injury to the product user and (2) if its container is composed in whole or in part, of any poisonous or deleterious substance which may render the contents injurious to health.

179.    Misbranding refers to violations involving improperly labeled or deceptively packaged products.

180.    Under the FD&C Act, a cosmetic is misbranded if (1) labeling is false or misleading, (2) the label does not include all required information, (3) required information is not prominent and conspicuous, (4) the packaging and labeling is in violation of an applicable regulation issued pursuant to section 3 and 4 of the Poison Prevention Packaging Act of 1970.[75]

181.    Under U.S. law, cosmetic manufacturers are not required to submit their safety data to the FDA. However, it is against the law to put an ingredient in a cosmetic that makes the cosmetic harmful when used as intended.[76] An example is methylene chloride because it causes cancer in animals and is likely to be harmful to human health as well.[77]

182.    On May 19, 2022, the FDA issued a rule to amend its food additive regulations to no longer provide for most previously authorized phthalates to be used as food additives because these uses have been abandoned by industry.[78] The FDA revoked authorizations for the food contact use of 23 phthalates and two other substances used as plasticizers, adhesives, defoaming agents, lubricants, resins, and slimicides.[79]

183.    Companies and/or individuals who manufacture or market cosmetics have a legal responsibility and duty to ensure the safety of their own products. Neither the law nor FDA regulations

---

[75] Food and Drug Administration Cosmetic Act § 602 (1938).
[76] *Prohibited & Restricted Ingredients in Cosmetics*, U.S. Food and Drug Administration, https://www.fda.gov/cosmetics/cosmetics-laws-regulations/prohibited-restricted-ingredients-cosmetics
[77] 21 Code of Federal Regulations § 700.19.
[78] § 87 FR 31080
[79] *Phthalates in Food Packages and Food Contact Applications,* U.S. Food and Drug Administration, https://www.fda.gov/food/food-ingredients-packaging/phthalates-food-packaging-and-food-contact-applications

1  require specific tests to demonstrate the safety of individual products or ingredients, and the law also
2  does not require cosmetic companies to share their safety information with the FDA.

3      184.    The FDA has consistently advised manufacturers to use whatever testing is necessary
4  to ensure the safety of products and ingredients, which may be substantiated through (a) reliance on
5  already available toxicological test data on individual ingredients and on product formulations that are
6  similar in composition to the particular cosmetic and (b) performance of any additional toxicological
7  and other tests that are appropriate in light of such existing data and information.[80]

8      185.    Except for color additives and ingredients prohibited or restricted by regulation, a
9  manufacturer may use any ingredient in the formulation of a cosmetic, provided that (1) the ingredient
10  and the finished cosmetic are safe under labeled or customary conditions of use, (2) the product is
11  properly labeled, and (3) the use of the ingredient does not otherwise cause the cosmetic to be
12  adulterated or misbranded under the laws the FDA enforces.[81]

13      186.    With respect to whether the product is properly labeled, Title 21 of the Code of Federal
14  Regulations defines the establishment of warning statements related to cosmetic products. Section
15  740.1 states that "[t]he label of a cosmetic product ***shall*** bear a warning statement whenever necessary
16  or appropriate to prevent a health hazard that ***may*** be associated with the product." (Emphasis added).
17  This warning directive directly correlates with the broad authority of manufacturers over their own
18  cosmetic products to ensure that products are safe under labeled or customary conditions of use,
19  properly labeled, and not adulterated or misbranded under FDA laws.

20      187.    In short, under the current regulatory framework in the United States, it is incumbent
21  upon the manufacturers of cosmetic products, and them alone, to assess the safety and efficacy of their
22  products, and to warn consumers anytime a health hazard may be associated with their products. Here,
23  a wealth of scientific information is available regarding long-term use of hair relaxers, straighteners
24  and hair dyes as containing certain endocrine-disrupting chemicals, which should have alerted
25
26
27
28

---

[80] *FDA Authority Over Cosmetics: How Cosmetics Are Not FDA-Approved, but Are FDA-Regulated,* U.S. Food and Drug Administration, Mar., 3, 2005, https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-over-cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated
[81] *Id.*

1  manufacturers of these products to the specific and dangerous harms associated with their products

2  when used as intended, particularly in women of color.

3      188.    It is generally accepted that EDCs, like those contained in Defendants' hair relaxer

4  products, act like "hormone mimics" and trick the body into thinking they are hormones.

5      189.    Products containing hormones that are topically applied, are regulated by the FDA

6  under 21 C.F.R. section 310.530, which states that "any OTC drug product containing an ingredient

7  offered for use as a topically applied hormone cannot be considered generally recognized as safe and

8  effective for its intended use." *See* 21 C.F.A 310.530(a).

9      190.    At all relevant times, Defendants' products referenced herein, contained endocrine

10  disrupting chemicals and hormonal agents, and are therefore subject to regulation by the FDA under

11  21 C.F.R. section 310.530.

12      191.    The Federal Food, Drug and Cosmetic Act also expressly prohibits the marketing of

13  "adulterated" or "misbranded" cosmetics in interstate commerce.

14      192.    Adulteration refers to a violation involving product composition whether it results from

15  ingredients, contaminants, processing, packaging shipping or handling.

16      193.    Under the FD&C Act a cosmetic is adulterated if: (1) it bears or contains any poisonous

17  or deleterious substance causing injury to the product user and (2) if its container is composed in whole

18  or in part, of any poisonous or deleterious substance which may render the contents injurious to health.

19      194.    Misbranding refers to violations involving improperly labeled or deceptively packaged

20  products.

21      195.    Under the FD&C Act, a cosmetic is misbranded if (1) labeling is false or misleading, (

22  2) the label does not include all required information, (3) required information is not prominent and

23  conspicuous, (4) the packaging and labeling is in violation of an applicable regulation issued pursuant

24  to section 3 and 4 of the Poison Prevention Packaging Act of 1970.[82]

25      196.    In addition, the federal regulations require that every ingredient in a cosmetic product

26  and finished cosmetic product be adequately substantiated for safety prior to marketing, and state that

27  ────────────────────

28  [82] Food and Drug Administration Cosmetic Act § 602 (1938).

1    any ingredient or product for which the safety has not been adequately substantiated prior to marketing

2    is misbranded unless it displays a warning statement declaring, "Warning – The safety or this product

3    has not been determined." 21 C.F.R. § 740.10.

4    **F.**    **California Prohibits Misbranded or Adulterated Cosmetics**

5       197.    The California Sherman Food, Drug, and Cosmetic Law prohibits the sale of

6    "misbranded" cosmetics. A cosmetic is deemed misbranded if, among other things, its labeling is false

7    or misleading if any word, statement or other information required to appear on the label or labeling

8    is not prominently placed upon the label or labeling with conspicuousness, as compared with other

9    words, statements, designs, or devices, in the labeling, and in terms as to render it likely to be read and

10   understood by the ordinary individual under customary conditions of purchase and use; and, if it is

11   subjected to the federal FDA regulations but is not in compliance therewith. Cal. Health & Saf. Code

12   §§ 111730, 111790.

13      198.    California also prohibits the sale of "adulterated" cosmetics mirroring the Federal

14   Food, Drug, and Cosmetics Act. A cosmetic is deemed adulterated if, among other things it bears or

15   contains any poisonous or deleterious substance that may render it injurious to users under the

16   conditions of use prescribed in the labeling or advertisement of the cosmetic, or under conditions of

17   use as are customary or unusual; and, if it is not in compliance with federal regulations. Cal. Health &

18   Saf. Code §§ 111670 - 111725.

19      199.    Effective January 1, 2006, the California Safe Cosmetics Act of 2005 (CSCA) became

20   law.

21      200.    The CSCA requires cosmetics manufacturers to disclose to the California Department

22   of Public Health (CDPH) all products sold in California containing ingredients listed in the Cal. Health

23   & Saf. Code § 111791.5.

24      201.    The California Legislature found and declared all of the following:

25            a.    Independent testing in the United States and the European union has determined

26                that some cosmetic products contain substances known or suspected to cause cancer

27                and reproductive toxicity that can harm the mother, fetus, and nursing children.

28            b.    Neither the federal Food and Drug Administration (FDA) nor the State Department

of Health Services (DHS) require premarket safety testing, review, or approval of cosmetic products. According to the FDA, the regulatory requirements governing the sale of cosmetics are not as stringent as those that apply to other FDA regulated products.

c.  Under the federal Food, Drug and Cosmetic Act (21 U.S.C. Sec. 301), cosmetics and their ingredients are not required to be approved before they are sold to the public and the FDA does not have the authority to require manufacturers to file health and safety data on cosmetic ingredients or to order a recall of a dangerous cosmetic product.

d.  Under the state Sherman Food, Drug, and Cosmetic Act, DHS has no authority to identify, review, or regulate ingredients in cosmetic products that may cause chronic health effects, such as cancer and reproductive toxicity.

e.  Federal law exempts chemicals used as fragrances or flavoring from being identified as ingredients on the labels of cosmetic products. Laboratory analyses of cosmetic products sold in California have found products that contain substances known to or likely to cause cancer or reproductive toxicity and not identified as an ingredient on the product's label. The law also does not require any ingredient labeling on cosmetic products sold for commercial use, thereby denying any information on ingredients to beauty care workers.

f.  Alternatives to substances that cause cancer or reproductive toxicity are readily available for use in cosmetic products. A number of manufacturers, including both small domestic producers and large multinational corporations, have eliminated substances that cause cancer or reproductive toxicity from their products.

g.  Given the presence of substances in cosmetic products that cause cancer or reproductive toxicity, the heavy use of these products by women of childbearing age, the significant exposure to these products in occupational settings such as beauty salons, the adverse impacts of these substances on human health, the inadequate information about the presence of these substances in products or the

38

extent of their impacts, and the availability of alternatives to the use of these substances, it is in the interest of the people of the State of California to take steps to ensure that cosmetic products sold and used in the state can be used safely.[83]

202.    Section 11792(a) of the CSCA places an affirmative duty on cosmetics manufacturers to inform state officials when they sell products in California that contain carcinogens or reproductive toxins:

Commencing January 1, 2007, the manufacturer or any cosmetic product subject to regulation by the federal Food and drug Administration that is sold in this state shall, on a schedule and in electronic or other format, as determined by the division, provide the division with a complete and accurate list of its cosmetic products that, as of the date of submission, are sold in the state and that contain any ingredient that is a chemical identifies as causing cancer or reproductive toxicity.

203.    Section 11793.5 of the Act provides:

a.    The Legislature finds and declares the following:

(1) The Cosmetic Ingredient Review (CIR) panel is a nongovernmental body established and funded by the cosmetics industry to review the safety of cosmetic ingredients.

(2) According to a 2004 analysis of the 2003 CIR Compendium by the Environmental Working Group, 54 cosmetic products violate the CIR's own safe use recommendations to manufacturers by containing an ingredient that the CIR has found is not safe for the specific use indicated on the product's label.

(3) Federal regulations (21 C.F.R. 740.10) require every ingredient in a cosmetic product and every finished cosmetic product to be adequately substantiated for safety prior to marketing, and state that any ingredient or product whose safety has not been adequately substantiated prior to

---

[83] Cal. Health & Saf. Code § 111791 (2007).

marketing is misbranded unless it displays a warning statement declaring, "The safety of this product has not been determined."

b.  The division may, as early as feasible within existing resources, determine whether the products identified in paragraph (2) of subdivision (a) have been adequately substantiated for safety pursuant to § 740.10 of Title 21 of the Code of Federal Regulations. For any product adequately substantiated for safety, the division shall determine if the product contains any ingredient that the CIR has found is not safe for the specific use indicated on the product's label.

c.  If the division finds that a product has not been adequately substantiated for safety despite containing an ingredient that the CIR has found is not safe for the specific use indicated on the product's label, the division shall refer its findings to the Attorney General and the federal Food and Drug Administration for possible enforcement action pursuant to this part and the federal Food, Drug and Cosmetic Act (21 U.S.C. Sec. 301 *et seq.*).

204.    The California Cosmetic Fragrance and Flavor Right to Know Act (CFFIRKA) became effective January 1, 2022.

205.    CFFIRKA requires manufacturers that sell cosmetic products in California to report certain fragrance and flavor ingredients deemed hazardous to the Department of Public Health's (DPH) Safe Cosmetics Program.

206.    The CFFIRKA requires companies selling retail cosmetic or professional salon products in California to report the presence of any fragrance or flavor ingredient that appears on one or more of the twenty-three (23) authoritative hazard lists referenced in the law to the California Safe Cosmetics Program.

207.    The California Safe Cosmetics Program Database is updated twice annually and is available to the public.

208.    The policy underlying CFFIRKA is that California residents are entitled to information on known potential "carcinogens, reproductive toxicants, asthmagens, neurotoxins, allergens and other chemicals of concern" in cosmetics products.

209.   Similar to federal law, the CFFIRKA defines a "cosmetic product" as "an article for retail sale or professional use intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to the human body for cleansing, beautifying, promoting attractiveness, or altering the appearance."[84]

210.   The CFFIRKA applies to both consumer and professional use products.

211.   In addition to requiring the disclosure of reportable ingredients, under the CFFIRKA, manufacturers must also disclose, 1) whether the product is intended for professional or retail use; 2) the Chemical Abstracts Service number for each ingredient and allergen; and 3) the corresponding Universal product Code for the product.

212.   Review of the California Safe Cosmetics Program's Reportable Ingredient list yielded at least twenty-five (25) ingredients found in hair relaxers[85] that are deemed "reportable" under the California Safe Cosmetics Program.

**G.     Uterine Fibroids are Associated with Exposure to Endocrine Disrupting Chemicals**

213.   Uterine fibroids are associated with phthalate metabolites found in chemical hair straightening and hair relaxer products.

214.   Black women have a higher prevalence of uterine fibroids and tumors than any other ethnicity/racial group.[86]

215.   A study looking at over 1 million U.S. women from 2003 to 2014 found that Black women had the highest rate of diagnosed uterine fibroids, with most diagnoses made between the age

---

[84] *Id.*

[85] The 45 ingredients detected in hair relaxers examined by the Helm study were compared to those listed as of May 20, 2024 on the Reportable Ingredients excel database. *See* Helm JS, Nishioka M, Brody JG, Rudel RA, Dodson RE. Measurement of endocrine disrupting and asthma-associated chemicals in hair products used by Black women. Environ Res. 2018 Aug;165:448-458. doi: 10.1016/j.envres.2018.03.030. Epub 2018 Apr 25. PMID: 29705122. *See also* https://cscpsubmit.cdph.ca.gov/submission/assets/files/Reportable_Ingredients_List.xlsx, last visited May 20, 2024.

[86] Food and Drug Administration Cosmetic Act § 602, *supra.*

1  of 30 – 54 years old.[87]

2  216.    Studies show that Black women are three to four times more likely to develop uterine

3  fibroids in their lifetime compared to non-Hispanic white women, and an estimated 70-80% of Black

4  women will develop fibroids over their lifetime.[88]

5  217.    It is estimated that the annual financial impact of uterine fibroids on Black women in

6  the United States is as high as 30 billion dollars, and this number may be an underestimation, as at

7  least one-quarter of women reported losing work due to their disease.[89]

8  218.    Black women are seven (7) times more likely to undergo a myomectomy compared to

9  non-Hispanic white women.[90]

10  219.    Uterine fibroids return at higher rates for Black women than white women following

11  surgical treatment, and recurrence can be as high as 59% within 5 years.[91]

12  220.    Given the magnitude of the problem – markedly altered quality of life, the effect on

13  reproductive health, and the costs of health care for this disease – the high prevalence of uterine

14  fibroids in Black women is considered a major public health issue.[92]

15  221.    A 2012 study in the American Journal of Epidemiology associated fibroid risk with the

16  use of hair relaxers.[93] Shirley McDonald of the Hair and Scalp Clinic says, "We now know that many

17

18

---

[87] Yu O, Scholes D, Schulze-Rath R, Grafton J, Hansen K, Reed SD. A US population-based study of uterine fibroid diagnosis incidence, trends, and prevalence: 2005 through 2014. American Journal of Obstetrics and Gynecology. 2018;219(6):591.e1-591.e8.

[88] Al-Hendy A, Salama SA. Ethnic distribution of estrogen receptor-α polymorphism is associated with a higher prevalence of uterine leiomyomas in black Americans. Fertil Steril. 2006;86(3):686-693. Doi:10.1016/j.fertnstert.2006.01.052

[89] Igboeli P, Walker W, McHugh A, Sultan, A, et al. Burden of uterine fibroids: an african perspective, a call for action and opportunity for intervention. COGO. 287-294.

[90] Eltoukhi HM, Modi MN, Weston M, Armstrong AY, Stewart EA. The health disparities of uterine fibroid tumors for African American women: a public health issue. Am J Obstet Gynecol. 2014;210(3):194-199. doi:10.1016/j.ajog.2013.08.008

[91] Donnez J, Dolmans M. Uterine fibroid management: from the present to the future. Hum Reprod Update. 22(06):665–686.

[92] Eltoukhi HM, Modi MN, Weston M, Armstrong AY, Stewart EA. The health disparities of uterine fibroid tumors for African American women: a public health issue. Am J Obstet Gynecol. 2014;210(3):194-199. doi:10.1016/j.ajog.2013.08.008

[93] Wise LA, Palmer JR, Reich D, Cozier YC, Rosenberg L. Hair relaxer use and risk of uterine leiomyomata in African-American women. Am J Epidemiol. 2012 Mar 1;175(5):432-40. doi: 10.1093/aje/kwr351. Epub 2012 Jan 10. PMID: 22234483; PMCID: PMC3282879.

1    hair products contain chemicals that are considered carcinogenic and/or hormone disrupters, leading

2    to increased risk of medical issues such as fibroids (non-cancerous tumors that grow in the uterus,

3    potentially damaging fertility and leading to a host of other complications). Trichologists see lots of

4    conditions that are likely to be triggered by hair products, particularly central centrifugal cicatricial

5    alopecia, a type of permanent hair loss to the crown area of the scalp."

6    222.    More recently, the National Institutes of Health spent eight-years studying over 46,000

7    women of all races between the ages of 35–74. They were looking for links between chemical hair

8    relaxers and breast cancer. They discovered Black women's breast cancer risk increased risk by 45%.[94]

9    Breast cancer and other reproductive issues, including fibroid development, are often connected. This

10    study suggests there are even more reasons to steer clear of chemical hair straighteners and relaxers.

11    223.    Concerns around racial disparities in healthcare linked to chemicals found in cosmetic

12    products are not new; previous studies, as far back as 2012, have also suggested a correlation between

13    chemical relaxer use and uterine fibroids, a condition that disproportionately affects Black women.[95]

14    224.    Hair relaxers are used by millions of black women, possibly exposing them to various

15    chemicals through scalp lesions and burns. In the Black Women's Health Study, the authors assessed

16    hair relaxer use in relation to uterine leiomyomata incidence. In 1997, participants reported on hair

17    relaxer use (age at first use, frequency, duration, number of burns, and type of formulation). From

18    1997 to 2009, 23,580 premenopausal women were followed for incident uterine leiomyomata. The

19    incidence of uterine leiomyomata is 2–3 times higher in US black women than in US white women.

20    225.    The Houston Fibroids Clinic in Houston, Texas also highlights the association between

21    hair relaxers and uterine fibroids, stating that black women develop fibroids up to three times as often

22

23    ————————————

24

25    [94] Che-Jung Chang, Katie M. O'Brien, Alexander P. Keil, Symielle A. Gaston, Chandra L. Jackson, Dale P. Sandler, Alexandra J. White. Use of Straighteners and Other Hair Products and Incident Uterine Cancer. Journal of the National Cancer Institute DOI: https://doi.org/10.1093/jnci/djac165 (2022)

26

27    [95] Nadine White, *Campaign urges beauty firms to pull 'toxic' hair products aimed at Black women*, Independent (August 3, 2021), https://www.independent.co.uk/news/uk/home-news/black-hair-lye-no-more-lyes b1893747.html.

28

1  as women of other races, their fibroids develop earlier in age than other races (oftentimes in their

2  twenties), and are more likely to suffer from anemia due to fibroids. They also have a higher risk for

3  fibroid symptoms, including but not limited to, painful intercourse, severe pelvic pain, and heavy

4  periods.[96]

**FIRST CAUSE OF ACTION**

**STRICT LIABILITY – FAILURE TO WARN**

**(Against All Defendants)**

8  226.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation

9  set forth in the preceding paragraphs.

10  227.    At all pertinent times, the Defendants were manufacturing, marketing, testing,

11  promoting, selling and/or distributing the Products in the regular course of business.

12  228.    The Products had potential risks and side effects that were known or knowable to

13  defendants by the use of scientific knowledge available before, at, and after the time of manufacture,

14  distribution, and sale of the Products. Defendants knew or should have known of the defective

15  condition, characteristics, and risks associated with said product, as previously set forth herein.

16  229.    Defendants' Products were expected to and did reach consumers, including Plaintiff,

17  without substantial change in the condition in which their Products were manufactured, sold, or

18  otherwise released into the stream of commerce by Defendant.

19  230.    The Products that were manufactured, distributed, and/or sold by the defendants to

20  Plaintiff were in a defective condition that was unreasonably and substantially dangerous to any user

21  or ordinary consumer of the Products, such as Plaintiff. Such ordinary consumers, including Plaintiff,

22  would not and could not have recognized or discovered the potential risks and side effects of the

23  Products as set forth herein.

24  231.    At all pertinent times, Plaintiff used the Products on her hair and at the roots of her hair

25  which is a reasonably foreseeable use.

26  232.    At all pertinent times, Defendants knew or should have known that the use phthalates

27

28  [96]    Black Hair Relaxers and Fibroid Risk | Houston Fibroids

1    and other EDCs in hair products significantly increases the risk of diseases including but not limited
2    to cancer, fibroids and/or endometriosis, based upon scientific knowledge dating back for decades.

3        233.    At all pertinent times, including the time of sale and consumption, the Products,
4    Defendants were then and there guilty of one or more of the following acts:

5            a.    Manufactured, marketed, tested, promoted, sold, and/or distributed unreasonable
6            dangerous and defective products;

7            b.    Improperly warned of increased risk of diseases as required by C.F.R. § 740.1;

8            c.    Inadequately warned of increased risk of diseases as required by C.F.R. § 740.1;

9            d.    Inadequately labeled relaxer products as containing EDCs that act as hormonal
10           agents as required by 21 C.F.R. § 310.530.

11           e.    Improperly warned and instructed Plaintiff of inherent risks of debilitating and life-
12           altering conditions.

13       234.    Plaintiff sustained the following damages as a foreseeable, direct, and proximate result
14   of Defendants' acts and/or omissions:

15           a.    Economic losses including medical care and lost earnings; and

16           b.    Noneconomic losses including physical and mental pain and suffering, emotional
17           distress, inconvenience, loss of enjoyment and impairment of quality of life, past
18           and future.

19           c.    The sum of the damages Plaintiff has suffered is in excess of the minimum
20           jurisdictional limits of this Court.

21       235.    Defendants' lack of sufficient instructions or warnings prior to, on, and after the date
22   of Plaintiff's initial use of the Products was a substantial factor in causing Plaintiff's injuries and
23   damages, as described herein.

24       WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory
25   damages together with interest, the costs of suit and such other and further relief as this Court deems
26   just and proper.

27

28

**SECOND CAUSE OF ACTION**

**STRICT LIABILITY – DESIGN DEFECT**

**(Against All Defendants)**

236.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

237.    At all relevant times, Defendants engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in California and the United States.

238.    At all relevant times, Defendants engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff. Said defects included, but were not limited to, the fact that the Products contained phthalates and/or other endocrine receptive chemicals that substantially increased the risks of triggering tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of diseases including but not limited to cancer, fibroids, and/or endometriosis.

239.    Defendants caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

240.    The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which it was manufactured and sold by Defendant L'Oreal USA, Inc. and/or otherwise released into the stream of commerce.

241.    Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendants.

242.    Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing her risk of developing uterine fibroids.

243.    The propensity of phthalates and other endocrine receptive chemicals to trigger tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of diseases including but not limited to cancer, fibroids, and/or endometriosis, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

244.    Importantly, the Products are an inessential cosmetic product that do not treat or cure

1    any serious disease. Further, safer alternatives, including fragrance free products, have been readily

2    available for decades.

3        245.    Defendants knew, or by the exercise of reasonably care should have known, that the

4    Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute,

5    market, promote, and supply the Products to maximize sales and profits at the expense of public health

6    and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

7        246.    Defendants owed a duty to all reasonably foreseeable users to design a safe product.

8        247.    At all pertinent times, Defendants were then and there guilty of one or more of the

9    following acts and/or omissions:

10            a.    Designing, manufacturing, selling, distributing, marketing, promoting, and

11               supplying Products that they knew or should have known were unreasonable

12               dangerous;

13            b.    Failing to use reasonable care in the design and/or manufacturing of their Products;

14               or

15            c.    Failing to use reasonably feasible alternative designs in the design and/or

16               manufacturing of the Products.

17        248.    As a direct and proximate result thereof, it became necessary for plaintiff to incur

18    expenses for doctors, hospitals, surgeries, nurses, and other reasonably required and medically

19    necessary supplies and services. Plaintiff prays for leave to amend this Complaint to insert these

20    elements of damage when the same are finally determined.

21        249.    As a direct and proximate result of Defendants' conduct, including actions, omissions,

22    and misrepresentations, Plaintiff sustained the following damages:

23            a.    Economic losses including medical care and lost earnings; and

24            b.    Noneconomic losses including physical and mental pain and suffering, emotional

25               distress, inconvenience, loss of enjoyment and impairment of quality of life, past

26               and future.

27            c.    The sum of the damages Plaintiff has suffered is in excess of the minimum

28               jurisdictional limits of this Court.

1    250.    Defendants' design, manufacture, marketing, promotion, defense, and/or sale of the

2    Products was a substantial factor in causing plaintiff's injuries, as described herein.

3    WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory

4    damages together with interest, the costs of suit and such other and further relief as this Court deems

5    just and proper.

6    ### THIRD CAUSE OF ACTION

7    ### BREACH OF EXPRESS WARRANTY

8    ### (Against All Defendants)

9    251.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation

10    set forth in the preceding paragraphs.

11    252.    Defendants made statements of fact and promises to consumers, including Plaintiff,

12    that the Products were:

13        a.    Safe;

14        b.    efficacious;

15        c.    fit for use;

16        d.    of merchantable quality;

17        e.    adequately tested;

18        f.    did not increase the risk of injury;

19    253.    Defendants breached the express warranties as follows:

20        a.    Defendants misrepresented the safety of the Products in the Products' labeling,

21          advertising, marketing materials, promotion, and/or publications;

22        b.    Defendants misrepresented the risks associated with the Products;

23        c.    Defendants withheld and/or concealed and/or downplayed the information and/or

24          evidence that the products were associated with an increased risk of injuries;

25        d.    Defendants misrepresented that the Products were safe, and/or safer than other

26          similar products used;

27        e.    Defendants fraudulently concealed information about the safety of the Products

28          including information that the product was not safer than alternative products

48

1    available on the market; and

2        f.   Defendants misrepresented information regarding the safety and/or efficacy of the

3             Products.

4    254.   The Products did not conform to Defendants' express representations and warranties

5    or meet the quality of Defendants' descriptions of safety and efficacy.

6    255.   At all relevant times, including during the period that Plaintiff used the Products, they

7    did not perform as safely as an ordinary consumer would expect when used as intended or in a

8    reasonably foreseeable manner.

9    256.   At all relevant times, including during the period that Plaintiff used the Products, they

10   did not perform in accordance with the Defendants' representations.

11   257.   In deciding to purchase and use the Products, Plaintiff and other consumers relied upon

12   Defendants' express warranties.

13   258.   As a direct and proximate result of Defendants' conduct, including actions, omissions,

14   and misrepresentations described herein, Plaintiff sustained the following damages:

15       a.   Economic losses including medical care and lost earnings; and

16       b.   Noneconomic losses including physical and mental pain and suffering, emotional

17            distress, inconvenience, loss of enjoyment and impairment of quality of life, past

18            and future.

19       c.   The sum of the damages Plaintiff has suffered is in excess of the minimum

20            jurisdictional limits of this Court.

21   259.   The failure of the Products to perform as represented was a substantial factor in causing

22   Plaintiff's injuries and damages, as described herein.

23       WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory

24   damages together with interest, the costs of suit and such other and further relief as this Court deems

25   just and proper.

26

27

28

**FOURTH CAUSE OF ACTION**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

**(Against All Defendants)**

260.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

261.    Plaintiff purchased the Products from Defendants, and each of them.

262.    At all relevant and material times, including the time of Plaintiff's purchase, Defendants were in the business of manufacturing, designing, formulating, producing, marketing, promoting, selling and/or distributing the Products.

263.    Defendants by their occupation held themselves out as having special knowledge or skill regarding the Products.

264.    Defendants knew and intended that the Products be used when they were placed into the stream of commerce.

265.    Defendants knew and intended that the Products be used as they were by Plaintiff.

266.    Defendants impliedly warranted to Plaintiff that the Products were safe for use.

267.    Plaintiff reasonably and justifiably relied on Defendants' expertise, skill, judgment, and knowledge of the Defendants and upon the Defendants' express and/or implied warranty that the Products were safe, of merchantable quality, and fit for use.

268.    The Products used were not safe, of merchantable quality, fit for use, the quality that a buyer would expect, or the same quality of those products generally acceptable in the trade.

269.    The Products were not fit for the ordinary purposes for which such goods are used and did not conform to the quality established by the parties' prior dealings or by usage of trade.

270.    The Products used by Plaintiff were neither safe nor fit for use.

271.    Defendants were aware that consumers, including Plaintiff, would use the Products, which is to say that Plaintiff was a foreseeable user of Defendants' Products.

272.    Plaintiff was at all relevant times in privity with Defendants.

273.    Plaintiff took reasonable steps to notify Defendants, and each of them, within a reasonable time that the Products did not have the expected quality.

274.    The Products were expected to reach and did in fact reach consumers, including Plaintiff, without substantial change in the condition in which the product was manufactured and sold by Defendants.

275.    Defendants breached various implied warranties with respect to the Products as set forth above.

276.    Defendants breached the implied warranties in that the Products did not conform to Defendants' implied representations and warranties.

277.    Plaintiff reasonably relied upon one and/or several of the Defendants' implied warranties.

278.    Plaintiff used the Products as intended and directed by the Defendants and in a foreseeable manner as intended, recommended, promoted, and/or marketed by Defendants.

279.    Defendants breached one or several of the implied warranties provided to and relied on by Plaintiff.

280.    As a direct and proximate result of Defendants' conduct, including actions, omissions, and misrepresentations described herein, Plaintiff sustained the following damages:

        a.   Economic losses including medical care and lost earnings; and

        b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

        c.   The sum of the damages Plaintiff has suffered is in excess of the minimum jurisdictional limits of this Court.

281.    The failure of the Products to have the expected quality was a substantial factor in causing Plaintiff's harm.

WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory damages together with interest, the costs of suit and such other and further relief as this Court deems just and proper.

**FIFTH CAUSE OF ACTION**

**BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE**

**(Against All Defendants)**

282.   Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

283.   Plaintiff purchased the Products from Defendants, and each of them.

284.   At the time of purchase, Defendants, and each of them, knew or had reason to know that Plaintiff intended to use the product for a particular purpose.

285.   At the time of purchase, Defendants, and each of them, knew or had reason to know that Plaintiff was relying on Defendants' skill and judgment to select or furnish a product that was suitable for the particular purpose.

286.   Plaintiff reasonably and justifiably relied on Defendants' skill and judgment.

287.   The Products were not suitable for Plaintiff's particular purpose.

288.   Plaintiff took reasonable steps to notify Defendants, and each of them, within a reasonable time that the Products were not suitable.

289.   As a direct and proximate result of Defendants' conduct, including actions, omissions, and misrepresentations described herein, Plaintiff sustained the following damages:

      a.   Economic losses including medical care and lost earnings; and

      b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

      c.   The sum of the damages Plaintiff has suffered is in excess of the minimum jurisdictional limits of this Court.

290.   The failure of the Products to be suitable was a substantial factor in causing Plaintiff's harm.

WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory damages together with interest, the costs of suit and such other and further relief as this Court deems just and proper.

**SIXTH CAUSE OF ACTION**

**NEGLIGENCE – DESIGN, MANUFACTURE AND SALE**

**(Against All Defendants)**

291.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

292.    Prior to, on and after the date of Plaintiff's initial use of the Products, and at all relevant times, Defendants designed, tested, distributed, manufactured, advertised, sold, and/or marketed the Products for use by consumers, such as Plaintiff.

293.    Prior to, on, and after Plaintiff's initial use of the Products, Defendants were negligent and careless in and about their design, testing, distribution, manufacture, advertising, sale, and/or marketing of the above-described Products.

294.    Prior to, on, and after Plaintiff's initial use of the Products, Defendants performed inadequate evaluation and testing of the Products where such evaluation and testing would have revealed the propensity of the Products' failures, and increased risk of injury as described herein.

295.    Prior to, on, and/or after Plaintiff's initial use of the Products, Defendants had received complaints from consumers that the Products failed and posed an increased risk of injury as described herein, but Defendants consciously decided not to: perform any further testing on the Products; investigate the root cause of these failures and increased risk of injury; suspend sales and distribution; or warn consumers, such as Plaintiff, of the propensity of the Products to fail and pose an increased risk of injury as described herein.

296.    Defendants' conduct is *per se* negligent because their negligent design, manufacture, and sale of defective and dangerous products violated several federal and state laws, including but not limited to:

        a.  The Food, Drug, & Cosmetics Act, 21 U.S.C. ch. 9 § 301 et seq., and its accompanying regulations, including 21 U.S.C. §§ 331; 361; 21 U.S. Code § 362; and 21 CFR Part 740, including but not limited to 21 CFR § 740.1 and 21 CFR;

        b.  The California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Saf. Code §§ 111730, 111790;

1        c.  The California Safe Cosmetics Act of 2005, Cal. Health & Saf. Code § 111791.5;

2        d.  The California Cosmetic Frangrance and Flavor Right to Know Act (CFFIRKA)

3            Cal. Health & Saf. Code § 111791.5; and

4        e.  The Safe Drinking Water and Toxic Enforcement Act of 1986 ("Proposition 65"),

5            Cal. Health & Saf. Code § 25249.5.

6    297.   As a direct and proximate result of Defendants' above-described negligence in design,

7    testing, distribution, manufacture, advertising, sales, and/or marketing, Plaintiff sustained the

8    following damages:

9        a.  Economic losses including medical care and lost earnings; and

10       b.  Noneconomic losses including physical and mental pain and suffering, emotional

11           distress, inconvenience, loss of enjoyment and impairment of quality of life, past

12           and future.

13       c.  The sum of the damages Plaintiff has suffered is in excess of the minimum

14           jurisdictional limits of this Court.

15   298.   As a direct and legal result of Defendants' actions and/or omissions, Plaintiff has also

16   suffered, and continues to suffer, an increased risk of developing illnesses, diseases and/or disease

17   processes relating to exposure to the Products.

18   299.   As a direct and legal result of Defendants' tortious conduct, Plaintiff has also suffered

19   the past, present and future medical need to undergo diagnostic testing for the early detection of latent

20   or misidentified illnesses, diseases and/or disease processes related to her exposure to the Products.

21   300.   Diagnostic and/or monitoring procedures exist that comport with contemporary

22   scientific principles and the standard of care and make early detection of illnesses and conditions

23   related to exposure to the Products possible and beneficial to Plaintiff.

24   301.   As a result of being significantly and repeatedly exposed to the Products, the need for

25   Plaintiff's medical monitoring is currently necessary, and the monitoring is reasonable.

26   302.   Plaintiff thus also seeks an award of the cost of medical monitoring for the early

27   detection of latent or misidentified illnesses, diseases and/or disease processes associated with

28   exposure to the Products.

1    303.    Defendants' negligence in design, testing, distribution, manufacture, advertising, sales,

2    and/or marketing prior to, on, and after the date of Plaintiff's initial surgery was a substantial factor in

3    causing Plaintiff's injuries and damages, as described herein.

4    WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory

5    damages together with interest, the costs of suit and such other and further relief as this Court deems

6    just and proper.

### SEVENTH CAUSE OF ACTION

### NEGLIGENCE – FAILURE TO RECALL/RETROFIT

### (Against All Defendants)

10    304.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation

11    set forth in the preceding paragraphs.

12    305.    Prior to, on, and/or after the date of Plaintiff's initial use of the Products, and at all

13    relevant times, Defendants designed, distributed, manufactured, sold, and/or marketed the Products

14    for use by consumers, such as Plaintiff.

15    306.    Prior to, on, and/or after the date of Plaintiff's initial use of the Products, and at all

16    relevant times, Defendants knew or reasonably should have known that the Products and their

17    warnings were dangerous or were likely to be dangerous when used in a reasonably foreseeable

18    manner.

19    307.    Prior to, on, and/or after the date of Plaintiff's initial use of the Products, defendants

20    became aware of the defects of the Products, including their propensity to increase the risk of injury

21    as described herein.

22    308.    Defendants failed to recall, retrofit, or warn consumers, such as Plaintiff, about the

23    danger of the Products prior to, on, and/or after the date of Plaintiff's initial use of the Products, and

24    at all relevant times, and continue to fail to recall the Products to date.

25    309.    In light of the severity and amount of the data available to Defendants, reasonable

26    manufacturers and distributors under the same or similar circumstances would have recalled or

27    retrofitted the Products, and would thereby have avoided and prevented harm to hundreds of thousands

28    of consumers, such as Plaintiff.

310.    As a direct and proximate result of Defendants' above-described negligent failure to recall or retrofit, Plaintiff sustained the following damages:

    a.   Economic losses including medical care and lost earnings; and

    b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

    c.   The sum of the damages Plaintiff has suffered is in excess of the minimum jurisdictional limits of this Court.

311.    Defendants' negligent failure to recall or retrofit the Products and their warnings was a substantial factor in causing Plaintiff's injuries and damages, as described herein.

WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory damages together with interest, the costs of suit and such other and further relief as this Court deems just and proper.

## EIGHTH CAUSE OF ACTION

## <u>NEGLIGENCE – FAILURE TO WARN</u>

### (Against All Defendants)

312.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

313.    At all relevant times, Defendants engaged in the design, development, manufacture, marketing, sale and distribution of the Products in a defective and unreasonably dangers condition to consumers, including Plaintiff.

314.    Defendants knew, or by the exercise of reasonable care, should have known use of their Products were dangerous, harmful, and injurious when used by consumers, such as Plaintiff, in a reasonably foreseeable manner. Such danger included the Products' propensity to increase the risk of injury, illness, and/or disease as described herein.

315.    Defendants knew, or by the exercise of reasonable care, should have known ordinary consumers, such as Plaintiff, would not have realized the potential risks and dangers of their Products, and that the Products were likely to increase the risk of tumors and cancerous growths in

premenopausal women, thereby increasing the risk of cancer, fibroids, and/or endometriosis, when used in the manner they were intended and to an extent beyond that would be contemplated by the ordinary consumer.

316.    Defendants owed a duty to all reasonably foreseeable consumers to disclose the risks associated with the use of their Products.

317.    At all pertinent times, Defendants were then and there guilty of one or more of the following acts and/or omissions:

      a.    Failed to provide adequate warnings on their Products;

      b.    Inadequately provided warnings on their Products;

      c.    Provided misleading advertisements; or

      d.    Failed to provide instructions on how to safely use their Products.

      e.    Failed to use due care in the manufacture, inspection and labeling of the Products to prevent risk of injuries to individuals, such as Plaintiff, who used the Products;

      f.    Failed to provide adequate and accurate warnings and information regarding the risk and dangers associated with the Products as described herein, to non-defendant entities that sold the Products; and

      g.    Failed to label the Products to adequately warn Plaintiff of the increased risk of injury associated with the product including an increased risk of hormone-related cancers and reproductive problems including the development of uterine fibroids and other injuries.

318.    Defendants' conduct is *per se* negligent because their failure to warn of dangerous ingredients of their products violated several federal and state laws, including but not limited to:

      a.    The Food, Drug, & Cosmetics Act, 21 U.S.C. ch. 9 § 301 et seq., and its accompanying regulations, including 21 U.S.C. §§ 331, 361; 21 U.S. Code § 362; and 21 CFR Part 740, including but not limited to 21 CFR § 740.1 and 21 CFR;

      b.    The California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Saf. Code §§ 111730, 111790;

       c.   The California Safe Cosmetics Act of 2005, Cal. Health & Saf. Code § 111791.5;

       d.   The California Cosmetic Fragrance and Flavor Right to Know Act (CFFIRKA) Cal. Health & Saf. Code § 111791.5; and

       e.   The Safe Drinking Water and Toxic Enforcement Act of 1986 ("Proposition 65"), Cal. Health & Saf. Code § 25249.5.

319.   As a direct and proximate result of Defendants' above-described negligent conduct, including failure to warn, actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

       a.   Economic losses including medical care and lost earnings; and

       b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

       c.   The sum of the damages Plaintiff has suffered is in excess of the minimum jurisdictional limits of this Court.

320.   Defendants' negligent failure to warn consumers, including Plaintiff, at all relevant times, was a substantial factor in causing Plaintiff's injuries and damages, as described herein.

WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory damages together with interest, the costs of suit and such other and further relief as this Court deems just and proper.

## NINTH CAUSE OF ACTION

## <u>FRAUD – INTENTIONAL MISREPRESENTATION</u>

**(Against L'Oréal USA, Inc, L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I))**

321.   Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

322.   Defendants engaged in the development, manufacture, marketing, sale, and distribution of cosmetic and personal care products, including the Products, and owed a duty to provide accurate and complete information regarding said products.

323.    Defendants fraudulently misrepresented the use of the Products as safe, effective, and not unreasonably dangerous.

324.    Defendants knowingly and intentionally represented to consumers, including the Plaintiff, and the public that the Products were safe for use and that Defendants' labeling, marketing, and/or promotional materials fully described all known risks associated with the Products. Said representations were of facts that were material and important to Plaintiff's decision to use the Products.

325.    When Defendants made said representations, Defendants either knew that said representations were false or made said representations recklessly and without regard for their truth.

326.    When Defendants made said representations, Defendants intended that consumers, such as Plaintiff, would rely on said representations.

327.    Consumers, such as Plaintiff, reasonably and justifiably relied on Defendants' representations that the Products were safe for use and that their labeling, marketing, and promotional materials fully described all known risks associated with the Products.

328.    A recent article was published on October 4, 2022, on MSN and other online news outlets, titled "The Relaxer Box Girls: Where Are They Now ", which revealed that many of the young black girls featured on relaxer boxes and in relaxer ads in the 80s, 90s, and 2000s, never actually got their hair relaxed. Instead, they used other straightening tools and styling products to achieve the look of having the relaxer, without having exposed themselves to the dangerous chemicals within relaxers. Many of them are wearing natural hairstyles today.[97]

329.    At all pertinent times, Defendants were then and there guilty of one or more of the following acts and/or omissions:

        a.  Knowingly made omissions that were material, false, incomplete, misleading, deceptive, and deceitful;

        b.  Knowingly made misrepresentations for the purpose of deceiving and defrauding consumers, including Plaintiff; or

---

[97] The Relaxer Box Girls: Where Are They Now? (msn.com)

1          c.  Knowingly made omissions for the purpose of deceiving and defrauding

2              consumers, including Plaintiff.

3    330.    Plaintiff relied, with reasonable justification, on the misrepresentations by Defendants,

4  which induced her to purchase and use the Products on a regular basis for decades.

5    331.    Defendants profited, significantly, from their unethical and illegal conduct that

6  fraudulently induced Plaintiff, and millions of other consumers, to purchase a dangerous and defective

7  product.

8    332.    As a direct and proximate result of Defendants' above-described fraudulent conduct,

9  including intentional misrepresentations, Plaintiff sustained the following damages:

10          a.  Economic losses including medical care and lost earnings; and

11          b.  Noneconomic losses including physical and mental pain and suffering, emotional

12              distress, inconvenience, loss of enjoyment and impairment of quality of life, past

13              and future.

14          c.  The sum of the damages Plaintiff have suffered is in excess of the minimum

15              jurisdictional limits of this Court.

16    333.    Plaintiff's reliance on said representations made by Defendants were a substantial

17  factor in causing Plaintiff to suffer the injuries and damages described herein.

18    WHEREFORE, Plaintiff demand judgment against Defendants and seek compensatory

19  damages together with interest, the costs of suit and such other and further relief as this Court deems

20  just and proper.

21                      **TENTH CAUSE OF ACTION**

22               **FRAUD – INTENTIONAL MISREPRESENTATION**

23              **(Against Godrej SON and Strength of Nature)**

24    334.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation

25  set forth in the preceding paragraphs.

26    335.    Defendants engaged in the development, manufacture, marketing, sale, and distribution

27  of cosmetic and personal care products, including the Products, and owed a duty to provide accurate

28  and complete information regarding said products.

336.    Defendants fraudulently misrepresented the use of the Products as safe, effective and not unreasonably dangerous. For example, Defendants Godrej Consumer Products, Godrej SON, and Strength of Nature's Soft & Beautiful Products are intentionally labeled as "Botanicals" and with "Natural" ingredients that are "Ultra Nourishing," including but not limited to using "Natural Plant Oils and Butters."

337.    Defendants knowingly and intentionally represented to consumers, including the Plaintiff, and the public that the Products were safe for use and that Defendants' labeling, marketing, and/or promotional materials fully described all known risks associated with the Products. Said representations were of facts that were material and important to Plaintiff's decision to use the Products.

338.    When Defendants made said representations, Defendants either knew that said representations were false or made said representations recklessly and without regard for their truth.

339.    When Defendants made said representations, Defendants intended that consumers, such as Plaintiff, would rely on said representations.

340.    Consumers, such as Plaintiff, reasonably and justifiably relied on Defendants' representations that the Products were safe for use and that their labeling, marketing, and promotional materials fully described all known risks associated with the Products.

341.    A recent article was published on October 4, 2022, on MSN and other online news outlets, titled "The Relaxer Box Girls: Where Are They Now ", which revealed that many of the young black girls featured on relaxer boxes and in relaxer ads in the 80s, 90s, and 2000s, never actually got their hair relaxed. Instead, they used other straightening tools and styling products to achieve the look of having the relaxer, without having exposed themselves to the dangerous chemicals within relaxers. Many of them are wearing natural hairstyles today.[98]

342.    At all pertinent times, Defendants were then and there guilty of one or more of the following acts and/or omissions:

---

[98] The Relaxer Box Girls: Where Are They Now? (msn.com)

d.  Knowingly made omissions that were material, false, incomplete, misleading, deceptive, and deceitful;

e.  Knowingly made misrepresentations for the purpose of deceiving and defrauding consumers, including Plaintiff; or

f.  Knowingly made omissions for the purpose of deceiving and defrauding consumers, including Plaintiff.

343.  Plaintiff relied, with reasonable justification, on the misrepresentations by Defendants, which induced her to purchase and use the Products on a regular basis for decades.

344.  Defendants profited, significantly, from their unethical and illegal conduct that fraudulently induced Plaintiff, and millions of other consumers, to purchase a dangerous and defective product.

345.  As a direct and proximate result of Defendants' above-described fraudulent conduct, including intentional misrepresentations, Plaintiff sustained the following damages:

d.  Economic losses including medical care and lost earnings; and

e.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

f.  The sum of the damages Plaintiff have suffered is in excess of the minimum jurisdictional limits of this Court.

346.  Plaintiff's reliance on said representations made by Defendants were a substantial factor in causing Plaintiff to suffer the injuries and damages described herein.

WHEREFORE, Plaintiff demand judgment against Defendants and seek compensatory damages together with interest, the costs of suit and such other and further relief as this Court deems just and proper.

## ELEVENTH CAUSE OF ACTION

### FRAUD – INTENTIONAL MISREPRESENTATION

#### (Against Avlon)

347.  Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation

62

1    set forth in the preceding paragraphs.

2        348.    Defendants engaged in the development, manufacture, marketing, sale, and distribution

3    of cosmetic and personal care products, including the Products, and owed a duty to provide accurate

4    and complete information regarding said products.

5        349.    Defendants fraudulently misrepresented the use of the Products as safe, effective, and

6    not unreasonably dangerous, specifically:

7            a.  Defendants Namaste, Dabur, and Dermoviva's Products are marketed as "Olive Oil"

8                products to imply natural products, and their Products are advertised as being "Build

9                in Protection;"

10           b.  Defendants Namaste, Dabur, and Dermoviva's website states that their Products use

11               "Rich Olive and Avocado Oils" that they claim "moisturize and condition while

12               Aloe Vera protects the skin and scalp."

13           c.  Defendants Namaste, Dabur, and Dermoviva's Products claim that they "use[] the

14               latest technology to safely elongate tight coils."

15       350.    Defendants knowingly and intentionally represented to consumers, including the

16   Plaintiff, and the public that the Products were safe for use and that Defendants' labeling, marketing,

17   and/or promotional materials fully described all known risks associated with the Products. Said

18   representations were of facts that were material and important to Plaintiff's decision to use the

19   Products.

20       351.    When Defendants made said representations, Defendants either knew that said

21   representations were false or made said representations recklessly and without regard for their truth.

22       352.    When Defendants made said representations, Defendants intended that consumers,

23   such as Plaintiff, would rely on said representations.

24       353.    Consumers, such as Plaintiff, reasonably and justifiably relied on Defendants'

25   representations that the Products were safe for use and that their labeling, marketing, and promotional

26   materials fully described all known risks associated with the Products.

27       354.    A recent article was published on October 4, 2022, on MSN and other online news

28   outlets, titled "The Relaxer Box Girls: Where Are They Now ", which revealed that many of the young

1  black girls featured on relaxer boxes and in relaxer ads in the 80s, 90s, and 2000s, never actually got

2  their hair relaxed. Instead, they used other straightening tools and styling products to achieve the look

3  of having the relaxer, without having exposed themselves to the dangerous chemicals within relaxers.

4  Many of them are wearing natural hairstyles today.[99]

5      355.    At all pertinent times, Defendants were then and there guilty of one or more of the

6  following acts and/or omissions:

7          g.  Knowingly made omissions that were material, false, incomplete, misleading,

8              deceptive, and deceitful;

9          h.  Knowingly made misrepresentations for the purpose of deceiving and defrauding

10             consumers, including Plaintiff; or

11         i.  Knowingly made omissions for the purpose of deceiving and defrauding

12             consumers, including Plaintiff.

13     356.    Plaintiff relied, with reasonable justification, on the misrepresentations by Defendants,

14  which induced her to purchase and use the Products on a regular basis for decades.

15     357.    Defendants profited, significantly, from their unethical and illegal conduct that

16  fraudulently induced Plaintiff, and millions of other consumers, to purchase a dangerous and defective

17  product.

18     358.    As a direct and proximate result of Defendants' above-described fraudulent conduct,

19  including intentional misrepresentations, Plaintiff sustained the following damages:

20         g.  Economic losses including medical care and lost earnings; and

21         h.  Noneconomic losses including physical and mental pain and suffering, emotional

22             distress, inconvenience, loss of enjoyment and impairment of quality of life, past

23             and future.

24         i.  The sum of the damages Plaintiff has suffered is in excess of the minimum

25             jurisdictional limits of this Court.

26     359.    Plaintiff's reliance on said representations made by Defendants was a substantial factor

27

28  _____

[99] The Relaxer Box Girls: Where Are They Now? (msn.com)

1    in causing Plaintiff to suffer the injuries and damages described herein.

2        WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory

3    damages together with interest, the costs of suit and such other and further relief as this Court deems

4    just and proper.

### TWELFTH CAUSE OF ACTION

### FRAUD – INTENTIONAL MISREPRESENTATION

### (Against Doe Defendants 1-100)

8    360.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation

9        set forth in the preceding paragraphs.

10    361.    Defendants engaged in the development, manufacture, marketing, sale, and distribution

11    of cosmetic and personal care products, including the Products, and owed a duty to provide accurate

12    and complete information regarding said products.

13    362.    Defendants fraudulently misrepresented the use of the Products as safe, effective and

14    not unreasonably dangerous.

15    363.    Defendants knowingly and intentionally represented to consumers, including the

16    Plaintiff, and the public that the Products were safe for use and that Defendants' labeling, marketing,

17    and/or promotional materials fully described all known risks associated with the Products. Said

18    representations were of facts that were material and important to Plaintiff's decisions to use the

19    Products.

20    364.    When Defendants made said representations, Defendants either knew that said

21    representations were false or made said representations recklessly and without regard for their truth.

22    365.    When Defendants made said representations, Defendants intended consumers, such

23    as Plaintiff, would rely on said representations.

24    366.    Consumers, such as Plaintiff, reasonably and justifiably relied on Defendants'

25    representations that the Products were safe for use and that their labeling, marketing, and promotional

26    materials fully described all known risks associated with the Products.

27    367.    A recent article was published on October 4, 2022, on MSN and other online news

28    outlets, titled "The Relaxer Box Girls: Where Are They Now," which revealed that many of the young

black girls featured on relaxer boxes and in relaxer ads in the 80s, 90s, and 2000s, never actually got their hair relaxed. Instead, they used other straightening tools and styling products to achieve the look of having the relaxer, without having exposed themselves to the dangerous chemicals within relaxers. Many of them are wearing natural hairstyles today.[100]

368.    At all pertinent times, Defendants were then and there guilty of one or more of the following acts and/or omissions:

        j.    Knowingly made omissions that were material, false, incomplete, misleading, deceptive, and deceitful;

        k.    Knowingly made misrepresentations for the purpose of deceiving and defrauding consumers, including Plaintiff; or

        l.    Knowingly made omissions for the purpose of deceiving and defrauding consumers, including Plaintiff.

369.    Plaintiff relied, with reasonable justification, on the misrepresentations by Defendants, which induced her to purchase and use the Products on a regular basis for decades.

370.    Defendants profited, significantly, from their unethical and illegal conduct that fraudulently induced Plaintiff, and millions of other consumers, to purchase a dangerous and defective product.

371.    As a direct and proximate result of Defendants' above-described fraudulent conduct, including intentional misrepresentations, Plaintiff sustained the following damages:

        j.    Economic losses including medical care and lost earnings; and

        k.    Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

        l.    The sum of the damages Plaintiff have suffered is in excess of the minimum jurisdictional limits of this Court.

372.    Plaintiff's reliance on said representations made by Defendants was a substantial factor

---

[100] The Relaxer Box Girls: Where Are They Now? (msn.com)

1  in causing Plaintiff to suffer the injuries and damages described herein.

2      WHEREFORE, Plaintiff demand judgment against Defendants and seeks compensatory

3  damages together with interest, the costs of suit and such other and further relief as this Court deems

4  just and proper.

5                          **THIRTEENTH CAUSE OF ACTION**

6                          <u>**FRAUD – CONCEALMENT**</u>

7      **(Against L'Oréal USA, Inc., L'Oréal USA Products, Inc., Soft Sheen, and Carson (W.I))**

8      373.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation

9  set forth in the preceding paragraphs.

10     374.    In marketing and selling the Products, Defendants concealed material facts from

11 consumers, including Plaintiff. Said concealment included some or all of the following: disclosure of

12 some facts to consumers, such as Plaintiff, but intentional failure to disclose other important facts,

13 making said disclosure deceptive; intentionally failing to disclose important facts known only to

14 Defendants and that consumers, including Plaintiff, could not have discovered; and/or actively

15 concealing important facts from consumers, including Plaintiff, from discovery said important facts.

16     375.    At all pertinent times, Defendants were then and there guilty of one or more of the

17 following acts and/or omissions:

18          a.  Defendants omitted, suppressed, and/or concealed material facts concerning the

19              dangers and risk of injuries associated with the use of the Products and the fact that

20              the Product was unreasonably dangerous;

21          b.  Defendants purpose was willfully blind to, ignored, downplayed, avoided, concealed

22              and/or otherwise understated the nature of the risks associated with the use of the

23              Products to increase sales;

24          c.  Defendants undertook the concealment of material facts with an intent that

25              consumers, including Plaintiff, rely upon them.

26     376.    Plaintiff and other consumers did not know that Defendants concealed material facts

27 and were justified in their reliance on Defendants representations regarding the safety of the Products.

28     377.    Defendants had sole access to material facts concerning the dangers and unreasonable

1   risks of the Products.

2       378.    The intentional concealment of information by Defendants about the substantial risks

3   of injury and/or disease associated with the Products, was known by Defendants to be wrongful.

4       379.    Had Defendants not fraudulently concealed the information as described herein, the

5   Products would not have been used by Plaintiff.

6       380.    Had Plaintiff been aware of the increased risks of injury associated with the Products,

7   Plaintiff would not have used them.

8       381.    As a direct and proximate result of Defendants' fraudulent and/or intentional

9   concealment of facts, upon which Plaintiff reasonably relied, Plaintiff sustained the following

10  damages:

11          a.  Economic losses including medical care and lost earnings; and

12          b.  Noneconomic losses including physical and mental pain and suffering, emotional

13              distress, inconvenience, loss of enjoyment and impairment of quality of life, past

14              and future.

15          c.  The sum of the damages Plaintiff have suffered is in excess of the minimum

16              jurisdictional limits of this Court.

17      382.    Plaintiff's reasonable reliance on Defendants' fraudulent and/or intentional

18  concealment of facts was a was a substantial factor in causing Plaintiff to suffer the injuries and

19  damages described herein.

20      WHEREFORE, Plaintiff demands judgment against Defendants and seek compensatory

21  damages together with interest, the costs of suit and such other and further relief as this Court deems

22  just and proper.

23                          **FOURTEENTH CAUSE OF ACTION**

24                          **FRAUD – CONCEALMENT**

25                      **(Against Godrej SON and Strength of Nature)**

26      383.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation

27  set forth in the preceding paragraphs.

28      384.    In marketing and selling the Products, Defendants concealed material facts from

1    consumers, including Plaintiff. Said concealment included some or all of the following: disclosure of
2    some facts to consumers, such as Plaintiff, but intentional failure to disclose other important facts,
3    making said disclosure deceptive; intentionally failing to disclose important facts known only to
4    Defendants and that consumers, including Plaintiff, could not have discovered; and/or actively
5    concealing important facts from consumers, including Plaintiff, from discovery said important facts.

6        385.    At all pertinent times, Defendants were then and there guilty of one or more of the
7    following acts and/or omissions:

8            a.   Defendants omitted, suppressed, and/or concealed material facts concerning the
9                 dangers and risk of injuries associated with the use of the Products and the fact that
10                the Product was unreasonably dangerous;

11           b.   Defendants purpose was willfully blind to, ignored, downplayed, avoided, concealed
12                and/or otherwise understated the nature of the risks associated with the use of the
13                Products in order to increase sales;

14           c.   Defendants undertook the concealment of material facts with an intent that
15                consumers, including Plaintiff, rely upon them.

16       386.    Plaintiff and other consumers did not know that Defendants concealed material facts
17    and were justified in their reliance on Defendants representations regarding the safety of the Products.

18       387.    Defendants had sole access to material facts concerning the dangers and unreasonable
19    risks of the Products.

20       388.    The intentional concealment of information by Defendants about the substantial risks
21    of injury and/or disease associated with the Products, was known by Defendants to be wrongful.

22       389.    Had Defendants not fraudulently concealed the information as described herein, the
23    Products would not have been used by Plaintiff.

24       390.    Had Plaintiff been aware of the increased risks of injury associated with the Products,
25    Plaintiff would not have used them.

26       391.    As a direct and proximate result of Defendants' fraudulent and/or intentional
27    concealment of facts, upon which Plaintiff reasonably relied, Plaintiff sustained the following
28    damages:

d.  Economic losses including medical care and lost earnings; and

e.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

f.  The sum of the damages Plaintiff have suffered is in excess of the minimum jurisdictional limits of this Court.

392.  Plaintiff's reasonable reliance on Defendants' fraudulent and/or intentional concealment of facts was a was a substantial factor in causing Plaintiff to suffer the injuries and damages described herein.

WHEREFORE, Plaintiff demand judgment against Defendants and seek compensatory damages together with interest, the costs of suit and such other and further relief as this Court deems just and proper.

### FIFTEENTH CAUSE OF ACTION

### <u>FRAUD – CONCEALMENT</u>

### (Against Avlon)

393.  Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

394.  In marketing and selling the Products, Defendants concealed material facts from consumers, including Plaintiff. Said concealment included some or all of the following: disclosure of some facts to consumers, such as Plaintiff, but intentional failure to disclose other important facts, making said disclosure deceptive; intentionally failing to disclose important facts known only to Defendants and that consumers, including Plaintiff, could not have discovered; and/or actively concealing important facts from consumers, including Plaintiff, from discovery said important facts.

395.  At all pertinent times, Defendants were then and there guilty of one or more of the following acts and/or omissions:

a.  Defendants omitted, suppressed, and/or concealed material facts concerning the dangers and risk of injuries associated with the use of the Products and the fact that the Product was unreasonably dangerous;

b.  Defendants purpose was willfully blind to, ignored, downplayed, avoided, concealed and/or otherwise understated the nature of the risks associated with the use of the Products in order to increase sales;

c.  Defendants undertook the concealment of material facts with an intent that consumers, including Plaintiff, rely upon them.

396.    Plaintiff and other consumers did not know that Defendants concealed material facts and were justified in their reliance on Defendants representations regarding the safety of the Products.

397.    Defendants had sole access to material facts concerning the dangers and unreasonable risks of the Products.

398.    The intentional concealment of information by Defendants about the substantial risks of injury and/or disease associated with the Products, was known by Defendants to be wrongful.

399.    Had Defendants not fraudulently concealed the information as described herein, the Products would not have been used by Plaintiff.

400.    Had Plaintiff been aware of the increased risks of injury associated with the Products, Plaintiff would not have used them.

401.    As a direct and proximate result of Defendants' fraudulent and/or intentional concealment of facts, upon which Plaintiff reasonably relied, Plaintiff sustained the following damages:

g.  Economic losses including medical care and lost earnings; and

h.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

i.  The sum of the damages Plaintiff has suffered is in excess of the minimum jurisdictional limits of this Court.

402.    Plaintiff's reasonable reliance on Defendants' fraudulent and/or intentional concealment of facts was a was a substantial factor in causing Plaintiff to suffer the injuries and damages described herein.

WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory

1    damages together with interest, the costs of suit and such other and further relief as this Court deems
2    just and proper.

### SIXTEENTH CAUSE OF ACTION

### FRAUD – CONCEALMENT

### (Against Doe Defendants 1-100, inclusive)

6    403.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation
7    set forth in the preceding paragraphs.

8    404.    In marketing and selling the Products, Defendants concealed material facts from
9    consumers, including Plaintiff. Said concealment included some or all of the following: disclosure of
10   some facts to consumers, such as Plaintiff, but intentional failure to disclose other important facts,
11   making said disclosure deceptive; intentionally failing to disclose important facts known only to
12   Defendants and that consumers, including Plaintiff, could not have discovered; and/or actively
13   concealing important facts from consumers, including Plaintiff, from discovery said important facts.

14   405.    At all pertinent times, Defendants were then and there guilty of one or more of the
15   following acts and/or omissions:

16            a.  Defendants omitted, suppressed, and/or concealed material facts concerning the
17                dangers and risk of injuries associated with the use of the Products and the fact that
18                the Product was unreasonably dangerous;

19            b.  Defendants purpose was willfully blind to, ignored, downplayed, avoided, concealed
20                and/or otherwise understated the nature of the risks associated with the use of the
21                Products in order to increase sales;

22            c.  Defendants undertook the concealment of material facts with an intent that
23                consumers, including Plaintiff, rely upon them.

24   406.    Plaintiff and other consumers did not know that Defendants concealed material facts
25   and were justified in their reliance on Defendants representations regarding the safety of the Products.

26   407.    Defendants had sole access to material facts concerning the dangers and unreasonable
27   risks of the Products.

28   408.    The intentional concealment of information by Defendants about the substantial risks

1 | of injury and/or disease associated with the Products, was known by Defendants to be wrongful.

2 | 409. Had Defendants not fraudulently concealed the information as described herein, the
3 | Products would not have been used by Plaintiff.

4 | 410. Had Plaintiff been aware of the increased risks of injury associated with the Products,
5 | Plaintiff would not have used them.

6 | 411. As a direct and proximate result of Defendants' fraudulent and/or intentional
7 | concealment of facts, upon which Plaintiff reasonably relied, Plaintiff sustained the following
8 | damages:

9 |      j. Economic losses including medical care and lost earnings; and

10 |      k. Noneconomic losses including physical and mental pain and suffering, emotional
11 |        distress, inconvenience, loss of enjoyment and impairment of quality of life, past
12 |        and future.

13 |      l. The sum of the damages Plaintiff have suffered is in excess of the minimum
14 |        jurisdictional limits of this Court.

15 | 412. Plaintiff's reasonable reliance on Defendants' fraudulent and/or intentional
16 | concealment of facts was a was a substantial factor in causing Plaintiff sto suffer the injuries and
17 | damages described herein.

18 | WHEREFORE, Plaintiff demand judgment against Defendants and seek compensatory
19 | damages together with interest, the costs of suit and such other and further relief as this Court deems
20 | just and proper.

21 | <div align="center">**SEVENTEENTH CAUSE OF ACTION**</div>
22 | <div align="center">**UNLAWFUL, UNFAIR AND FRAUDULENT BUSINESS PRACTICES IN VIOLATION OF**</div>
23 | <div align="center">**CALIFORNIA B & P CODE SEC. 17200, ET SEQ.**</div>
24 | <div align="center">**(Against All Defendants)**</div>

25 | 413. Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation
26 | set forth in the preceding paragraphs.

27 | 414. California's Unfair Competition Law (UCL) creates a cause of action for those harmed
28 | by unfair competition, which includes "any unlawful, unfair or fraudulent business act or practice and

1    unfair, deceptive, untrue or misleading advertising."

2    415.    Defendants have made numerous misrepresentations to Plaintiff, consumers, and the

3    general public. Among those misrepresentations are Defendants' claims that the Products are safe,

4    effective, and not unreasonably dangerous.

5    416.    Defendants failed to disclose to Plaintiff, consumers, and the general public that the

6    Products are defective, unreasonably dangerous and are likely to increase the risk of tumors and

7    cancerous growths in premenopausal women, thereby increasing the risk of cancer, fibroids, and/or

8    endometriosis, and injuries as described herein.

9    417.    Defendants' business practices relating to the Products are unlawful because they

10    constitute false advertising, intentional misrepresentation, and fraudulent concealment.

11    m. As a direct and proximate result of Defendants' unlawful business practices and

12    false advertising, Defendants have generated enormous revenues and profits at the

13    expense of Plaintiff.  Plaintiff is thus entitled to restitutionary disgorgement, in an

14    amount to be proven at trial, injunctive relief, attorney's fees, and other remedies

15    available under the law.

16    418.    Defendants' unlawful business practices, at all relevant times, were a substantial factor

17    in causing Plaintiff's harm, as described herein.

18    WHEREFORE, Plaintiff demands judgment against Defendants and seeks an order of this

19    Court awarding restitutionary disgorgement, injunctive relief, attorneys' fees and costs and all other

20    relief as this Court deems just and proper under California Business and Professions Code Section

21    17200 et seq.

22    ## V.    PRAYER FOR RELIEF

23    419.    Plaintiff incorporates by reference each and every paragraph of this Complaint as

24    though set forth here in full and further prays.

25    420.    So far as the law and this Court allows, Plaintiff demands judgment against each

26    Defendant on each count as follows:

27    a.    Compensatory damages for the described losses with respect to each cause of

28    action;

1          b.     Past medical expenses;

2          c.     Past and future lost wages and loss of earning capacity;

3          d.     Past and future emotional distress;

4          e.     Punitive damages with respect to each cause of action;

5          f.     Reasonable attorneys' fees where recoverable;

6          g.     Costs of this action;

7          h.     Pre-judgment and all other interest recoverable; and

8          i.     Such other additional and further relief as Plaintiff may be entitled to in law or

9    in equity.

10   **JURY DEMAND**

11   Plaintiff demands a jury trial for all claims so triable.

12

13   Dated:  July 18, 2024               SINGLETON SCHRIBER, LLP

14

15                        By: _____

16                            Andrew Bluth (SBN: 232387)

                              Christopher Rodriguez (SBN: 212274)

17                            Danielle Ward Mason *(pro hac vice forthcoming)*

18

19                            *Attorneys for Plaintiff*

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DAMAGES

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Christopher R. Rodriguez SBN 212274, Andrew D. Bluth SBN 232387, Singleton Schreiber, LLP, 1414 K Street, Suite 470, Sacramento, CA 958144 | **ELECTRONICALLY FILED** Superior Court of California, County of Alameda 07/18/2024 at 04:43:15 PM By: Damaree Franklin, Deputy Clerk |

TELEPHONE NO.: 916-248-8478    FAX NO. *(Optional)*: (619) 255-1515
E-MAIL ADDRESS: crodriguez@singletonschreiber.com
ATTORNEY FOR *(Name)*: Plaintiff

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA
STREET ADDRESS: 1225 Fallon Street
MAILING ADDRESS: 1225 Fallon Street
CITY AND ZIP CODE: Oakland, 94612
BRANCH NAME: Oakland - Rene C. Davidson Courthouse

CASE NAME:
Cynthia Jones v. L'Oreal USA, et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: 24CV083993 |
|---|---|---|---|---|
| [x] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter  [ ] Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | | JUDGE: DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403) |
|---|---|---|
| [ ] Auto (22) | [ ] Breach of contract/warranty (06) | [ ] Antitrust/Trade regulation (03) |
| [ ] Uninsured motorist (46) | [ ] Rule 3.740 collections (09) | [ ] Construction defect (10) |
| **Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort** | [ ] Other collections (09) | [x] Mass tort (40) |
| [ ] Asbestos (04) | [ ] Insurance coverage (18) | [ ] Securities litigation (28) |
| [ ] Product liability (24) | [ ] Other contract (37) | [ ] Environmental/Toxic tort (30) |
| [ ] Medical malpractice (45) | **Real Property** | [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41) |
| [ ] Other PI/PD/WD (23) | [ ] Eminent domain/Inverse condemnation (14) | |
| **Non-PI/PD/WD (Other) Tort** | [ ] Wrongful eviction (33) | **Enforcement of Judgment** |
| [ ] Business tort/unfair business practice (07) | [ ] Other real property (26) | [ ] Enforcement of judgment (20) |
| [ ] Civil rights (08) | **Unlawful Detainer** | **Miscellaneous Civil Complaint** |
| [ ] Defamation (13) | [ ] Commercial (31) | [ ] RICO (27) |
| [ ] Fraud (16) | [ ] Residential (32) | [ ] Other complaint *(not specified above)* (42) |
| [ ] Intellectual property (19) | [ ] Drugs (38) | **Miscellaneous Civil Petition** |
| [ ] Professional negligence (25) | **Judicial Review** | [ ] Partnership and corporate governance (21) |
| [ ] Other non-PI/PD/WD tort (35) | [ ] Asset forfeiture (05) | [ ] Other petition *(not specified above)* (43) |
| **Employment** | [ ] Petition re: arbitration award (11) | |
| [ ] Wrongful termination (36) | [ ] Writ of mandate (02) | |
| [ ] Other employment (15) | [ ] Other judicial review (39) | |

2. This case [x] is   [ ] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties     d. [x] Large number of witnesses
   b. [x] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve     e. [x] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. [x] Substantial amount of documentary evidence     f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a. [x] monetary  b. [x] nonmonetary; declaratory or injunctive relief  c. [x] punitive
4. Number of causes of action *(specify)*: 17
5. This case [ ] is   [x] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: 07/18/2024
Andrew D. Bluth
_____                    ►                    _____
(TYPE OR PRINT NAME)                                        (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. September 1, 2021]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courts.ca.gov

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**CM-010**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
Damage/Wrongful Death
Uninsured Motorist (46) *(if the
case involves an uninsured
motorist claim subject to
arbitration, check this item
instead of Auto)*
**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/
Wrongful Death
Product Liability *(not asbestos or
toxic/environmental)* (24)
Medical Malpractice (45)
Medical Malpractice–
Physicians & Surgeons
Other Professional Health Care
Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip
and fall)
Intentional Bodily Injury/PD/WD
(e.g., assault, vandalism)
Intentional Infliction of
Emotional Distress
Negligent Infliction of
Emotional Distress
Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
Practice (07)
Civil Rights (e.g., discrimination,
false arrest) *(not civil
harassment)* (08)
Defamation (e.g., slander, libel)
(13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice
*(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease
Contract *(not unlawful detainer
or wrongful eviction)*
Contract/Warranty Breach–Seller
Plaintiff *(not fraud or negligence)*
Negligent Breach of Contract/
Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open
book accounts) (09)
Collection Case–Seller Plaintiff
Other Promissory Note/Collections
Case
Insurance Coverage *(not provisionally
complex)* (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute
**Real Property**
Eminent Domain/Inverse
Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property *(not eminent
domain, landlord/tenant, or
foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
drugs, check this item; otherwise,
report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court
Case Matter
Writ–Other Limited Court Case
Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor
Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
*(arising from provisionally complex
case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of
County)
Confession of Judgment *(non-
domestic relations)*
Sister State Judgment
Administrative Agency Award
*(not unpaid taxes)*
Petition/Certification of Entry of
Judgment on Unpaid Taxes
Other Enforcement of Judgment
Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
above)* (42)
Declaratory Relief Only
Injunctive Relief Only *(non-
harassment)*
Mechanics Lien
Other Commercial Complaint
Case *(non-tort/non-complex)*
Other Civil Complaint
*(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate
Governance (21)
Other Petition *(not specified
above)* (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult
Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late
Claim
Other Civil Petition

CM-010 [Rev. September 1, 2021]

**CIVIL CASE COVER SHEET**

Page 2 of 2

**For your protection and privacy, please press the Clear
This Form button after you have printed the form.**

| Print this form | Save this form |

 Clear this form

F. ADDENDUM TO CIVIL CASE COVER SHEET

*Unified Rules of the Superior Court of California, County of Alameda*

| Short Title: Cynthia Jones v. L'Oreal USA, Inc., et al. | Case Number: |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM

**THIS FORM IS REQUIRED IN ALL NEW <u>UNLIMITED</u> CIVIL CASE FILINGS IN THE
SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA**

[ X] Oakland, Rene C. Davidson Alameda County Courthouse (446)

[  ] Hayward Hall of Justice (447)
[  ] Pleasanton, Gale-Schenone Hall of Justice (448)

| Civil Case Cover Sheet Category | Civil Case Cover Sheet Case Type | Alameda County Case Type (check only one) | | |
|---|---|---|---|---|
| Auto Tort | Auto tort (22) | [ ] | 34 | Auto tort (G) |
| | | | | Is this an uninsured motorist case? [ ] yes [ ] no |
| Other PI /PD / WD Tort | Asbestos (04) | [ ] | 75 | Asbestos (D) |
| | Product liability (24) | [ ] | 89 | Product liability (not asbestos or toxic tort/environmental) (G) |
| | Medical malpractice (45) | [ ] | 97 | Medical malpractice (G) |
| | Other PI/PD/WD tort (23) | [ ] | 33 | Other PI/PD/WD tort (G) |
| Non - PI /PD / WD Tort | Bus tort / unfair bus. practice (07) | [ ] | 79 | Bus tort / unfair bus. practice (G) |
| | Civil rights (08) | [ ] | 80 | Civil rights (G) |
| | Defamation (13) | [ ] | 84 | Defamation (G) |
| | Fraud (16) | [ ] | 24 | Fraud (G) |
| | Intellectual property (19) | [ ] | 87 | Intellectual property (G) |
| | Professional negligence (25) | [ ] | 59 | Professional negligence - non-medical (G) |
| | Other non-PI/PD/WD tort (35) | [ ] | 03 | Other non-PI/PD/WD tort (G) |
| Employment | Wrongful termination (36) | [ ] | 38 | Wrongful termination (G) |
| | Other employment (15) | [ ] | 85 | Other employment (G) |
| | | [ ] | 53 | Labor comm award confirmation |
| | | [ ] | 54 | Notice of appeal - L.C.A. |
| Contract | Breach contract / Wrnty (06) | [ ] | 04 | Breach contract / Wrnty (G) |
| | Collections (09) | [ ] | 81 | Collections (G) |
| | Insurance coverage (18) | [ ] | 86 | Ins. coverage - non-complex (G) |
| | Other contract (37) | [ ] | 98 | Other contract (G) |
| Real Property | Eminent domain / Inv Cdm (14) | [ ] | 18 | Eminent domain / Inv Cdm (G) |
| | Wrongful eviction (33) | [ ] | 17 | Wrongful eviction (G) |
| | Other real property (26) | [ ] | 36 | Other real property (G) |
| Unlawful Detainer | Commercial (31) | [ ] | 94 | Unlawful Detainer - commercial    Is the deft. in possession |
| | Residential (32) | [ ] | 47 | Unlawful Detainer - residential    of the property? |
| | Drugs (38) | [ ] | 21 | Unlawful detainer - drugs    [ ] Yes    [ ] No |
| Judicial Review | Asset forfeiture (05) | [ ] | 41 | Asset forfeiture |
| | Petition re: arbitration award (11) | [ ] | 62 | Pet. re: arbitration award |
| | Writ of Mandate (02) | [ ] | 49 | Writ of mandate |
| | | | | Is this a CEQA action (Publ.Res.Code section 21000 et seq) [ ] Yes [ ] No |
| | Other judicial review (39) | [ ] | 64 | Other judicial review |
| Provisionally Complex | Antitrust / Trade regulation (03) | [ ] | 77 | Antitrust / Trade regulation |
| | Construction defect (10) | [ ] | 82 | Construction defect |
| | Claims involving mass tort (40) | [X] | 78 | Claims involving mass tort |
| | Securities litigation (28) | [ ] | 91 | Securities litigation |
| | Toxic tort / Environmental (30) | [ ] | 93 | Toxic tort / Environmental |
| | Ins covrg from cmplx case type (41) | [ ] | 95 | Ins covrg from complex case type |
| Enforcement of Judgment | Enforcement of judgment (20) | [ ] | 19 | Enforcement of judgment |
| | | [ ] | 08 | Confession of judgment |
| Misc Complaint | RICO (27) | [ ] | 90 | RICO (G) |
| | Partnership / Corp. governance (21) | [ ] | 88 | Partnership / Corp. governance (G) |
| | Other complaint (42) | [ ] | 68 | All other complaints (G) |
| Misc. Civil Petition | Other petition (43) | [ ] | 06 | Change of name |
| | | [ ] | 69 | Other petition |

202-19 (5/1/00)

A-13

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF ALAMEDA | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Rene C. Davidson Courthouse<br>Administration Building, 1221 Oak Street, Oakland, CA 94612 | **FILED**<br>Superior Court of California<br>County of Alameda<br>07/18/2024 |
| PLAINTIFF:<br>CYNTHIA L JONES | Chad Fike, Executive Officer /Clerk of the Court<br>By: _____ Deputy<br>D. Franklin |
| DEFENDANT:<br>L'Oreal USA. Inc., a corporation et al | |
| **NOTICE OF CASE MANAGEMENT CONFERENCE** | CASE NUMBER:<br>24CV083993 |

## TO THE PLAINTIFF(S)/ATTORNY(S) FOR PLAINTIFF(S) OF RECORD:

You are ordered to serve all named defendants and file proofs of service on those defendants with the court within 60 days of the filing of the complaint (Cal. Rules of Court, 3.110(b)).

Give notice of this conference to all other parties and file proof of service.

Your Case Management Conference has been scheduled on:

> Date: 11/15/2024    Time: 8:30 AM    Dept.: 23
>
> Location: Rene C. Davidson Courthouse
> Administration Building, 1221 Oak Street, Oakland, CA 94612

## TO DEFENDANT(S)/ATTORNEY(S) FOR DEFENDANT(S) OF RECORD:

The setting of the Case Management Conference does not exempt the defendant from filing a responsive pleading as required by law, you must respond as stated on the summons.

TO ALL PARTIES who have appeared before the date of the conference must:

Pursuant to California Rules of Court, 3.725, a completed Case Management Statement (Judicial Council form CM-110) must be filed and served at least 15 calendar days before the Case Management Conference. The Case Management Statement may be filed jointly by all parties/attorneys of record or individually by each party/attorney of record.

**Meet and confer**, in person or by telephone as required by Cal. Rules of Court, rule 3.724.

**Post jury fees** as required by Code of Civil Procedure section 631.

If you do not follow the orders above, the court may issue an order to show cause why you should not be sanctioned under Cal. Rules of Court, rule 2.30. Sanctions may include monetary sanctions, striking pleadings or dismissal of the action.

The judge may place a Tentative Case Management Order in your case's on-line register of actions before the conference. This order may establish a discovery schedule, set a trial date or refer the case to Alternate Dispute Resolution, such as mediation or arbitration. Check the court's eCourt Public Portal for each assigned department's procedures regarding tentative case management orders at https://eportal.alameda.courts.ca.gov.

Form Approved for Mandatory Use
Superior Court of California,
County of Alameda
ALA CIV-100 [Rev. 10/2021]

**NOTICE OF
CASE MANAGEMENT CONFERENCE**

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF ALAMEDA | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Rene C. Davidson Courthouse<br>1225 Fallon Street, Oakland, CA 94612 | **FILED**<br>Superior Court of California<br>County of Alameda<br>07/18/2024<br>Chad Finke, Executive Officer / Clerk of the Court<br>By: _____ Deputy<br>D. Franklin |
| PLAINTIFF/PETITIONER:<br>CYNTHIA L JONES | |
| DEFENDANT/RESPONDENT:<br>L'Oreal USA. Inc., a corporation et al | |
| **CERTIFICATE OF MAILING** | CASE NUMBER:<br>24CV083993 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the attached document upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Oakland, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.

Christopher R. Rodriguez
SINGLETON SCHREIBER LLP
1414 K St Ste 470
Sacramento, CA 95814

Chad Finke, Executive Officer / Clerk of the Court

Dated: 07/22/2024          By:

D. Franklin, Deputy Clerk

**CERTIFICATE OF MAILING**